1   NICOLA T. HANNA
    United States Attorney
2   PATRICK R. FITZGERALD
    Assistant United States Attorney
3   Chief, National Security Division
    JOHN J. LULEJIAN (Cal. Bar No. 186783)
4   Assistant United States Attorney
        1200 United States Courthouse
5       312 North Spring Street
        Los Angeles, California 90012
6       Telephone: (213) 894-0721
        Facsimile: (213) 894-0141
7       E-mail:    John.Lulejian@usdoj.gov

8   Attorneys for Plaintiff
    UNITED STATES OF AMERICA

9

10                  UNITED STATES DISTRICT COURT

11            FOR THE CENTRAL DISTRICT OF CALIFORNIA

12  UNITED STATES OF AMERICA,        No. 2:19-cv-05397-JFW-JPR

13           Plaintiff,              UNITED STATES' EXTRADITION
                                     MEMORANDUM; DECLARATION OF
14           v.                      JOHN J. LULEJIAN; APPENDICIES

15  CHRISTOPHER PHILIP AHN,          [18 U.S.C. § 3184]

16           A Fugitive from the     Hearing Date: January 10, 2020
             Government of the       Hearing Time: 10:00 a.m.
17           Kingdom of Spain.       Location:     Courtroom of the
                                                   Honorable Jean P.
18                                                 Rosenbluth

19

20       Plaintiff United States of America, by and through its counsel

21  of record, the United States Attorney for the Central District of

22  California, and Assistant United States Attorney John J. Lulejian,

23  hereby submits its Extradition Memorandum.

24       The Memorandum is based on all of the documents and exhibits

25  lodged and filed under seal and publicly with the Court (in original

26  and redacted forms), which were submitted by the Government of the

27  \\

28  \\

1  Kingdom of Spain in support of its request for extradition in this

2  matter, as well as the attached Declaration of John J. Lulejian.

3

4   Dated: September 20, 2019          Respectfully submitted,

5                                      NICOLA T. HANNA
                                       United States Attorney
6
                                       PATRICK R. FITZGERALD
7                                      Assistant United States Attorney
                                       Chief, Criminal Division
8

9                                      _/s/ John J. Lulejian_____
                                       JOHN J. LULEJIAN
10                                     Assistant United States Attorney

11                                     Attorneys for Plaintiff
                                       UNITED STATES OF AMERICA
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

<u>DESCRIPTION</u>                                                              <u>PAGE</u>

TABLE OF AUTHORITIES.............................................iii

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.    INTRODUCTION..................................................1

II.   STATEMENT OF FACTS...........................................2

      A.    Factual Background.....................................3

      B.    Procedural Background..................................8

III.  LEGAL FRAMEWORK AND ARGUMENT.................................9

      A.    Applicable Law Concerning Extradition Hearings...........9

            1.    Sui Generis Nature of Extradition Proceedings.......9

            2.    General Standards and the Elements of Extradition...10

            3.    Probable Cause Determination.......................12

            4.    Rules of Criminal Procedure, Civil Procedure, and
                  Evidence Do Not Apply..............................13

            5.    Limitations on Fugitive's Evidence.................14

            6.    The Rule of Non-Inquiry............................16

      B.    THE ELEMENTS FOR CERTIFICATION ARE MET..................17

            1.    There is Subject Matter Jurisdiction...............17

            2.    There is Personal Jurisdiction.....................18

            3.    Extradition Treaty is in Force.....................18

            4.    The Fugitive is Sought for Offenses the Treaty
                  Covers.............................................18

            5.    Probable Cause Exists..............................20

                  a.    Fugitive Appears Before the Court............20

                  b.    Evidence Establishing Probable Cause.........20

                        (A)   Illegal Restraint......................20

                        (B)   Breaking and Entering..................21

i

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                                    PAGE

               (C)   Causing Injuries..........................22

               (D)   Threaten to Injury.......................23

               (E)   Robbery with Violence and Intimidation....24

               (F)   Criminal Organization....................24

IV.   CONCLUSION................................................25

**TABLE OF AUTHORITIES**

FEDERAL CASES                                                      PAGES

Austin v. Healey,

    5 F.3d 598 (2d Cir. 1993) ................................. 18

Barapind v. Enomoto,

    400 F.3d 744 (9th Cir. 2005) (en banc) ................ 14, 15

Benson v. McMahon,

    127 U.S. 457 (1888) ...................................... 13

Bingham v. Bradley,

    241 U.S. 511 (1916) .................................. 12, 13

Charlton v. Kelly,

    229 U.S. 447 (1913) .................................. 10, 15

Clarey v. Gregg,

    138 F.3d 764 (9th Cir. 1998)............................... 19

Collins v. Loisel,

    259 U.S. 309 (1922) ................................. passim

Cucuzzella v. Keliikoa,

    638 F.2d 105 (9th Cir. 1981) .................... 11, 12, 19

Eain v. Wilkes,

    641 F.2d 504 (7th Cir. 1981) ............................ 15

Emami v. U.S. Dist. Court for N. Dist.,

    834 F.2d 1444 (9th Cir. 1987) ........................... 14

Factor v. Laubenheimer,

    290 U.S. 276 (1933) .................................. 11, 12

Fernandez v. Phillips,

    268 U.S. 311 (1925) .................................. 12, 13

Glucksman v. Henkel,

    221 U.S. 508 (1911) ...................................... 13

iii

**TABLE OF AUTHORITIES (CONTINUED)**

PAGES

_Grin v. Shine_,
    187 U.S. 181 (1902)......................................... 20

_Hooker v. Klein_,
    573 F.2d 1360 (9th Cir. 1978) .......................... 14, 15

_In re Extradition of Acevedo_,
    No. 16-1766, 2017 WL 3491749
    (C.D. Cal. Aug. 11, 2017)............................... 16, 25

_In re Extradition of Gonzalez_,
    217 F. Supp. 717 (S.D.N.Y. 1963) ........................... 17

_In re Extradition of Lara Gutierrez_,
    No. 16-cv-05061, 2017 WL 8231237
    (C.D. Cal. Feb. 22, 2017)............................... 16, 25

_In re Extradition of Mainero_
    990 F. Supp. 1208(S.D. Cal. 1997) ........................... 18

_In re Extradition of McMullen_,
    989 F.2d 603 (2d Cir. 1993) ................................. 13

_In re Extradition of Kirby_,
    106 F.3d 855 (9th Cir. 1996)................................. 13

_In re Lincoln_,
    228 F. 70 (E.D.N.Y. 1915) ................................. 17

_In re Ryan_,
    360 F. Supp. 270 (E.D.N.Y. 1973) ........................... 14

_Jhirad v. Ferrandina_,
    536 F.2d 478 (2d Cir. 1976) ................................. 9

_Kelly v. Griffin_,
    241 U.S. 6 (1916)......................................... 19

iv

**TABLE OF AUTHORITIES (CONTINUED)**

PAGES

Koskotas v. Roche,

   931 F.2d 169 (1st Cir. 1991) ............................. 13

Mainero v. Gregg,

   164 F.3d 1199 (9th Cir. 1999) ......................... 13, 14

Man-Seok Choe v. Torres,

   525 F.3d 733 (9th Cir. 2008).......................... 16, 25

Manta v. Chertoff,

   518 F.3d 1134 (9th Cir. 2008) .......................... 11

Martin v. Warden,

   993 F.2d 824 (11th Cir. 1993) .................. 9, 10, 13

McElvy v. Civiletti,

   523 F. Supp. 42 (S.D. Fla. 1981).......................... 20

Messina v. United States,

   728 F.2d 77 (2d Cir. 1984) ............................... 13

Neely v. Henkel,

   180 U.S. 109 (1901) ..................................... 10

Noeller v. Wojdylo,

   922 F.3d 797 (7th Cir. 2019).......................... 16, 25

Ordinola v. Hackman,

   478 F.3d 588 (4th Cir. 2007) ............................ 11

Ornelas v. Ruiz,

   161 U.S. 502 (1896) ..................................... 12

Prasoprat v. Benov,

   421 F.3d 1009 (9th Cir. 2005) ......................... passim

Quinn v. Robinson,

   783 F.2d 776 (9th Cir. 1986) ......................... passim

v

**TABLE OF AUTHORITIES (CONTINUED)**

PAGES

Romeo v. Roache,

    820 F.2d 540 (1st Cir. 1987) ............................... 13

Sabatier v. Dabrowski,

    586 F.2d 866 (1st Cir. 1978) ............................... 13

Sainez v. Venables,

    588 F.3d 713 (9th Cir. 2009)............................... 12

Santos v. Thomas,

    830 F.3d 987 (9th Cir. 2016) ........................... *passim*

Shapiro v. Ferrandina,

    478 F.2d 894 (2d Cir. 1973) ....................... 11, 15, 16

Simmons v. Braun,

    627 F.2d 635 (2d Cir. 1980) ............................... 13

Then v. Melendez,

    92 F.3d 851 (9th Cir. 1996) ............................... 18

United States ex rel. Sakaguchi v. Kaulukukui,

    520 F.2d 726 (9th Cir. 1975) ............................. 12

United States v. Lui Kin-Hong,

    110 F.3d 103 (1st Cir. 1997) ............................. 17

Valencia v. Limbs,

    655 F.2d 195 (9th Cir. 1981) ............................. 12

Ward v. Rutherford,

    921 F.2d 286 (D.C. Cir. 1990) ........................... 18

Yapp v. Reno,

    26 F.3d 1562 (11th Cir. 1994) ........................... 13

**TABLE OF AUTHORITIES (CONTINUED)**

PAGES

STATUTES

18 U.S.C. § 3181 ............................................. 18

18 U.S.C. § 3184 ......................................... passim

18 U.S.C. § 3186 ......................................... 10, 16


FEDERAL RULES

Fed. R. Crim. P. 1(a)(5) ..................................... 13

Fed. R. Evid. 1101(d)(3) ..................................... 13


SPANISH STATUTES

C.P., art. 147(1) ......................................... 8, 22

C.P., art. 147(2) ......................................... 8, 22

C.P., art. 147(3) ......................................... 8, 22

C.P., art. 163 ............................................ 8, 20

C.P., art. 165 ............................................ 8, 20

C.P., art. 169 ............................................ 8, 23

C.P., art. 171 ............................................ 8, 23

C.P., art. 202 ............................................ 8, 21

C.P., art. 203 ............................................ 8, 21

C.P., art. 237 ............................................ 8, 24

C.P., art. 241 ............................................ 8, 24

C.P., art. 242 ............................................ 8, 24

C.P., art. 570 bis ........................................ 8, 24

**TABLE OF AUTHORITIES (CONTINUED)**

TREATIES

Treaty on Extradition between the United States of America
    and Spain, U.S.-Spain, May 29, 1970, 22 U.S.T. 737;
    Supplementary Treaty in Extradition between the United States
    of America and Spain, signed January 25, 1975;
    Second Supplementary Extradition Treaty between the
    United States of America and the Kingdom of Spain,
    U.S.-Spain, Feb. 9, 1998, S. Treaty Doc. No. 102-24
    (1992); Third Supplementary Treaty between the
    United States of America and the Kingdom of Spain,
    U.S.-Spain, Mar. 12, 1996, S. Treaty Doc. No. 105-15
    (1997); and the Instrument on Extradition between
    the United States of America and Spain, as contemplated
    by Article 3(2) of the Agreement on Extradition between
    the United States and the European Union signed
    25 June 2003, as to the application of the Treaty
    on Extradition between the United States of America
    and Spain signed May 29, 1970, and the Supplementary
    Treaties on Extradition signed January 25, 1975,
    February 9, 1988 and March 12, 1996, U.S.-Spain,
    Dec. 17, 2004 S. Treaty Doc. No. 109-14 (2006),
    with Annex........................................... _passim_

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

**I.    INTRODUCTION**

3         The Kingdom of Spain ("Spain") is prosecuting fugitive

4  CHRISTOPHER PHILIP AHN ("AHN" or "the fugitive") for his role in the

5  February 22, 2019, attack of the Embassy of the Democratic People's

6  Republic of Korea in Madrid, Spain ("the Embassy").  According to the

7  information provided by Spain, ADRIAN HONG CHANG ("HONG CHANG"),

8  entered the Embassy under false pretenses and then ushered in AHN and

9  several other accomplices when the Embassy's diplomats were not

10 looking.  Once they were all inside, AHN and his accomplices

11 assaulted and physically restrained the diplomats, placed bags over

12 some of their heads, held a woman and her minor son captive in their

13 room, and caused another woman to jump from the Embassy's terrace

14 resulting in a serious injury that required surgery.  The attackers

15 also searched the Embassy, breaking down doors and seizing electronic

16 items, including computers, hard drives, pen drives, and a cellular

17 telephone.  After holding the diplomats and families hostage for

18 approximately four-and-a-half hours, the attackers escaped in Embassy

19 vehicles.

20        On May 21, 2019, Spain formally requested AHN's extradition

21 pursuant to its extradition treaty with the United States.[1]  The

22

23         [1] Treaty on Extradition between the United States of America and
Spain, U.S.-Spain, May 29, 1970, 22 U.S.T. 737; the Supplementary
24  Treaty in Extradition between the United States of America and Spain,
signed January 25, 1975; the Second Supplementary Extradition Treaty
25  between the United States of America and the Kingdom of Spain, U.S.-
Spain, Feb. 9, 1998, S. Treaty Doc. No. 102-24 (1992); the Third
26  Supplementary Treaty between the United States of America and the
Kingdom of Spain, U.S.-Spain, Mar. 12, 1996, S. Treaty Doc. No. 105-
27  15 (1997); and the Instrument on Extradition between the United
States of America and Spain, as contemplated by Article 3(2) of the
28  Agreement on Extradition between the United States and the European

United States acts in this proceeding in accordance with its treaty obligations to the Spanish government.  By statute, the judicial officer handling the extradition proceeding is required to hold a hearing to consider the evidence of criminality presented by Spain and to determine whether it is "sufficient to sustain the charge under the provisions of the proper treaty or convention."  18 U.S.C. § 3184.  If the judicial officer finds the fugitive extraditable, he or she certifies that finding to the Secretary of State, who decides whether to surrender the fugitive.

In this case, the requirements for certification have been met. First, this Court is authorized to conduct the extradition proceeding.  Second, this Court has jurisdiction over AHN.  Third, the extradition treaty between the United States and Spain is in full force and effect.  Fourth, the offenses for which AHN's extradition is sought are covered by the Treaty.  Finally, there is probable cause to believe AHN committed the charged offenses.

Accordingly, the United States respectfully requests that the Court certify AHN's extradition to Spain for the Secretary of State's consideration.

## II.  STATEMENT OF FACTS

The formal request for extradition summarizes the case's procedural history, the law supporting the extradition request, witness statements, and other evidence.  It also contains the texts of the applicable laws of Spain; a statement regarding the applicable

---

Union signed 25 June 2003, as to the application of the Treaty on Extradition between the United States of America and Spain signed May 29, 1970, and the Supplementary Treaties on Extradition signed January 25, 1975, February 9, 1988 and March 12, 1996, U.S.-Spain, Dec. 17, 2004 S. Treaty Doc. No. 109-14 (2006), with Annex (collectively the "Treaty").  (Dkt. 55-1 at 1-10.)

statutes of limitations; victim and witness statements; certified copies of the arrest order issued by the Spanish court; and documents establishing AHN's identity.[2]  The supplemental materials from Spain contain information about Spain and North Korea's diplomatic relations; the investigating judge's assessment of the credibility of the victims; medical and forensic reports of two of the victims; additional witness statements; and photographs of the attack on the Embassy and aftermath from the Embassy's security cameras.[3]  From these materials, the following facts may reasonably be derived:

A.   **Factual Background**[4]

On February 22, 2019, HONG CHANG rang the door of the Embassy, claiming that he needed to see YSS, the Commercial Attaché.  (Dkt. 55-3 at 5, 15, 23, 77; SD at 8:1-2.)  While SJC went into the chancery to get YSS, HONG CHANG opened the front door and allowed AHN and other men, two of whom were armed with pistols and one of whom

_____

[2] All original exhibits cited to or otherwise referenced herein were previously filed as attachments to the Government's Request for Extradition), which was filed on June 20, 2019.  Redacted copies of these documents were filed on June 28, 2019 (Dkt. 55).  As a result, they are not attached to this memorandum but instead are referenced by docket and CM/ECF page number.  The instant request for extradition is based upon all of the documents submitted by Spanish authorities, which have been filed with the Court.

[3] The United States moved to file the Supplemental Document in Support of the Extradition of Christopher Philip Ahn ("Supplemental Document") from Spain was filed under seal, along with redacted versions of these documents, pursuant to Local Civil Rule 79.1 on September 20, 2019.  The redacted documents are referred to as "SD" followed by the Annex number and Folio page ("#:#").

[4] To assist the Court, concise summaries of the statements of the victims, witnesses, and Spanish police officers are attached to the Declaration of John J. Lulejian, dated 09/20/2019 ("Lulejian Decl."), as Appendix A.

was carrying a crowbar, into the Embassy.[5]  (Id. at 5, 15, 23, 26, 35, 77-78; SD at 8:2-9.)  The assailants ran into the Embassy and physically assaulted the diplomats (YSS, SJC, HRJ, and SGJ), hitting and throwing them to the ground; restrained their hands and feet with cable ties, hinged handcuffs, and adhesive tape; covered their heads with cloth bags; and moved them to a meeting room inside the chancery.[6]  (Id. at 5-7, 15, 23, 26, 35.)  When two of the diplomats tried to resist, the attackers retaliated.[7]  (Id. at 7, 15-16, 23-24, 26-27, 35-36, 77-78; SD at 8:10-14.)  The attackers guarded the diplomats and ordered them to keep silent, threatening to gag or move them to another room if they spoke with one another.  (Dkt. 55-3 at 16, 24, 26, 36.)

      After the attackers entered the chancery, HONG CHANG broke into the locked bedroom of OGJ (YSS's wife) and her minor son.[8]  (Id. at

---

[5] LGD, who was sitting across the street waiting for a bus, stated that she saw a person with a ponytail close to the Embassy door with a pistol.  (SD at 6:6-7.)

[6] LGD stated that she heard screams coming from inside the Embassy and saw a person on the ground with two or three others above the person.  (SD at 6:6-7, 9-10.)  TVO, who also was waiting for the bus, also heard screams coming from inside the Embassy.  (SD at 7:15-16.)  She also said that she saw a man crouching low, next to a man in black who was standing, as well as three people grabbing a person lying on the floor.  (Id. at 17.)

[7] One of the attackers put a pistol near SCJ's face in order to intimidate and threaten him.  (Dkt. 55-3 at 35-36.)  Other attackers forced YSS into a bathroom and threatened him with iron bars and a firearm pointed at the back of his neck.  (Id. at 16.)  The attackers kept YSS in the bathroom for approximately 30 minutes before putting him in the same room as the other restrained diplomats.  (Id. at 7, 16, 78.)  On April 3, 2019, YSS identified AHN as one of the men who hit him.  (Id. at 21.)

[8] OGJ told Spanish authorities that she heard a loud noise coming from the hall, saw two men hitting and attempting to restrain SJC on the floor, and saw two or three men hitting SGJ and holding his face firmly against the ground.  (Dkt. 55-3 at 29-30.)  On April 25, 2019, OGJ positively identified HONG CHANG as the man who broke into her room.  (Id. at 33-34.)

7, 16, 29-30, 78-79.)  Even though HONG CHANG claimed that they were there to help them, he left her guarded by the attackers, including one who showed her a pistol in an effort to intimidate and threaten her.  (Id. at 7, 16, 30, 79.)  The attackers also refused her requests to see YSS.  (See id. at 30, 31.)

The attackers also tried to break into the locked room of CSH (SGJ's wife).  (Id. at 7, 16-17, 39, 79.)  However, after hearing loud noises and fighting between people, CSH escaped from her room by jumping from the terrace outside of her window to the ground, in the process, losing her balance, falling, and hitting her head on a tile. (Id. at 7-8, 17, 39, 79.)  Even though she felt pain in her leg and was bleeding from her head, she managed to escape to the public roadway, where she flagged down OSP, a passing motorist.[9]  (Id. at 8, 39-40, 79; SD at 5:2.)  OSP helped her receive emergency medical treatment.[10]  (Id. at 8, 40; SD at 5:2-3.)  CSH, through Google Translate, told the police about the attack on the Embassy and urged them to rescue the hostages.[11]  (Dkt. 55-3 at 8, 40, 79; SD at 3:3-4, 4:2.)

_____

[9] OSP initially thought that CSH had survived a rape or assault because she was in great distress and her face was completely covered in blood.  (SD at 5:2.)  The police officers also observed that CSH's face was covered in blood.  (SD at 3:3.)

[10] OSP observed that CSH had difficulty getting out of his vehicle, that she was leaning to one side as she walked lopsidedly with some difficult, and she needed help from the paramedics.  (SD at 5:3.)  He also saw that her back was covered with remnants of grass, twigs, and soil.  (Id.)

[11] The medical personnel told the police that despite her injury (a contused lacerated wound), CSH was more concerned about what was happening inside the Embassy than her physical well-being.  (SD at 3:4.)  Ultimately, CSH needed surgery to repair the damage she sustained to her leg during the escape.  (Dkt. 55-3 at 40; SD 1:1-13.)

Believing what CSH told them, the police went to the Embassy and rang the intercom. (Dkt. 55-3 at 8, 79; SD at 3:4-5, 8:15.)  After a few minutes, HONG CHANG, posing as a North Korean diplomat, opened the door, assured the police that everything was fine, and demanded that the police report any issues involving North Korean citizens. (Dkt. 55-3 at 8, 79; SD at 3:6, 4:3, 8:16.)

Approximately one hour after holding YSS captive in the meeting room with the other diplomats, the attackers carried him to a room in the basement of the Embassy and threw him face down to the ground. (Dkt. 55-3 at 9, 18, 80.)  Later, the captors allowed him to sit in a chair and untied his hands and removed the bag over his head.[12]  (Id.)  Although the men, who claimed to be associated with a human rights organizion, urged YSS to defect, he steadfastly refused. (Id. at 9-10, 18, 80.)  Concerned about his wife and colleagues, YSS assured his captors that if they left, there would be no reprisals and they would be safe.  (Id. at 18.)  When the captors asked about Embassy vehicles, YSS, who was under guard and in the basement, agreed to let the captors take the vehicles.  (Id. at 18-19.)  The captors retied YSS's hands and covered his head with a black bag.  (Id. at 9, 19, 80.)

After destroying furniture and pictures of political leaders, and stealing computers, hard drives, memory sticks, and a mobile telephone, the attackers fled in three Embassy vehicles and an Uber, leaving the hostages bound and restrained.[13]  (Id. at 9, 19-20, 25, 80-81; SD at 8:17-19.)

---

[12] YSS told Spanish authorities that his captors included HONG CHANG and another man who was wearing a balaclava and carrying a pistol.  (See Dkt. 55-3 at 16.)

[13] The vehicles were abandoned in Madrid.  (Dkt. 55-3 at 11, 80.)

Once their captors fled, SJC, SGJ, and HRJ were able to remove the bags over their heads and some of their bonds. (Id. at 25, 27, 36-37.) As the diplomats were freeing themselves, three North Korean architecture students (CHK, KHP, and MNJ) rang the intercom after learning that something had happened at the Embassy. (Id. at 9, 44-45, 47-48, 82.) After speaking with SJC, the students entered the Embassy by climbing the fence and through the open vehicle entrance. (Id. at 9, 44-46, 82.) Once inside, the students discovered SJC, HRJ, and SGJ were handcuffed and injured with blood on some of their faces, and OGJ and her son, agitated and frightened. (Id. at 44, 46, 48.) They also discovered YSS calling for help from the basement, his hands and feet bound with tape, a hood over his head, and injuries and blood on his face.[14] (Id. at 31, 44, 46, 48.) The diplomats (some of whom still were handcuffed), OGJ and her son, and the students left the Embassy, and met with the police officers and medical personnel.[15] (Id. at 11, 31, 44, 46, 48, 82.)

Following the attack, Spanish law enforcement entered the Embassy and took photographs of the items that the attackers left behind, including cable ties, a box of hinged handcuffs, a tactical flashlight, gloves, pliers, bolt cutter tools, balaclavas, knives, defense spray, imitation pistols, a shoulder holster.[16] (Id. at 59-

---

[14] Medical and hospital reports detail the injuries to YSS's face and hands as a result of the Embassy attack. (SD at 2:14-18.)

[15] The Spanish police officers reported that a number of the victims were restrained with hinged handcuffs and cable ties, and observed injuries, bruises on the face, consistent with blows to the face and head. (SD at 3:10-11, 4:6.) The Embassy security cameras show SJC and HRJ in handcuffs as they leave the chancery. (SD at 8:20-22.)

[16] Spanish law enforcement obtained the receipt reflecting the purchases that HONG CHANG made at Shoke, a police supply store, at

65, 67, 69-74.)   The police also documented damage to internal doors in the Embassy.  (Id. at 66-68.)

**B.   Procedural Background**

On April 11, 2019, José de la Mata Amaya, Judge of the Central Court of Investigation, ordered the provisional custody of AHN without bail based on the following charges: (1) Illegal Restraint, in violation of Spanish Penal Code ("C.P."), arts. 163 & 165; (2) Breaking and Entering, in violation of C.P., arts. 202 & 203; (3) Causing Injuries, in violation of C.P., art. 147; (4) Threats, in violation of C.P., arts. 169 & 171; (5) Robbery with Violence and Intimidation, in violation of C.P., arts. 237, 241, & 242; and (6) Criminal Organization in violation of C.P., art. 570 bis. Following Judge Amaya's issuance of the provisional custody order, Spain submitted to the United States a request for AHN's provisional arrest with a view towards his extradition. As Judge Amaya states in the Supplemental Document dated September 12, 2019, the extradition request "has nothing to do with political or diplomatic aspects with

---

approximately 10:56 a.m., less than six hours before the attack. (Dkt No. 55-3 at 51.)  The purchased items include five fast-draw pistol holsters, four combat knives, six imitation pistols, a shoulder holster, four pairs of shooting glasses, five tactical flashlights, four elastic balaclavas, and five pairs of hinged handcuffs.  (Id.)  Shoke's security cameras show Hong Chang at the store.  (Id. at 51-53.)

Spanish law enforcement also obtained receipts of purchases that other assailants made at the Ferreteria Delicas hardware store on the day of the attack, as well as on February 20, 2019.  (Id. at 53-54.) The purchased items include two crowbars, nine pry bars, a pair of bolt cutters, pliers, six rolls of electrical tape, three rolls of double-sided tape, a cloth tape, and a telescopic ladder.  (Id.) Ferreteria Delicas's security camera shows some of the assailants at the store.  (Id. at 54-56.)  Law enforcement discovered the telescopic ladder inside the trunk of the vehicle that the attackers drove to the Embassy. (Id. at 57-58.)

North Korea, and is based solely on facts with criminal relevance."[17]
(SD at 0:2.)

After receiving the provisional arrest request from Spain, the United States filed an extradition complaint in this District and sought the issuance of a warrant for AHN's arrest.  (Dkt. 1.)  On April 12, 2019, the Honorable Jacqueline Chooljian, United States Magistrate Judge for the Central District of California, issued a warrant for AHN's arrest.  (Dkt. 2.)  On April 18, 2019, the United States Marshals Service arrested AHN in Los Angeles, California, when he arrived at the residence of HONG CHANG.  (Dkt. 6.)  Although the Court initially detained AHN pending extradition, it later placed him on bond.  (Dkt. 11, 58.)

On May 21, 2019, Spain submitted its formal request for AHN's extradition.  (Dkt. 55-1, 55-2).  On September 12, 2019, Spain provided additional information in support of its extradition request, which attached eight exhibits.  On September 20, 2019, the United States moved to file this document under seal.

## III.  LEGAL FRAMEWORK AND ARGUMENT

### A.  Applicable Law Concerning Extradition Hearings

#### 1.  <u>Sui Generis Nature of Extradition Proceedings</u>

The extradition hearing prescribed by 18 U.S.C. § 3184 is <u>sui generis</u>, with its structure and process defined by statute and treaty.  <u>See, e.g.</u>, <u>Martin v. Warden</u>, 993 F.2d 824, 828 (11th Cir. 1993); <u>Jhirad v. Ferrandina</u>, 536 F.2d 478, 482 (2d Cir. 1976).  An extradition hearing is not a criminal proceeding; its purpose is to

---

[17] Judge Amaya also stated that "Spain maintains diplomatic relations with the Democratic People's Republic of North Korea. However, it has no extradition or mutual legal assistance treaty with that country."  (SD at 0:2.)

9

decide the sufficiency of the charge under the relevant treaty, not guilt or innocence.  Neely v. Henkel, 180 U.S. 109, 123 (1901); Santos v. Thomas, 830 F.3d 987, 991 (9th Cir. 2016) (en banc); In re Extradition of Kirby, 106 F.3d 855, 867 (9th Cir. 1996).

The limited nature of the hearing has resulted in special procedural and evidentiary rules that apply.  For example, the person whose extradition is sought is not entitled to the rights available in a criminal trial.  See Neely, 180 U.S. at 122; accord Charlton v. Kelly, 229 U.S. 447, 461 (1913); Martin, 993 F.2d at 829.  The purpose of an extradition hearing under Section 3184 is not to try the underlying charge; that is for the foreign court.  See Neely, 180 U.S. at 123; Santos, 830 F.3d at 991-92.

2.     General Standards and the Elements of Extradition

Extradition is primarily an executive responsibility with a specially defined role for a judicial officer.  That judicial officer is authorized by statute to determine whether to certify to the Secretary of State that the evidence submitted by the country requesting extradition is "sufficient to sustain the charge."  18 U.S.C. § 3184.  The Secretary of State, and not the Court, decides whether the fugitive should be surrendered to the requesting country.  See 18 U.S.C. §§ 3184, 3186; Santos, 830 F.3d at 991; Prasoprat v. Benov, 421 F.3d 1009, 1012 (9th Cir. 2005); Martin, 993 F.2d at 828.

At the extradition hearing, the Court should consider the evidence presented on behalf of the requesting country and determine whether the legal requirements for certification, as defined in the relevant treaty, statutes, and case law, have been established.  If any explanatory evidence is offered by the fugitive, the Court rules on its admissibility.  Once the evidentiary record is complete, the

extradition judge should make findings on each of the requirements for certification, including separate findings for each offense as to which extradition is sought. See Shapiro v. Ferrandina, 478 F.2d 894 (2d Cir. 1973). If the extradition court decides that the elements necessary for extradition are present, it must issue a certificate of extraditability, which is forwarded to the Department of State for disposition by the Secretary of State. See 18 U.S.C. § 3184.[18]

To issue a certificate of extraditability, the extradition court must find that: (1) the court has authority to conduct the proceedings; (2) the court has jurisdiction over the fugitive; (3) an extradition treaty is in force; (4) the treaty covers the offenses for which the requesting country seeks extradition; and (5) sufficient evidence exists to establish probable cause that the individual appearing in court is the fugitive who committed the offenses. See Santos, 830 F.3d at 991; Manta v. Chertoff, 518 F.3d 1134, 1140 (9th Cir. 2008); Quinn v. Robinson, 783 F.2d 776, 783, 790 (9th Cir. 1986).

When interpreting an extradition treaty, the court should construe its provisions liberally, in a manner favoring the obligation to surrender fugitives. See Factor v. Laubenheimer, 290 U.S. 276, 293-94, 298, 303 (1933); Cucuzzella v. Keliikoa, 638 F.2d 105, 107 n.3 (9th Cir. 1981). As the Supreme Court has stated,

---

[18] If the Court certifies the evidence to the Secretary of State, the Court must commit the fugitive to the custody of the United States Marshal to await further determination by the Secretary regarding surrender to the representatives of the requesting state. See 18 U.S.C. § 3184. The Court should then forward, or have forwarded, a certified copy of the certification and commitment order to the Secretary of State, together with a copy of any evidence outside the formal extradition package and a transcript of any testimony at the hearing. See id.; Ordinola v. Hackman, 478 F.3d 588, 597 (4th Cir. 2007).

11

"[t]he obligation to do what some nations have done voluntarily, in
the interest of justice and friendly international relationships,
should be construed more liberally than a criminal statute or the
technical requirements of criminal procedure." Factor, 290 U.S. at
298 (internal citation omitted).  Accordingly, "[f]orm is not to be
insisted upon beyond the requirements of safety and justice,"
Fernandez v. Phillips, 268 U.S. 311, 312 (1925), and objections that
"savor of technicality" do not find favor in court, Bingham v.
Bradley, 241 U.S. 511, 517-18 (1916).

### 3.    Probable Cause Determination

The extradition court is not authorized to determine whether the
evidence is sufficient to justify conviction, as that determination
will be made by the foreign court that handles the case.  See Collins
v. Loisel, 259 U.S. 309, 316 (1922); Santos, 830 f.3d at 992; Quinn,
783 F.2d at 815; Valencia v. Limbs, 655 F.2d 195, 198 (9th Cir.
1981).  The extradition court need only determine whether probable
cause exists to believe that the fugitive committed the offense or
offenses for which extradition is sought.  See Ornelas v. Ruiz, 161
U.S. 502, 512 (1896).

In the extradition context, the Ninth Circuit has explicated the
"magistrate's function is to determine whether there is any evidence
sufficient to establish reasonable or probable cause." Sainez v.
Venables, 588 F.3d 713, 717 (9th Cir. 2009) (quoting United States ex
rel. Sakaguchi v. Kaulukukui, 520 F.2d 726, 730-31 (9th Cir. 1975)).

The Supreme Court stated in Benson v. McMahon, 127 U.S. 457, 463
(1888):

> the proceeding before the commissioner is not to be regarded
> as in the nature of a final trial by which the prisoner
> could be convicted or acquitted of the crime charged against

him, but rather of the character of those preliminary examinations which take place every day in this country before an examining or committing magistrate for the purpose of determining whether a case is made out which will justify the holding of the accused, either by imprisonment or under bail, to ultimately answer to an indictment, or other proceeding, in which he shall be finally tried upon the charge made against him.

See also Collins, 259 U.S. at 316; Fernandez, 268 U.S. at 312. Further, at the extradition hearing, the government may present evidence "even in somewhat untechnical form according to our ideas." Glucksman v. Henkel, 221 U.S. 508, 512 (1911) (affirming extradition despite minor or technical objections).

4.   Rules of Criminal Procedure, Civil Procedure, and Evidence Do Not Apply

The Federal Rules of Criminal Procedure, Civil Procedure, and Evidence do not apply to extradition proceedings.  See Santos, 830 F.3d at 992; Fed. R. Crim. P.  1(a)(5); Fed. R. Evid. 1101(d)(3).[19] See Santos, 830 F.3d at 992; Kirby, 106 F.3d at 867.  An example of the difference between a criminal trial and an extradition proceeding is that, in the latter, hearsay is permitted.  See Collins, 259 U.S. at 317; Mainero v. Gregg, 164 F.3d 1199, 1206 (9th Cir. 1999) ("it is well settled in this circuit that evidence [in an extradition

---

[19] A fugitive has no right to discovery. Prasoprat, 421 F.3d at 1014; Koskotas v. Roche, 931 F.2d 169, 175 (1st Cir. 1991); Messina v. United States, 728 F.2d 77, 80 (2d Cir. 1984).  There is no Sixth Amendment right to a speedy extradition.  See Yapp v. Reno, 26 F.3d 1562, 1565 (11th Cir. 1994); Martin, 993 F.2d at 829; Sabatier v. Dabrowski, 586 F.2d 866, 869 (1st Cir. 1978).  The Fifth Amendment guarantee against double jeopardy does not apply to successive extradition proceedings.  See Collins, 262 U.S. at 429; In re Extradition of McMullen, 989 F.2d 603, 612-13 (2d Cir. 1993).  The exclusionary rule is inapplicable.  See Romeo v. Roache, 820 F.2d 540, 545 (1st Cir. 1987); Simmons v. Braun, 627 F.2d 635, 636-37 (2d Cir. 1980).  And the fugitive lacks a right to confront witnesses whose written statements are used against him.  See Bingham, 241 U.S. at 517.

1   proceeding] is not incompetent simply because it is hearsay"),

2   superseded by statute on other grounds, Pub. L. No. 105-277, § 2242,

3   1999 U.S.C.C.A.N. (112 Stat. 2681); Emami v. U.S. Dist. Court for

4   N. Dist., 834 F.2d 1444, 1451 (9th Cir. 1987) ("In the Ninth Circuit

5   it has been repeatedly held that hearsay evidence that would be

6   inadmissible for other purposes is admissible in extradition").

7   Indeed, "[a] determination of probable cause in an extradition

8   proceeding may rest entirely upon hearsay."  In re Ryan, 360 F. Supp.

9   270, 273 (E.D.N.Y. 1973), aff'd sub nom. 478 F.2d 1397 (2d Cir.

10  1973).

11      Further, the calling of live witnesses is not contemplated at

12  extradition proceedings.  "An extradition proceeding is not a trial.

13  Indeed, the very purpose of extradition treaties is to obviate the

14  necessity of confronting the accused with the witnesses against him."

15  Mainero, 164 F.3d at 1207 (internal quotations and citation omitted);

16  see also Quinn, 783 F.2d at 815-16 ("Barring hearsay from extradition

17  proceedings would thwart one of the objectives of bilateral

18  extradition treaties.").

19              5.   Limitations on Fugitive's Evidence

20      The fugitive's grounds for opposing an extradition request are

21  limited.  A fugitive may not introduce evidence that contradicts the

22  evidence submitted by the requesting country "[b]ecause extradition

23  courts do not weigh conflicting evidence in making their probable

24  cause determinations."  Barapind v. Enomoto, 400 F.3d 744, 749 (9th

25  Cir. 2005) (en banc) (internal quotation marks and citation omitted).

26  In other words, the fugitive cannot offer evidence that would lead to

27  an evidentiary dispute.  See Hooker v. Klein, 573 F.2d 1360, 1368

28  (9th Cir. 1978); Santos, 830 F.3d at 992; Barapind, 400 F.3d at 749-

                                   14

50.  That is necessarily so because the introduction of such evidence "would convert the extradition into a full-scale trial, which it is not to be." Eain v. Wilkes, 641 F.2d 504, 511 (7th Cir. 1981); see also Hooker, 573 F.2d at 1368 (a person fighting extradition is "not permitted to introduce evidence on the issue of guilt or innocence"). A fugitive may therefore only introduce evidence explaining the evidence submitted in support of the extradition request. See Barapind, 400 F.3d at 749. Hence, the extradition court does not weigh conflicting evidence and determine what to credit, "but, rather, determines only whether there is competent evidence to support the belief that the accused has committed the charged offense." Quinn, 783 F.2d at 815.

It is also well settled that affirmative defenses to the merits of the charge are not to be entertained in extradition hearings. See Charlton, 229 U.S. at 462; Collins, 259 U.S. at 316-17; Santos, 830 F.3d at 993; Hooker, 573 F.2d at 1368. For example, a fugitive may not introduce evidence that merely conflicts with the evidence submitted on behalf of the demanding state, Collins, 259 U.S. at 315-17; or attempts to establish an alibi, Shapiro, 478 F.2d at 901. See also Santos, 830 F.3d at 993. These issues, which require factual and credibility determinations, are for the court in the requesting country to resolve at a trial of the charges.

In fact, the Ninth Circuit, like other courts around the country, has held that credibility determinations are outside the scope of an extradition proceeding. See, e.g., Santos, 830 F.3d at 993 ("an individual contesting extradition may not . . . call into question the credibility of the government's offer of proof"); Man-Seok Choe v. Torres, 525 F.3d 733, 740 (9th Cir. 2008) ("[Witness's]

lack of credibility is merely a weakness in Korea's case; it does not completely obliterate the evidence of probable cause.") (internal quotation marks, citation, and alterations omitted); Noeller v. Wojdylo, 922 F.3d 797, 807 (7th Cir. 2019) ("Evidence that contradicts the demanding country's proof or poses questions of credibility—i.e., contradictory evidence—is off-limits."); Shapiro, 478 F.2d at 905 ("The judge's refusal to examine the credibility of the testimony and statements included in the translated material was clearly proper, since the declarants were not before him."); In re Extradition of Acevedo, No. 16-1766, 2017 WL 3491749, at *8 n.4 (C.D. Cal. Aug. 11, 2017) ("arguments [raising]] factual disputes regarding the weight and credibility of evidence . . . are beyond the scope of this extradition proceeding and are properly reserved for trial in the requesting country"); In re Extradition of Lara Gutierrez, No. 16-cv-05061, 2017 WL 8231237, at *4 (C.D. Cal. Feb. 22, 2017) ("The circumscribed nature of this Court's inquiry does not permit the Court to weigh the credibility of [witness's] statements."); but see Quinn, 783 F.2d at 815 ("[C]redibility of witnesses and the weight to be accorded their testimony is solely within the province of the extradition magistrate.").

　　　　　6.　　The Rule of Non-Inquiry

All matters raised by the fugitive as a defense to extradition, other than those related to the requirements for certification, are to be considered by the Secretary of State, not by the Court. See 18 U.S.C. §§ 3184 & 3186.  For example, the Court should not look behind the extradition request into the motives of the requesting country.  As stated in In re Lincoln, 228 F. 70, 74 (E.D.N.Y. 1915):

> [I]t is not a part of the court proceedings nor of the hearing upon the charge of crime to exercise discretion as to whether the criminal charge is a cloak for political action, nor whether the request is made in good faith.  Such matters should be left to the Department of State.

Accord Quinn, 783 F.2d at 789; see also In re Extradition of Gonzalez, 217 F. Supp. 717, 722 n.15 (S.D.N.Y. 1963) (18 U.S.C. § 3184 gives court no authority to inquire into such matters).

In addition, the Court should not investigate the fairness of the requesting country's justice system.  United States v. Lui Kin-Hong, 110 F.3d 103, 110 (1st Cir. 1997).  It is the role of the Secretary of State, not judicial officers, to determine whether extradition should be denied on humanitarian grounds or on account of the treatment the fugitive will likely receive on return to the requesting country.  Prasoprat, 421 F.3d at 1016.

**B.   THE ELEMENTS FOR CERTIFICATION ARE MET**

In the instant case, the elements necessary for the Court to certify the fugitive's eligibility for extradition have been met. The Court has subject matter and personal jurisdiction over him.  A valid extradition treaty permits extradition for the offenses charged in Spain.  And there is probable cause to believe that the fugitive committed that offenses.

### 1.   There is Subject Matter Jurisdiction

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State."  18 U.S.C. § 3184.  Consequently, both magistrate judges and district judges may render a "certification" under Section 3184.  See Austin v. Healey, 5 F.3d 598, 601-02 (2d Cir. 1993); Ward v. Rutherford, 921 F.2d 286,

287 (D.C. Cir. 1990).  Here, this Court's General Order 05-07 delegates to magistrate judges the authority to handle extradition matters.  Accordingly, this Court is authorized to conduct this extradition proceeding.

### 2.    There is Personal Jurisdiction

This Court has jurisdiction over the fugitive because he was "found" in this District when the Marshals arrested him in Los Angeles, California, on April 18, 2019.  See In re Extradition of Mainero, 990 F. Supp. 1208, 1216 (S.D. Cal. 1997).  When the fugitive is "found within [this] jurisdiction," the personal jurisdictional requirement of 18 U.S.C. § 3184 is met.

### 3.    Extradition Treaty is in Force

There is an extradition treaty in full force and effect between the United States and Spain.  See 18 U.S.C. § 3181 (Historical and Statutory Notes); Dkt. 55-1 at 2-19.  The State Department's conclusion that the Treaty is in full force and effect, as expressed in the Declaration of Tom Heinemann, is entitled to deference.  See Then v. Melendez, 92 F.3d 851, 854 (9th Cir. 1996); Dkt. 55-1 at

### 4.    The Fugitive is Sought for Offenses
### the Treaty Covers

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances defined in the treaty. Article II of the Treaty states that "[a]n offense shall be an extraditable offense if it is punishable under the laws in both [the United States and Spain] by deprivation of liberty for a period of more than one year or by a more severe penalty."  See Treaty, Art. II(A).  In other words, there must be dual criminality.  The Treaty further provides that "[e]xtradition shall also be granted for

18

participation in any of these offenses . . . when such participation, attempt or conspiracy is subject, under the laws of both Parties, to a term of imprisonment exceeding one year." Treaty, Art. II(B).  In addition, the Treaty states that "[i]f extradition has been granted for an extraditable offense, it shall also be granted for any other offense specified in the request even if the latter offense is punishable by less than one year's deprivation of liberty, provided that all other requirements for extradition are met." Treaty, Art. II(D).

A requesting country is not obliged to establish that its crimes are identical to ours.  See Kelly v. Griffin, 241 U.S. 6, 15 (1916). The Supreme Court noted in Collins that dual criminality is not a technical concept involving a comparison of elements of the two countries' offenses:

> The law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries.  It is enough if the particular act charged is criminal in both jurisdictions.

259 U.S. at 312; see also Clarey v. Gregg, 138 F.3d 764, 765 (9th Cir. 1998) ("The primary focus of dual criminality has always been on the conduct charged; the elements of the analogous offenses need not be identical.").

Dual criminality is established if the conduct involved in the foreign offense would be criminal under either United States federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states.  See Cucuzzella, 638 F.2d at 107-08. The Court should "approach challenges to extradition with a view toward finding the offense within the treaty," McElvy v. Civiletti,

523 F. Supp. 42, 48 (S.D. Fla. 1981), "because extradition treaties should be interpreted with a view to fulfil our just obligations to other powers." Grin v. Shine, 187 U.S. 181, 184 (1902).  Foreign governments should not be expected to be versed in our criminal laws and procedures.  Id. at 184-85.

Here, the dual criminality requirement is met because the crimes for which AHN is charged are punishable in both Spain and the United States pursuant to Article II of the Treaty.  (See Lulejian Decl. ¶ 3; App. B.)

> 5.   Probable Cause Exists

In the instant case, probable cause exists to believe that AHN committed each of the crimes charged by Spain.

> a.   *Fugitive Appears Before the Court*

The person before this Court is the person named in the Spanish arrest warrant for the offenses.  AHN's passport photograph and the photographs of him outside of the Embassy strongly resembles the person before the Court.[20]  (Dkt. 55-3 at 3, 14, 49-50.)  Also, neither AHN nor his counsel have denied that he is the person named in the extradition request.

> b.   *Evidence Establishing Probable Cause*[21]

> (A)   Illegal Restraint

Spain has provided evidence that the diplomats and their family members were restrained against their wills, in violation of C.P., arts. 163 & 165.  SJC, SGJ, HRJ, and YSS each told authorities that

---

[20] Spanish authorities obtained AHN's passport photograph at passport control of Adolfo Suarez-Madrid-Barajas Airport on February 22, 2019, following his 8:10 a.m. arrival on American Airlines flight 94.  (Dkt. 55-3 at 3.)

[21] The relevant provisions of the Spanish Penal Code are set forth in the Request for Extradition.  (Dkt. 55-3 at 87-92.)

the attackers bound them with cable ties and/or hinged handcuffs and held them captive in various rooms within the Embassy.  (Dkt. 55-3 at 16, 19, 24, 26-27, 36.)  OGJ said that she saw two men hitting and attempting to restrain SJC on the floor, and two or three men hitting SGJ and holding his face firmly against the ground.  (Id. at 29-30.) She also said that one of attackers who guarded her was armed with a pistol.  (Id. at 31.)  These statements are corroborated by, among other things: (i) statements from the North Korean students that they saw the Embassy employees restrained when they entered the Embassy (id. at 44, 46, 48); (ii) images from the Embassy's security cameras showing individuals in handcuffs (SD at 8:20-23); (iii) statements from two Spanish police officers who said that they saw persons exit the Embassy, restrained by handcuffs and cable ties (id. at 3:10, 4:6); (iv) a witness who saw three people grabbing a person lying on the floor inside the Embassy (id. at 7:17); (v) receipts from stores where AHN's co-conspirators purchased handcuffs (as well as imitation pistols, knives, balaclavas, bolt cutters, and other items in preparation for the attack) (Dkt. 55-3 at 51, 53-54); and (vi) crime scene photographs showing cable ties, handcuffs, imitation pistols, and other items that the attackers left at the Embassy (id. at 59-65, 67, 69-71).

(B)   Breaking and Entering

The evidence supports a finding that there is probable cause to believe that AHN and the other attackers entered the Embassy, and remained there, against the will of its occupants in violation of C.P., arts. 202 & 203.  Specifically, HONG CHANG entered the Embassy under the false pretense that he wanted to meet with YSS.  (Dkt. 55-3 at 15, 23.)  But when SJC went to find YSS, HONG CHANG used the

opportunity to open the Embassy door and let in AHN and his co-
conspirators.  (Id.)  Once inside, the assailants physically attacked
the diplomats, bound them, and held them captive.  (Id. at 15-28, 35-
37.)  These actions are captured on the Embassy's external security
camera, which show HONG CHANG entering the Embassy, and then
reappearing outside the Embassy door less than two minutes later, by
which point other attackers had begun to gather.  (SD at 8:1-2.)  The
images show that AHN and the other attackers entering the Embassy and
run toward the chancery.  (Id. at 8:2-11.)

(C)   Causing Injuries

There is probable cause to believe that AHN and his co-
conspirators caused CSH to jump from a terrace in fear of her life,
resulting in her suffering serious injury, in violation of C.P., art.
147(1).  CSH told the Spanish police officers that the Embassy had
been attacked and that she injured herself trying to flee the
Embassy.  (Dkt. 55-3 at 40; SD at 3:3-4, 4:2.)  CSH elaborated on her
escape from the Embassy in a subsequent victim statement to Spanish
authorities.  (Dkt. 55-3 at 40.)  The police officers and the
motorist who stopped to help CSH noted that she was covered in blood
and had problems walking.  (SD at 3:3, 5:2.)  One of the police
officers reported that when he encountered CSH, she was suffering
from a contused lacerated wound.  (SD at 3:4.)  Medical reports
document the extent of CSH's injuries and the surgery that was
necessary to heal her.  (Id. at 1:1-13.)

There also is probable cause to believe that AHN and his
accomplices injured YSS and SGJ in violation of C.P., arts. 147(2) &
147(3).  YSS's statements that he was injured during the course of
the attack are corroborated by, among other things, the medical

22

reports.  (SD at 2:14-18.)  Likewise, SGJ's statement that the
assailants attacked him with such force that he required stitches
(Dkt. 55-3 at 360) is corroborated by, among other things, one of the
police officers who reported that the oldest individual had the most
injuries and looked like he had suffered heavy blows to the head.[22]
(SD at 3:10-11.)  Another police officer reported that the persons
exiting the Embassy presented "minor injuries, bruises such as blows
to the face, to the head and they were disheveled, it looked like
that they had been beaten."  (Id. at 4:6.)

(D)  Threaten to Injury

Spain has provided evidence that AHN and his accomplices
threatened to injure the diplomats and their family members and
deprive them of their liberty in violation of C.P., arts. 169 & 171.
Specifically, YSS stated that when he tried to resist the assault,
the assailants threatened him with iron bars and covered his head
with a bag.  (Dkt. 55-3 at 15.)  SJC, HRJ, and SGJ described how the
assailants threatened to gag them if they tried to speak with one
another.  (Id. at 24, 27, 36.)  In addition, SGJ told Spanish
authorities that one of the attackers put a pistol near his face in
order to intimidate and threaten him.  (Id. at 35-36.)  OCJ stated
that one of her guards displayed a pistol to threaten and intimidate
her.  (Id. at 31.)  These statements are corroborated by physical
evidence, including crime scene photographs showing the imitation
pistols that the attackers left behind and receipts for the purchase
of those pistols and other items that the assailants purchased in
advance of the attack.  (Id. at 51, 53-54, 61, 72, 74.)

---

[22] It can be inferred that the officer was referring to SGJ since
he is substantially older than the other diplomats.

1                 (E)   Robbery with Violence and Intimidation

2      There is probable cause to believe that during the course of the

3 violent attack AHN and his accomplices stole electronic items from

4 the Embassy in violation of C.P., arts. 237, 241, & 242.   SJC stated

5 that while being held captive in the meeting room he could hear the

6 assailants putting objects into rucksacks, as he heard zips being

7 closed.   (Id. at 24.)   YSS told Spanish authorities that the items

8 seized by the assailants included two computers, two hard drives, two

9 memory sticks, and a mobile telephone.   (Id. at 19-20.)   He estimated

10 that the value of the stolen items could be worth as much as € 3,000.

11 (Id. at 19-20.)

12                  (F)   Criminal Organization

13      Finally, there is probable cause to believe that AHN, HONG

14 CHANG, and the other assailants, conspired to coordinate and execute

15 the attack on the Embassy in violation of C.P., art. 570 bis.   As

16 detailed above, images from the Embassy's exterior security camera

17 show AHN entering the Embassy with several other assailants at the

18 same time.   (SD 8:2-9.)   The group's coordination and preparation for

19 the attack is also evidenced by their purchase of combat knives,

20 imitation pistols and holsters, flashlights, balaclavas, hinged

21 handcuffs, tape, pliers, bolt cutters, and a telescopic ladder in

22 advance of the attack.   (Dkt. 55-3 at 51-56.)   During the course of

23 the attack, the attackers divided responsibilities, including taking

24 turns guarding OGJ and her minor son, guarding YSS while he was held

25 captive in the bathroom and basement, guarding the members of the

26 Embassy while they were held captive in the meeting room, and looting

27 the Embassy of electronics.   (Id. at 16, 18-20, 23-24, 26-27, 29-31,

28 35-36.)

Based on prior briefing in this case, AHN claims that the North Korean victims are not credible. (Dkt. 13 at 33.) As discussed above, however, the weight of authority holds that credibility determinations fall outside the narrow scope of an extradition hearing and should be reserved for the ultimate trier of fact in the requesting country, who can evaluate the victims' demeanor and consider their testimony in the context of the entire body of evidence. See, e.g., Santos, 830 F.3d at 993; Man-Seok Choe, 525 F.3d at 740; Noeller, 922 F.3d at 807; Shapiro, 478 F.2d at 905; Acevedo, 2017 WL 3491749, at *8 n.4; Lara Gutierrez, 2017 WL 8231237, at *4. It also is important to note that the judicial officer closest to the facts and who issued the arrest warrant, Judge Amaya, has "objectively assessed" the "statements of the national victims of North Korea" and "considered [them] credible without any connection to their nationality." (SD 0:2.) Notwithstanding Judge Amaya's assessment of the victim's credibility, the substantial evidence that corroborates those statements establishes probable cause, by itself, and includes medical reports, images from the Embassy's security cameras, crime scene photographs, store receipts, testimony from Spanish law enforcement, and testimony from witnesses not associated with the Embassy. Collectively, the evidence presented by Spain far surpasses what is necessary to determine that probable cause exists.

## IV.  CONCLUSION

For the foregoing reasons, the United States respectfully requests the certification of fugitive CHRISTOPHER PHILIP AHN's extraditability to Spain on the offenses for which his extradition has been sought.

## <u>DECLARATION OF JOHN J. LULEJIAN</u>

I, John J. Lulejian, declare as follows:

1.    I am an Assistant United States Attorney and have been assigned to prosecute <u>United States v. Christopher Philip Ahn</u>, Case No. 2:19-cv-05397-JFW-JPR.  I make this declaration in support of the United States' Extradition Memorandum.

2.    Attached hereto as Appendix A are summaries of the statements and testimonies of the victims, witnesses, and Spanish police officers submitted by Spain.  To assist the Court, the summaries include citations to the Request for Extradition, filed on June 20, 2019, and 28, 2019, and the Supplemental Document, that the United States moved to file on September 20, 2019.

3.    Attached hereto as Appendix B is a summary of the offenses charged in Spain and some of the offenses which could be charged in the United States, along with the maximum penalties for those offenses.

I declare under penalty of perjury that the foregoing is true and correct.


Executed this <u>20th</u> day of September, 2019, at Los Angeles, California.


<i>/s/ John J. Lulejian</i>
JOHN J. LULEJIAN