1   Ekwan E. Rhow - State Bar No. 174604
       erhow@birdmarella.com
2   Naeun Rim - State Bar No. 263558
       nrim@birdmarella.com
3   Christopher Jumin Lee - State Bar No. 322140
       clee@birdmarella.com
4   BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
    DROOKS, LINCENBERG & RHOW, P.C.
5   1875 Century Park East, 23rd Floor
    Los Angeles, California 90067-2561
6   Telephone: (310) 201-2100
    Facsimile: (310) 201-2110
7
8   Attorneys for Relator
    Christopher Philip Ahn

9              **UNITED STATES DISTRICT COURT**

10      **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

11

| 12   UNITED STATES OF AMERICA, | CASE NO. 2:19-cv-5397 JFW (JPR) |
|---|---|
| 13              Plaintiff | **REDACTED** |
| 14              v. | **RELATOR'S OPPOSITION TO REQUEST FOR EXTRADITION FILED BY THE UNITED STATES** |
| 15   CHRISTOPHER PHILIP AHN, | |
| 16              Relator | [Filed Concurrently with Declaration of Christopher Ahn, Declaration of Naeun Rim and Declaration of Christopher J Lee] |
| 17 | |
| 18 | Date: April 9, 2021 |
| 19 | Time:   10:00 a.m. Courtroom: 690 |
| 20 | |
| 21 | Assigned to Hon. Jean Rosenbluth, U.S. Magistrate Judge |

22                    **REDACTED**

23

24

25

26

27

28

3678696.2

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... 4

I.      INTRODUCTION ....................................................................... 8

II.     BACKGROUND .......................................................................... 11

        A.      North Korea's Totalitarian State ............................... 11

        B.      Christopher Ahn's North Korean Human Rights Work ....................... 14

        C.      The Madrid Incident, According to Non-North Korean Evidence ....... 16

        D.      Involuntary Testimony of North Korean Witnesses ............................ 20

III.    PROCEDURAL BACKGROUND ................................................ 22

IV.     LEGAL STANDARD ................................................................. 23

V.      SUMMARY OF EVIDENCE ..................................................... 24

VI.     ARGUMENT .............................................................................. 26

        A.      The Court Must Disregard the Testimony of the North Korean Officials As Inherently Unreliable. ....................... 26

        B.      Mr. Ahn Should Not Be Extradited Because Spain Fails To Satisfy Dual Criminality. ........................................... 29

                1.      The Dual Criminality Requirement Is Not Satisfied Because Mr. Ahn Believed His Actions Were Consensual. ....... 30

                2.      The Dual Criminality Requirement Is Also Not Satisfied Due to Mr. Ahn's Honest Belief that He Was Acting Under the Direction of the United States Government. ............. 32

        C.      The Court Must Deny Extradition Because Spain Has Failed To Establish Probable Cause. ........................ 33

                1.      Spain Cannot Establish Probable Cause That Mr. Ahn Committed Any Charged Offense ............. 33

                        a.      Criminal Organization .................................. 34

                        b.      Breaking and Entering ................................... 35

                        c.      Threats ............................................................ 36

                        d.      Causing Injuries ............................................ 36

                        e.      Illegal Restraint ............................................ 37

                        f.      Robbery .......................................................... 38

D.   The Court Should Acknowledge A Humanitarian Exception To Extradition Given The Unprecedented Nature Of This Case. .............. 38

VII.   CONCLUSION ............................................................................... 41

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Ahmad v. Wigen*,
    726 F.Supp. 389 (E.D.N.Y. 1989)............................................................39, 41

*Arnbjornsdottir–Mendler v. U.S.*,
    721 F.2d 679 (9th Cir. 1983) ........................................................................39

*Ashcraft v. Tennessee*,
    322 U.S. 143 (1944) ......................................................................................26

*Barapind v. Enomoto*,
    400 F.3d 744 (9th Cir. 2005) ...................................................................24, 33

*Barr v. U.S.*,
    819 F.2d 25 (2nd Cir. 1987) .........................................................................41

*Brinegar v. U.S.*,
    338 U.S. 160 (1949) ......................................................................................33

*U.S. v. Burrows*,
    36 F.3d 875 (9th Cir. 1994) ..........................................................................32

*U.S. v. Smyth*,
    61 F.3d 711 (9th Cir.1995) ...........................................................................40

*Clarey v. Gregg*,
    138 F.3d 764 (9th Cir. 1998) ...................................................................30, 33

*Crowe v. County of San Diego*,
    608 F.3d 406 (9th Cir. 2010) ........................................................................27

*Emami v. U.S. Dist. Court. for Northern Dist. of California*,
    834 F.2d 1444 (9th Cir. 1989) ......................................................................39

*Matter of Extradition of Mainero*,
    990 F.Supp. 1208 (1997)...............................................................................24

*Matter of Extradition of Santos*,
    228 F.Supp.3d 1034 (C.D. Cal. 2017).......................................................25, 29

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Franks v. Delaware*,
    438 U.S. 154 (1978) ........................................................................................24

*Gallina v. Fraser*,
    278 F.2d 77 (2nd Cir. 1960) ....................................................................38, 39

*Giordenello v. U.S.*,
    357 U.S. 480 (1958) ........................................................................................24

*Glucksman v. Henkel*,
    221 U.S. 508 (1911) ........................................................................................39

*Han Kim v. D.P.R.K.*,
    774 F.3d 1044 (D.C. Cir. 2014)................................................................*passim*

*U.S. v. Juan*,
    776 F.2d 256 (11th Cir. 1985) ........................................................................32

*Lopez-Smith v. Hood*,
    121 F.3d 1322 (9th Cir.1997) .........................................................................39

*U.S. v. Lui Kin-Hong*,
    110 F.3d 103 (1st Cir. 1997) ..........................................................................26

*Mainero v. Gregg*,
    164 F.3d 1199 (9th Cir. 1999)....................................................................38, 39

*Man-Seok Choe v. Torres*,
    525 F.3d 733,738 (9th Cir. 2008) ...................................................................24

*Manta v. Chertoff*,
    518 F.3d 1134 (9th Cir. 2008)....................................................................10, 30

*U.S. v. Martinez-Hernandez*,
    932 F.3d 1198 (9th Cir. 2019) ........................................................................31

*Massie v. D.P.R.K.*,
    592 F.Supp.2d 57 (D.D.C. 2008)....................................................................13

*Neely v. Henkel*,
    180 U.S. 109 (1901) ........................................................................................39

*Ocasio v. U.S. v. Wallace*,
    136 S. Ct. 1423 (2016)....................................................................................31

5

*Ornelas v. U.S.*,
  517 U.S. 690 (1996) ............................................................................... 33

*Prasoprat v. Benov*,
  421 F.3d 1009 (9th Cir. 2005) ........................................................ 38, 39

*Quinn v. Robinson*,
  783 F.2d 776 (9th Cir. 1986) .......................................................... 23, 24

*Reis v. U.S. Marshal*,
  192 F.Supp. 79 (E.D. Pa. 1961) ........................................................... 33

*Sainez v. Venables*,
  588 F.3d 713 (9th Cir. 2009) ............................................................... 24

*Santos v. Thomas*,
  830 F.3d 987 (9th Cir. 2016) ....................................... 10, 24, 25, 26

*U.S. v. Smith*,
  831 F.3d 1207 (9th Cir. 2016) ............................................................. 32

*U.S. v. Soyland*,
  3 F.3d 1312 (9th Cir.1993) ............................................................ 33, 36

*U.S. v. Taitz*,
  130 F.R.D. 442 (S.D. Cal. 1999) .......................................................... 42

*Tang Yee-Chun v. Immundi*,
  686 F.Supp. 1004 (S.D.N.Y. 1987) ...................................................... 30

*U.S. v. Tingle*,
  658 F.2d 1332 (9th Cir. 1981) ............................................................. 27

*Warmbier, v. D.P.R.K.*,
  356 F.Supp.3d 30 (D.D.C. 2018) .................................................... 13, 26

*Ybarra v. Illinois*,
  444 U.S. 85 (1979) ............................................................................... 33

*Zanazanian v. U.S.*,
  729 F.2d 624 (9th Cir.1984) ................................................................ 23

1

**State Cases**

2

*People v. Mayberry*,
    15 Cal.3d 143 (Cal. 1975) ..................................................................30

3

4

*People v. Rivera*,
    157 Cal. App. 3d 736 (Cal. App. 1984) ...............................................31

5

6

*People v. Yoder*,
    100 Cal. App. 3d 333 (Cal. App. 1979) ...............................................31

7

8

**Federal Statutes**

9

18 U.S.C. § 112..................................................................................................31

10

18 U.S.C. § 113..................................................................................................31

11

18 U.S.C. § 956..................................................................................................31

12

18 U.S.C. § 960..................................................................................................31

13

18 U.S.C. § 970..................................................................................................31

14

15

18 U.S.C. § 1116................................................................................................31

16

18 U.S.C. § 1201................................................................................................31

17

18 U.S.C. § 2111................................................................................................31

18

19

20

21

22

23

24

25

26

27

28

3678696.2

RELATOR'S OPPOSITION TO REQUEST FOR EXTRADITION FILED BY THE UNITED STATES

# I.      INTRODUCTION

Since the United States executed its first international extradition treaty, there has never been an extradition case like this. The United States Government ("Government") is allowing North Korea—a country found by American courts to have committed human rights atrocities against Americans, including kidnappings and extrajudicial killings[1]—to use the Spanish government as a tool to extradite a U.S. veteran based on the word of North Korean officials. The United States has chosen this course even though it is undisputed that Christopher Ahn is in danger of being killed by North Korea, and the danger to his life increases exponentially if he leaves the United States. (Declaration of Naeun Rim ("Rim Decl.") ¶ 3). While the Government has tried to maintain the fiction that this case is about Spanish process, Spanish evidence, and Spanish law, the extradition memorandum exposes this fallacy—the brief is almost entirely based on the unreliable statements of the nine North Korean witnesses, with the statements of any Spanish witnesses relegated to mere footnotes.

While the request for extradition may be written in Spanish, it is the North Korean government that is driving the prosecution of Mr. Ahn. At the direction of their superiors, and out of fear for their own lives, North Korean diplomats from the embassy have propagated a self-serving narrative that Mr. Ahn and members of Free Joseon committed a violent raid with the aim of disrupting the Hanoi summit and intimidating them into betraying their country. This narrative is as false as it is incoherent. Free Joseon is a known human rights group that seeks to protect and empower, not harm, North Korean refugees. The truth is that ███████████ █████████████████████████ had contacted Free Joseon and asked them to

---

[1]    *See, e.g.*, *Han Kim v. D.P.R.K.*, 774 F.3d 1044, 1045-46 (D.C. Cir. 2014) (evidence satisfactory to show North Korea kidnapped a reverend, who was known for providing humanitarian and religious services to defectors, while he was in China and murdered him outside of the normal legal process).

1     ██████████████████ escape the embassy. ██████████████

2 ██████████████████████████ feared the retaliation that might befall

3 their relatives in North Korea once the North Korean government discovered their

4 betrayal. Accordingly, ██████ *suggested and requested* that Free Joseon stage a

5 false kidnapping so that no retaliation would befall any defectors. The tragedy is that

6 the psychological hold of the North Korean dictatorship was too great—when a

7 woman in the embassy unexpectedly jumped out of the window and prompted the

8 Spanish police to surround the embassy in the middle of the defection attempt ████

9 ██ was overcome with fear and changed ██ mind. ██████████████

10 ████████████████████████████████████████

11 ██████ After receiving permission ████████████████ Mr. Ahn

12 and the others left the embassy. Mr. Ahn committed no crimes recognizable under

13 United States law during these events.

14        Mr. Ahn returned swiftly to the United States, where he cooperated with Mr.

15 Hong's request that he speak to the FBI. It is undisputed that both Mr. Ahn and

16 Adrian Hong willingly spoke to the FBI following the Madrid incident, hardly the

17 actions of those with a guilty mind. As a U.S. Marine Corps veteran, Mr. Ahn

18 viewed himself and the human rights efforts of Free Joseon as staunchly aligned

19 with the United States Government and American principles of democracy. He

20 never dreamed that the Government would lend credence to the account of North

21 Korean officials, who clearly had every incentive to save themselves by vilifying

22 Free Joseon, over his. But in a stunning departure from America's steadfast refusal

23 to entertain bilateral relations with North Korea, in April of 2019, the Trump

24 Administration accepted a request from Spain to extradite Mr. Ahn, a United States

25 veteran with no criminal history, based at the time *entirely on the statements of*

26 *North Korean officials and their family members*. (Dkt. No. 1, 55-3). The

27 extradition proceedings began just a little over a month after the unprecedented

28 meeting between then-President Donald J. Trump and North Korean dictator Kim

1  Jong Un, which took place on February 27-28, 2019. The talks between the two

2  countries were ultimately cut short, with no agreement reached.[2]

3      While the vagaries of international politics loom large on the periphery of

4  these extradition proceedings, the Court can put a stop to this injustice based on

5  purely legal grounds. The Court must decline to certify the extradition of Mr. Ahn

6  for the following reasons:

7      First, the request for extradition is based almost entirely on inherently

8  unreliable witness statements made by North Korean officials. These involuntary

9  statements are not competent evidence, cannot form the basis for probable cause,

10 and should not be considered by the Court. *See Santos v. Thomas*, 830 F.3d 987,

11 1004 (9th Cir. 2016).

12     Second, the United States cannot satisfy the extradition treaty's requirement

13 of dual criminality because it cannot establish that Mr. Ahn's had the requisite *mens*

14 *rea* for his conduct. *See Manta v. Chertoff*, 518 F.3d 1134, 1142 (9th Cir. 2008). The

15 explanatory evidence submitted by Mr. Ahn establishes, without contradicting any

16 competent evidence submitted by Spain, that he lacked the criminal intent necessary

17 to satisfy dual criminality because he believed his actions were consensual.

18     Third, the United States cannot present competent evidence sufficient to

19 establish probable cause that Mr. Ahn, who arrived in Spain that morning and had a

20 broken right hand, engaged in extraditable criminal conduct. No Spanish witness

21 suggests Mr. Ahn restrained, physically harmed, or threatened anybody. At most,

22 the evidence establishes that he was merely present as the alleged activity occurred.

23     Finally, due to the undisputed and credible threats by the North Korean

24 regime against Mr. Ahn's life, this is the rare case where the Court can recognize a

25

26 [2]   *See*, *e.g.*, "US-North Korea summit with President Donald Trump and Kim Jong
27 Un cut short in Vietnam," *ABC News*, published February 28, 2019, *available at*
   https://abcnews.go.com/Politics/trump-kim-meeting-2nd-summit-us-pushes-
28 concrete/story?id=61368977.

10

humanitarian exception to extradition without violating the rule of non-inquiry. The humanitarian concerns are directed at North Korea's long-documented penchant for carrying out extrajudicial kidnappings and murders on foreign soil. These concerns have nothing to do with the Spanish justice system. The Court therefore need not inquire into the fairness of *Spain's* legal process to conclude, as other courts have before, that North Korea is more than capable of "torturing and killing its political enemies" outside of the normal legal process. *See Han Kim*, 774 F.3d at 1046.

## II.   BACKGROUND

### A.   North Korea's Totalitarian State

A brief history of North Korea and its totalitarian regime is necessary to provide critical context for the evidentiary and legal arguments made throughout this brief.

The gross human rights abuses of the North Korean regime are *sui generis* within the international community. In particular, the regime's complete lack of respect for due process – evidenced by its willingness to engage in arbitrary detention, torture, hostage taking, and other coercive tactics to obtain desired outcomes – is beyond dispute. In 2014, the United Nations published a comprehensive report on human rights abuses in North Korea, concluding that North Korean government entities including the Ministry of State Security, the Office of the Public Prosecutor, and the judiciary – acting "under the effective control of the Korean Workers' Party ("KWP") and the Supreme Leader Kim Jong Un – engage in "systematic, widespread and gross human rights violations" including "crimes against humanity based on State policies." (Declaration of Christopher Jumin Lee, ("Lee Decl.") Exh. C ¶ 24).[3]  North Korean authorities regularly commit "gross

---

[3]   United Nations, General Assembly, *Report of the Commission of Inquiry on Human Rights in the Democratic People's Republic of Korea*, A/HRC/25/63 ("UNHCR Report") *available at* https://www.ohchr.org/EN/HRBodies/HRC/CoIDPRK/Pages/ReportoftheCommissi

human rights violations in order to create a climate of fear that pre-empts any challenge to the current system of government[,]" including "detention, executions, and disappearances . . . characterized by a high degree of centralized coordination between different parts of the extensive security apparatus." (*Id.* ¶ 57). Torture is an "established feature of the interrogation process[,]" (*Id.* ¶ 58), and the "vast majority of inmates are victims of arbitrary detention . . . imprisoned without trial or on the basis of a trial that fails to respect . . . due process and fair trial guarantees[.]" (*Id.* ¶ 62). Individuals so detained are routinely subject to "[t]orture, rape and other arbitrary cruelties" which are "widespread and committed with impunity." (*Id.*)

While diplomats enjoy some level of privilege in North Korean society, that privilege comes at the cost of heightened surveillance and swift punishment for deviation. As set forth in more detail in the expert report of Robert Collins, loyalty is the singular quality demanded from all North Korean diplomats: they are hand-picked from the most loyal North Korean families, screened for loyalty before being selected for diplomatic service, and indoctrinated with loyalty as "***the*** major component of training during their entire career." (Lee Decl. Exh. A. at 4) (emphasis in original). When they are deployed overseas, with rare exceptions for very senior diplomats, their family members effectively become hostages. (*Id.* at 4). Should the diplomat offend the regime while serving abroad, their loved ones – including spouses, children, parents, and siblings – are considered "as guilty as the perpetrator" and subject to "imprisonment or worse." (*Id.* at 4-5). Defection is the worst offense of all: family members of defectors are arrested and sentenced to life imprisonment in North Korea's infamous gulags. (*Id.* at 9).

The regime imposes an additional layer of control to diplomats abroad through around-the-clock monitoring. Every North Korean embassy is also a cell of the KWP, with the ambassador as its chief. (Lee Decl. Exh. A. at 5). The

_____

onofInquiryDPRK.aspx.

ambassador monitors their subordinates and reports on their activities to the Ministry of Foreign Affairs ("MFA") in Pyeongyang, which in turn reports to the KWP Organization and Guidance Department ("KWP OGD"), the internal security organ responsible for ensuring loyalty of every one of the 3.2 million party members nationwide. (*Id.*). Every embassy also has an entirely separate layer of monitoring through an embedded embassy security officer, who reports to the Ministry of State Security ("MSS") – North Korea's equivalent to the Nazi Gestapo. (*Id.* at 7). The ambassador and the MSS officer are expected to act as checks against each other to ensure that they both remain loyal to the regime. (*Id.*).

In addition to its oppression of diplomats, North Korea has a known track record for imprisoning, torturing, and even killing people without regard for due process. American courts have credited testimony from various North Korean experts to conclude that individuals taken into custody for political purposes – particularly those involved in assisting defectors – would be invariably singled out for "exceptionally painful, brutal, and outrageous treatment" potentially including "starvation, brutal beatings," and various methods of torture including "kneeling motionless for hours on end, water torture, pidgeon torture with arms pinned behind the back and attached to cell bars in ways that made it impossible either to stand up or sit down[.]" *See Han Kim*, 774 F.3d at 1050 (internal quotations ommitted); *see also Warmbier, v. Democratic People's Republic of Korea*, 356 F.Supp.3d 30, 52 (D.D.C. 2018) (finding satisfactory evidence to prove North Korean officials arbitrarily detained and tortured Otto Warmbier – an American college student – for seventeen months, causing severe brain damage and eventually resulting in his death). Courts have also confirmed that North Korea routinely uses hostage-taking as an instrument of policy. *Id.* at 50-51; *see also Massie v. D.P.R.K.,* 592 F.Supp.2d 57, 75-78 (D.D.C. 2008) (finding that North Korea had kidnapped, detained, and tortured crew of U.S.S. Pueblo for eleven months in order to gain leverage against United States).

As the Court recognized in its Order conditionally granting bail, the United States has chosen not to maintain diplomatic relations with North Korea – including an extradition treaty – precisely because of the gross abuses that are routine within its justice system. (Dkt. No. 58 at 2 ("the United States does not have diplomatic relations [with North Korea] in part because its justice system, including specifically pretrial investigations, is not trustworthy and does not comply with due process."))[4] Spain, on the other hand, has taken a different route, having established diplomatic relations with North Korea in 2001. The disparity has allowed North Korea, a terrorist state and a known enemy of the United States, to use Spain in these proceedings to effectively execute an "extradition by proxy"—to exploit the bilateral relations between Spain and the United States to gain access to an American citizen.

### B.    Christopher Ahn's North Korean Human Rights Work

Christopher Ahn is an American-born citizen who was born and raised in Southern California. (Declaration of Christopher Ahn ("Ahn Decl.") ¶ 2). As the son of a United States Air Force veteran, and the grandson of a woman who was rescued by American soldiers during the Korean War, Mr. Ahn has always been grateful for the opportunities that America had given his immigrant family. (*Id*.) He enlisted as a Marine and spent six years honorably serving his country, including a deployment in Iraq, where he primarily held a desk job working in intelligence. (*Id*. ¶¶ 2, 10.)

Mr. Ahn has no criminal history. Prior to his arrest, he was a full-time

---

[4]    As of the time of this filing, the State Department continues to maintain that "the United States does not maintain diplomatic or consular relations with North Korea[,]" while "strongly urg[ing] U.S. citizens not to go to [North Korea] due to the serious risk of arrest and long-term detention." *Country Information: North Korea*, travel.state.gov, https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/KoreaDemocraticPeoplesRepublicof.html (last visited February 22, 2021).

entrepreneur who always made time to volunteer for charitable causes. Numerous

letters attesting to Mr. Ahn's character are attached as Exhibit B.[5] David Bellavia, a

recipient of the Medal of Honor in 2019 and a former roommate of Mr. Ahn, writes:

> Chris always prided his service in the United States Marine Corps on
> saving lives. There is a difference and he always made a point of
> sharing that with his peers. Not all service at war was that of the trigger
> pulling class. Chris was an intellectual Marine. He solved problems with
> his mind. Ahn worked to help the people of Iraq and he took great pride
> in what he was able to accomplish. He is not and never has been a violent
> person. Christopher is and always will be a faithful and dutiful Marine.
> His life is predicated on honor and duty.

(Lee Decl. Exh B at 23). Will Prescott, a former army officer and business school

classmate, describes Mr. Ahn as being "motivated by a strong desire to help others

in need, which led him to join the U.S. Marines, volunteer for deployment in Iraq,

and volunteer with numerous charitable organizations after returning to civilian

life." (*Id.* at 33).

In 2009, Mr. Ahn met Adrian Hong ("Mr. Hong") through mutual friends in

a social setting. (Ahn Decl. ¶¶ 3-4). At the time, Mr. Hong was already well-known

as a North Korean human rights activist. He was a proponent of coordinating an

organized effort to empower North Koreans to take control of their own society by

finding ways to enable them to communicate with each other and with the outside

world. At the time Mr. Ahn met him, Mr. Hong had just become a TED Fellow and

was often featured in publications about human rights issues. (*Id.* ¶ 3)

Mr. Ahn stayed in contact with Mr. Hong based on their shared interest in

North Korean human rights. (Ahn Decl. ¶ 4.) At some point, Mr. Hong started an

organization called Cheollima Civil Defense, which later became Free Joseon. (*Id.*)

On a few occasions, Mr. Hong called Mr. Ahn and ask him to help on specific tasks

related to helping with North Korean defections. (*Id.*). Mr. Ahn's assigned tasks

were usually limited to helping make travel arrangements for people and escorting

---

[5]   These letters were previously submitted for Mr. Ahn's Application for bail.

them from one place to another. (*Id*. ¶ 5). Those periodic tasks were the extent of Mr. Ahn's involvement with the group. (*Id*. ¶ 4). Because of the safety issues surrounding North Korean defections, Mr. Ahn was never informed of the entire plan, and it was common for him to be coordinating with people he was meeting for the first time. (*Id*. ¶ 5).

Over time, Mr. Ahn came to believe that Mr. Hong was working in conjunction with the United States Government and other governments for these defection operations. (*Id*. ¶ 7). In 2011, Mr. Ahn attended a meeting with Mr. Hong and several U.S. government officials, during which Mr. Hong and the U.S. officials spoke collaboratively about ways to further empower North Koreans and improve defection efforts. (*Id*.). Mr. Ahn's belief was further reinforced in 2017, when two agents from the United States Central Intelligence Agency showed up in a different country to assist him in the process of helping several North Koreans proceed to their next destination during a highly sensitive defection. (*Id*.).

**C.     The Madrid Incident, According to Non-North Korean Evidence**

On the morning of February 22, 2021, the day of the Madrid incident, Mr. Ahn traveled to Madrid to meet Mr. Hong. While others in the group had apparently been in Madrid for days or even weeks, passport control records indicate that Mr. Ahn arrived in Madrid at 8:10 a.m. that morning. (Dkt. 55-3 at 3). As was often the case when Mr. Hong asked Mr. Ahn to help with a North Korean defection, Mr. Ahn was not told what specific task he would be asked to do until he was on the ground. (Ahn Decl. ¶ 8.)

Once Mr. Ahn arrived in Madrid, Mr. Hong explained to Mr. Ahn as follows: ███████████████████████████████████████████, had asked Mr. Hong to help him defect ████████████; ████████ wanted to defect, but ███████████████; and ████ had asked Mr. Hong to stage the defection as a kidnapping to protect

against any retaliation. (Ahn Decl. ¶ 8).

Mr. Ahn was aware that defectors, especially diplomats, are terrified that their actions will result in retaliation against their family in North Korea. (Ahn Decl. ¶ 9). As stated above, this fear is effectively used to hold them hostage while they are abroad. (Lee Decl. Exh. A at 4). The news had broken just two days prior to the Madrid incident that North Korea had abducted the daughter of Jo Song Gil, the former North Korean ambassador to Italy who defected in late 2018, from the streets of Rome and forced her to return to North Korea.[6] (Ahn Decl. ¶ 9). Within this context, Mr. Ahn believed it was credible that ███████████ would ask Mr. Hong to stage this mission as an involuntary kidnapping to protect themselves and their families. Based on prior experience, Mr. Ahn had no reason to believe Mr. Hong would try to force anyone to defect or physically harm anyone against their will. (*Id.*).

Knowing North Korea to be a surveillance state, the group had every expectation that the embassy would be covered with security cameras, and the North Korean government would be able to see everything that happened on embassy grounds. (Ahn Decl. ¶ 11). Mr. Ahn personally did not carry any weapons, but understood others in the group would have weapons, such as fake guns, and understood that the purpose of having these items was to make the "kidnapping" look real, not hurt anyone. (*Id.*) ████████████████████ ███████████ (*Id.*).

At around 4:40 p.m., Mr. Hong, Mr. Ahn, and others arrived at the North Korean embassy in various groups. (Dkt. 118-1 at 115-120). Mr. Hong was allowed inside the embassy by one of the North Korean officials, and the door was left

---

[6]   *See*, *e.g.*, "North Korea accused of abducting its former ambassador's daughter," *The Guardian*, published February 20, 2019, available at https://www.theguardian.com/world/2019/feb/20/north-korea-accused-of-abducting-its-former-ambassadors-daughter.

1   slightly open. (Ahn Decl. ¶ 12). Mr. Ahn believed this had been done on purpose to

2   allow the group to enter. (*Id*.). The group then entered the embassy, and once inside,

3   several members of the group went through the motions of tying people up. (*Id*.).

4   Mr. Ahn, whose right hand was fractured, did not participate in any restraining. He

5   did not hit anyone or commit any violence. (*Id*.). Based on his observations, the

6   others appeared to be taking great pains to make the restraining look real without

7   actually hurting anyone. (*Id*.). He believed the entire process was consensual, and

8   any resistance from the North Korean officials was being performed for the benefit

9   of possible North Korean surveillance. (*Id*.).

10          The evidence from Spanish witnesses do not contradict the account of Mr.

11   Ahn. They reported seeing events that would be consistent with what a staged

12   kidnapping would look like to a third party observer. Lynn Gayero Dayao, a

13   passerby standing outside the embassy, said she heard screaming from inside the

14   embassy and peeked in through a hole in the wall. (Dkt. No. 118-1 at 80). Ms.

15   Dayao says she saw a man being restrained by two or three people, one of whom

16   had a ponytail and was carrying what she thought was a pistol. (*Id.* at 80-83).

17   Another passerby, Teofila Villarroel Orozco, also says she saw a man being

18   restrained. (*Id.* at 101-102). None of these witnesses identify Mr. Ahn as one of the

19   people participating in the restraining.

20          Unbeknownst to Mr. Ahn or others inside the embassy, upon the group's

21   arrival, one of the wives of the North Korean officials, Cho Sun Hi, jumped from

22   her second floor window and fled the embassy grounds. Around 5:12 p.m., a man

23   named Oscar Santiago Perales was driving past the embassy when he saw Ms. Cho

24   step into the middle of the street in front of his car to stop him. (Dkt. No. 118-1 at

25   65). Seeing that Ms. Cho was injured, Mr. Perales phoned emergency services and

26   drove her to his workplace – a nearby gym – to offer first aid. (*Id.)* Eventually,

27   paramedics and two police officers arrived at the gym. (*Id.* at 66). Ms. Cho

28   communicated with the two officers through Google Translate, and claimed that

1    "some individuals had entered the Embassy and they were killing people, they were
2    eating people and there were children there." (Dkt. No. 118-1 at 19).

3         The officers passed on Ms. Cho's claims to their superior, who directed them
4    to establish a police perimeter around the embassy. (Dkt. No. 118-1 at 20). At
5    around 5:50 p.m., three officers rang the doorbell at the embassy gates. (*Id.* at 152-
6    53). Mr. Hong went to the door to speak to them. That was the first time those inside
7    the embassy learned from the police that a woman had jumped out of the window
8    and left the building. (Ahn Decl. ¶ 13). The police left shortly after speaking with
9    Mr. Hong without incident. (*Id.*).  After the police contact, the energy in the
10   embassy changed, and the North Koreans grew increasingly distressed. (*Id.*).

11        Mr. Hong and a few others ████████████████████. (*Id.* ¶ 14). Mr.
12   Ahn did not go with them and did not hear what was discussed. (*Id.*). He waited for
13   them for several hours and grew concerned. (*Id.*). The phone in the embassy kept
14   ringing during this time. (*Id.*). The ringing of the phone seemed to terrify the North
15   Koreans, who were viscerally upset and seemed to be convinced the phone ringing
16   was proof that they were all being monitored. (*Id.*).

17        Eventually, Mr. Hong came out and told Mr. Ahn that █████ had changed his
18   mind and did not want to go through with the defection. (*Id.* ¶ 15). The visit from
19   the police and the phone ringing had alarmed him, and █████ now believed that
20   North Korean state security knew what was going on. (*Id.*). ████████████
21   ████████████████████████████████████████████████████████
22   (*Id.*). ████████████████████████████████████████████
23   ████████████████████████████ so they could depart safely. (*Id.* ¶
24   16).

25        Around 9:04 p.m., the group departed the compound in a mix of embassy cars
26   and an Uber. (Dkt. No. 118-1 at 5, 24, 130-32). ████████████████████
27   ████████████████████████████████████████████████████
28   ████████████ As they were leaving, someone from the group sent an email to the

1 Spanish government ████████████████████████████

2 ████████████████████████████

3    Around 9:22 p.m., three North Korean individuals, who later claimed to be

4 architecture students, arrived at the front of the embassy. (*Id.* at 25, 51, 133). One of

5 them jumped the fence and went inside. (*Id.* at 25-26). At 9:25 p.m., several North

6 Koreans emerged from the embassy compound. (Dkt. No. 118-1 at 133). Spanish

7 officers on the scene report that some of them had their hands bound with cable ties

8 or handcuffs. (*Id.* at 26, 52). Mr. So, who identified himself as "the person in

9 charge," spoke to the officers and told them that South Koreans had attacked the

10 embassy. (*Id.* at 26-27). The police were not able to enter the embassy at that time,

11 and did not conduct a search until "[m]uch, much later." (*Id.* at 52). When they

12 searched the premises, they recovered an eclectic collection of items, including

13 cable ties, handcuffs, flashlights, gloves, a box of toys, a bag of gummy bears,

14 balaclavas, pepper spray, duct tape, pliers, a bolt cutter, knives, scissors, and fake

15 guns. (Dkt. No. 55-3 at 59-74).

16    **D.    Involuntary Testimony of North Korean Witnesses**

17    Starting with Mr. So's contemporaneous statement to the police officers that

18 the Madrid Incident was a South Korean attack, the North Korean diplomats

19 involved began to construct a false narrative of the incident as a violent and

20 unprovoked "raid." A total of nine North Korean witnesses gave testimony to

21 Spanish authorities. Six of these individuals were diplomats who were inside the

22 embassy at the time of the Incident: Mr. So, Jang Ok Kyung (Mr. So's wife), Jang

23 Song Guk, Ju Hak Rim, Choe Song Jin, and Cho Sun Hi. The other three witnesses

24 were the unidentified individuals who entered the embassy around 9:00 p.m, who

25 claim to be students from nearby Nebrija University.

26    While speaking to Spanish authorities, each and every one of the North

27 Korean witnesses was accompanied by Mr. So, the highest ranking official at the

28 embassy, who purported to translate their testimony from Korean to Spanish. (Dkt.

No. 55-3 at 23, 26, 29, 33, 35, 38, 43, 45, 47). It does not appear that any Korean speaker unaffiliated with the North Korean government was present to verify the accuracy of Mr. So's translation. *Id.* Through their testimony – as delivered by Mr. So – the North Korean witnesses allege that:

- Mr. Hong and others restrained and put bags over the heads of the North Korean witnesses against their will. (Dkt. No. 55-3 at 16, 24, 26, 35).
- Mr. So was beaten by a group of four or five intruders, one of whom he identifies as Mr. Ahn. (Dkt. No. 55-3 at 21-22).
- Mr. Hong and others detained Mr. So's wife and minor son throughout the incident. (Dkt. No. 55-3 at 29).
- Ms. Cho jumped out of a window to escape the embassy because she was convinced that her colleagues had been murdered by the intruders. (Dkt. No. 55-3 at 39).
- Mr. So was separately taken to a basement, where three or four intruders tried to force him to defect. (Dkt. No. 55-3 at 18). Mr. So claims that he refused "each and every one of the offers" and was also able to convince the intruders to leave voluntarily. (*Id.* at 18-19).
- A North Korean official contacted the "students" from Nebrija University and directed them to check on the embassy's status. (Dkt. No. 55-3 at 43).

In addition to the aforementioned allegations regarding the intruders, the North Korean testimony is rife with what appears to be exaggerated professions of loyalty to the North Korean regime. For example, Mr. So insists that he was "insulted" by the offers to defect and considered it a "serious affront" when Free Joseon allegedly destroyed framed pictures of the Kim family – North Korea's dynastic rulers. (Dkt. No. 55-3 at 18-19). Likewise, Mr. So's wife Ms. Jang claims that she attempted to slit her wrists and kill herself to avoid being kidnapped – despite the fact that her death would have left her young son alone with the intruders. (*Id.* at 30-31). Another embassy official, Mr. Jang, recounts defiantly

1  shouting out to the intruders that "attacking [the Embassy] . . . was an act of war[.]"

2  (*Id.* at 36).

3  **III.   PROCEDURAL BACKGROUND**

4       On March 25, 2019, the Spanish National High Court ("Spanish Court")

5  issued an order commencing criminal proceedings in connection with the Madrid

6  Incident. On or about April 12, 2019, the Spanish Court issued an international

7  warrant for Mr. Ahn's arrest. That same day, the Government filed the Complaint in

8  the instant matter, seeking a provisional arrest pursuant to relevant extradition

9  treaties between the United States and Spain. Spain later submitted its formal

10  request for extradition on May 21, 2029.

11       Mr. Ahn was taken into custody on April 18, 2019, where he remained for

12  three months until he was released on bail on July 9, 2019. (Dkt No. 73). In its order

13  conditionally granting Bail, the Court held that a special circumstance arose in this

14  case due to "the fact that much of the evidence supporting the . . . extradition comes

15  from diplomatic officials of the North Korean government, a country with which the

16  United States does not have diplomatic relations in part because its justice system,

17  including specifically pretrial investigations, is not trustworthy and does not comply

18  with due process." (Dkt. No. 58 at 2). In particular, the Court expressed significant

19  reservations regarding the competence of testimony provided by North Korean

20  witnesses:

21       [T]he only witnesses to the Relator's conduct inside the North Korean
         embassy in Spain on February 22, 2019, were North Korean officials or

22       their family members and that each of them was interviewed by the
         Spanish police in the company of a high-ranking North Korean diplomat

23       at the embassy, who was not only present but acted as the interpreter.

24       (Dkt. No. 58 at 2).

25       In the intervening fifteen months since his release on bail, Mr. Ahn has not

26  attempted to flee and has remained in compliance with all of his conditions of

27  release. On November 3, 2020, in recognition of Mr. Ahn's continued compliance,

28  the Court lifted his house arrest to allow him limited travel subject to a curfew. (Dkt.

1    No. 163).

2    **IV.    LEGAL STANDARD**

3         "The right of a foreign sovereign to demand and obtain extradition of an

4    accused criminal is created by treaty." *Quinn v. Robinson*, 783 F.2d 776, 782 (9th

5    Cir. 1986).[7] In determining whether to certify an extradition request pursuant to

6    treaty, an extradition court must determine: (1) whether it has jurisdiction; (2)

7    whether a valid treaty exists; (3) whether the provisions of the treaty, including dual

8    criminality, have been satisfied; and (4) whether probable cause exists. *See*

9    *Zanazanian v. U.S.,* 729 F.2d 624, 625–26 (9th Cir.1984). The doctrine of dual

10   criminality provides that extradition is only available if the underlying offense is

11   "considered criminal by the jurisprudence or under the laws of both the requesting

12   and requested nations." *Quinn*, 783 F.2d at 783; *see also* Extradition Treaty (Dkt.

13   No. 55-1 Art. II.A) (extraditable offenses must be punishable by more than one year

14   imprisonment under the laws of both the United States and Spain).

15        In an extradition proceeding, the Government bears the burden of providing

16

17   [7]    A valid extradition treaty exists between the United States and Spain. The
18   operative treaty encompasses the following documents, collectively referred to
     herein as the "Treaty": Treaty on Extradition between the United States of America
19   and Spain, U.S.-Spain, May 29, 1970, 22 U.S.T. 737; Supplementary Treaty in
     Extradition between the United States of America and Spain, signed January 25,
20   1975; Second Supplementary Extradition Treaty between the United States of
     America and the Kingdom of Spain, U.S.-Spain, Feb. 9, 1998, S. Treaty Doc. No.
21   102-24 (1992); Third Supplementary Treaty between the United States of America
22   and the Kingdom of Spain, U.S.-Spain, Mar. 12, 1996, S. Treaty Doc. No. 105-15
     (1997); and the Instrument on Extradition between the United States of America and
23   Spain, as contemplated by Article 3(2) of the Agreement on Extradition between the
24   United States and the European Union signed 25 June 2003, as to the application of
     the Treaty on Extradition between the United States of America and Spain signed
25   May 29, 1970, and the Supplementary Treaties on Extradition signed January 25,
26   1975, February 9, 1988 and March 12, 1996, U.S.-Spain, Dec. 17, 2004 S. Treaty
     Doc. No. 109-14 (2006), with Annex. (The integrated text of the Treaty is available
27   at Dkt. 55-1 at 1-10.)

28

sufficient evidence to establish probable cause. *See Quinn*, 783 F.2d at 783; *Barapind v. Enomoto*, 400 F.3d 744, 747 (9th Cir. 2005) ("Certification of extradition is lawful only when the requesting nation has demonstrated probable cause to believe the accused person is guilty of committing the charged crimes.") Determining whether the burden has been met does not require the extradition court to rule on innocence or guilt. *Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir. 2009). Rather, the court need only determine "whether there is ***competent*** evidence to support the belief that the accused has committed the charged offense." *Quinn*, 783 F.2d at 815 (emphasis added).

This limited scope does not render the judicial inquiry a mere rubber stamp: the extradition court has the authority to conduct an independent review of the evidence proffered, and not "accept without question the complainant's mere conclusions that the person whose arrest is sought has committed a crime." *Giordenello v. U.S.*, 357 U.S. 480, 486 (1958); *see also Man-Seok Choe v. Torres*, 525 F.3d 733,738 (9th Cir. 2008) ("Though the extradition papers accuse Choe of doing [illegal] things, accusations are not evidence."); *Franks v. Delaware*, 438 U.S. 154, 165 (1978) ("[I]t is the magistrate who must determine independently whether there is probable cause.")

## V.  SUMMARY OF EVIDENCE

In making its probable cause determination, the Court has "wide latitude to admit evidence." *Matter of Extradition of Mainero*, 990 F.Supp. 1208, 1219 (1997) (citing *Extradition of Kraiselburd*, 786 F.2d 1395, 1399 (9th Cir.1986)). In particular, the Court may consider "explanatory evidence" from the relator which "explains away or completely obliterates probable cause." *Santos*, 830 F.3d at 1003 (9th Cir. 2016); *see also Quinn*, 783 F.2d at 815 ("The credibility of witnesses and the weight to be accorded their testimony is solely within the province of the extradition magistrate"). The Relator is generally not permitted to introduce evidence that contradicts evidence presented by the Government. *Santos*, 830 F.3d

at 992. In practice, this means that the Relator cannot offer evidence regarding alibis, contradictory facts, or affirmative defenses. *Id.* at 993. On the other hand, evidence that is not inconsistent with the facts as put forth by the government's evidence but instead puts them in a light that "explains away or completely obliterates probable cause" is freely admissible. *Id.* at 992. When it comes to the admissibility of a Relator's evidence regarding the testimony of government witnesses, the Ninth Circuit has established a clear distinction: evidence that attacks the credibility of those witnesses is inadmissible contradictory evidence; evidence that attacks the ***competence*** of their testimony is admissible explanatory evidence. *Id.* at 1003. Further, when the competence of testimony is challenged, the burden of proof flips: the Government "must show by a preponderance of the evidence that the statements of [the witnesses] were not obtained by coercion." *Matter of Extradition of Santos*, 228 F.Supp.3d 1034, 1037 (C.D. Cal. 2017).

Mr. Ahn seeks to admit the following as explanatory evidence in support of his opposition:

- Declaration of Christopher Ahn
- Expert Report of Robert Collins (Lee Decl. Exh. A)
- Character Letters for Mr. Ahn (Lee Decl. Exh. B)
- U.N. Report (Lee Decl. Exh. C)
- Medical Records of Mr. Ahn (previously filed under seal as Exhibit 1 to Dkt. No. 33.)
- Declaration of Naeun Rim

The Collins Report[8] and U.N. Report go to the competency of the North

---

[8]    Mr. Collins is a scholar of North Korean politics who has authored several books on the country's ruling elites, including diplomats. (Exh. B. at 1). He is a United States Army veteran who served over three decades in Korea, including as Chief of Strategy of the ROK-US Combined Forces Command – the military command tasked with countering North Korean aggression on the Peninsula. (*Id.* at 12). The Collins Report details the inhumane tactics the regime applies to its own diplomats

Korean witness statements. The Declaration of Mr. Ahn, the character letters, his
medical records, and the Declaration of Naeun Rim are submitted as explanatory
evidence that negates dual criminality, obliterates probable cause, or supports a
finding of the humanitarian exception.

## VI.   ARGUMENT

### A.   The Court Must Disregard the Testimony of the North Korean Officials As Inherently Unreliable.

As a threshold matter, the Court should not consider the testimony of the
North Korean witnesses for the purpose of this extradition hearing. Involuntary
confessions are incompetent and cannot be introduced under the due process clause
of the Fifth Amendment. *Ashcraft v. Tennessee*, 322 U.S. 143, 155 (1944). Based on
the same principle, the Ninth Circuit has held that "evidence that the government's
evidence was obtained by torture or coercion" is admissible in extradition
proceedings, because coerced testimony is incompetent and therefore cannot support
probable cause. *Santos*, 830 F.3d at 1004*; see also U.S. v. Lui Kin-Hong*, 110 F.3d
103, 122 (1st Cir. 1997) ("confession obtained by duress is inherently unreliable and
would be given little weight even if the confession were authenticated").

While the *Santos* court was considering the admissibility of testimony
obtained by torture, courts have identified other conditions in which testimony given
under duress may be incompetent. *See, e.g.*, *Crowe v. County of San Diego*, 608
F.3d 406, 431 (9th Cir. 2010) (finding Fifth Amendment violation for evidentiary
use of confession obtained by "psychologically brutal" interrogation of minor that –

---

to ensure unquestioning loyalty, and how these methods would have likely played
out in the aftermath of the Madrid Incident. Mr. Collins's expert opinion has been
previously been accepted by a federal court as evidence of North Korean practices.
*See Warmbier*, 356 F.Supp.3d at 47 (accepting Mr. Collins's conclusion that North
Korea had likely tortured Otto Warmbier to obtain a false confession and dictated a
statement to him that he was later forced to read on camera).

1  while absent of physical violence – involved isolation, threats, and pressure by

2  police officers); *U.S. v. Tingle*, 658 F.2d 1332, 1334 (9th Cir. 1981) (reversing

3  conviction on basis that Defendant's confession was obtained by FBI agent who told

4  her she would "not see her [two-year-old child] for a while" if she did not

5  cooperate).

6        The testimony of the North Korean diplomats presents unique and

7  unprecedented evidentiary challenges regarding reliability. As set forth in the

8  Collins report, North Korean diplomats are in a constant state of duress and would

9  never be able to admit that they were trying to defect without putting their lives and

10  the lives of their families at risk. North Korean diplomats "face the distrust and

11  security pressures that their North Korean counterparts face every hour of every

12  day." (Lee Decl. Exh. B. at 11). In the aftermath of the Madrid Incident, these

13  pressures would have been at their Zenith. Mr. Collins assesses that the incident

14  would have been reported to the regime through both MOFA and MSS channels.

15  (*Id.* at 10). Once informed, KWP OGD would have immediately formulated a plan

16  to arrest the family members and confiscate the assets of any diplomats at the

17  embassy. (*Id.*). Mr. Collins also assesses that KWP OGD would have directed the

18  diplomats regarding their testimony to Spanish authorities, with any deviation

19  punishable by violence against their families. (*Id.*). With regards to Mr. So's

20  presence as a "translator" during each of the witness interviews, Mr. Collins

21  concludes that this was likely intended to provide "assurance that the [interviewee]

22  complies with KWP directives" and to allow Mr. So to compile a detailed report on

23  the interview for KWP OGD. (*Id.*). Ultimately, Mr. Collins concludes based on his

24  review of the witness statements that "the testimony of all North Korean witnesses

25  who spoke to the Spanish authorities was likely involuntary." (*Id.* at 11.)

26        Voluntary, competent testimony is simply not possible in these circumstances.

27  *See Han Kim*, 774 F.3d at 1048 (acknowledging that North Korea "is known to

28  intimidate defectors and potential witnesses[,]" and that North Korean witnesses

3678696.2

27

feared the regime to the extent that they would offer testimony to foreign authorities only "sparingly and anonymously," if at all.) Each of the North Korean diplomats lived in a compound under constant observation by both their direct superior **and** an agent of a Gestapo-like secret police.[9] By the time they sat for interviews several months after the Madrid Incident, the regime would have been ready to round up their family members as hostages and seize their assets at a moment's notice. Mr. So accompanied each of them, not only keeping a watchful eye on their testimony but also translating it from Korean to English – literally putting words in their mouth on behalf of the regime. The witnesses had no choice but to disclaim any coordination with Free Joseon—admitting as much would have effectively signed their death sentence.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ Defection is the worst possible form of disloyalty in the eyes of the regime, and their sensitivity has been heightened in recent years due to a string of high-profile diplomatic defections. (Lee Decl. Exh. A at 8-9). ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████

---

[9]   Indeed, any of the North Koreans interviewed by the Spanish authorities may potentially have been an embedded MSS officer, including the three "students."

In its briefing, the Government does not even attempt to address the competency issue, instead misrepresenting it as a determination of "credibility" that falls outside the scope of an extradition hearing. (Dkt. No. 113 at 25:1-22). The Government has offered no explanation for Mr. So's presence at each of the witness interviews, nor any explanation for how any of these witnesses would be able to testify freely and truthfully that they had asked for Free Joseon's help without risking being killed by the North Korean regime. The Government's only support for the competence of the North Korean testimony is a conclusory statement by the presiding judge in Spain which asserts that the North Korean testimony was "objectively assessed" and found to be credible. (Dkt. No. 113 at 25:11-22). It is difficult to understand how Spain would be able to make any assessment at all about competence given that they have only the "translation" of a self-interested party who was acting as the agent of a coercive state security apparatus.

The Government has failed its burden to "show by a preponderance of the evidence that the statements of [the witnesses] were not obtained by coercion." *Santos*, 228 F.Supp.3d at 1037. It is evident from the totality of the circumstances that the testimony of the North Korean witnesses could not have been voluntary. The testimony must be excluded from the Court's consideration.

### B.     Mr. Ahn Should Not Be Extradited Because Spain Fails To Satisfy Dual Criminality.

Article II of the Treaty contains a requirement of dual criminality. (Dkt. 55-1 at 10) ("an offense shall be an extraditable offense if it is punishable under the laws in both Contracting Parties by depravation of liberty for a period of more than one year or by a more severe penalty.") Dual criminality requirements in extradition treaties are satisfied "only if the alleged criminal conduct is considered criminal under the laws of both the surrendering and requesting nations." *Clarey v. Gregg*, 138 F.3d 764, 765 (9th Cir. 1998) (analyzing dual criminality provision in extradition treaty with Mexico). In practice, this requires two separate findings by

the extradition court: (1) that the alleged acts would be crimes under U.S. law; and (2) that those crimes are "substantially analogous" to the crimes listed by the requesting nation. *Tang Yee-Chun v. Immundi*, 686 F.Supp. 1004, 1010 (S.D.N.Y. 1987); *see also Clarey,* 138 F.3d at 765 ("when the laws of both the requesting and the requested party appear to be directed at the same basic evil . . . the statutes are substantially analogous, and can form the basis of dual criminality.")

When intent is an essential element of the applicable domestic crime, an extradition court must consider evidence regarding the relator's intent as part of its dual criminality analysis. *Manta v. Chertoff*, 518 F.3d 1134, 1142 (9th Cir. 2008) (discussing domestic fraud statute's requirement of "specific intent to defraud.") If the evidence indicates that had the alleged conduct occurred, it would not be criminal under U.S. law due to lack of intent, the dual criminality requirement is not satisfied.

### 1.    The Dual Criminality Requirement Is Not Satisfied Because Mr. Ahn Believed His Actions Were Consensual

As discussed *supra*, the Madrid Incident was not a violent raid, but a staged kidnapping that Mr. Ahn believed was being carried out at the request of those in the embassy. (Ahn Decl. ¶ 8-9). Mr. Ahn's belief was consistent with the nature of his previous work assisting Mr. Hong with defections, all of which had involved voluntary participants who had asked for help. (*Id.* at 6). Given that the news had just confirmed North Korea's brazen kidnapping of the former North Korean ambassador's daughter ***while she was in Italy***, it was not hard to imagine that North Korean officials in nearby Spain would want to go to great lengths to protect their families from similar retaliation.

Mr. Ahn's honest belief that Mr. So and others had consented to the staged kidnapping negates the *mens rea* for the substantive U.S. crimes which would apply to the alleged conduct. *See, e.g., People v. Mayberry*, 15 Cal.3d 143, 156 (Cal. 1975) (conviction for kidnapping unavailable if defendant "entertains a reasonable

and bona fide belief that [the victim] voluntarily consented to accompany him"); *U.S. v. Martinez-Hernandez*, 932 F.3d 1198, 1207 (9th Cir. 2019) (conviction for robbery requires "exercise of control over property ***without consent*** with the criminal intent to deprive the owner of the rights and benefits of ownership); *People v. Rivera*, 157 Cal. App. 3d 736, 742-43 (Cal. App. 1984) (reasonable belief that physical contact was consensual, even if mistake of fact, "negate[s] the element of intent" for assault); *People v. Yoder*, 100 Cal. App. 3d 333, 336 (Cal. App. 1979) (with regards to burglary, "in the absence of the required specific intent [to engage in illegal conduct] the crime is not committed"); *Ocasio v. U.S. v. Wallace*, 136 S. Ct. 1423, 1429 (2016) (formation of criminal conspiracy requires "specific intent that the underlying crime be committed by some member of the conspiracy") (internal quotations omitted).[10] Without being able to establish the requisite criminal intent under U.S. law, the Government cannot satisfy dual criminality.

---

[10] In Appendix B to their Extradition Memorandum, the Government lists various federal statutes that specifically pertain to offenses against foreign officials. (Dkt. No. 113-2 at 2-4). These statutes should play no part in the Court's dual criminality analysis for two separate reasons: (1) Spain has not alleged any crimes that pertain exclusively to foreign officials; (2) North Korea has no diplomatic relations with the United States, and therefore their representatives – if located in the United States – would enjoy no official status. *See* 18 U.S.C. § 1116(b)(3)(B) (defining "foreign official" as "any person of a foreign nationality who is ***duly notified to the United States*** as an officer or employee of a foreign government . . . ***who is in the United States on official business.***") (emphasis added); *see also* 18 U.S.C. §§ 112(c), 1201(a)(4), 970(c) (defining "foreign official" in accordance with 18 U.S.C. § 1116(b)(3)). The other federal statutes listed are similarly inapplicable. *See* 18 U.S.C. §§ 113, 956, 2111 (the North Korean embassy in Spain is not part of United States special maritime and territorial jurisdiction); 18 U.S.C. § 960 (North Korea is not a friendly nation.)

2.      **The Dual Criminality Requirement Is Also Not Satisfied Due to Mr. Ahn's Honest Belief that He Was Acting Under the Direction of the United States Government.**

Courts have recognized that an individual's honest belief that they are acting under the direction of a government authority may "[negate] the mens rea for the crime[.]" *U.S. v. Burrows*, 36 F.3d 875, 881 (9th Cir. 1994); *see also U.S. v. Smith*, 831 F.3d 1207, 1220 (9th Cir. 2016) (acknowledging that a defendant lacks criminal intent when they act in reliance on "orders from superior officers whom they reasonably believed had authority to issue the orders."); *U.S. v. Juan*, 776 F.2d 256, 258 (11th Cir. 1985) (vacating conditional guilty plea on the basis that defendant had not been allowed to present evidence that "he had engaged in a relationship with government agencies the nature of which were such that his belief, [that he was cooperating with the U.S. Government] at the time of the charged crime, was reasonable and genuine.")

Here, Mr. Ahn had reason to believe that the Madrid Incident was carried out with the authorization of ███████████████████████████████ ████████████████████████████ Moreover, Mr. Ahn also had reason to believe that the ***United States*** Government worked in coordination with Mr. Hong on major North Korean defection missions. This belief was based on Mr. Ahn's previous interactions with Government officials while accompanying Mr. Hong, and the intervention of the CIA in a prior defection. (*Id.* at ¶ 7). Mr. Ahn is an ordinary American citizen who is not intimately familiar with the intricacies of international politics. Having seen government officials speaking to Mr. Hong with approval, and CIA agents suddenly appearing in a foreign country to assist with a sensitive defection, Mr. Ahn formed a genuine belief that Mr. Hong was acting with the authority of the Government, and that any work he did with Mr. Hong was therefore on behalf of the United States. For purposes of dual criminality, it is irrelevant whether the U.S. Government has the actual authority to ratify facially criminal

conduct in a foreign jurisdiction: for extradition, Mr. Ahn's conduct must be criminal in **both jurisdictions**, *Clarey*, 138 F.3d at 765, and the Government would unquestionably have the authority to ratify identical conduct on American soil.

### C.      The Court Must Deny Extradition Because Spain Has Failed To Establish Probable Cause.

"Certification of extradition is lawful only when the requesting nation has demonstrated probable cause to believe the accused person is guilty of committing the charged crimes." *Barapind*, 400 F.3d at 747. Under federal law, probable cause is a flexible standard:

> Articulating precisely what "reasonable suspicion" and "probable cause" mean is not possible. They are commonsense, nontechnical conceptions that deal with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. As such, the standards are not readily, or even usefully, reduced to a neat set of legal rules … They are instead fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed.

*Ornelas v. U.S.*, 517 U.S. 690, 695-96 (1996) (quotations and citations omitted). A determination of probable cause, therefore, requires a flexible, case-specific approach that is "accordingly correlative to what must be proved." *Brinegar v. U.S.*, 338 U.S. 160, 175 (1949).

### 1.      Spain Cannot Establish Probable Cause That Mr. Ahn Committed Any Charged Offense

There is no competent evidence tying Mr. Ahn to any criminal act apart from his mere presence at the embassy that day. Mere presence in proximity to "others individually suspected of criminal activity does not, without more, give rise to probable cause." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979); *see also U.S. v. Soyland*, 3 F.3d 1312, 1314 (9th Cir.1993) (mere presence in vehicle containing drugs does not support probable cause for drug possession); *Reis v. U.S. Marshal*, 192 F.Supp. 79, 82 (E.D. Pa. 1961) ("Probable cause means more than the opportunity to commit crime or presence in a particular place. It must be more than surmise or suspicion").

Mr. Ahn is photographed calmly entering the embassy with nothing but sunglasses in his hands. There is no Spanish witness or documentary evidence suggesting that Mr. Ahn restrained, harmed, or threatened anyone. There is no evidence of his extensive planning or organizing with others—in fact, just the opposite. The undisputed evidence shows that while *others* went to shop for weapons and *others* had been in Madrid for several days or weeks, Mr. Ahn flew in just that morning.

The only witness – North Korean or otherwise – who identifies Mr. Ahn as having engaged in any misconduct is Mr. So, who claims that Mr. Ahn, who had a broken hand, participated in hitting him. (Dkt. No. 55-3 at 20). As argued above, Mr. So's testimony is not competent and must be disregarded.[11]

Spain attempts to overcome the lack of evidence connecting Mr. Ahn directly to any of the alleged crimes by suggesting he may still be liable under a vicarious liability theory. (Dkt No. 55-3 at 91). Under Spanish law, an individual can be held vicariously liable as a principal if he "directly induce[d] another or others to commit a crime" or "cooperate[d] in the commission thereof by an act without which a crime could not have been committed." (*Id.*). But Spain offers no evidence whatsoever of inducement or "but-for" conduct by Mr. Ahn that would support probable cause. Nothing about the evidence suggests that Mr. Ahn contributed to alleged criminal activity in any way other than being physically present at the embassy.

### a.    Criminal Organization

In addition to the lack of direct evidence, an examination of the criminal

---

[11]   Mr. Ahn's medical records further demonstrate that Mr. So's account is impossible, given that Mr. Ahn sought treatment for his fractured hand before and after he was in Madrid, and the X-rays showed continued *healing*. (Dkt. No. 33, Sealed Exhibit 1 at 7-8). Nonetheless, even if the Court were to take Mr. So's testimony into account, the Court can still find, based on explanatory evidence, that Mr. Ahn lacked the requisite *mens rea* because he had a good faith belief that Mr. So had consented to such conduct.

statutes listed in the extradition requests reveals several other reasons why Spain fails to establish probable cause. Article 570 bis of the Spanish Penal Code states that an individual is guilty of criminal organization when they "promote, constitute, organise, coordinate or oversee a criminal organization." (Dkt No. 55-3 at 90). The statute also defines a criminal organization as "a group formed of more than two people that is stable in nature and operates for an ***indefinite period***, which, in an arranged and coordinated manner, assigns various tasks or functions with the ***aim of committing crimes***." (*Id.*) (emphasis added).

There is no evidence indicating that Free Joseon is a criminal organization, certainly not one created "with the aim of committing crimes" that "operates for an indefinite period." Nor is there sufficient evidence that Mr. Ahn is a "member" of Free Joseon as defined in the statute. Mr. Ahn does not dispute that he has in the past taken on volunteer tasks on behalf of Mr. Hong in order to help North Korean defectors. It is Spain's burden, however, to prove that his role rose to the level of "promoting, constituting, organizing, coordinating, or overseeing." (Dkt No. 55-3 at 90). If anything, the evidence indicates that Mr. Ahn's role in the group was minor at best, given that he arrived on the morning of the incident and was not told details of the plan prior to his arrival. (Ahn Decl. ¶ 8).

### b.     Breaking and Entering

Article 202 of the Spanish Penal Code states that an individual is guilty of breaking and entering when they "enter into the dwelling of another or remain there against the will of the resident[.]" (Dkt. No. 55-3 at 89). ███████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████—or at the very least, Mr. Ahn believed that to be case. (Ahn Decl. at ¶ 8). Surveillance footage clearly shows Mr. Hong being invited into the embassy by a North Korean official. (Dkt. No. 118-1 at 138). As Mr. So himself corroborates, Free Joseon departed the embassy voluntarily

1    when he made it clear that he no longer intended to defect and asked them to leave.

2    (Ahn Decl. at ¶ 15-16; Dkt. No. 55-3 at 17-18). Based on the competent evidence

3    available to the Court, there is no probable cause to believe that Mr. Ahn or anyone

4    else had entered into or were remaining in the embassy against the will of ███████

5    ████████████████

6                           **c.**      **Threats**

7         Article 169 of the Spanish Penal Code states that an individual is guilty of

8    threats when he "threaten[s] others with causing them, their family, or other persons

9    with whom they are intimately related detriment entailing homicide, injuries,

10    abortion, offences against liberty, torture and offences against moral integrity,

11    sexual freedom, privacy, honour, property, and the social-economic order[.]" (Dkt.

12    No. 55-3 at 88). Spain's evidence for threats is derived entirely from the testimony

13    of North Korean witnesses. (Dkt No. 113 at 33:11-22). Without this testimony, all

14    that remains is the photographs of fake guns left behind after Free Joseon and Mr.

15    Ahn had departed the embassy. (Dkt No. 55-3 at 72, 74). Absent more, the mere

16    existence of these objects is insufficient to support probable cause that Mr. Ahn – or

17    anyone inside the embassy – made any kind of threat against the North Korean

18    officials. *See Soyland*, 3 F.3d at 1314.

19                          **d.**      **Causing Injuries**

20         Article 147 of the Spanish Criminal Code states that an individual is guilty of

21    causing injuries when he "by any means or procedure, cause[s] another individual

22    an injury that impairs his or her bodily, physical or mental integrity[.]" (Dkt. No. 55-

23    3 at 87). Causing injury is punishable by imprisonment of six months to three years

24    only when "the injury, to objectively heal, in addition to first aid, requires medical

25    treatment and/or surgery." (*Id.*). "The simple vigilance or medical monitoring of the

26    progress of the injury shall not be considered medical treatment." (*Id.*). Causing an

27    injury for which no "medical treatment" is required is a separate offense, punishable

28    by one to three months imprisonment only. (*Id.*).

The record indicates that only two individuals suffered injuries that are corroborated by evidence other than the testimony of North Korean witnesses. The first is Ms. Choi, who jumped out of a second-floor window. Her resulting injuries are corroborated by medical records (Dkt. No. 118-1, Sealed Annex 1:1-13) and the testimony of several Spanish witnesses (*Id.* at 18-19, 48, 65). As an initial matter, there is no corresponding crime in the United States for indirectly "causing" injury as a standalone crime without some sort of criminal intent. Setting that aside, there is no indication that Mr. Ahn, who believed those in the embassy had asked the group to stage a kidnapping, could have reasonably foreseen that someone would jump out of a two-story window upon their arrival. Spain cannot establish probable cause that Ms. Choi's injuries were caused by Mr. Ahn.

The second is Mr. So, who claims that he was physically assaulted by Free Joseon and Mr. Ahn. While Mr. So's injury is corroborated by medical records, these records obliterate probable cause rather than bolster it. Mr. So's hospital discharge report, written on February 25, 2019 (three days after the Madrid Incident) does not indicate that he received any treatment other than testing at the hospital, and does not recommend any further treatment other than prescription drugs and periodic follow-up by doctors. (Dkt. No. 118-1, Sealed Annex 2). A separate examination report compiled on March 15, 2019 states that Mr. So suffered only "basic injury" with "[n]o aesthetic damage" which would "heal and/or stabilise" within ten days. (*Id.*). These records are clear evidence that Mr. So suffered only minor injuries that did not require "medical treatment and/or surgery" as defined in Article 147 of the Spanish Criminal Code. Thus, even if probable cause exists for Mr. Ahn or anyone else causing injury to Mr. So, the applicable crime in Spain would carry a maximum sentence of three months; falling far short of the Treaty's requirement that extraditable offenses be punishable "by deprivation of liberty for a period of more than one year." (Dkt. 55-1 at 10).

### e.   Illegal Restraint

Article 163 of the Spanish Criminal Code states that an individual is guilty of illegal restraint when he "lock[s] up or detains others, depriving them of their freedom[.]" (Dkt. No. 55-3 at 88). There is no evidence that Mr. Ahn personally restrained anyone within the North Korean embassy against their will, or that he knowingly aided and abetted anyone else within the group that did. Moreover, to the extent that any of the North Korean witnesses were restrained, Mr. Ahn's testimony is explanatory evidence that casts serious doubts on probable cause, (Ahn Decl. ¶ 12), because he had a genuine believe that those witnesses consented to be restrained as part of a staged kidnapping.

### f.  Robbery

Article 237 of the Spanish Criminal Code states that an individual is guilty of Robbery when he "seize[s] the moveable property of another person, using force in order to gain access or to leave the place where this is located, or violence or intimidation towards individuals[.]" (Dkt. No. 55-3 at 89). There is no evidence that Mr. Ahn took any property, and certainly no evidence that he did so using force, violence, or intimidation. This is not sufficient to support probable cause.

### D.  The Court Should Acknowledge A Humanitarian Exception To Extradition Given The Unprecedented Nature Of This Case.

Under the "rule of non-inquiry," federal courts generally refrain from inquiring into the justice system of the requesting nations, reserving any humanitarian issues implicated by extradition for the Secretary of State. *Prasoprat v. Benov*, 421 F.3d 1009, 1016 (9th Cir. 2005) Courts have acknowledged, however, that an exception to the rule may exist when extradition would expose an individual to "procedures or punishment … antipathetic to a federal court's sense of decency[.]" *Gallina v. Fraser*, 278 F.2d 77, 79 (2nd Cir. 1960)*; see also Mainero v. Gregg*, 164 F.3d 1199, 1210 (9th Cir. 1999) (assuming existence of humanitarian exception but declining invoke based on facts of case); *Lopez-Smith v. Hood*, 121 F.3d 1322, 1326–27 (9th Cir.1997) (same); *Arnbjornsdottir–Mendler v. U.S.,* 721

F.2d 679, 683 (9th Cir. 1983) (same). In *Emami v. U.S. Dist. Court. for Northern Dist. of California,* 834 F.2d 1444, 1452 (9th Cir. 1989), the Ninth Circuit "[left] open the possibility that the considerations expressed in [*Gallina*] might someday cause us to develop a humanitarian exception in a case where the facts warranted it."

The facts warrant it here, as this is a unique case where the Court may adopt a humanitarian exception without violating the rule of non-inquiry. Previously, where the Ninth Circuit has declined to adopt the exception, the relator's argument was invariably centered on purported deficiencies the requesting nation's justice system. *See, e.g., Prasoprat*, 421 F.3d at 1013 (existence of death penalty in Thailand); *Mainero*, 164 F.3d at 1210 (possibility of interrogation by torture in Mexico); *Arnbjornsdottir–Mendler*, 721 F.2d at 683 (possibility of solitary confinement in Iceland); *Emami*, 834 F.2d 1453 (speculation that length of investigation in Germany may have adverse effect on relator's health); *Lopez-Smith*, 121 F.3d at 1327 (extortion by Mexican authorities).

Consideration of these issues are inherently inappropriate under the rule of non-inquiry. As demonstrated by the earliest Supreme Court cases articulating the rule, its roots lie on the assumption that the Executive would not have entered into – and Congress would not have ratified – an extradition treaty with any nation whose justice system was plainly inadequate. *Glucksman v. Henkel*, 221 U.S. 508, 512 (1911) ("We are bound by the existence of an extradition treaty to assume the trial will be fair"); *Neely v. Henkel*, 180 U.S. 109, 123 (1901) ("in the judgment of Congress these provisions were deemed adequate to the ends of justice"); *see also Ahmad v. Wigen,* 726 F.Supp. 389, 411 (E.D.N.Y. 1989) ("Congress and the executive branch do not enter into extradition treaties with countries in whose criminal justice system they lack confidence."), *aff'd,* 910 F.2d 1063 (2nd Cir. 1990). Ignoring the rule of non-inquiry, therefore, would lead a Court to go against the clearly expressed will of both the Executive and Legislative branches and conduct an independent determination on the adequacy of the requesting nation's

justice system. *C.f. U.S. v. Smyth*, 61 F.3d 711, 714 (9th Cir.1995) ("[C]ourts are ill-equipped as institutions and ill-advised as a matter of separation of powers and foreign relations policy to make inquiries into and pronouncements about the workings of foreign countries' justice systems.")

These concerns are absent in this case because the humanitarian issues have nothing to do with Spain: rather, they pertain to the undisputed, credible threats against Mr. Ahn's life by the North Korean regime. Regardless of how fair the Spanish justice system may be, North Korea has not hesitated to violate the laws of foreign nations to kidnap and murder their targets without due process. *See Han Kim*, 774 F.3d at 1051 (court has "no trouble concluding" North Korea had killed a reverend known to assist with defections "outside the formal legal process"). The danger against Mr. Ahn in particular is acute due to press reports of his participation in the rescue of Kim Han Sol, the nephew of North Korean dictator Kim Jong Un and considered the greatest living threat to Kim Jong Un's legitimacy.[12] This association distinguishes Mr. Ahn from the average political dissident.

Here, extradition is not simply a matter of moving from one geographic location to another but of sending a known target for North Korea assassination to a country where North Korea has far greater access. The heightened danger to Mr. Ahn should he be sent to Spain is undisputed: ████████████████████ ████████████████████████████████ ████████████████████████ There can be no question that North Korea, which is known to have ties to crime rings, will have no trouble finding a way to act upon their threats should Mr. Ahn be extradited to Europe—as was confirmed by the 2018 North Korean kidnapping of a defector's daughter ***in***

---

[12]   Kim Han-sol escaped with help of anti-North Korea group, *Korea Times*, published May 29, 2019, *available at* www.koreatimes.co.kr/www/nation/2019/05/356_269710.html

*Italy*. The risk to Mr. Ahn's life from extradition is real—and it has nothing to do with the Spanish criminal justice system. As a result, the fact that the Executive has entered into – and Congress ratified – an extradition treaty with Spain is of no import here: applying the humanitarian exception merely acknowledges the unique threat to Mr. Ahn's life posed by North Korea, and does not require the Court to disturb the determination of co-equal branches.

Free Joseon – and especially Mr. Ahn – have become enemies of the North Korean regime by offering hope and opportunity to those who dare speak out against this totalitarian dictatorship and its unparalleled repression. For a regime built almost entirely on fear, it is imperative that Mr. Ahn and others like him are hunted down, jailed, and – where possible – assassinated in order to suppress future defection and dissent. While the Court must normally exercise deference to other branches of government when application of a humanitarian exception would force them to pass judgment on a foreign justice system, that is not the case here. Therefore, the Court should invoke the humanitarian exception to extradition for Mr. Ahn, lest it "blind [itself] to the foreseeable and probable results of the exercise of [its] jurisdiction." *Ahmad*, 726 F.Supp. at 410; *see also Barr v. U.S.*, 819 F.2d 25, 28 n. 2 (2nd Cir. 1987) ("regardless of the degree of American government involvement in the conduct of a foreign sovereign, the federal courts will not allow themselves to be placed in the position of putting their imprimatur on unconscionable conduct.").

## VII.   CONCLUSION

The law offers the Government a relatively streamlined procedure for extradition not because the Due Process rights of individuals in these cases are unimportant, but because they must be balanced against the possibility that failure to extradite pursuant to a valid treaty may damage the international standing of the United States. *See U.S. v. Taitz*, 130 F.R.D. 442, 444 (S.D. Cal. 1999) ("the resulting diplomatic embarrassment would have an effect on foreign relations and the ability

1    of the United States to obtain extradition of its fugitives.") But that accommodation

2    has its limits – limits which are far exceeded here. If this extradition is allowed to

3    proceed, and the United States delivers one of its own citizens to the clutches of a

4    totalitarian dictator on the basis of plain falsehoods, the damage to its international

5    standing will dwarf the potential embarrassment of a failed extradition. Spain's

6    request to extradite Mr. Ahn on North Korea's behalf should be denied.

7

8    DATED:  February 22, 2021      Ekwan E. Rhow

9                                    Naeun Rim

                                    Christopher J. Lee

10                             Bird, Marella, Boxer, Wolpert, Nessim,

11                             Drooks, Lincenberg & Rhow, P.C.

12

13                 By:

14                                  Naeun Rim

15                           Attorneys for Relator Christopher Philip

                          Ahn

16

17

18

19

20

21

22

23

24

25

26

27

28