Ekwan E. Rhow - State Bar No. 174604
  erhow@birdmarella.com
Naeun Rim - State Bar No. 263558
  nrim@birdmarella.com
Christopher Jumin Lee - State Bar No. 322140
  clee@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Relator
Christopher Philip Ahn

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff <br><br> v. <br><br> CHRISTOPHER PHILIP AHN, <br><br> Relator | CASE NO. 2:19-cv-5397-FLA (JPR) <br><br> **DECLARATION OF CHRISTOPHER JUMIN LEE IN SUPPORT OF RELATOR'S OPPOSITION TO EXTRADITION FILED BY THE UNITED STATES** <br><br> [Filed concurrently with Relator's Opposition To Extradition Filed By The United States; Declaration of Christopher Philip Ahn; Declaration of Naeun Rim] <br><br> Date:    April 9, 2021 <br> Time:    10:00 a.m. <br> Crtrm.:  690 <br><br> Assigned to Hon. Jean Rosenbluth, U.S. Magistrate Judge |

3702629.1

I, Christopher Jumin Lee, declare as follows:

1. I am an active member of the Bar of the State of California and an associate with Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, A Professional Corporation, attorneys of record for Defendant Christopher Philip Ahn in this action. I make this declaration in support of Mr. Ahn's Opposition To The Request For Extradition Filed By The United States (the "Opposition"). Except for those matters stated on information and belief, I make this declaration based upon personal knowledge and, if called upon to do so, I could and would so testify.

2. Attached to the Opposition as **Exhibit A** is a true and accurate copy of the Report of Robert M. Collins, an expert on North Korean politics and society, regarding this matter.

3. Attached to the Opposition as **Exhibit B** are true and accurate copies of letters written by Mr. Ahn's family and friends in support of his Application for Reconsideration of Bail (Dkt. No. 33).

4. Attached to the Opposition as **Exhibit C** is a true and accurate copy of the United Nations' Report of the Commission of Inquiry on Human Rights in the Democratic People's Republic of Korea, A/HRC/25/63. This document is also available online at:

https://www.ohchr.org/EN/HRBodies/HRC/CoIDPRK/Pages/ReportoftheCommissionofInquiryDPRK.aspx.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I executed this declaration on February 22, 2021 at Los Angeles, California.

Christopher Jumin Lee

# EXHIBIT A

## Report on Christopher Ahn Extradition Matter by Robert Collins

## Section One: Introductory Summary

This report is intended to provide context regarding the North Korean diplomats serving at their embassy in Spain, and their actions in the wake of the incident at that embassy on February 22, 2019. To that end, this report explains the oppressive circumstances under which North Korean diplomats are recruited, trained and employed in a socio-political system that is based in all-encompassing distrust, oppressive security policies and practices, and personal threats to all North Koreans, but especially any North Korean working in an overseas billet, and applies those circumstances to the events following the incident at the Spanish embassy. In order to familiarize myself with those events, I was provided with and reviewed documents containing the testimony of the North Korean witnesses submitted by the Spanish government in support of extradition. Based on my expertise and the information provided to me, I conclude that the testimony of all North Korean witnesses who spoke to the Spanish authorities was likely involuntary and delivered under duress by the North Korean regime.

## Section Two: Expert Qualifications

The information provided is based in the author's 50 years of research, report writing, and personal interviews of high-level North Korean defectors. Such experience resulted in hundreds of military classified reports and open source publications addressing human rights of North Koreans. A biography detailing the author's experience has been attached to this report.

## Section Three: Background

It is important to understand that North Korean society is a socio-political class-based system. This system is referred to as "songbun" which means "materials" – in other words, what one is made of politically and, consequently, socially. Accompanying the Soviet Union's 25th Army, communist Korean revolutionaries brought the songbun concept to northern Korea above the 38th parallel immediately after the fall of the Japanese occupation of Korea at the end of World War II.  All families in North Korea

1

were sociologically classified at that point, meaning that what one's grandfather did on August 15, 1945 literally determined one's family's fate. (That is not an exaggeration.) All families that were religious, capitalists, land owners, or those that cooperated with the Japanese occupiers were imprisoned, executed or exiled to isolated mountainous terrain in northeast North Korea. (Millions escaped to South Korea during the Korean War.) Essentially, those that were on the bottom of northern Korea's social ring went to the top, and those at the top went to the bottom.

During the 1950's and 1960's, the ruling Korean Workers' Party (KWP) refined the sociological classification process. Eventually the system established three classes of North Korean residents. At the top of society is the core class which consists of those that were deemed loyal to the supreme leader (Kim Il-sung, then Kim Jong-il, and now Kim Jong-un) and the ruling Korean Workers' Party (KWP). In North Korea's socialist system, the "core class" is judged the most loyal and receives the best in housing, food, healthcare, education and opportunity. The middle "wavering class" consists of those whose loyalty is questionable and needed to be proven on a daily basis. It was and is the largest class in population numbers. Those in this class received average to below average housing, food, healthcare, education and opportunity.  At the bottom of the socio-political system is the "hostile class" which consists of those families' whose past history[1] demonstrated little to no loyalty to the supreme leader and KWP.  The hostile class receives the most sub-standard housing, food, healthcare, education and opportunity. Criminal activity or proof of disloyalty can cause reclassification of an entire family from higher classifications downward.

These three classes were broken down into 51 sub-categories in the late 1960s. That number has varied since. The KWP determines the sub-categories and North Korea's national police investigate every person upon graduation from high school and the local KWP committee leaders determine one's category. Security agencies conduct

---

[1] i.e., those whose families were descended from backgrounds of religious, capitalist, land owners, or those that cooperated with the Japanese occupiers.

2

investigations based on class and KWP-supervised courts employ conviction and sentencing actions based on class.[2]

North Korea's elite are from highest of the core class. The elite are comprised of those families that fought alongside Kim Il-sung in the 1930's and early 1940's against the Japanese occupation of Korea and those that fought against South Korea and the United Nations Command forces during the Korean War. The vast majority of the elite live in the capital of Pyongyang where the best of everything – by North Korean standards – is obtainable. *Nearly all North Korean diplomats are recruited from the elite class. A few are from the core class.*

The elite of North Korea dominate all of the major positions in the KWP and the state government, not to mention senior officers in the military[3] and security services. Since hereditary links are important within the Kim regime, the children of the elite get the best of everything the party has to offer.

To be politically and professionally successful within North Korea's Kim regime, one must live through and publicly support the daily propaganda of the KWP, not to mention the party's policies and practices. By the time an individual succeeds in reaching a position of influence within the regime, regardless of the institution or profession, one's lifestyle is totally dependent on loyalty to the supreme leader and the party. This focus on "loyalty first" provides a road to success for the elite. Demand for such loyalty is a key component to the Kim Regime's ruling strategy and is a key to holding the regime together in the face of any crisis.  Personal success within North Korea's Kim Regime is directly tied to regime priorities of such loyalty, Kim Jong-un's personal security, complete obedience to his guidance, and superiority of the KWP over all sectors of society.

### Section Four: North Korean Diplomat Selection and Training

Every North Korean diplomat comes from the most loyal of families based on political lineage and professional performance within loyalty guidelines. During their

---

[2] For a detailed explanation of songbun, see Robert Collins, "Marked for Life: Songbun, North Korea's Social Classification System," *Committee for Human Rights in North Korea*, 2012. URL: https://www.hrnk.org/uploads/pdfs/HRNK_Songbun_Web.pdf.

[3] One must be a party member to be an officer in the military.

3

upbringing, each diplomat attended the best schools and universities in Pyongyang. He/she is then selected for service in the Ministry of Foreign Affairs (MOFA) based on family background, party loyalty, and academic achievement – in that order. Indoctrination on loyalty is *THE* major component of training during their entire career. Once accepted into the MOFA and having undergone diplomatic, political, security, and language training, the diplomat serves at a low-grade position at MOFA. He/she is then sent as a third secretary to a regional embassy where one's skill set best fits the region and the diplomatic objectives of the Kim regime and the KWP. Assignments overseas and at home alternate thereafter, as it is for any diplomat.

Furthermore, any North Korean destined for an assignment overseas undergoes the most strenuous of background investigations, regardless of socio-political class. These investigations are conducted by the Ministry of State Security[4] (MSS) primarily and supported by the Ministry of Social Security – the national police. The focus of such investigations is loyalty to the supreme leader and the KWP.

### Section Five: Controls over North Korean diplomats

The primary responsibility for North Korean diplomats overseas is loyalty to the supreme leader and the secondary responsibility is to raise funds for the supreme leader.[5] The system that ensures these dynamics is the control and command[6] strategy that is conducted through embedded KWP committees and party cells at every level of MOFA, both overseas and domestically.

When a diplomat is initially deployed overseas, his / her family immediately becomes hostage in the sense that a political mistake or treason against the regime is cause for arrest of family/relatives and imprisonment or worse. This system of family guilt is referred to as guilt-by-association (연좌제 - *yonjwaje*). This system was initiated by Kim Il-sung on the grounds that punishing the individual for a political or unlawful

---

[4] The MSS is somewhat analogous to the U.S. FBI, the Ministry of State Security operates much more like Nazi Germany's Gestapo with complete loyalty to the regime and not the law.
[5] Yoshihiro Makino, "For N. Koreans serving abroad, diplomacy is about surviving," Asahi Shinbum, September 9, 2016. URL: http://www.asahi.com/ajw/articles/AJ201609090009.html.
[6] The Kim regime's focus on control demands an appropriate description of "control and command" rather than the standard international term of "command and control."

4

misdeed would eventually result in the family seeking revenge. Consequently, the parents and the children of the perpetrator are deemed as guilty as the perpetrator and suffer similar fates.

North Korean diplomats are well aware of this from notification of assignment overseas to return from overseas duty to North Korea. Once the diplomat deploys, the diplomat understands exactly the consequences of actions that are not based in loyalty to the supreme leader and the KWP. Even if the diplomat is not married, the diplomat must fear for the well-being of his/her parents and siblings. Experiencing several diplomatic assignments successfully (in the eyes of the KWP), certain diplomats are then permitted to bring their family with them to the overseas assignment. One especially important judgment point is success in earning currency for the regime. Selling drugs and pushing weapons proliferation are two key initiatives. Diplomatic pouches are frequently used to smuggle in contraband for sale in the country of assignment.

Every member of the MOFA is monitored for loyalty by the KWP committee embedded in MOFA. Every embassy maintains a party cell where membership is mandatory for every member of the embassy staff. Each of those party cells reports directly to the MOFA's embedded KWP committee. The MOFA's KWP committee is controlled by the KWP Organization and Guidance Department (OGD). The OGD controls every one of the 3.2 million party members nationwide. Within the OGD is the Party Life Guidance Section that maintains an action officer responsible monitoring the loyalty and effectiveness of some agency, association, or regional party committee.[7] There are no exceptions. Consequently, there is a direct line of loyalty that is monitored from individual North Korean to the supreme leader. For a diplomat, that line begins with the diplomat to the North Korean ambassador (and the embassy security officer) to the organization secretary at MOFA's KWP Committee to the OGD Party Life Guidance Section action officer for MOFA to the Party Life Guidance Section director to the OGD director to the supreme leader. Directives follow the same path down to the diplomat.

---

[7] See Robert Collins, "

An important component of reporting through this chain is the "*saenghwal chonghwa*" (*생활총화* - lifestyle self-critique). From the middle of grade school [8] until one dies, every North Korean (no exceptions up through the most senior personnel) must undergo a weekly self-critique where one critiques oneself on how he/she failed to conduct themselves to the utmost loyalty to the supreme leader and the party, as well as observance of Kim Il-sung and Kim Jong-il directives. The focus is on failure, not success. At an embassy session held typically on a Saturday, every member of the embassy and any accompanying family member participate in the embassy staff self-critique session. In the graphics below are simulations of the yearly book every North Korean maintains for their weekly self-critique.




The individual maintains the red *생활총화* - lifestyle self-critique book. For every weekly self-critique meeting, there is a six-part entry. Upper left page is a quote of Kim Il-sung or Kim Jong-il chosen by the individual. In the middle left is a self-criticism. Bottom left is the criticism from that session from a fellow diplomat. At the upper right, the diplomat prepares another quote from one of the supreme leaders. At the middle right is another self-criticism. Finally for that critique session, at the lower right, the

---

[8] See Robert Collins, "Denied From The Start: Human Rights at the Local Level in North Korea," Committee for Human Rights in North Korea, 2018, pp.78-85.

6

diplomat concludes by criticizing a fellow diplomat. According to dozens of interviews with North Korean defectors, self-critiques and critiques of others are purposefully not too harsh as to cause irreversible harm to another. The party cell leader – usually the ambassador – metes out punishment that is not too harsh but punishment nonetheless.

The embassy security officer (usually an MSS officer) uses a similar chain that goes through security officer channels. The security officer makes his own evaluation of the diplomat's performance in terms of loyalty to regime directives and sends his findings through his own channel to his headquarters, which in turn is forwarded to the OGD Party Life Guidance Section action officer responsible for the MSS, thus a parallel chain of reporting designed as a check to the other. Differences between the two reports are often altered through corruption, e.g., bribes.


## Section Six: Brief History of Prominent Recent Diplomatic Defections

The following is a list of recent defections by North Korean diplomats. It is not all-inclusive as some information concerning individual defectors and their family members remains classified or treated as close-hold by the South Korean government. The author knows some of these individuals who are not listed below but is not at liberty to discuss any information regarding those individuals due to past security obligations. Regardless, the information from those other individuals would not alter any of the reporting in this document.

Hwang Jang-yop. Easily the highest-ranking North Korean defector to South Korea (1997), Hwang was not a diplomat per se. However, he was the highest ranking member of the North Korean government's highest legislative body (1983), the Supreme People's Assembly. Furthermore, he is regarded as the "highest priest" of the Kim regime's Juche philosophy of self-reliance. On Kim regime protocol lists, he was rated 22nd within regime protocol. After defection in Beijing while returning from an official visit to Tokyo, his wife committed suicide in North Korea, one daughter fell to her death from the back of a truck, and his son, other daughter and grandchildren disappeared.

7

<u>Thae Young-ho</u>. Thae defected in 2016 with his wife and two sons. At the time, Thae was serving as Deputy Chief of Mission at the North Korean embassy in London.  Thae is the son of a Kim Il-sung confidant, Tae Byung-ryul. Thae's wife, Oh Hye-seon, is the daughter of Oh Baek-ryong, also a confidant of Kim Il-sung. This made Thae and wife one of most elite couples in North Korean society. After defection, Thae wrote a book about his experiences entitled <u>3 층 서기실의 암호 – 태영호 증언 (Password to the 3rd Floor Office of the Secretariat – Testimony by Thae Young-ho)</u> in 2018.

<u>Jang Seung-gil</u>. Jang was the North Korean ambassador to Egypt when he defected to the United States in 1997. Jang's older brother, Jang Sung-gil, also defected simultaneously to the United States from a posting in Paris.

<u>Ko Young-hwan</u>. Ko was the first North Korean diplomat to defect to South Korea (1991). At the time of his defection, Ko served as the First Secretary at the North Korean embassy in the Congo. After coming to the South, Ko has since served as an analyst and eventually the institute deputy director for South Korea's National Intelligence Service's (Korean CIA) Institute for National Security Strategy.

<u>Jo Sung-gil</u>.[9] North Korea's acting Ambassador to Italy at the time of his defection in 2018, Jo is known to be from a family of diplomats where both father and father-in-law served as ambassadors. He graduated from Pyongyang University of Foreign Studies and is fluent in four languages, including English, Italian and French.

<u>Hyun Seong-il</u>. Hyun was a third secretary at the North Korean Embassy in Zambia when he defected in 1996. His wife, Choi Su-bong, accompanied Hyun. Hyun wrote the most detailed book on North Korean politics, published in Korean in 2007. It is titled <u>북한의 국가전략과 파워엘리티 – 간부정책을 중심으로 (North Korea's National Strategy and Power Elite – Focus on Cadre Policy)</u>. Hyun has been employed at the National Intelligence Service's (Korean CIA) Institute for National Security Strategy.

---

[9] Alternate name spelling is Cho Seong-gil.

8

Hong Sun-Kyong. Hong defected to South Korea from Thailand in 2000 while serving as North Korea's Science and Technology Counselor. He defected along with his wife and son.[10]

Kim Cheol-sung. Kim was a third secretary serving as a North Korean trade representative in St. Petersburg, Russia at the time of his defection in 2016. No further information.

Kim Dong-soo. Kim was a 3rd Secretary at North Korea's office at the UN Food and Agriculture Organization's when he defected in 1998. He defected with his wife and 8-year-old son. Kim left behind his mother and a daughter in North Korea.

Kim Kyung-pil. Kim was a 3rd secretary in the Interests Section of the North Korean embassy in Berlin when he defected in to the United States in 1999.

*There are others I am not at liberty to name here.*

Once any North Korean has defected, his/her family members are arrested based on guilt-by-association, thrown in political prison for the rest of their lives, or worse. Every defector knows this before defecting. It should be noted that the vast majority of diplomats do not defect due to this threat. The incentive for defection is either one of two things: fear of return for them personally or opportunity for their family that accompanied them overseas; or disillusionment with the North Korean system.

Upon defecting, all North Koreans with a significant high-level knowledge of the inner-workings of the Kim regime and North Korea's national institutions do not go through the same process as the remainder of escapees/defectors. Instead they go directly to work for South Korea's (Republic of Korea) National Intelligence Service's (Korean CIA) Institute for National Security Strategy to provide that agency with specific knowledge of Kim regime tactics, policies and practices. Some remain long-term such as Ko Young-hwan and some short-term to seek other goals such as Thae Young-ho who is now a conservative in South Korea's National Assembly.

---

[10] Descriptive story of one diplomat's escape. URL: https://www.youtube.com/watch?v=790lPCfehQk.

9

## Section Seven: Kim Regime Reaction to Spain-based Incident

The immediate reaction of the Kim regime to this incident would have been based on the reports from So Yoon Suk, the acting ambassador to Spain, and the embassy security officer. It would have been updated based on media reporting coming out of Spain's media. The acting ambassador would have reported the incident immediately to the MOFA's KWP Committee chain as discussed above. The KWP Party Life Guidance Section action officer for MOFA would report the issue to his section director who would forward a report up the chain to the supreme leader. The embassy security officer would forward his report through his chain. There would be coordination with the same KWP Party Life Guidance Section's action officer for the MSS for a plan to arrest family members of the diplomats and confiscation of the diplomats' families' assets. The supreme leader would be informed of the coordination and intent. That process would be spread through all other government agency KWP committees as a warning to others.

North Korea's diplomats and security personnel in Spain as well as throughout Europe would have been ordered to reveal as little as possible to local authorities and employ diplomatic immunity whenever possible. Excessive cooperation would put that diplomat and the entire embassy staff at risk professionally and personally, as well as all their families. Every North Korean diplomat knows that the Kim regime controls their families and thus they will comply with the regime's directives. Even families of those operating in North Korea are subject to the same threats.

Whenever the Spanish authorities ordered the local North Korean diplomats to testify about the incident, each diplomat was accompanied by another embassy official. The purpose of this action is two-fold. First, their presence in front of the North Korean witness is assurance that the North Korean being interviewed complies with KWP directives while talking to the Spanish authorities. Second, the accompanying official must provide a report of the proceedings up through the KWP Committee chain of control as described earlier. The interviewee would understand this and reveal only what he/she was directed to convey.

10

Overall, given the above-described conditions, coupled with the overwhelming emphasis on loyalty and day-to-day controls imposed by the North Korean regime and described throughout this report, I conclude that the testimony of all North Korean witnesses who spoke to the Spanish authorities was likely involuntary and delivered under duress.

## Section Eight: Conclusion

The intent of this report was to provide a framework for understanding of the personal and professional circumstances under which a North Korean diplomat is developed, trained and employed by a distrustful regime. In a society where distrust is the dominate attitude within group dynamics, security for the supreme leader and the party is paramount. The effect of this distrust and resultant oppressive day in – day out, hour in – hour out security on the North Korean diplomat is one of consistently looking over one's shoulder for regime security threat to not only one's profession, but one's personal life as well. It is difficult to imagine that diplomats of any other country face the distrust and security pressures that their North Korean counterparts face every hour of the day. In the end, any thought of defection to escape such oppression basically comes down to "what part of my family am I willing to sacrifice?"

Signed,


Robert Collins

11

## **Robert Collins Bio**

Robert M. Collins completed 37 years of service as a soldier and U.S. Department of the Army civilian employee. He served 31 years in various assignments with the U.S. military in Korea, including several liaison positions with the Republic of Korea Armed Forces.



Mr. Collins' final assignment was as Chief of Strategy, ROK-US Combined Forces Command, serving the four-star American commander as a political analyst for planning on Korean Peninsula and Northeast Asian security issues.

He received the Sam-il Medal (Republic of Korea Order of National Security Medal, Fourth Class) from President Lee Myung-bak and U.S. Army Decoration for Exceptional Civilian Service by the Secretary of the Army.

Mr. Collins earned a B.A. in Asian History from the University of Maryland in 1977, and a M.A. in International Politics, (focusing on North Korean Politics) from Dankook University in 1988.

Mr. Collins is a senior adviser at the Committee for Human Rights in North Korea, Washington, DC, (see hrnk.org) for whom he conducts interviews with North Korean escapees in the Republic of Korea to develop specific information for North Korean socio-political and human rights data. He is the author of

- Marked For Life: Songbun – North Korea's Social Classification System
- Pyongyang Republic: North Korea's Capital of Human Rights Denial
- Cradle to Grave: The Path of North Korean Innocents
- Denied From the Start: Human Rights at the Local Level in North Korea
- North Korea's Organization and Guidance Department: The Control Tower of Human Rights Denial
- South Africa's Apartheid and North Korea's Songbun: Parallels in Crimes Against Humanity
- (All published by the Committee for Human Rights in North Korea)

Collins has also published numerous articles on North Korean leadership and decision-making at 38north.org, Small Wars Journal, and hrnk.org.

12

# EXHIBIT B

Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthouse
255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA, 90012

Honorable Jean P. Rosenbluth:

Hello. My name is Grace Ahn and I am the wife of Christopher Ahn. We were married in July of 2017, but have been together since May of 2004 when we were both only 23 years old. We met when I was taking a year off after graduating from UCLA and preparing to attend UCSB for teaching credential and Masters in Education. I have been an English teacher at West Covina High School for the last 13 years. I am currently also the English Language Development (ELD) Coordinator on campus.

In 1998, at the young age of 17, Christopher lost his father to cancer and had to take over the family business to provide for his immigrant mother, aging grandmother and a 14-year-old brother. I did not know him then, but I know his father's death is a significant source of his compassion and integrity. Chris has revealed to me that after his father's death, he vowed to live his life to honor his father, to do good work to make his father proud. And Christopher has lived up to that promise to the best of his abilities. I wish he didn't have to go through such a tremendous loss, but I believe firmly that this loss shaped him into the man that I not only love, but also respect.

Less than a year after we started dating, Christopher deployed to Fallujah and served his country honorably. After his service with the Marine Corps, he continued to serve the military community through his work with the Vets for Freedom, Warrior Legacy Foundation, Spirit of America and the Young Marines. Even while attending Darden School of Business, he devoted his time with the Darden Military Association for various humanitarian causes. Then returning home with an MBA in 2013, he reconnected with his former boss to start up Moku, a digital consulting firm. As Chief Strategy Officer, he worked day and night, quickly making the business a success.

I cannot be more proud of his valor and big heart to serve his family and country. But really, I have been the biggest beneficiary of his big heart. I do not recognize the man described in the allegations in the complaint.  I know in my heart Christopher would never do the things he is being accused of, and I trust that the evidence will show that he did not harm anyone.  He is not capable of violence. But I also know he would never run and hide from his responsibilities. He would want to clear his name through the proper process.  In the weeks before he was arrested,

Christopher was living with me and going about his usual routine.  He told me that the FBI had warned him about death threats, but it didn't even occur to him to flee.  He would never do that to me or his family.

Part of the reason I married Christopher is because everything he has done has always been for the love of country and family. The desire to support family drives him. Same goes for my dedication to my parents who immigrated to provide better lives for us. Christopher has been the main financial provider for the two of us because I financially support my parents. With Chris currently in detention, I had to move back in with my parents because I am not able to afford the mortgage on their home and maintain an apartment for myself. It may be difficult to comprehend, but our dedication to our parents is the reason why the court should be entirely confident that Christopher is not a flight risk. He values family too much; I would never leave my family. It is unthinkable to cause that much pain to our parents. Our home is here. Our hearts are here. Our lives are here. Chris was away numerous times during our 15 years together, but I always remained in California and he always returned home. This is where we want to build our lives together.

Christopher never sees value in creating conflict or causing pain. He is the first one the say sorry, first one to reach out, and first one to help the fallen. I remember last winter was particularly cold. He had become friendly with a homeless man always outside of our local Ralphs. One very cold night, we saw that man passed out and shivering violently. We tried to wake him up, but he was incoherent. So Christopher rushed home and brought several of our blankets to wrap him up in. Christopher asked the store for cardboard boxes and built a sort of wind blocker and left some money in his pocket. This is the real Christopher Ahn. He is a big ball of love, generosity, honor and service. He is a gentle soul. He has lived his entire adult life with a moral standard higher anyone else I know. I plead with the court to see all that is good in him and grant him bail. Thank you.

Sincerely,

Gracie Ahn

Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthous
244 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA, 90012

Dear Honorable Jean P. Rosenbluth,

Thank you for your time. My name is Daniel Ahn, Christopher's younger brother. I hope to introduce myself and share with you who my brother is and how much he means to me. My brother and I grew up in a small family with my late Father, Mother and Grandmother in southern california. I shared and slept in the same bed with my brother until I reached middle school. I remember him making up bedtime stories, helping me with homework, walking with me to the comic book store, we were inseparable. Growing up, my mother and father were always working with my grandmother caring for us. Seeing how hard they worked gave us perspective of how much they sacrificed and loved us. As a child, my brother was my role model and my best friend. He taught me from right and wrong, to live honorably and continues to help me in every way to this day. I love him so much.

When I was born, I had several complications and went through numerous surgeries into elementary school. My brother was always there by my side as my protector. He always put me and others before himself as early as I can remember. He's been such a positive role model in my life and shaped me to who I am today.

In 1998 my father passed away from cancer. My brother immediately took on the responsibility and role of taking care of our family. Looking back, my brother was still a boy. However at the time, I can remember feeling secure knowing my brother was there. My brother became a father figure to me and within our household. He became our families pillar of support and hope. He grew up fast helping my mother with our families international business The Garment Broker. Helping my mother with everything from business documents, phone calls to accompanying her on business meetings overseas. It seemed all natural to me as a child, but looking back…he was a 16 year old boy wearing a suit putting his family on his back. My brother showed me what being selfless meant and how to live with respect and honor toward others. Shortly after he graduated High School, my brother joined the US Marines. Together we've grown so much with my brother, every step of our journey in life he's been there for us. Soon after, my brother left to Iraq to serve his duty. Our family became even stronger with the love and respect we had for each other. My brother showed us what being an American

was and what sacrifice truly meant. When he came back, the world seemed brand new and our eyes felt heavy with appreciation for the men and woman that sacrificed for our freedom before us.

My brother has always been a role model and shown me what hard work looked like. In 2009 my brother helped me with my online business, leading my operations, financial planning, helping me develop a business plan for growth. He's been there for me every step in my life, always making time for me. After my brother graduated from the University of Virginia, he immediately moved back home to support our family. I watched him continue to build his career working with Shell, Volcom Brand to Digital Consulting. He continues to never stop working, always putting my mother and family before him.

My brother has been financially supporting my mother with many things including basic utilities, mortgage bills, loan payments to medicine for her trigeminal neuralgia illness. My brother and I carry the responsibility of providing for my mother and grandmother. However as of lately I have not been able to support much at all. I am a small business owner. I run a small online fashion retail store, my company sells dresses and fashionable clothes for special occasions. In these recent years to this day, it has been a very difficult time. I'm not proud, however the reality of my business has been struggling deeply. I am currently working extremely hard to pay several business debts with little room to provide much of anything to support our family let alone myself.

While running my women's dress company, I recently started two new separate businesses which have taken up the majority of my time all together. One is an exciting new tech App I am building. It is now successfully launched and ready for download on Itunes and Google. The other is an online women's wig retail store. I provide hundreds of fashionable women's synthetic and real human hair wigs in a variety of styles and colors. I am working daily late in to the morning handling a total of three businesses on a daily basis leaving me almost no free time.

Being physically present at my mother's home has been a large responsibility my brother and I have been sharing. My mother suffers from a very painful disease trigeminal neuralgia and requires either one of us to be present and help with any frequent emergencies. This passed month, my mother collapsed from dizziness from her medication. My brother was able to take her to the emergency room and I was able to tend to my grandmother.

Basic important chores like preparing dinner and meals for my grandmother and mother

are our responsibility as my mother often feeling weak and very dizzy from her daily pain killer medicine. It's important my mother rest. My brother and I share daily chores such as doing laundry, cleaning the household, driving my mother to do errands, taking her to the hospital. Taking care my grandmother is another big part of our lives.

My grandmother is 97 years old and suffers from blindness and shows signs of memory loss which we requires us to monitor daily. We share the responsibility of taking care and monitoring my grandmother every day. My brother helps her with her daily hygiene from cleaning her teeth, walking her to the restroom, to giving her sponge baths. As she has gotten older, she often times may involuntary release herself in her bed. This has been a big task for our family, cleaning her sheets and cleaning my Grandmother. We love her so much as she's raised us since we were children, my brother and I do everything we can to be there for her.

A very big task is also at night there would be often times my grandmother wanders outside her room from insomnia. We make sure either my brother or I are at home monitoring physically on stretches of days my grandmother shows insomnia. We've went through several doctor prescriptions to help her sleep, which lead to many instances where she did not accept well. Her insomnia is something we have accepted as a routine chore we must monitor.

I don't live with my mother and often I work very late into the night meeting deadlines, anywhere up to 3am. It's been a very busy time for me with my three running business ventures. My brother is a giant support and presence at home taking on the majority load of helping while I am working. He is the reason our family has balance and is healthy.

My brother has always been someone I looked up to, not only because of his accomplishments but overall character. He genuinely is a real life teddy bear and has the biggest heart. He enjoys cooking food for friends, listening to reggae music and spending time with close friends and family. My brother dresses like he came from the beach wearing shorts and sandals all year long. He is one of the most down to earth kindest spirits I can say I know in my life. After his service in Iraq I've seen a calmness and peace through the years following to present day. He has shown me what life is about which is family, dedication to work and love for one another. To live by a simple code of honor, do right, and treat others with utmost respect. My brother is the most selfless person I know and I continue to learn through his example.

I hope you may consider him to come back to us, as I am 100% confident and promise

you there is no risk whatsoever. My brother is dedicated to our family and his purpose in life is to help and support the people he loves. He will never do anything to jeopardize our family. I hope you may allow my brother to come back to our home and continue to be there for us. We need him so much right now and I know my brother will never flee or cause any trouble whatsoever. I've only witnessed my brother express kindness to others with only respect. My brother is loved by so many people and I can assure you, my brother is not a danger to anyone and never will be. He is the kindest honorable man I know. I appreciate you taking the time to read my thoughts and who my brother is. He is my best friend, my brother and so much to so many people. Thank you so much.

Sincerely,
Daniel Ahn

5/13/2019

Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthouse
255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA 90012

Dear Honorable Judge Rosenbluth,

I hope this letter finds you well. I'm writing this letter on behalf of Christopher Ahn in support for his bail application. My name is Jason Kim, 35 years old, a naturalized citizen of the greatest country in the world, a full time employee for over ten years at the same company Azurelite Inc and a full-time husband to my loving wife Jessica Kim. Christopher Ahn is my brother-in-law who has been with my older sister, Grace Ahn, for the past fifteen years.

I did not know Christopher from his younger days, but I do know that he lost his father, who was the breadwinner of the family, when Christopher was only seventeen years old. I know that losing his father was not only a physical loss, but it also greatly impacted the financial survival of his family - grandmother, mother and youngest brother. As the oldest son, he took it upon himself to become the new breadwinner. And while also attending college, he made the decision to serve his country by joining the Marine Corps. At the age of 24, when he was called upon for active duty in Iraq, he put his life on the line to served with the 5th Battalion 14th Marines. That was when my sister and he were dating. It got to see what a difficult time that was for both of them, but I also saw them battle through it together and come out stronger in the end. After fulfilling his duty as a Marine, he continued to be dedicated to worthy military causes. I noticed that it really matter to him to make a difference for that community. When he decide to attend Darden School of Business at the relatively late age of 30 something, I know he did so to become a better provider for my sister. Honorable Judge Rosenbluth, I do not bring up Christopher's misfortunes with his father for you to have pity or sympathy for him because I know tragedy can happen to anyone. I do not bring up his military service or his earning an MBA simply to list what he has accomplished in his life. Insead, I hope you would take a look at the past decisions he has made in life and how those reveal his genuine moral integrity. He never tried to avoid challenges or difficulties. He would face them and overcome them. Time and time again, he made decisions in life to be there for his family, community and country.

Although I can't say too much about his professional life, I can speak as to what kind of man he is to my sister. When Christopher and Grace finally got married in 2017, he became the loving, respectful and sacrificial husband my sister deserved. The love and mutual respect I see between them special, one that I assume comes when a couple has been through thick and thin together. As the brother, I am pleased to witness Christopher always putting Grace first, always thinking about her needs and never wanting to disappoint her. He is also very good to our parents. We all love him dearly because he is a kind man and so good to my sister. What also didn't surprise me

was that he still continued to be the "man of the house" for his mother and now ninety-eight-year-old grandmother whom he adores. What I mean by that is he is still the one they rely on for day-to-day needs as well as in any emergencies. He is the one they call when the garage door breaks, when his grandmother has wondered out of the house in her sleep, and especially when his mother is bedridden from her illness. That is the epitome of Christopher I know, someone who never neglects his duties, whether it be as a loving husband or a dependable son/grandson. As a son myself to immigrants parents, I know all to well the responsibility of taking care of your parents, especially when language is a big problem. Based on his relationship with family and friends, I can confidently state that he is not a flight risk because it is a priority for him to never bring shame or pain to his loved ones. I know he would never want to disappoint those people who believe in him and are supporting him now. In that same way, I am confident that he poses no threat to society. He is a man who upholds the law, and has no history of violence. Instead, he has dedicated his time to serving his country and community. I plead for you to take a closer look at who Christopher really is by the way he has led his life - always putting others before himself. As such, I have absolutely no doubt in my mind that he will show up to court when asked upon by you, a federal judge of the United States government.

Christopher Ahn is an honorable member of society, a loving husband and the most patriotic citizen of the United States of America I have come to know and love. I know Christopher is not a flight risk because he would never abandon his family to flee to save himself from these ridiculous claims made by the Spanish and North Korean government. Please provide Christopher with bail. Please send him home to my sister. Thank you for your consideration.

Sincerely,

Jason Kim

Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthouse
244 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA, 90012

Dear Honorable Judge Rosenbluth,

I am Christopher's Mother.

My son is the center of our family.  He has been the man of the house since his father died 21 years ago and is like a father to my younger son. He picked up the business his father left behind when Christopher was only 17 years old.

I did not agree with his choice to join the marines after high school. I asked him "Why are you going to the Marines?" and he responded, "I have lived too comfortably for my whole life. I want to challenge myself so I can be stronger and help others." I didn't want to stand in the way of my child. We talked over the phone and wrote each other letters during his training period as much as possible. Once, he said he told his boss "My parents came to America empty-handed so I could have a better life. I joined the Marine because I wanted to do something good for America as a second generation Korean American." As a mother, I am so thankful he grew up to be so responsible and mature.

While he is with the Marines, the Iraq war began. I never thought in a million years that a war would start while my son was a Marine. Thankfully, his service period was over so I thought he wouldn't have to go to the war.  But my son said he felt that his time to give back was not over, and he would regret not serving during the war. I couldn't stop him, and I prayed that he would come back safe. After coming from war, he got a stable job and became a responsible young man. During his time away, taking care of the family business became too hard so it went under.

After 3 years of working, he decided to go to business school. He and his younger brother used to help support me financially together, but that change when Daniel's internet business began struggling. Chris is my primary financial supporter and has helped me with my loans, health insurance, car insurance, utility bills, and taxes. I was diagnosed with stage 3 neuralgia and needed money. I often went to the emergency room. During Chris's 37 years of existence, there was not one time he complained or got in trouble at school and he was a good student. He was the school secretary and the president of the Keyclub and has been leader of the household since graduating from high school.

His grandmother turned 97 years old. She can't see and is suffering from Alzheimer's disease. When grandmother leaves in the middle of the night, he goes and protects her. He cuts her toenails and fingernails, cleans the bathtub, and holds her hand when he take her out. Grandmother doesn't know when she'll pass away and keeps asking when her grandson will

come back. My son is not a coward. I swear on my life that my son will never run away or hide. I am proud of him and highly respect him. Dear Your Honor, please allow me to live with my son.

Sincerely,
We Young Ahn


5/13/2019

# RE: MATTER OF CHRISTOPHER P. AHN

**5/10/19**

Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthouse
255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA 90012

**Dear Honorable Jean P. Rosenbluth:**

This letter is in support of my dear friend and business partner, Christopher Ahn. I met Chris through my best friend, as they went to Grad School together at Darden, at UVA. I've known Chris for many years and am shocked that he would be detained like this without bail.

Chris is an American patriot, a Marine, a husband and a devoted son to his mother and caretaker of his elderly grandmother. Chris and I work together side by side every day and has displayed absolutely no history or indication of violence. He has never displayed any threat to society. He consistently drives from DTLA to Chino to take care of his family. He provides medicine and healthcare to his grandmother and takes responsibility for many family matters for his mother. He is gentle, thoughtful and extremely kind. Since his detainment, I know that there is now a financial hardship for his family, that myself and a few others are trying to step in and help in any way we can.

I hope you can seriously reconsider bail for Chris, and a release from custody. There is no reason for him to flee. He has been a great business partner with many important responsibilities both in the business and towards his family.

I appreciate your consideration.

Sincerely,

**Daniel Kam**
████████  ████████ / ████████ **cell**



May 14 2019

Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthouse 255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA, 90012

Judge Rosenbluth,

I met Christopher in 2009, during his last year of graduate school at the University of Virginia, when he began an internship with an apparel manufacturer named Volcom where I worked as the Director of eCommerce.

He was tasked with helping Volcom to evolve their retail business and given the strategic value of the eCommerce business, he was allocated to my team. We quickly developed a friendship which matured as we worked side-by-side for more than a year. His contributions were significant and had a material impact on the growth of the business.

I started a business in late 2012 and Christopher was my first call to join as a business partner. We worked side-by-side for what seemed like endless weeks and months to build a great people-focused organization. Throughout the growth of the business, I came to know his family well - both through the stories he would tell and through personal interaction. They were, and are, the center of his universe. He would drive for hours every week to travel from his apartment to spend time with his grandmother, mother and brother at their family home. He would take his elderly grandmother on walks, take her to run errands, do her laundry and spend whatever time he could with her.

With the loss of his dad as a kid, he was thrust into the role of the "man of the house" - one which he took very seriously. He would give his mom money from his paychecks to help with her mortgage and the care of his grandmother. Never once did he complain about this responsibility but instead felt

privileged to do it, being able to help those who needed it, which is no surprise to anyone that really knows Christopher.

Regardless of the challenge that he was faced with, he wouldn't ever complain, he would always look at the morally-correct bright side of things. That's to say he would always do things for the "right" reasons - one of the many reasons that I love him. He would regularly guide me on decision making with our business, focusing on being a great partner to our clients and always doing the right thing.

For as long as I've known him, he's talked fondly about his time as a Marine, how he loved serving his country and how that experience helped to solidify his focus on the things that mattered most in his life. He made many lifelong friends in the military and once his time was up, he focused on veterans affairs, working to better the lives of his fellow soldiers.

Christopher has lived a lot of life in his 30+ years. He's unlike any friend I've ever had because his friendship is unwavering - he would do anything needed to help out a friend while helping to ensure it's the right thing to do.

I don't have a single concern about him fleeing because of his passion for, and responsibility to, his family and friends. His life is here in the Los Angeles area and he wouldn't sacrifice that for anything. I also don't have a single concern about him behaving violently as he hasn't ever done so in as long as I've known him.

Sincerely,

Ben Noonan

Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthouse
255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA 90012

Dear Honorable Jean P. Rosenbluth:

My husband and I are both graduates of UC Irvine and are working professionals living in Los Angeles, CA.  We have both known Christopher Ahn and his wife, Grace Ahn, for a very long time.  We have known Grace for more than 25 years through school and church and met Chris more than 15 years ago since they first started dating in college.

Making sure that your best friend is dating a great guy is a given and I for one wanted to make sure that Chris was the best person for my friend.  Getting to know him throughout the 15 plus years I've known him, there has never been a doubt in my mind that my best friend met someone whose heart was filled with unconditional love, who was honest and a person who stood up for what he believed in.  Chris comes from a close knit and loving family that consists of his mom, brother and grandma.  After losing his dad in high school to cancer, Chris has been the pillar of his family since a very young age.  He has been a confidant both emotionally and financially to his mom and has also been a caregiver to his grandma who is in her nineties and can barely hear and see.  Chris has been the main financial supporter for his mom and grandma when it comes to paying for their expenses whether it's their mortgage or something as small as their cell phone or internet bill. He has also been a father figure to his younger brother Daniel ever since high school.  Even though Chris was also young himself, he did everything his power to make sure that his brother was well taken care of and had a good role model to look up to.  Chris' love for others is not only displayed by the unwavering love he shows his family but is truly evident with his choice to serve in the United States Marine Corp to help and protect the citizens of the United States.  In my opinion, even putting your life at risk for people you love can be a hard decision so deciding to do that for millions of people you don't even know is not something that anyone can do.  Chris served in Iraq twice as a deputy chief of intelligence and not only helped to make detention facilities better but also utilized his skills to help stop human trafficking and terrorist activities.  Personally, he has always been willing to help us with anything he could.  Whether it was helping us move, cooking delicious home cooked meals, going volunteering with us for my birthday or just being a great listener and at times giving us sound advice, Chris has never hesitated to be there for us.

Like mentioned before, Chris is also an honest guy who stands up for things that he believes in.  This though does not mean that he is one of those my way or the highway type of guy.  He also knows the importance of respecting other's beliefs and being open minded to all.  For instance,

there have been conversations ranging from political to even the smallest things like TV shows or music or food where we've definitely not had the same opinion.  But even during times when the conversation became heated, Chris has always been one who is not confrontational but instead asks MANY questions to make sure that he is understanding the reasoning behind your beliefs instead of casting it aside and saying that you are wrong.

Being at the courthouse for his bail hearing, we know that one of the concerns that was brought up was the issue of violent character.  We have never known Chris to be a violent person.  Chris is a happy-go guy who is like a teddy bear inside.  He wears his Hello Kitty apron, a gift from Gracie, while he leads the prep for our weekly couples dinner together.  He's a guy who loves singing and brags about being part of the concert and show choir in high school.  He's the kind of guy who would rather be happy and joyful and helping others than wasting his time being otherwise.

We are also confident in knowing that if Chris is granted bail he is not a flight risk.  There is nothing more important to Chris than being near his loved ones and caring for them.  After the passing of his dad in high school, Chris has a deeper sentiment of what family means to him and he would not do anything to jeopardize anything when it comes to his family.  Knowing all the support his family and friends have given him, we can honestly say that Chris would not flee if he was out on bail.  Also, Chris is a man of integrity and would not go against the statutes of his bail.  Whatever limitations you put on him when granting his bail, not only will he be following it but his family and friends will keep him accountable in making sure that he abides by all rules set forth for his bail.

All in all, we have nothing but good things to say about Christopher Ahn.  We know you may think we are biased in saying that because we are his friends but in all honesty, just because you consider someone a friend doesn't mean that you would vouch for that person no matter what.  There are many people who you consider as friends who would rather stay out of situations and not be involved.  In the case of Chris though, we are writing this letter to you to let you know that we support him and know that he is a good person who has loving family and friends who want to see him out and at home defending himself against the charges filed.

Sincerely,

Helen & Edward Min



May 13 2019

Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthouse 255 E. Temple St.,
Courtroom 690, 6th Floor
Los Angeles, CA, 90012

Judge Rosenbluth,

I first met Christopher Ahn over dinner when our mutual friend was creating a business called Moku Collective. Christopher, or Chris, and I instantly hit it off and would be business partners for several years.  I'd never met someone like him before. He was an intelligent, funny, goofy man who gave me the biggest bear hug I'd ever received from someone I'd just met. I quickly learned that he had a strong bond to his family, country and friends.

Chris served as the Chief Strategy Officer for our group. We spent most of our time together trying to get new business for our growing company. Chris would stay up into the wee hours of the night working to make sure that our presentations were as prepared as possible. Without Chris's dedication to our business, the company would have failed, leaving a dozen mouths hungry.

I'm sure others will tell you stories of serving with Chris in the Marines, but I didn't get to see that side of him, other than knowing his time in the military strengthened his love of country and sense of self. Meeting his fellow veterans at his wedding was such a great chance to see another side of Chris.

When he was not working on getting Moku off the ground, he was frequently caring for his grandmother and mom, two women he adored tremendously. He would shuttle them around, cooking meals and taking them on errands. He also helped his brother try to get his business off the ground. To this day I don't know how Chris managed to get everything done for everyone, all the while falling further in love with his now wife Grace.

It is his love for family that causes me to believe he is not a flight risk if awarded bail. As the leader of his family, we would not leave them behind. He is a kind, loving, non-violent man who needs to be reunited with his family and friends. I hope I get the chance to see him again and would work with him in a heartbeat if given the chance.

Sincerely,

**Mark Rubin**



5/13/2019

Re: Matter of Christopher Ahn

Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthouse 255 E. Temple St., Courtroom 690, 6th
Floor
Los Angeles, CA, 90012

I have known Christopher Ahn for nearly 10 years. I was shocked and saddened by the news of
his recent trouble. Chris has been an amazing friend, family member, and community member
in the years that I have known him. I was introduced to Chris while I was on a trip to visit a friend
who was in business school at the University of Virginia. I had taken a week off of work as a
medical device sales representative and I felt a little out of place being a California kid visiting
the east coast. Chris made me feel right at home and our friendship has remained constant for
many years. We speak regularly about our business endeavors as well share highlights and
lowlights from everyday life. We both care deeply about the well being of each other's family
and I am lucky to call Chris a good friend.

Chris served his country honorably and after retirement from the military he has worked hard to
provide for his family. He went back to school and received his MBA from the University of
Virginia which he has used to help his family business sustain his elderly Grandmother, Mother,
and younger brother. Chris continues to work hard everyday as an entrepreneur creating
businesses as a consultant as well as bring new physical products to market. His family counts
on him to help provide financial and emotional support to live everyday. Chris is a gentle person
who I have always been happy to introduce to my friends or family members. He is wrapped
deep in his community and has ties that will likely keep him in Southern California most of his
life. It is my opinion that Chris will not flee because everything that is important to him is here,
and he would never abandon his family. Chris is an asset to his community and has never been
a threat. I am a better person for knowing Christopher Ahn and my family and friends all feel the
same way.

Regards,
Mitchell Bialosky

**Honorable Jean P. Rosenbluth**
United States Magistrate Judge
Roybal Federal Building and United States Courthouse
255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA, 90012

**Re: Matter of Christopher Ahn**

Dear Judge Rosenbluth:

I am writing to convey my support for the court to grant Chris Ahn's request for bail. Chris and I have been friends for nearly 10 years and were roommates for 2 years while in business school together at the University of Virginia. I have always known Chris to be of the highest character and principle and believe that he will honor the terms of his bail in this matter.

In the years that I've known Chris, he has consistently demonstrated deep concern and care for others, volunteering and raising money for the Wounded Warrior foundation, actively participating in community outreach and volunteer efforts, and going above and beyond for friends and acquaintances in their times of need. He genuinely cares for his fellow man or woman and finds ways to be of service whenever possible.

Most importantly, Chris loves his parents, brother and supportive wife, and strongly believe he will honor the terms of his bail and remain with the state or country as would be required to see this legal matter through to its eventual conclusions.

Chris is no danger, whatsoever, to his fellow citizen and I have always experienced Chris as being a kind, gentle and compassionate individual.

Sincerely,

Timothy Henson

United States Magistrate Judge
Roybal Federal Building and United States Courthouse
255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA, 90012

To Honorable Jean P. Rosenbluth:

I've known Chris Ahn since August of 2010, as we were both First Year students working our way to a MBA from the Darden School of Business at the University of Virginia. Beyond being classmates at Darden, I've also had the ability to continue my friendship with Chris and his wonderful wife Gracie since moving out to Los Angeles 2 years ago.

Immediately before the beginning of Second Year at Darden, I suffered a number of seizures and had to undergo a craniotomy to remove a large mass that had developed in my left frontal lobe. I'll never forget the overwhelming support of my fellow classmates, but none more so than Chris Ahn. Chris not only reached out to me independently to support me through my trauma, but he also rallied a large group of friends so that upon my return to campus after my 8 week bedrest, I would feel supported, safe and hopefully, a little less traumatized.

I think that our friendship became something even more meaningful after my move to Los Angeles. Chris and his wife took me under their wing, showing me around Koreatown and the wonderful treats within, and introduced me to a number of their friends, many of whom, have known Chris and Gracie for more than many moons. I've never had friends who have lasted a lifetime, and these closeknit relationships struck me. Additionally, Chris and I had conversations where we explored what it means to be a Korean in America (I'm half Korean myself) and he shared his insights, having been raised in much more of a Korean community here in Los Angeles than myself, and we went into the depths of our history as Asian Americans trying to understand what it means to fit in, if "fitting in" is truly something of value, how we've adapted and beyond. Family means everything to Chris, and I feel like he and Gracie both immediately opened their arms to me, which wasn't a surprise - if I was to find a few adjectives to describe him, I would use supportive, caring, and of course, hilarious.

From class, I know Chris to be curious. I know Chris to be an out of the box thinker, but always guided by the truths of this world which I think his experience in life has firmly grounded him within. I know Chris to be kind. I know Chris to always stand up for what he thinks is right - in terms of how people treat one another, in terms of business ethics, in terms of how his friends and family should always be supported.

I offer my full support behind Chris, and hope that this letter is clear in my opinion of him.

Sincerely,

Tina Glickman

Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthouse
244 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA, 90012

Dear Honorable Judge Rosenbluth:

I am currently serving as the head pastor at Halleluyah Korean Church in Walnut, California. It is an honor to write to support Christopher Ahn, and I thank you for the opportunity to do so. The Church and I are praying over Christopher Ahn and his mother every morning and evening.

I, Pastor Song JaeHo, have forged a relationship based on faith with Christopher Ahn's mother for quite some time now. I also attended Chris's most recent wedding. Christopher Ahn unfortunately lost his father at a young age and has been taking care of his mother through high school to graduate school. He also volunteered for Iraq war as a US marine for the country. Personally, when I think of Christopher Ahn, I think of his great responsibility and his reverence for his parents and sincere belief in God.

Christopher Ahn's maternal grandmother is also currently attending Halleluyah Korean Church. Chris's grandmother is 97 years old and is suffering from Alzheimer's disease. But the most pressing problem is that she will often leave in the middle of the night and wander, so she will need special care all times.

As Chris's mother lost her husband early on, she has been depending on her son. She has been dealing with stage 3 neuralgia, so she has been physically unwell to deal with finances such as car insurance, health insurance, mortgage, and her taxes. She has been relying on her son to help her with payments as well.

Another problem deals with how although emotional support is possible from Christopher Ahn's younger brother Daniel Ahn and the church family, help is still needed to lift the financial burdens. Christopher Ahn's mother has been dealing with much emotional distress and worry due to this case.

Your honor, please have empathy for Chris's mother and his 97-year-old grandmother's difficult situation. Christopher Ahn represents their emotional pillar.

I beg you to think about the void that will be left without Christopher Ahn, and I appeal to your graciousness and mercy.

Pastor Song JaeHo
5/14/2019

Honorable Jean P. Rosenbluth
United States Magistrate Judge
Royal Federal Building and United States Courthouse
255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA, 90012

I went to Business School with Chris at the University of Virginia from summer 2010 to spring 2012.

I really got to know Chris during an organized school trip to Argentina. The purpose of the trip was to introduce us to Argentinian business practices by taking us on company tours, and to teach us about Argentinian people by having us interact in real situation with Argentine counterparts.

I remember being particularly impressed on this trip by Chris, and the respect and open mindedness he displayed for the different culture and people we were getting to know. Chris was undoubtedly the individual who went out of his way the most to engage with local residents, and the one most interested in understanding them.

As I got to know Chris better following this trip it became evermore apparent that Chris was someone who respected and empathized with others. Furthermore, Chris was a consistent source of support throughout those years, someone you could rely on to provide sound advice based on his own personal experience and struggles. I also remember Chris being a leader who would stand up for the less popular students, or opinions, if they were being attacked in class, and who would assume leadership roles that others were reluctant to take on.

Knowing Chris as I do, it is impossible for me to regard him as a danger to society or someone who would flee his beloved Country. I urge you to keep Chris' good nature, kindness, open mindedness, and strong moral integrity in mind through this process.

Best,

Joshua Shragie

29 May 2019

# HON JEAN P. ROSENBLUTH

Roybal Federal Building and United States Courthouse

255 E. Temple St., Courtroom 690, 6th Floor

Los Angeles, CA, 90012

Your Honor,

My name is David Bellavia. I served in the United States Army Infantry for six years. Serving in Iraq I have received the Silver Star, Bronze star and have been nominated for the Congressional Medal of Honor and the Distinguished Service Cross. I have known Christopher Ahn since 2007. We worked together in Washington DC, traveling across the country working for veterans and charity organizations that specialized in eliminated suicides. Together we passed legislation in statehouses and in Congress. We assisted in the post 9/11 GI Bill and helped veteran small business owners have access to secured loans.

We shared a DC apartment for almost two years.

Christopher Ahn is an American patriot. While my service focus on the violence of action needed to survive on the battlefield in Iraq, Chris always prided his service in the United States Marine Corps on saving lives. There was a difference and he always made a point of sharing that with his peers. Not all service at war was that of the trigger pulling class. Chris was an intellectual Marine. He solved problems with his mind. Ahn worked to help the people of Iraq and he took great pride in what he was able to accomplish. He is not and never has been a violent person. Christopher is and always will be a faithful and dutiful Marine. His life is predicated on honor and duty.

Chris received his Master's degree from the Darden School of Business at the University of Virginia. While his peers immediately put their degree to work to better themselves, Christopher joined me in helping veterans start businesses. He helped save struggling charities balance their books. Again, Christopher Ahn lives his life for his country, his community and his peers.

When our charity organization was struggling to make ends meet during the financial crisis of 2008, Chris took out a credit card and gave us $20,000. He covered payroll and travel. When a peer was struggling financially, he took their household bills and paid for their children's Christmas presents. When a friend of ours took his own life on Memorial Day, Chris flew to his hometown and attended their funeral. He also paid for three of his fellow Marines airfare and hotels. They didn't even know it was Chris was took care of this, as Christopher told them it was a donor of our organization. He did not want credit. He didn't want thanks. He did this all while he was in graduate school. Not an easy time and it was a heavy financial burden. Christopher is an outcome based man. If something needs to be done, he does it. The effect that it had on people who depended on him is always more important than his current financial situation

During the Iraq war there were many protests for and against our foreign adventures overseas. The political climate was polarizing and even though organizations like ours were non-partisan, we would enviably get sucked in to the vortex of the margins of the war debate. At times, during the conventions of 2008, our events devolved into a police presence where opposing sides became violent. Christopher Ahn would immediately take charge to stop this from escalating. At times, ending an event early. Or even cancelling future events to avoid these things from happening again. Many of his peers accused him of being too soft. I was one of them. We look back at it now as seeing Christopher's heart. His principles are clearly defined. He does not believe in hurting other people even if they are threatening his own well-being. I am not that man. I want to strike the rattle snake as it coiled, not after it bites me. In my most honest moments, I wish I had the heart and courage of Chris. He is what we should all want to be in this life. He lives in a Christ like approach to his fellow man. Loving friends and giving enemies the opportunity to see him as non-threatening. Even if it comes at a cost.

In 2009, our group had a chance to visit Iraq as civilians. Christopher did not want to witness violence. Even to cover a story or to be a part of combat in any way. He was done with that life

2

and would not be convinced otherwise. Christopher Ahn would never hurt, injure or threaten anyone in the twelve years that I have known him.

Chris is the sole provider for his mother and elderly grandmother. I can think of many times when he had to cancel trips or work extra jobs to be able to provide for his mother and grandmother. Having lost his father as a teenager, Chris became the man of the house before he was able to drive a car. His decision to join the Marine Corps was a heavy burden to them. One of the reasons he decided to not reenlist was the stress and the financial struggle it put on his family. His absence has provided unnecessary burden and stress on frail and unhealthy family members.

When we lived in DC, he would divide his check like it was a child support payment. This amount was for his rent, this amount for his bills and the remainder for his family.

I would be willing to mortgage my own freedom on the promise that Christopher Ahn will never flee. I know honor and I know men of integrity. This is the entire basis of my adult life. Christopher Ahn is one of the most decent and honorable men I have met. If Christopher called me today and said he needed me, I would set aside my life and do what I needed to do for him. Not just out of blind fidelity, out of guilt. The guilt based on the fact that I have witnessed him do this for me on far too many occasions. These are rare qualities in America today. These are rare qualities in men. America has far too many people with "hollow chests." People who say one thing and do another because it is the easier path. Christopher is a rare breed. He honors his word. He would rather die than bare false witness. And he will never dishonor his family, his nation or his own integrity. A man such as this, is worthy of equal trust and fidelity.

Christopher Ahn is the embodiment of an individual in a community. He loves this nation. He is proud of his culture. And he has risked his life to protect us from conflicts he disagreed with on principle because it was duty to serve.

Christopher Ahn is a not a danger to society. He is man of the highest honor and integrity. He is a man that I hold up as an example to my three children. Ahn is a true beacon of what we should all be to fix the issues we have in this society. He is thoughtful. Slow to anger. A thinker

3

and a scholar in a world of violence. His service in the Marine Corps, his dedication to the community, his family's reliance on his income are only a few of the many reasons he should be allowed bail to await his trial away from the confines of jail.

He is due his day in court. Christopher has risked so much to defend these very clear rights and his service and character should give you peace of mind that this man will not embarrass you or cause you to regret your most kind consideration. Thank you for your time. And thank you for considering this motion on behalf a beautiful human being, Christopher Ahn.

SINCERELY,

DAVID BELLAVIA

May 19, 2019

To:   The Honorable Jean P. Rosenbluth
      United States Magistrate Judge
      Roybal Federal Building and United States Courthouse
      255 E. Temple St., Courtroom 690, 6th Floor
      Los Angeles, CA 90012

Your Honor -

It is with hopeful heart that I write this letter in support of Mr. Christopher Ahn's bail application. I hope that my experiences with Chris will help you gain another positive impression in order to develop a fuller picture of the great man you have before you.

I take this opportunity to write on behalf of Chris with the highest degree of respect for your responsibilities and experience. My relationship with Chris goes back to September of 2009, when Chris was working as a military liaison with a non-profit called the Spirit of America (SOA). Even today, SOA supports requests from Marines in areas of strife for goods that will help local people. It is support that improves relations with locals and "wins hearts and minds."  My Marine unit strove to provide genuine, sincere assistance to war-torn towns in the Nawa District of Helmand Province in Afghanistan. Without hesitation, I can affirm that we could not have succeeded without the dedication of individuals like Chris.

I would like to take the opportunity to provide insight into what I believe builds the character of a patriot like Chris. Like many who have had the pleasure of serving with Chris, I find the reported events which have led to his confinement to be shocking and out of character for the type of person who has been highly regarded and trusted throughout his military and civilian career. I only ask that Chris be given the opportunity to reunite with his family by using the last measure of trust we can possibly afford an individual who has served his Nation honorably, and who has risen from the ranks to become a successful businessman and no criminal record.

Your Honor, for Chris to have earned high levels of responsibility in the sensitive field of intelligence and work his way to senior strategy roles in business while earning a graduate degree at one of our Nation's top universities speaks volumes of his initiative, tenacity, conviction, and work ethic. For that alone I have been proud to support him in his endeavors. At the same time, his consistent dedication to working against human suffering, injustice, and oppression also speaks volumes to the values he holds in his heart. Chris truly embodies the best our Nation can offer in his dedication to his Faith, his Family, and his Fellow Man. He cannot possibly be a flight risk because he has so much to live for here in the United States. With a man of such conviction and dedication to others, it would tear Chris apart to leave family or friends behind.

I would offer another perspective on why Chris deserves bond and a small measure of freedom. I am a Marine Corps Reservist, and have held career positions in predictive analytics roles and in network engineering. While undoubtedly Chris has more immediate and practical reasons to remain in the United States, please consider the technological hurdles a person of Chris' public persona would have to overcome to successfully flee. Our world's electronic documentation systems, imagery systems, currency tracking, and transportation tracking systems are thorough enough to allow a high degree of confidence that Chris will remain in the United States. Surely there are mechanisms within the power of the Court to provide an alternative means of assuring the Chris will be present to defend himself, as a citizen presumed innocent deserves. Knowing Chris' sense of honor, he will want to ensure that the career he has built up since he became a Marine will be defended with his days in court. He simply will not be a danger to society, because he has dedicated his life to bettering society – both domestically and abroad.

Judge Rosenbluth, I humbly ask for your reconsideration of bond for Christopher Ahn. The gentleman I served with in Afghanistan impressed me so thoroughly, that after ten years of sporadic communication, I am willing to put my personal reputation and record of service to our Country on the line for him. For the sake of his family, for the sake of his well-being, and for the sake of showing leniency during this extremely difficult time in Chris' life, please grant Chris approval of his bail application. Should you have any questions, I am available at any time, night or day, to take your call.

Very Respectfully,

Rodolfo A. Quiles
Colonel
United States Marine Corps Reserve

Honorable Jean P. Rosenbluth                                      11 May, 2019
United States Magistrate Judge
Roybal Federal Building and United States Courthouse
255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA, 90012

Judge Rosenbluth,

My name is Wade Buick. I am writing you as a concerned citizen and former military officer regarding
Christopher Ahn. As brief background I spent over 11 years in uniform serving in the U.S. Navy, 7 of
those on active duty deploying to the Western Pacific, Kuwait, the Persian Gulf and Afghanistan. During
that time I was also a resident of California living in San Diego. I continue to serve my community both
professionally and personally through veteran mentoring and the hiring of returning citizens. I'm also a
founding board member of two faith based non-profits. One provides care for orphaned children in Kiisi
Kenya. The second is building a small retirement village for senior members of my local church. I
currently run operations for a wholesale distributor of wood products in Bethlehem, PA.

I've known Chris Ahn for 9 years. We met during graduate school at the University of Virginia's Darden
School of Business. Chris and I were in the same section during our first year of classes and were both
members of the Darden Military Association, seeing each other every day. I immediately liked Chris for
his honesty, authenticity and sincere regard for his fellow human beings. In class he often spoke
passionately about serving others and our shared obligation as future business leaders to not only
employ people but understand and care for the whole person. In an academic environment charged
with competition Chris was always eager to lend a hand or ask for help. His genuine good nature made
the people around him and the teams he worked in better.

Chris distinguished himself during 6 years serving in the Marine Corps leading Marines in Iraq in 2005
and 2006, performing critical intelligence aggregation and analysis. He exemplified the Marine Corps'
servant-leader ethos by always taking care of his men and women ensuring their needs were met before
his own while serving in a combat theater. This approach to leadership fueled his success and interest in
many different pursuits. Before and after his time on active duty he was an entrepreneur, starting a
family clothing business that anticipated the coming of the e-commerce era and thrived. He worked to
support public servants who shared his view of service. He worked in the non-profit community to serve
veterans and after business school he held roles of increasing responsibility as an executive, consultant
and business owner. The theme throughout his career has always been service, kindness and regard for
others.

**To provide more detail on Chris's conduct as a professional I have added screen captures of
recommendations for Chris provided by co-workers, clients and supervisors from his LinkedIn profile in
an attachment to this letter.

Like his professional and volunteer pursuits Chris has also sought to serve his family and loved ones. His
startup clothing business provided employment for family members and friends. For many years he has
cared for family members both financially and with his time, most notably his grandmother who relies
on him deeply.

Chris's wife Grace, grandmother, family and life are in Los Angeles and have been since he was a boy.
He will not flee the people he loves and cares for, and his integrity will guide him to stay and fight for his
good name. Not only is Chris not a flight risk you couldn't drag him away. He didn't run from people
trying to kill him in a combat theater, and he won't run from his day in court. It is for these same
reasons that Chris would not hurt anyone or be a danger to society. Every fiber in his being is bent
toward service, not aggression. Chris is a humble, kind, earnest man who has served his country,
community, neighbor and family. He is not a danger or flight risk.

In closing if it was helpful I would be happy to speak with anyone in your department regarding my
experiences with Chris Ahn including giving testimony regarding his character. Though I did not have the
opportunity to serve or work with Chris I do consider him a close friend, know the content of his
character and hold him in the highest regard.

Sincerely,

Wade W. Buick

**Attachment A**

## Recommendations

Ask for a recommendation    | Recommend Christopher |

**Received (6)**    Given (5)



**John Furnari**
Marketing Director at Riot Games
October 31, 2017, John was a client of Christopher's

Chris and I have worked together on strategic planning projects for a number of organizations. He brings a combination of rigor and practicality to the table that's invaluable to the process...and the outcome. At every turn, he comes from the place of "what is truly going to have an impact on the business?" And he knows how to dig deep to uncover answers that can be put in place to do just that.

If you are looking for an experienced professional to frame a business problem, and turn that challenge into opportunity, this is someone you want on your team. I certainly continue to. **See less**



**Jeremy Johnson**
Corporate SME - Rotating Equipment at Tesoro
June 22, 2012, Jeremy was senior to Christopher but didn't manage directly

Chris consistently showed an exemplary ability to build teams and lead through example to achieve management goals.



**Ben Noonan**
Global eCommerce Executive and Entreprenuer
December 16, 2011, Christopher worked with Ben in the same group

Christopher has the most well-rounded skill set of anyone I've ever worked with. He's got the executive experience to generate a top-down strategy and the operational experience to ensure that all tactical details are accounted for and executed to plan.

His private- and public-sector experience have provided him with an incredible ability to build consensus and motivate teams large and small. His leadership skills are second to none. **See less**



**Claire Meyer**
Department of Defense
April 12, 2010, Claire reported directly to Christopher

Christopher is a truly gifted leader, who allows his subordinates the space and freedom to preform their duties, while anticipating and tackling issues as they arise.



**Joel Arends**
Attorney | Combat Veteran | Problem Solver
April 23, 2008, Christopher worked with Joel in the same group

"Chris has been an incredible help to Vets for Freedom in California. His hard work, character and commitment have resulted in the creation of a robust California organization. Chris is to be commended for his leadership in California's VFF Chapter. Chris was instrumental in spearheading our San Diego National Hero's Tour event that was held on the deck of the U.S.S. Midway. We had incredible turnout and great talent show up for the concert because of Chris' hard work and ingenuity." See less



**Chris I.**
Bull Manure Farmer
March 8, 2007, Chris was senior to Christopher but didn't manage directly

Chris Ahn's deployment to Iraq was marked by outstanding performance. Although he worked outside of his military specialty, Chris's intelligence, versatility, and stamina enabled him to complete his duties in an exceptional manner. Chris continually demonstrated a level of maturity, work quality, leadership, and professionalism far beyond his peers. The quality of work he produced gained him immense respect from his unit. He interacted with Marines of much higher seniority, including both Officer and Staff Non-Commissioned Officer level, to produce mission critical reports on a daily basis. Chris's diligence and work ethic easily stand among the top performers that I came in contact with while deployed to Iraq. See less

William A. Prescott

███████████████

May 11, 2019

The Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthouse
255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA 90012

Re: Character Statement for Christopher Ahn

Dear Judge Rosenbluth:

I am writing to you to express my deep support and trust in my close friend, Christopher Ahn. I have known Chris since 2010 when we both started graduate school at the Darden School of Business at the University of Virginia. Like Chris, I am also a veteran and we were both members of the Darden Military Association. Prior to attending the University of Virginia, I served as a Captain in the United States Army after receiving my commission from the United States Military Academy at West Point.

During our time as students at Darden, Chris displayed an outstanding work ethic in tackling our studies but still made time to engage in volunteer work. Of the several volunteer activities I know he took part in, I worked directly with him on one, which was volunteering with Prudential Financial, Inc. to develop and expand their VETalent program, a program aimed at expanding job opportunities for veterans returning to the civilian workforce. Chris put in countless hours to the detriment of his studies to help improve and expand the program because he truly believed in the program's importance. Chris cared deeply for his fellow Marines and veterans that were not able to transition as successfully to the civilian sector as he had, and he wanted to offer his time, skills, and energy to help as many veterans as possible.

Of all my deep friendships I made during business school, I have kept in closest contact with Chris since graduation. Besides being veterans, Chris and I shared other commonalities as well. Like Chris, I came back to California to help my family business and to help care for my grandmother, who is now 98. We both shared an intense dedication to our respective families and a desire to care and provide for the generations that came before us and who provided us with so many opportunities. Despite Chris' many obligations to support his family, he was always willing to lend a helping hand to others even at a great inconvenience to himself. Once, when I was preparing to leave on a trip overseas with my family for two weeks, the person who

was supposed to stay at my house and care for my various pets cancelled at the very last minute. When I mentioned my frustration with the situation to Chris, he immediately offered to stay at my house and look after my pets for two weeks even though it meant that he had a long commute every day back and forth to Chino Hills to help care for his mother and grandmother. I accepted his offer and was able to enjoy my trip with my family knowing that Chris was caring for my interests at home.

Chris has been a frequent guest at my house and is beloved by my three children, ages 5, 4, and 10 months. I completely trust Chris around my family and would entrust him with the lives of my wife and children without a second thought. I have never known Chris to be a violent person or a danger to society. He is one of the brave few who was willing to sacrifice his life to defend the USA as a Marine including a deployment to Iraq at the height of hostilities there. It is unconscionable that his military training and his exercising of his constitutional rights is being used against him to try to paint him as a threat to society.

If granted bail, I am confident that Chris will not flee and that he will obey the law and follow any restrictions or rules that the court may impose as a condition of his release from detention. I am confident because I know that Chris is a man of his word and because of his love and devotion to his friends and family and that he understands the effect that his actions would have on his family if he were to flee.

Chris Ahn is a truly patriotic American, a selfless servant, a devoted family man, and an example for others to follow. I implore you to grant Chris bail while his case winds its way through the judicial system so that Chris can return home to continue to help support his family. Thank you for your consideration.

Respectfully,

William A. Prescott

William A. Prescott

Todd Conetta



13 May 2019

Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthouse
255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA, 90012

Your Honor:

I am writing to you in support of Christopher Ahn's bail application. I have known Christopher (Chris) for
the last nine years I can confidently attest to the quality of his character.

Chris and I first became acquainted as first-year students at the University of Virginia Darden School of
Business. As veterans, we both joined the Darden Military Association (DMA), a formal "club"
established to support career transitions for veterans and encourage comradery. Of the 12 or so DMA
members from the Class of 2012, Chris was one of only two veterans that had served as an enlisted
member for his entire military career. To his credit, Chris did not let this fact quiet his voice or reduce his
influence. Instead Chris was a driving force for the legacy that the DMA Class of 2012 would leave.
During our 18 months at Darden, the DMA engaged with multiple veterans' charities including Children
of Fallen Patriots and the Wounded Warrior Project to determine how our group could support their
missions. We also established relationships with military groups at other top-MBA programs to scale our
impact. Chris took the reins on outreach and coordination, and was pivotal in the impact our team had
during our time at Darden and the legacy we created for the DMA.

Darden brings together individuals from a large variety of backgrounds creating a diverse community.
This aspect did not go overlooked by Chris who went above and beyond to help those outside of the
DMA understand more about the military and a veteran's perspective. Whether public speaking
engagements, DMA-sponsored outreach, or raising awareness within the DMA itself Chris took it on as a
personal mission to bridge our classmates' understanding of military life and the veteran's perspective.

One final anecdote I would like to share with you highlights an interaction I had with Chris after
graduation when Chris visited Washington, D.C. I was living across the Potomac in Arlington, Virginia and
Chris reached-out seeking a place to stay. Happy to oblige, I hosted Chris for one night of his trip and the
two of us grabbed food and a drink at a nearby pub. Over the meal we caught-up on a number of things,
and during that conversation Chris shared with me a detail about his time at Darden that I had not been
aware of. Despite his dedication and exceptional work ethic, Chris had struggled academically early on at
Darden. He did not have the advantage of a lot of business experience that some of our classmates
entered Darden. After a difficult first semester, Chris was offered the opportunity to cut his losses and
leave the school no questions asked. Instead, Chris doubled-down on himself and his commitment to

graduating successfully. Working closely with the Dean of Students and professors that had shown a personal interest in Chris' success, Chris charted a path to right the ship. Over the next three semesters Chris pushed through the remaining "core" required courses, excelled in elective courses and graduated in May as part of the class of 2012. By forging productive relationships and through his own fantastic work ethic, diligence, and dedication to a goal, Chris was able to accomplish what some Darden staff had told him was likely not possible. For me, what truly set this academic turnaround apart was the fact that Chris didn't let his struggles impact the way that he interacted with others and the Darden community at-large. Chris never raised this at DMA meetings, nor had he raised it privately with me. All the amazing, selfless things Chris was doing for DMA and for our class at-large, he was doing while dealing with these very personal academic challenges. Sitting at this meal, two years after graduation, listening to Chris recount his situation really brought everything into perspective and highlighted for me, yet again, what an amazing person Chris is.

I know Chris only to be a person of upstanding character. Over the last nine years Chris constantly puts others before him. When we would discuss his family life, his loyalty and dedication to them was quickly made obvious. Chris is not a violent person and poses absolutely no risk to society if he is granted bail. Furthermore, Chris has proven that he will do the right thing, he is a man of integrity and poses no risk of flight. He loves this country, loves what America stands for, and would not turn his back on a justice system central to our nation's identity.

I request you take in consideration these qualities as you evaluate Christopher Ahn's application for bail.

Sincerely,

Todd Conetta

Ryan W. Fisher

May 13, 2019

Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthouse
255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA 90012

Re:  Christopher Ahn

Your Honor,

The purpose of my writing is to briefly describe my relationship with Christopher Ahn, and provide
reference to his outstanding character, in the interest of demonstrating that he is in no way a threat to
society, nor the type of person who would flee.  I am a California resident currently living in Alameda,
and am employed by Apple Inc., where I manage the iPad New Product Operations team.  Prior to my
career at Apple, I served as an Explosive Ordnance Disposal Officer in the United States Army, and was
honorably discharged in 2010.

I met Chris at the University of Virginia, where he and I attended the Darden Graduate School of
Business.  Though Chris and I did not have any classes together during our first semester at Darden, we
had the opportunity to meet through the Darden Military Association, where Chris held the role of VP of
Community Affairs.  On first meeting Chris, it was immediately evident that he was (and is) an
unwavering American Patriot, a proud but humble Veteran of the the United States Marine Corps, and a
compassionate leader.  As Chris and I became close friends over our two years at Darden, these attributes
became even more apparent through his actions; he worked tirelessly in coordinating volunteer activities
for Veterans organizations and events, and was continuously brainstorming creative new ways to give back
to the community, and to get more people involved along the way.  His positive energy and dedication to
service were both impactful and an inspiration to others.

While it is impossible to fully portray Chris' character in a short letter, I do hope to provide a glimpse of
the honorable and upstanding man that Chris is.  He is a selfless servant to his community and the United
States, a loyal husband, devoted son, and a friend to many.  In closing, I humbly recommend the most
favorable consideration for Chris' bail application, as he presents no threat nor flight risk.

Respectfully,

Ryan W. Fisher

May 16, 2019

Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthouse
255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA 90012

**RE: Bail Application for Christopher Ahn**

To Whom It May Concern:

Please accept this letter of support for Christopher Ahn as he seeks release on bail from the Court.

Many people will describe Chris as proud Marine, a war hero, an ardent patriot, a defender and advocate for freedom – for all people beyond the borders of our country. These are all accurate descriptions, and I wholeheartedly endorse them. However, to me, Chris is all of these things, but also a good friend. Today, I write to you as his friend and former colleague, respectfully requesting that you extend to him the kind of compassion that Chris has shown to others throughout his life.

I first met Chris when I was given the opportunity to work for the veteran's advocacy organization, Vets for Freedom, in 2007. Vets for Freedom was founded by veterans of the wars in Iraq and Afghanistan, and was therefore staffed – both volunteer and paid – primarily by veterans. With the exception of our Communications Director, who was married to an actively deployed Army Ranger, I was the only non-veteran who worked for the organization.

My career has been exciting, spanning from Capitol Hill to the White House, the Governor of California to the private sector. However, the most rewarding 2 years of my professional career came while working with the tremendous men and women who returned from war and continued to honor the service and sacrifice of their comrades through their work with Vets for Freedom. This is where I first met Chris. What Chris, and in fact all my veteran colleagues, did not know, is that I never felt his or their equal. Each of the men and women I worked with had sacrificed so much in service of our nation. I felt unworthy in their presence.

Despite this personal insecurity, Chris and I developed a friendship. He, the son of a Korean immigrant; me a Jewish twenty-something from West Texas, we bonded instantly over similar stories of our experiences with racism/anti-Semitism, and our unabashed love for our Country and our fellow citizens, regardless of some of their faults. Despite my lack of ever having worn the uniform, he treated me as an equal – as a brother – and consistently reminded me that the work we were doing on the home front was important to the men and women forward deployed. I admired him greatly.

Chris returned home from war in 2006, and before his family had the opportunity to get used to having him around, he deployed again. This time, voluntarily; this time to Washington, DC. Chris did this much to the disappointment of his family – especially his then girlfriend, now wife, Gracie. He did this with a sense of purpose that I didn't fully understand until mid-2008, when, after another long day of work we grabbed dinner together, and he opened up about his experience in Iraq, and why it was so important for him to honor the sacrifices of those he served with who never returned home. Vets for Freedom and

the issues we were advocating for became his mission. It was the only way he knew how to honor the memories of the friends he lost in combat.

So, he moved to Washington, shared an old apartment with a bunch of our colleagues in the suburbs of DC, traded in his uniform for a suit and tie; his rifle for his verbal eloquence, and worked tirelessly to advocate for Congressional support for those who were carrying on the fight overseas.

Although I only had the honor of working with Chris for a couple of years, several things became apparent almost immediately. And although distance and time have separated us over the years, our friendship has always remained strong, so I know these things remain true today.

- Chris Ahn is completely dedicated to his family. His wife, mother, and grandmother are everything to him, and he loves them all dearly.
- Chris Ahn fights for those who can't fight for themselves. His volunteer and charitable work speaks for itself. He always puts others before him – even in situations such as these that land him in trouble.
- Chris Ahn is passionate, yet non-violent. He may have been a warrior on the battlefield, but at home he is a kind and gentle man.
- Chris Ahn is not a flight risk. He is committed to setting the record straight and defending his name when given the chance. More so, he is committed to his family, to his community, and to his country, and would never leave them behind.
- Chris Ahn is smart and career oriented. He is highly educated and is a solid contributor to society – the complete opposite of a danger to it. He has spent his entire adult life protecting America, its citizens, and our way of life; and if given the opportunity for release, will continue being a positive member of the community he so dearly loves.

In summary, Chris should be considered for release from custody. His service and commitment to his family, to his community, and to our country have certainly earned him the right to continue to support his loved ones from home while he waits for his day in court.

I greatly appreciate the opportunity to speak on behalf of my friend, Christopher Ahn, and appreciate your consideration of this request.

Respectfully,

Josh Grodin

May 12, 2019

Honorable Jean P. Rosenbluth

United States Magistrate Judge

Roybal Federal Building and United States Courthouse

255 E. Temple St., Courtroom 690, 6th Floor

Los Angeles, CA, 90012

Dear Honorable Rosenbluth,

My name is Curtis Flood and I am writing to respectfully request that my friend and fellow veteran, Mr. Christopher Ahn, be granted bail.

I had the pleasure of being one of Chris' friends during our education at the University of Virginia's Darden School of Business from 2010-2012. During that time, Chris was very active in the Darden Military Association, an organization dedicated to the advancement of active duty, reserve and veteran members of the United States military. Chris was a compassionate leader of the group, well respected amongst his classmates, fellow veterans and the local community for his selfless acts and volunteering his time for charities. Chris either led or participated in several volunteering events during his time at Darden, including the following 1) Toys for Tots, the U.S. Marine Corps charity that raises toys during Christmas every year for disadvantaged children; 2) Habitat for Humanity, in which he helped reroof and replank an elderly woman's home in rural Virginia; and 3) Children of Fallen Patriots, a charity that grants scholarships to the children of slain service members in which he helped raise more than $20,000 through various events and sponsorship grants, including such notable corporate sponsors as Johnson & Johnson and Fidelity Investments. Chris was a proud ex-Marine and kept the Marine Corps code of integrity at all times: respect for human dignity, honor, personal responsibility and helping those who were in need.

The countless friends, family and complete strangers that have come in contact with Chris are better for it and we all hope that he will be granted bail at the soonest possible time. He is not a flight or public danger risk as he would never consider running from a problem and is likely eager to be vindicated. Chris' service to this country in its time of need can never be repaid but it should mark him as worthy of your utmost consideration in this matter.

Very Respectfully,

Lieutenant Curtis Flood, U.S.N.R. (HD)

**Korean Community Lawyers Association**
K. Freeman Lee
3550 Wilshire Blvd., Suite 1110
Los Angeles, CA 90010

**Korean American Federation of Los Angeles**
Dr. Laura Jeon
981 S. Western Ave., Suite 100
Los Angeles, CA 90006
info@kafla.org

**Orange County Korean American Bar Association**
Chang Lim
PO Box 16691
Irvine, CA 92623
admin@ockaba.org

**Korean American Bar Association of San Diego**
John Ahn
P.O. Box 122831
San Diego, CA 92112

May 28, 2019

Dear Judge Rosenbluth,

We write this letter on behalf of the members of the Korean Community Lawyers Association (KCLA), Korean American Federation of Los Angeles (KAFLA), Orange County Korean American Bar Association (OCKABA), and Korean American Bar Association of San Diego (KABA-SD) in support of Christopher Philip Ahn. Each of our organizations represents members of the Korean-American community in California. We join in this letter to raise certain facts and circumstances regarding the North Korean regime, which we believe merit the Court's consideration as it adjudicates Mr. Ahn's case.

North Korea and its authoritarian regime, led by the dictator Kim Jong-Un, is one of the world's worst serial abusers of human rights. In 2014, the United Nations Human Rights Council issued a report on human rights in North Korea, finding that "crimes against humanity have been committed in the Democratic People's Republic of Korea, pursuant to policies established at the highest level of the State" including "extermination, murder, enslavement, torture, imprisonment, rape, forced abortions and other sexual violence, persecution on political, religious, racial and gender grounds, the forcible transfer of populations, the enforced disappearance of persons and the inhumane act of knowingly causing prolonged starvation."[1]

In considering the bail request of Mr. Ahn, we ask that the Court take into consideration the deplorable offenses perpetrated by North Korea and its leaders, and the inherent untrustworthiness of allegations premised on the self-interested testimony of officials from that regime. The regime has every incentive to level false accusations against those who work to help North Koreans escape tyranny and violence, in order to deter them from continuing such

---

[1]   United Nations, General Assembly Human Rights Council, *Report of the commission of inquiry on human rights in the Democratic People's Republic of Korea*, A/HRC/25/63 (7 February 2014), p. 14, ¶¶ 75-76, available at
https://www.ohchr.org/EN/HRBodies/HRC/CoIDPRK/Pages/ReportoftheCommissionofInquiry DPRK.aspx.

efforts.  We do not believe that Mr. Ahn – or any American citizen – should be detained based
on such accusations, nor should they be extradited to a country in which they may be exposed to
violent reprisal by the regime.

While we are conscious that the United States has the diplomatic obligation to produce
eligible fugitives under the terms of its extradition treaty with the Kingdom of Spain, we believe
the unique circumstances of this case may implicate several bars to extradition, such as the bar
against extradition for political offenses, and the bar against extradition of individuals who may
face torture.  We ask that the Court give due consideration to these issues in making its final
determination on whether Mr. Ahn should be released on bail, and whether he should be
extradited.

K. Freeman Lee
President
Korean Community Lawyers Association

Laura Jeon, Ph.D.
President
Korean American Federation of Los Angeles

Chang Lim
President
Orange County Korean American Bar
Association

John Ahn
President
Korean American Bar Association of San
Diego

P.O. Box 387
San Francisco, CA 94104
www.aaba-bay.com



ASIAN AMERICAN BAR ASSOCIATION
OF THE GREATER BAY AREA

**CHARLES H. JUNG**
*President*

**JOHN HAMASAKI**
*Vice President/President-Elect*

**MICHELLE PARK CHIU**
*Treasurer*

**LISA P. MAK**
*Secretary*

**LIN CHAN
ROLAND CHANG
CLAIRE CHOO
ANGEL GARRETT
JOHN B LOUGH, JR.
MARIE MA
KELLY MATAYOSHI
SEAN TAMURA-SATO
ELVIN VU
JASON YEE**
*Directors*

June 14, 2019

Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthouse
244 E. Temple Street, Courtroom 690, 6th Floor
Los Angeles, CA 90012

Dear Judge Rosenbluth,

I write this letter on behalf of the Asian American Bar Association of the Greater Bay Area (AABA). AABA is the oldest and largest pan-Asian bar association in the United States and one of the largest, if not the largest, affinity bar organization in California. We have been the voice of the San Francisco Bay Area's Asian Pacific American (APA) legal community since 1976. While we do not know Chris Ahn, we write this letter to highlight facts about North Korea that are a source of concern for many in the APA community.

North Korea has a disturbing record of human rights violations. In considering the bail request of Mr. Ahn, we ask that the Court take into consideration the likelihood that if Mr. Ahn fell into the hands of North Korea, he would not receive a fair trial. The United States Department of State reports that North Korea maintains "a distinction between those accused of political, as opposed to nonpolitical, crimes and claimed that the government offered trials and lawyers only to the latter [nonpolitical crimes]." The State Department reported that "there is no indication that independent, nongovernmental defense lawyers existed," and "most inmates were sent to prison camps without trial, without knowing the charges against them, and without having legal counsel."[1]

Moreover, according to the United Nations' 2014 report on human rights in North Korea, it is likely that those detained in North Korea for political crimes will be subject to severe human rights violations: "in the political prison camps of the Democratic People's Republic of Korea, the inmate population has been gradually eliminated through deliberate starvation, forced labor, executions, torture, and rape."[2] This is confirmed by the stories of Americans detained in North Korea before. We do not believe that Mr. Ahn or any American citizen should be placed under the risk of being extradited or otherwise exposed to the reach of a country in which there is a "lack of an independent judiciary, arbitrary arrest and punishment of crimes, torture in custody, forced labor, and executions maintain fear and control"[3]

While we respect and understand the United States' diplomatic obligations to the Kingdom of Spain, we believe the danger and complications created by North Korea's involvement in this case warrants extra consideration from the Court.

Sincerely

*Ezra F. Denney*

Ezra Denney
AABA Operations Director

1   2018 Country Reports on Human Rights Practices: DPRK, US Department of State, March 13, 2019, https://www.state.gov/reports/2018-country-reports-on-human-rights-practices/democratic-peoples-republic-of-korea/.
2 - United Nations Human Rights Council, *Report of the commission of inquiry on human rights in the Democratic People's Republic of Korea*, A/HRC/25/63 (7 February 2014) ¶ 60.
3 - Human Rights Watch, World Report 2018 on North Korea, at https://www.hrw.org/world-report/2018/country-chapters/north-korea

Faton Gjuka

June 14, 2019

Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthouse
255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA, 90012

To the Honorable Jean P. Rosenbluth,

I met Chris Ahn while earning my MBA at The Darden Graduate School of Business at The University of Virginia. The first few days and weeks at Darden were filled with new faces and the pressure of establishing connections and making friends. Striking a friendly rapport with Chris was effortless. He was a breath of fresh air and a charismatic addition to our class. In addition to being in my class, Chris was also in my section, which meant, we spent a full semester in one room making our way through a grueling curriculum, all the while learning about our section-mates, our professors, and the business cases we'd debate to an endless degree.

In class, I remember Chris as a thoughtful, mature, caring and value-driven person. You could tell his service in the Marines gave him a lot of pride for his country. Outside class, he was a connector – always gathering people together at social events and welcoming them into his home.  He spoke fondly of his California roots, his family, his love of country and his time in the Marines.  He supported his family even as a student – always putting aside money that were appropriated for school to send to his family to ensure key bills were paid.

Chris was also in The Consortium, the nation's largest diversity network that links top-tier students with MBA programs. He valued inclusivity and camaraderie among our diverse classmates. He would actually go above and beyond to ensure minority and international students were well represented in key student associations and received the coveted interview spots for the top firms recruiting on campus. This ensured every student received a fair shot at the best jobs, not just the well-connected students.

Your Honor, Chris is not a violent or dangerous person. It's unfathomable to me that he would hurt anyone.

Sincerely,

Faton Gjuka

June 5, 2019

Honorable Jean P. Rosenbluth
United States Magistrate Judge
Royal Federal Building and United States Courthouse
255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA, 90012

Dear Judge Rosenbluth,

I went to school with Chris Ahn at the University of Virginia, Darden School of Business, from 2010 to 2012. He was an exemplary and beloved classmate, friend, businessman, and human.

I know Chris' character to be one who always works hard, lives life with purpose, gentle, humorous, and stands up for those who don't have a voice. He is extremely kind and I've known him to always put others before himself. He loves his family, friends, and country fiercely and would literally lay down his life as a moment's notice for any of them.

I've recently heard of events regarding Chris and was in absolute shock. The accusations brought against him I believe to be 100% false and linked to a "government" and troubled country, North Korea, who have been known to compulsively lie and continuously assassinate those who speak out against them.

At this time we need to protect our citizen who has fought for our beloved country and now fight for him. Please do not allow Chris to become another statistic of the North Korean regime.

Chris prides himself of being a man of his word and I know if he says he will not flee, he won't. He also has many family ties that he needs and desires to be close to. Nor in 1000 years could Chris be a "danger" to society. He has continuously fought to protect our society FROM danger.

Thank you for your time. I do hope you truly consider those of us who know Chris and can speak to his character, his stellar reputation for his country, his professionalism as an entrepreneur and businessman, and the history of the lies of North Korea when making your decision.

Thank you again.

Best,

Kendall Jennings
Darden Class of 2012
Washington, D.C.

Daniel Tifft



Honorable Jean P. Rosenbluth
United Magistrate Judge
Royal Federal Building and United States Courthouse
255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA, 90012

Dear Judge Rosenbluth:

I am writing to you on behalf of my friend Christopher Ahn, in support of his application for bail. I have known Chris for nearly 10 years, having attended business school with him at the University of Virginia.

Chris is one of the most loyal, compassionate and honorable individuals I have ever met. In school he was a vocal proponent of our university honor code, reminding all of us that any academic or career success we might achieve was never worth the cost of our good names. He was also well-regarded by our classmates as a person who would drop anything to come to the aid of a friend. Once, during a stressful period in school, he walked all the way to my apartment to check on my family and me and to chat. This was despite his need to walk with a cane at the time due to a knee injury.

I found Chris to be a man of impeccable character who was kind, thoughtful and compassionate. I believe in my heart that should Chris be granted bail, he would honor any conditions placed upon him, would not constitute a flight risk, and would pose no risk to any other individuals. I strongly support the grant of bail so that Chris may rejoin his family while preparing his defense in this case.

Sincerely,

Daniel Tifft

Stephanie Yeung



June 7, 2019

Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthouse
225 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA 90012

RE: Matter of Christopher Ahn

Dear Judge Rosenbluth:

I am writing on behalf of my business school classmate, Christopher Ahn. I had the pleasure of attending the Darden School of Business at the University of Virginia with him where we were in the same learning section. I was shocked to see his name in the news and to learn of the crimes he is accused of committing because they are completely out of his character and do not reflect the friend I know.

I have a great amount of respect for Chris for many reasons. While most of us took out loans to attend graduate school but were otherwise mostly unencumbered, Chris was not only attending business school but at the same time supporting his mother, grandmother and helping his younger brother by running a business apart from school. When I asked him about his company, he explained that his parents had been in the clothing industry but his father died suddenly when Chris was a teenager so he had to step up and run the business to keep his family afloat. The tremendous weight of responsibility he bore at an early age definitely shaped his core values of family and hard work.

Darden uses the case method which relies heavily on class participation and I always looked forward to when Chris would raise his hand to add to the discussion. His comments usually started with something outrageous to capture our attention like, "This accounting case reminds me of Jurassic Park..." which would make everyone laugh but as he went on to make his points, they were always incredibly insightful and drew on his experience as an entrepreneur, Marine, and deeply reflective person.

Given the responsibility to his family and wife, including financially, his role as an entrepreneur with his own company, and his profound love for our country, Chris is not a flight risk. In fact, he is one of the most patriotic people I have ever met and someone I am very proud to call my friend. I hope you will take this into consideration with your decision to grant him bail.

Regards,

Stephanie Yeung

63

# EXHIBIT C



United Nations

A/HRC/25/63

# General Assembly

Distr.: General
7 February 2014

Original: English

**Human Rights Council**
**Twenty-fifth session**
Agenda item 4
**Human rights situations that require the Council's attention**

## Report of the commission of inquiry on human rights in the Democratic People's Republic of Korea˙

*Summary*

       The present report contains the main findings and recommendations of the commission of inquiry on human rights in the Democratic People's Republic of Korea. **

---

  * The annexes to the present report are circulated as received, in the language of submission only.
  ** For detailed findings of the commission of inquiry, see document A/HRC/25/CRP.1.

GE.14-10866



 Please recycle



# Contents

|  |  |  | *Paragraphs* | *Page* |
|---|---|---|---|---|
| I. | | Introduction......................................................................................................... | 1–2 | 3 |
| II. | | Mandate and methodology.................................................................................... | 3–23 | 3 |
| | A. | Non-cooperation by the Democratic People's Republic of Korea.................. | 9–11 | 4 |
| | B. | Methods of work........................................................................................... | 12–20 | 4 |
| | C. | Legal framework and standard of proof for reported violations.................... | 21–22 | 6 |
| | D. | Archiving and record-keeping of testimony .................................................. | 23 | 6 |
| III. | | Principal findings of the commission.................................................................... | 24–73 | 6 |
| | A. | Violations of the freedoms of thought, expression and religion.................... | 26–31 | 7 |
| | B. | Discrimination .............................................................................................. | 32–37 | 8 |
| | C. | Violations of the freedom of movement and residence ................................. | 38–45 | 9 |
| | D. | Violations of the right to food and related aspects of the right to life ........... | 46–55 | 10 |
| | E. | Arbitrary detention, torture, executions and prison camps ........................... | 56–63 | 11 |
| | F. | Abductions and enforced disappearances from other countries.................... | 64–73 | 13 |
| IV. | | Crimes against humanity....................................................................................... | 74–79 | 14 |
| V. | | Conclusions and recommendations....................................................................... | 80–94 | 15 |
| Annexes | | | | |
| I. | | Correspondence with the Supreme Leader of the Democratic People's Republic of Korea and First Secretary of the Workers' Party of Korea, Kim Jong-un ................................................. | | 22 |
| II. | | Correspondence with China ................................................................................. | | 26 |

2

## I.    Introduction

1.      In its resolution 22/13, adopted on 21 March 2013, the Human Rights Council established the commission of inquiry on human rights in the Democratic People's Republic of Korea. In resolution 22/13, the Council mandated the commission to investigate the systematic, widespread and grave violations of human rights in the State, with a view to ensuring full accountability, in particular, for violations that may amount to crimes against humanity.

2.      On 7 May 2013, the President of the Human Rights Council announced the appointment of Michael Kirby (Australia) and Sonja Biserko (Serbia), who joined the Special Rapporteur on the situation of human rights in the Democratic People's Republic of Korea, Marzuki Darusman (Indonesia) to serve as the members of the commission of inquiry. Mr. Kirby was designated to serve as Chair. The commission implemented the mandate entrusted by the States Members of the Human Rights Council, bearing in mind the decision of the Council to transmit the reports of the commission to all relevant bodies of the United Nations and to the Secretary-General for appropriate action.

## II.    Mandate and methodology[1]

3.      The mandate of the commission of inquiry is described in paragraph 5 of Human Rights Council resolution 22/13, in which the Council made specific reference to paragraph 31 of the 2013 report of the Special Rapporteur on the situation of human rights in the Democratic People's Republic of Korea.[2] Reading the two paragraphs together, the commission determined that it had been mandated to investigate the systematic, widespread and grave violations of human rights in the Democratic People's Republic of Korea including, in particular, the following nine specific substantive areas:

- Violations of the right to food

- The full range of violations associated with prison camps

- Torture and inhuman treatment

- Arbitrary arrest and detention

- Discrimination, in particular in the systemic denial and violation of basic human rights and fundamental freedoms

- Violations of the freedom of expression

- Violations of the right to life

- Violations of the freedom of movement

- Enforced disappearances, including in the form of abductions of nationals of other States

4.      The above list is not exhaustive. Where appropriate, the commission also investigated violations intrinsically linked to one of the nine areas.

---

[1]  For further information on the interpretation of the mandate and the Commission's methods of work, see A/HRC/25/CRP.1, sect. II.

[2]  A/HRC/22/57.

5.      The mandate further indicates that the inquiry should pursue three interlinked objectives:

(a) Further investigating and documenting human rights violations;

(b) Collecting and documenting victim and perpetrator accounts;

(c) Ensuring accountability.

6.      The commission paid specific attention to gender-based violations, particularly violence against women, and the impact of violations on particular groups, including women and children.

7.      Paragraph 5 of Council resolution 22/13 does not limit the temporal scope for the commission's inquiry to a particular period within the existence of the Democratic People's Republic of Korea.

8.      With regard to its geographic scope, the commission interpreted its mandate to include violations committed on the territory of the Democratic People's Republic of Korea, as well as those violations that involve extraterritorial action originating from the State, such as abductions from other countries. The commission also considered violations that causally enable, or are the immediate consequence of, violations in the Democratic People's Republic of Korea, and made findings regarding the extent to which other States carry relevant responsibility.

## A.      Non-cooperation by the Democratic People's Republic of Korea

9.      In its resolution 22/13, the Human Rights Council urged the Government of the Democratic People's Republic of Korea to cooperate fully with the commission's investigation, to permit the commission's members unrestricted access to visit the country and to provide them with all information necessary to enable them to fulfil their mandate. Immediately after the adoption of resolution 22/13, the Democratic People's Republic of Korea publicly stated that it would "totally reject and disregard" it. In a letter dated 10 May 2013, it informed the President of the Human Rights Council that it "totally and categorically rejects the commission of inquiry". Regrettably, this stance has remained unchanged, despite numerous attempts at engagement by the commission.

10.      The Democratic People's Republic of Korea did not respond to the commission's repeated requests for access to the country and to information on the human rights situation (see sect. III below).

11.      The Commission shared its detailed findings (A/HRC/25/CRP.1) with the Government of the Democratic People's Republic of Korea, and invited its comments and factual corrections. A summary of the most serious concerns, in particular the principal findings on crimes against humanity, was also included in a letter addressed to the Supreme Leader of the Democratic People's Republic of Korea, Kim Jong-un (see annex I). In the letter, the commission drew attention to the principle of command and superior responsibility under international criminal law. It urged the Supreme Leader to prevent and suppress crimes against humanity, and to ensure that perpetrators are prosecuted and brought to justice.

## B.      Methods of work

12.      Owing to its lack of access to the Democratic People's Republic of Korea, the commission obtained first-hand testimony through public hearings that were transparent, observed due process and protected victims and witnesses. More than 80 witnesses and

4

experts testified publicly and provided information of great specificity, detail and relevance, in ways that often required a significant degree of courage.

13.     Public hearings were conducted in Seoul (20 to 24 August 2013), Tokyo (29 and 30 August 2013), London (23 October 2013) and Washington, D.C. (30 and 31 October 2013).[3] The commission invited the authorities of the Democratic People's Republic of Korea to make representations at the public hearings, but received no reply.

14.     The commission and its secretariat conducted more than 240 confidential interviews with victims and other witnesses.

15.     In July 2013, the commission made a call for written submissions to all States Members of the United Nations and relevant stakeholders. At the finalization of the present report, 80 such submissions had been received.

16.     The commission conducted official visits to the Republic of Korea, Japan, Thailand, the United Kingdom of Great Britain and Northern Ireland and the United States of America.

17.     The commission sought access to China in order to conduct inquiries and to consult with officials of the Government and local experts. A working meeting was held in July 2013, at which that request was made. The commission requested access to parts of China bordering the Democratic People's Republic of Korea. On 7 November 2013, the commission transmitted a further request for an invitation to visit China. On 20 November 2013, the Permanent Mission of China in Geneva informed the secretariat that, given the State's position on country-specific mandates, especially on the Korean peninsula, it would not be possible to extend an invitation to the commission. In a follow-up letter dated 16 December 2013, the commission requested information on the status of citizens of the Democratic People's Republic of Korea and their children in China, forced repatriations to and related cooperation with the Democratic People's Republic of Korea, trafficking in persons and other issues relevant to the mandate of the commission (see annex II).

18.     The commission engaged with a number of United Nations entities and other humanitarian actors. It regrets that other such entities and actors were not in a position to provide relevant information. The commission expresses its gratitude to the Office of the United Nations High Commissioner for Human Rights (OHCHR) for its support. The commission benefited from the invaluable support of a number of non-governmental organizations that thoroughly document human rights violations in the Democratic People's Republic of Korea, despite the inadequate financial resources available to them.

19.     The most significant investigative challenge faced by the commission, aside from the inability to have access to the Democratic People's Republic of Korea, was the fear of reprisals by witnesses. Most of the potential witnesses residing outside the State were afraid to testify, even on a confidential basis, because they feared for the safety of family members and assumed that their conduct was still being clandestinely monitored by the authorities.

20.     The commission paid particular attention to the protection of victims and witnesses. It recalls that primary responsibility for protecting victims, witnesses and other persons cooperating with the commission rests with their States of residence and nationality. The commission therefore urges Member States to provide additional protection measures where necessary.

---

[3]  Video recordings and transcripts from all the public hearings are available on the website of the commission of inquiry at www.ohchr.org/EN/HRBodies/HRC/CoIDPRK.

## C.   Legal framework and standard of proof for reported violations

21.     In assessing the situation of human rights in the Democratic People's Republic of Korea, the commission relied chiefly on the binding legal obligations that the country voluntarily assumed as a State party to the International Covenant on Civil and Political Rights, the International Covenant on Economic, Social and Cultural Rights, the Convention on the Rights of the Child and the Convention on the Elimination of All Forms of Discrimination against Women. Where appropriate, the commission also considered relevant obligations of other States, including the prohibition of refoulement under international refugee law and international human rights law. Matters relating to crimes against humanity were assessed on the basis of definitions set out by customary international criminal law and in the Rome Statute of the International Criminal Court.

22.     The commission bases its findings on a "reasonable grounds" standard of proof. It concluded that there are reasonable grounds establishing that an incident or pattern of conduct had occurred whenever it was satisfied that it had obtained a reliable body of information, consistent with other material, based on which a reasonable and ordinarily prudent person would have reason to believe that such an incident or pattern of conduct had occurred.

## D.   Archiving and record-keeping of testimony

23.     All information gathered by the commission, including information pertaining to individual perpetrators, has been stored in a confidential electronic database. The commission has authorized OHCHR, acting as the residual secretariat of the commission, to provide access to the existing materials contained in the database to competent authorities that carry out credible investigations for purposes of ensuring accountability for crimes and other violations committed, establishing the truth about violations committed or implementing United Nations-mandated targeted sanctions against particular individuals or institutions. Access must only be granted to the extent that witnesses or other providers of information have given their informed consent and any protection and operational concerns are duly addressed.

## III.   Principal findings of the commission

24.     The commission finds that systematic, widespread and gross human rights violations have been and are being committed by the Democratic People's Republic of Korea.[4] In many instances, the violations found entailed crimes against humanity based on State policies. The main perpetrators are officials of the State Security Department, the Ministry of People's Security, the Korean People's Army, the Office of the Public Prosecutor, the judiciary and the Workers' Party of Korea, who are acting under the effective control of the central organs of the Workers' Party of Korea, the National Defence Commission and the Supreme Leader of the Democratic People's Republic of Korea.

25.     The commission emphasizes that the current human rights situation in the Democratic People's Republic of Korea has been shaped by the historical experiences of the Korean people. Confucian social structures and the experience of the Japanese colonial occupation have to some degree informed the political structures and attitudes prevailing in the country today. The division imposed on the Korean peninsula, the massive destruction

---

[4]   See also A/HRC/25/CRP.1, sect. IV.

caused by the Korean War and the impact of the Cold War have engendered an isolationist mindset and an aversion to outside powers that are used to justify internal repression. The particular nature and the overall scale of human rights violations in the State can be more easily understood through an appreciation of the nature of its political system, which is based on a single party led by a single Supreme Leader, an elaborate guiding ideology and a centrally planned economy.[5]

## A.   Violations of the freedoms of thought, expression and religion

26.     Throughout the history of the Democratic People's Republic of Korea, among the most striking features of the State has been its claim to an absolute monopoly over information and total control of organized social life. The commission finds that there is an almost complete denial of the right to freedom of thought, conscience and religion, as well as of the rights to freedom of opinion, expression, information and association.

27.     The State operates an all-encompassing indoctrination machine that takes root from childhood to propagate an official personality cult and to manufacture absolute obedience to the Supreme Leader (*Suryong*), effectively to the exclusion of any thought independent of official ideology and State propaganda. Propaganda is further used by the Democratic People's Republic of Korea to incite nationalistic hatred towards official enemies of the State, including Japan, the United States of America and the Republic of Korea, and their nationals.

28.     Virtually all social activities undertaken by citizens of all ages are controlled by the Workers' Party of Korea. Through the associations that are run and overseen by the Party, and to which citizens are obliged to be members, the State is able to monitor its citizens and to dictate their daily activities. State surveillance permeates the private lives of all citizens to ensure that virtually no expression critical of the political system or of its leadership goes undetected. Citizens are punished for any "anti-State" activities or expressions of dissent. They are rewarded for reporting on fellow citizens suspected of committing such "crimes".

29.     Citizens are denied the right to have access to information from independent sources; State-controlled media are the only permitted source of information in the Democratic People's Republic of Korea. Access to television and radio broadcasts, as well as to the Internet, is severely restricted, and all media content is heavily censored and must adhere to directives issued by the Workers' Party of Korea. Telephone calls are monitored and mostly confined to domestic connections for citizens. Citizens are punished for watching and listening to foreign broadcasts, including foreign films and soap operas.

30.     Strengthening market forces and advancements in information technology have allowed greater access to information from outside the country as information and media from the Republic of Korea and China increasingly enter the country. The State's monopoly on information is therefore being challenged by the increasing flow of outside information into the country and the ensuing curiosity of the people for "truths" other than those provided by State propaganda. Authorities seek to preserve their monopoly on information by carrying out regular crackdowns and enforcing harsh punishments.

31.     The State considers the spread of Christianity a particularly serious threat, since it challenges ideologically the official personality cult and provides a platform for social and political organization and interaction outside the realm of the State. Apart from the few organized State-controlled churches, Christians are prohibited from practising their religion and are persecuted. People caught practising Christianity are subject to severe punishments

---

[5]   See ibid., sect. III.

7

in violation of the right to freedom of religion and the prohibition of religious discrimination.

## B.  Discrimination

32.    The Democratic People's Republic of Korea presents itself as a State where equality, non-discrimination and equal rights in all sectors have been fully achieved and implemented. In reality, it is a rigidly stratified society with entrenched patterns of discrimination, although these are being modified to some extent by the transformative socioeconomic changes introduced by market forces and technological developments. State-sponsored discrimination in the Democratic People's Republic of Korea is pervasive, but is also shifting. Discrimination is rooted in the *songbun* system, which classifies people on the basis of State-assigned social class and birth, and also includes consideration of political opinions and religion. *Songbun* intersects with gender-based discrimination, which is equally pervasive. Discrimination is also practised on the basis of disability, although there are signs that the State may have begun to address this particular issue.

33.    The *songbun* system used to be the most important factor in determining where individuals were allowed to live; what sort of accommodation they had; what occupations they were assigned to; whether they were effectively able to attend school, in particular university; how much food they received; and even whom they might marry. This traditional discrimination under the *songbun* system was recently complicated by increasing marketization in the Democratic People's Republic of Korea and by the influence of money, including foreign currency, on people's ability to have greater access their economic, social and cultural rights. At the same time, significant segments of the population who have neither the resources nor favourable *songbun* find themselves increasingly marginalized and subject to further patterns of discrimination, given that basic public services have collapsed or now effectively require payment.

34.    Early reforms aimed at ensuring formal legal equality have not resulted in gender equality. Discrimination against women remains pervasive in all aspects of society. Indeed, it might even be increasing, as the male-dominated State preys on both economically advancing women and marginalized women. Many women, survival-driven during the famine of the 1990s, began operating private markets. The State imposed, however, many restrictions on female-dominated markets. Gender discrimination also takes the form of women being targeted to pay bribes or fines. There is recent evidence that women are beginning to object and to resist such impositions.

35.    The economic advances of women have not been matched by advances in the social and political spheres. Entrenched traditional patriarchal attitudes and violence against women persist in the Democratic People's Republic of Korea. The State has imposed blatantly discriminatory restrictions on women in an attempt to maintain the gender stereotype of the pure and innocent Korean woman. Sexual and gender-based violence against women is prevalent throughout all areas of society. Victims are not afforded protection from the State, support services or recourse to justice. In the political sphere, women make up just 5 per cent of the top political cadre and 10 per cent of central government employees.

36.    Discrimination against women also intersects with a number of other human rights violations, placing women in a position of vulnerability. Violations of the rights to food and to freedom of movement have resulted in women and girls becoming vulnerable to trafficking and increased engagement in transactional sex and prostitution. The complete denial of the freedoms of expression and association has been a large contributing factor to the generally unequal status of women vis-à-vis men. These limitations have, inter alia,

8

prevented women from collectively advocating for their rights as women have done elsewhere in the world.

37.     While discrimination exists to some extent in all societies, the Democratic People's Republic of Korea has practised a form of official discrimination that has had a very significant impact on individual enjoyment of human rights. Given the exceptional extent of State control, this official discrimination influences most aspects of people's lives. Discrimination remains a major means for the leadership to maintain control against perceived threats, both internal and external.

## C.   Violations of the freedom of movement and residence

38.     The systems of indoctrination and discrimination on the basis of social class are reinforced and safeguarded by a policy of isolating citizens from contact with each other and with the outside world, violating all aspects of the right to freedom of movement.

39.     In the Democratic People's Republic of Korea, the State imposes on citizens where they must live and work, violating their freedom of choice. Moreover, the forced assignment to a State-designated place of residence and employment is heavily driven by discrimination based on *songbun*. This has created a socioeconomically and physically segregated society, where people considered politically loyal to the leadership can live and work in favourable locations, whereas families of persons who are considered politically suspect are relegated to marginalized areas. The special status of Pyongyang, reserved only for those most loyal to the State, exemplifies this system of segregation.

40.     Citizens are not even allowed to leave their province temporarily or to travel within the country without official authorization. This policy is driven by the desire to maintain disparate living conditions, to limit the flow of information and to maximize State control, at the expense of social and familial ties.

41.     In an attempt to keep Pyongyang's "pure" and untainted image, the State systematically banishes entire families from the capital city if one family member commits what is deemed to be a serious crime or political wrong. For the same reason, the large number of street children migrating clandestinely to Pyongyang and other cities – principally in search of food – are subject to arrest and forcible transfer back to their home provinces, experiencing neglect and forced institutionalization on their return.

42.     The State imposes a virtually absolute ban on ordinary citizens travelling abroad, thereby violating their human right to leave the country. Despite the enforcement of this ban through strict border controls, nationals still take the risk of fleeing, mainly to China. When they are apprehended or forcibly repatriated, officials from the Democratic People's Republic of Korea systematically subject them to persecution, torture, prolonged arbitrary detention and, in some cases, sexual violence, including during invasive body searches. Repatriated women who are pregnant are regularly subjected to forced abortions, and babies born to repatriated women are often killed. These practices are driven by racist attitudes towards interracial children of Koreans, and the intent to punish further women who have left the country and their assumed contact with Chinese men. Persons found to have been in contact with officials or nationals from the Republic of Korea or with Christian churches may be forcibly "disappeared" into political prison camps, imprisoned in ordinary prisons or even summarily executed.

43.     Despite the gross human rights violations awaiting repatriated persons, China pursues a rigorous policy of forcibly repatriating citizens of the Democratic People's Republic of Korea who cross the border illegally. China does so in pursuance of its view that these persons are economic (and illegal) migrants. However, many such nationals of

9

the Democratic People's Republic of Korea should be recognized as refugees fleeing persecution or refugees *sur place*. They are thereby entitled to international protection. In forcibly returning nationals of the Democratic People's Republic of Korea, China also violates its obligation to respect the principle of non-refoulement under international refugee and human rights law. In some cases, Chinese officials also appear to provide information on those apprehended to their counterparts in the Democratic People's Republic of Korea.

44. Discrimination against women and their vulnerable status in the Democratic People's Republic of Korea, as well as the prospect of refoulement, make women extremely vulnerable to trafficking in persons. Many women are trafficked by force or deception from the Democratic People's Republic of Korea into or within China for the purposes of exploitation in forced marriage or concubinage, or prostitution under coercive circumstances. An estimated 20,000 children born to women from the Democratic People's Republic of Korea are currently in China. These children are deprived of their rights to birth registration, nationality, education and health care because their birth cannot be registered without exposing the mother to the risk of refoulement by China.

45. The Democratic People's Republic of Korea has repeatedly breached its obligations to respect the rights of its nationals who have special ties to, or claims in relation to, another country, in this case the Republic of Korea, to return there or otherwise to enjoy a facility to meet long separated families. The severe impediments put in place by the Democratic People's Republic of Korea to prevent contact and communication with family members in the Republic of Korea are a breach of the State's obligations under international human rights law. The restrictions are arbitrary, cruel and inhuman. This is particularly the case when previously agreed temporary reunions of separated families are cancelled for wholly unpersuasive reasons, especially given the advanced age of the persons concerned.

## D.    Violations of the right to food and related aspects of the right to life

46. The rights to food, freedom from hunger and to life in the context of the Democratic People's Republic of Korea cannot be reduced to a narrow discussion of food shortages and access to a commodity. The State has used food as a means of control over the population. It has prioritized those whom the authorities believe to be crucial in maintaining the regime over those deemed expendable.

47. Confiscation and dispossession of food from those in need, and the provision of food to other groups, follows this logic. The State has practised discrimination with regard to access to and distribution of food based on the *songbun* system. In addition, it privileges certain parts of the country, such as Pyongyang, over others. The State has also failed to take into account the needs of the most vulnerable. The commission is particularly concerned about ongoing chronic malnutrition in children and its long-term effects.

48. The State was aware of the deteriorating food situation in the country well before the first appeal for international aid in 1995. State-controlled production and distribution of food had not been able to provide the population with adequate food since the end of the 1980s. The lack of transparency, accountability and democratic institutions, as well as restrictions on freedom of expression, information and association, prevented the adoption of optimal economic solutions over those in accordance with Party directives. The State has evaded structural reforms to the economy and agriculture for fear of losing its control over the population.

49. During the period of famine, ideological indoctrination was used in order to maintain the regime, at the cost of seriously aggravating hunger and starvation. The concealment of information prevented the population from finding alternatives to the

10

collapsing public distribution system. It also delayed international assistance that, provided earlier, could have saved many lives. Despite the State's inability to provide its people with adequate food, it maintained laws and controls effectively criminalizing people's use of key coping mechanisms, particularly moving within or outside the country in search of food and trading or working in informal markets.

50.     Even during the worst period of mass starvation, the State impeded the delivery of food aid by imposing conditions that were not based on humanitarian considerations. International humanitarian agencies were subject to restrictions contravening humanitarian principles. Aid organizations were prevented from properly assessing humanitarian needs and monitoring the distribution of aid. The State denied humanitarian access to some of the most affected regions and groups, including homeless children.

51.     The State has consistently failed in its obligation to use the maximum of its available resources to feed those who are hungry. Military spending – predominantly on hardware and the development of weapons systems and the nuclear programme – has always been prioritized, even during periods of mass starvation. Nevertheless, the State still failed to feed the ordinary soldiers of its disproportionately large army. Large amounts of State resources, including parallel funds directly controlled by the Supreme Leader, have been spent on luxury goods and the advancement of his personality cult instead of providing food to the starving general population.

52.     The State has also used deliberate starvation as a means of control and punishment in detention facilities. This has resulted in the deaths of many political and ordinary prisoners.

53.     The commission found evidence of systematic, widespread and grave violations of the right to food in the Democratic People's Republic of Korea. While acknowledging the impact of factors beyond State control over the food situation, the commission finds that decisions, actions and omissions by the State and its leadership caused the death of at least hundreds of thousands of people and inflicted permanent physical and psychological injuries on those who survived.

54.     In the highly centralized system of the Democratic People's Republic of Korea, decisions relating to food, including its production and distribution, State budget allocation, decisions relating to humanitarian assistance and the use of international aid, are ultimately made by a small group of officials, who are not accountable to those affected by their decisions.

55.     While conditions have changed since the 1990s, hunger and malnutrition continue to be widespread. Deaths from starvation continue to be reported. The commission is concerned that structural issues, including laws and policies that violate the right to adequate food and freedom from hunger, remain in place, which could lead to the recurrence of mass starvation.

## E.   Arbitrary detention, torture, executions and prison camps

56.     The police and security forces of the Democratic People's Republic of Korea systematically employ violence and punishments that amount to gross human rights violations in order to create a climate of fear that pre-empts any challenge to the current system of government and to the ideology underpinning it. The institutions and officials involved are not held accountable. Impunity reigns.

57.     Gross human rights violations in the Democratic People's Republic of Korea involving detention, executions and disappearances are characterized by a high degree of centralized coordination between different parts of the extensive security apparatus. The

State Security Department, the Ministry of People's Security and the Korean People's Army Military Security Command regularly subject persons accused of political crimes to arbitrary arrest and subsequent incommunicado detention for prolonged periods of time. Their families are not informed of their fate or whereabouts. Persons accused of political crimes therefore become victims of enforced disappearance. Making the suspect disappear is a deliberate feature of the system that serves to instil fear in the population.

58.     The use of torture is an established feature of the interrogation process in the Democratic People's Republic of Korea, especially in cases involving political crimes. Starvation and other inhumane conditions of detention are deliberately imposed on suspects to increase the pressure on them to confess and to incriminate other persons.

59.     Persons who are found to have engaged in major political crimes are "disappeared", without trial or judicial order, to political prison camps (*kwanliso*). There, they are incarcerated and held incommunicado. Their families are not even informed of their fate if they die. In the past, it was common that the authorities sent entire families to political prison camps for political crimes committed by close relatives (including forebears, to the third generation) on the basis of the principle of guilt by association. Such cases still occur, but appear to be less frequent now than in past decades.

60.     In the political prison camps of the Democratic People's Republic of Korea, the inmate population has been gradually eliminated through deliberate starvation, forced labour, executions, torture, rape and the denial of reproductive rights enforced through punishment, forced abortion and infanticide. The commission estimates that hundreds of thousands of political prisoners have perished in these camps over the past five decades. The unspeakable atrocities that are being committed against inmates of the *kwanliso* political prison camps resemble the horrors of camps that totalitarian States established during the twentieth century.

61.     Although the authorities in the Democratic People's Republic of Korea deny the existence of the camps, this claim was shown to be false by the testimonies of former guards, inmates and neighbours. Satellite imagery proves that the camp system continues to be in operation. While the number of political prison camps and inmates has decreased owing to deaths and some releases, it is estimated that between 80,000 and 120,000 political prisoners are currently detained in four large political prison camps.

62.     Gross violations are also being committed in the ordinary prison system, which consists of ordinary prison camps (*kyohwaso*) and various types of short-term forced labour detention facilities. The vast majority of inmates are victims of arbitrary detention, since they are imprisoned without trial or on the basis of a trial that fails to respect the due process and fair trial guarantees set out in international law. Furthermore, many ordinary prisoners are, in fact, political prisoners, who are detained without a substantive reason compatible with international law. Prisoners in the ordinary prison system are systematically subjected to deliberate starvation and illegal forced labour. Torture, rape and other arbitrary cruelties at the hands of guards and fellow prisoners are widespread and committed with impunity.

63.     As a matter of State policy, the authorities carry out executions, with or without trial, publicly or secretly, in response to political and other crimes that are often not among the most serious crimes. The policy of regularly carrying out public executions serves to instil fear in the general population. Public executions were most common in the 1990s. However, they continue to be carried out today. In late 2013, there appeared to be a spike in the number of politically motivated public executions.

## F.   Abductions and enforced disappearances from other countries

64.     Since 1950, the Democratic People's Republic of Korea has engaged in the systematic abduction, denial of repatriation and subsequent enforced disappearance of persons from other countries on a large scale and as a matter of State policy. Well over 200,000 persons, including children, who were brought from other countries to the Democratic People's Republic of Korea may have become victims of enforced disappearance, as defined in the Declaration on the Protection of All Persons from Enforced Disappearance. More information would have to emerge from the Democratic People's Republic of Korea to provide a more precise estimate of the number of victims.

65.     For a nation State that seeks to live alongside others, the above-mentioned actions, in defiance of the sovereignty of other States and the rights of foreign nationals guaranteed under international law, are exceptional.

66.     The vast majority of abductions and enforced disappearances are linked to the Korean War and the organized movement of ethnic Koreans from Japan that started in 1959. However, hundreds of nationals of the Republic of Korea, Japan and other States were also abducted and disappeared between the 1960s and 1980s. In more recent years, the Democratic People's Republic of Korea abducted a number of its own nationals and nationals of the Republic of Korea from China.

67.     The Democratic People's Republic of Korea used its land, naval and intelligence forces to conduct abductions and arrests. Operations were approved at the level of the Supreme Leader. The vast majority of victims were forcibly disappeared to gain labour and other skills for the State. Some victims were used to further espionage and terrorist activities. Women abducted from Europe, the Middle East and Asia were subjected to forced marriages with men from other countries to prevent liaisons on their part with ethnic Korean women that could result in interracial children. Some of the abducted women have also been subject to sexual exploitation.

68.     A number of the forcibly disappeared travelled to the Democratic People's Republic of Korea voluntarily. Others were abducted through physical force or fraudulent persuasion. Subsequently, they were all denied the right to leave the country. They have also been subject to severe deprivation of their liberty and freedom of movement within the Democratic People's Republic of Korea, denied the right to recognition as a person before the law, and the right not to be subjected to torture and other cruel, inhuman or degrading treatment. All of the forcibly disappeared have been placed under strict surveillance. They have been denied education and employment opportunities.

69.     Ethnic Koreans from the Republic of Korea and Japan, forcibly disappeared by the Democratic People's Republic of Korea, have been discriminated against for their origins and background. They were categorized as "hostile" and forced to work in mines and farms in remote marginalized areas of the country. Many of them were likely to have been the first victims of the famine in the 1990s because of their lower social status.

70.     Non-Korean abductees were not able to integrate into social and economic life in the Democratic People's Republic of Korea as they were detained in tightly controlled compounds. They were denied the right to work, to leave their place of residence or to move freely in society, and they were unable to choose educational opportunities for themselves and their children.

71.     Family members abroad and foreign States wishing to exercise their right to provide diplomatic protection have been consistently denied information necessary to establish the fate and whereabouts of the victims. Family members of the disappeared have been subjected to torture and other cruel, inhuman or degrading treatment. They have been

denied the right to effective remedies for human rights violations, including the right to the truth. Parents and disappeared children have been denied the right to family life.

72.     Despite admitting to the abduction of 13 Japanese nationals by agents of the State, the Democratic People's Republic of Korea has never adequately disavowed the practice of international abductions. Since the 1990s, its agents have abducted a number of persons from Chinese territory, including nationals of China, the Republic of Korea and, in at least one case, a former Japanese national.

73.     The commission finds that almost all of the foregoing victims remain disappeared. Human rights violations continue against them and their families. The shock and pain caused by such actions is indescribable.

## IV.     Crimes against humanity

74.     In accordance with Human Rights Council resolution 22/13, the commission carried out its inquiry with a view to ensuring full accountability, in particular where these violations may amount to crimes against humanity. The commission is neither a judicial body nor a prosecutor. It cannot make final determinations of individual criminal responsibility. It can, however, determine whether its findings constitute reasonable grounds establishing that crimes against humanity have been committed so as to merit a criminal investigation by a competent national or international organ of justice.

75.     According to that standard, the commission finds that the body of testimony and other information it received establishes that crimes against humanity have been committed in the Democratic People's Republic of Korea, pursuant to policies established at the highest level of the State.[6]

76.     These crimes against humanity entail extermination, murder, enslavement, torture, imprisonment, rape, forced abortions and other sexual violence, persecution on political, religious, racial and gender grounds, the forcible transfer of populations, the enforced disappearance of persons and the inhumane act of knowingly causing prolonged starvation. The commission further finds that crimes against humanity are ongoing in the Democratic People's Republic of Korea because the policies, institutions and patterns of impunity that lie at their heart remain in place.

77.     Persons detained in political and other prison camps, those who try to flee the State, Christians and others considered to introduce subversive influences are the primary targets of a systematic and widespread attack against all populations that are considered to pose a threat to the political system and leadership of the Democratic People's Republic of Korea. This attack is embedded in the larger patterns of politically motivated human rights violations experienced by the general population, including the discriminatory system of classification of persons based on *songbun*.

78.     In addition, the commission finds that crimes against humanity have been committed against starving populations, particularly during the 1990s. These crimes arose from decisions and policies violating the right to food, which were applied for the purposes of sustaining the present political system, in full awareness that such decisions would exacerbate starvation and related deaths of much of the population.

79.     Lastly, the commission finds that crimes against humanity are being committed against persons from other countries who were systematically abducted or denied

---

[6]   See also A/HRC/25/CRP.1, sect. V.

repatriation, in order to gain labour and other skills for the Democratic People's Republic of Korea.

# V.   Conclusions and recommendations

80.    **Systematic, widespread and gross human rights violations have been and are being committed by the Democratic People's Republic of Korea, its institutions and officials. In many instances, the violations of human rights found by the commission constitute crimes against humanity. These are not mere excesses of the State; they are essential components of a political system that has moved far from the ideals on which it claims to be founded. The gravity, scale and nature of these violations reveal a State that does not have any parallel in the contemporary world. Political scientists of the twentieth century characterized this type of political organization as a totalitarian State: a State that does not content itself with ensuring the authoritarian rule of a small group of people, but seeks to dominate every aspect of its citizens' lives and terrorizes them from within.**

81.    **The Democratic People's Republic of Korea displays many attributes of a totalitarian State: the rule of a single party, led by a single person, is based on an elaborate guiding ideology that its current Supreme Leader refers to as "Kimilsungism-Kimjongilism". The State seeks to ensure that its citizens internalize this guiding ideology by indoctrinating citizens from childhood, suppressing all political and religious expression that questions the official ideology, and tightly controlling citizens' physical movement and their means of communication with each other and with those in other countries. Discrimination on the basis of gender and *songbun* is used to maintain a rigid social structure that is less likely to produce challenges to the political system.**

82.    **The State's monopolization of access to food has been used as an important means to enforce political loyalty. The distribution of food has prioritized those who are useful to the survival of the current political system at the expense of those deemed to be expendable. Citizens' complete dependence on the State led to one of the worst cases of famine in recent history. The authorities have only recently come to tolerate the fact that markets can no longer be fully suppressed. Instead of fully embracing reforms to realize the right to food, however, the Democratic People's Republic of Korea maintains a system of inefficient economic production and discriminatory resource allocation that inevitably produces more unnecessary starvation among its citizens.**

83.    **The key to the political system is the vast political and security apparatus that strategically uses surveillance, coercion, fear and punishment to preclude the expression of any dissent. Public executions and enforced disappearance to political prison camps serve as the ultimate means to terrorize the population into submission. The State's violence has been externalized through State-sponsored abductions and enforced disappearances of people from other nations. These international enforced disappearances are unique in their intensity, scale and nature.**

84.    **Today, the Democratic People's Republic of Korea finds itself surrounded by a world that is changing rapidly in political, economic and technological terms. These changes offer opportunities for incremental social change within the State. In response, the authorities engage in gross human rights violations so as to crack down on "subversive" influences from abroad. These influences are symbolized by films and soap operas from the Republic of Korea and other countries, short-wave radio broadcasts and foreign mobile telephones. For the same reason, the State**

15

systematically uses violence and punishment to deter its citizens from exercising their human right to leave the country. Persons who are forcibly repatriated from China are commonly subjected to torture, arbitrary detention, summary execution, forced abortion and other forms of sexual violence.

85.    A number of long-standing and ongoing patterns of systematic and widespread violations, which were documented by the commission, meet the high threshold required for proof of crimes against humanity in international law. The perpetrators enjoy impunity. The Democratic People's Republic of Korea is unwilling to implement its international obligation to prosecute and bring the perpetrators to justice, because those perpetrators act in accordance with State policy.

86.    The fact that the Democratic People's Republic of Korea, as a State Member of the United Nations, has for decades pursued policies involving crimes that shock the conscience of humanity raises questions about the inadequacy of the response of the international community. The international community must accept its responsibility to protect the people of the Democratic People's Republic of Korea from crimes against humanity, because the Government of the Democratic People's Republic of Korea has manifestly failed to do so. In particular, this responsibility must be accepted in the light of the role played by the international community (and by the great powers in particular) in the division of the Korean peninsula and because of the unresolved legacy of the Korean War. These unfortunate legacies help not only to explain the intractability of the human rights situation but also why an effective response is now imperative.

87.    The United Nations must ensure that those most responsible for the crimes against humanity committed in the Democratic People's Republic of Korea are held accountable. Options to achieve this end include a Security Council referral of the situation to the International Criminal Court or the establishment of an ad hoc tribunal by the United Nations. Urgent accountability measures should be combined with a reinforced human rights dialogue, the promotion of incremental change through more people-to-people contact and an inter-Korean agenda for reconciliation.

88.    On the basis of its findings and conclusions, the Commission makes the recommendations below.

89.    The commission of inquiry recommends that the Democratic People's Republic of Korea:

        (a)    Undertake profound political and institutional reforms without delay to introduce genuine checks and balances upon the powers of the Supreme Leader and the Workers' Party of Korea; such changes should include an independent and impartial judiciary, a multiparty political system and elected people's assemblies at the local and central levels that emerge from genuinely free and fair elections; reform the security sector by vetting the entire officers' corps for involvement in human rights violations and by limiting the functions of the Korean People's Army to defending the nation against external threats; and dismantle the State Security Department and place the Ministry of Public Security under transparent democratic oversight. An independent constitutional and institutional reform commission, consisting of respected members of society in the Democratic People's Republic of Korea, should be constituted to guide this process and should be assisted by appropriate international experts;

        (b)    Acknowledge the existence of human rights violations, including the political prison camps described by the commission in the present report; provide international humanitarian organizations and human rights monitors with immediate access to the camps and their surviving victims; dismantle all political prison camps

16

and release all political prisoners; and clarify with full detail the fate of any disappeared persons who cannot be readily traced;

(c)     Reform the Criminal Code and Code of Criminal Procedure to abolish vaguely worded "anti-State" and "anti-People" crimes and to fully enshrine the right to a fair trial and due process guarantees articulated in the International Covenant on Civil and Political Rights; enforce existing provisions in the Criminal Code and the Code of Criminal Procedure that prohibit and criminalize the use of torture and other inhuman means of interrogation that are illegal under international law; reform the ordinary prison system so as to ensure humane conditions of detention for all inmates deprived of liberty; end reprisals against persons on the basis of guilt by association; and abolish immediately the practice of forcibly resettling the families of convicted criminals;

(d)     Declare and implement an immediate moratorium on the imposition and execution of the death penalty, followed without undue delay by the abolition of the death penalty both in law and in practice;

(e)     Allow the establishment of independent newspapers and other media; allow citizens to freely access the Internet, social media, international communications, foreign broadcasts and publications, including the popular culture of other countries; and abolish compulsory participation in mass organizations and indoctrination sessions;

(f)     Introduce education to ensure respect for human rights and fundamental freedoms; and abolish any propaganda or educational activities that espouse national, racial or political hatred or war propaganda;

(g)     Allow Christians and other religious believers to exercise their religion independently and publicly, without fear of punishment, reprisal or surveillance;

(h)     End discrimination against citizens on the basis of their perceived political loyalty or the sociopolitical background of their families, including in matters of access to education and employment; dismantle the neighbourhood watch (*inminban*), the secret resident registration file system, and all surveillance of persons and their communications that serve purposes of political oppression and/or are not subject to effective judicial and democratic control; and publicly acknowledge the extent of surveillance practices carried out in the past and provide citizens with access to their resident registration file;

(i)     Take immediate measures to ensure gender equality in practice, such as by providing equal access for women in public life and employment; eradicate discriminatory laws, regulations and practices affecting women; take measures to address all forms of violence against women, including domestic violence, sexual and gender-based violence by State agents and/or within State institutions; and respond immediately and effectively to trafficking in women, and address the structural causes that make women vulnerable to such violations;

(j)     Ensure that citizens can enjoy the right to food and other economic and social rights without discrimination;   pay particular attention to the needs of women and vulnerable groups, such as street children, the elderly and persons with disabilities; promote agricultural, economic and financial policies based on democratic participation, good governance and non-discrimination; and legalize and support free market activities, internal and external trade and other independent economic conduct that provide citizens with a livelihood;

(k)     In the light of the past expenditures by the leadership, the military and security apparatus, realign priorities and dedicate the resources made available to

17

A/HRC/25/63

ensure, as necessary, freedom from hunger and other essential minimum standards for citizens, including those citizens serving in the armed forces;

(l)     Where necessary to ensure the right to food, seek international humanitarian assistance without delay; provide international humanitarian organizations with free and unimpeded access to all populations in need, including for the purposes of effective monitoring; and hold accountable State officials who illegally divert humanitarian aid for improper purposes;

(m)     Abolish the de facto prohibition on foreign travel imposed on ordinary citizens; decriminalize illegal border crossings and introduce border controls that conform to international standards; renounce orders to shoot and kill at the border; cease to regard citizens repatriated from China as political criminals or to subject them to imprisonment, execution, torture, arbitrary detention, deliberate starvation, illegal cavity searches, forced abortions and other sexual violence; and abolish the State's compulsory designation of places of residence and employment, as well as the requirement to obtain a permit for domestic travel outside a person's designated province;

(n)     Provide the families and nations of origin of all persons who have been abducted, or otherwise forcibly disappeared, with full information on their fate and whereabouts, if they have survived; allow those who remain alive, and their descendants, to return immediately to their countries of origin; and, in close cooperation with their families and nations of origin, identify and repatriate the physical remains of those who have died;

(o)     Allow separated families to unite, including by allowing citizens to travel or emigrate where they choose; and immediately provide such persons with facilities for unmonitored communications by way of mail, telephone, email and any other means of communication;

(p)     Prosecute and bring to justice those persons most responsible for alleged crimes against humanity; appoint a special prosecutor to supervise this process; ensure that victims and their families are provided with adequate, prompt and effective reparation and remedies, including by knowing the truth about the violations that have been suffered; launch a people-driven process to establish the truth about the violations; provide adults and children with comprehensive education on national and international law and practice on human rights and democratic governance; and seek international advice and support for transitional justice measures;

(q)     Take immediate steps to end all other human rights violations and to address the human rights concerns raised by the commission in the present report, as well as in successive resolutions of the General Assembly and the Human Rights Council, in the procedures of universal periodic review and in the reports of special procedures mandate holders and the treaty bodies;

(r)     Ratify without delay the International Convention for the Protection of All Persons from Enforced Disappearance, the Convention on the Rights of Persons with Disabilities, the Rome Statute of the International Criminal Court and the fundamental conventions of the International Labour Organization;

(s)     Accept immediately a field-based presence and technical assistance from the Office of the United Nations High Commissioner for Human Rights and other relevant United Nations entities to help to implement the above-mentioned recommendations.

90.     The commission of inquiry recommends that China and other States:

18

(a)     Respect the principle of non-refoulement and, accordingly, abstain from forcibly repatriating any persons to the Democratic People's Republic of Korea, unless the treatment there, as verified by international human rights monitors, markedly improves; extend asylum and other means of durable protection to persons fleeing the Democratic People's Republic of Korea who need international protection; ensure that such persons are fully integrated and duly protected from discrimination; stop providing information on activities and contacts of persons from the Democratic People's Republic of Korea living in China to the State Security Department and other security agencies in the Democratic People's Republic of Korea; and allow persons from the Democratic People's Republic of Korea free access to diplomatic and consular representations of any State that may be willing to extend nationality or other forms of protection to them;

(b)     Provide the Office of the United Nations High Commissioner for Refugees, and relevant humanitarian organizations, full and unimpeded access to all persons from the Democratic People's Republic of Korea seeking such contact;

(c)     Request technical assistance from the United Nations to help to meet the obligations imposed under international refugee law, and ensure the effective protection of persons from trafficking;

(d)     Adopt a victim-centric and human rights-based approach to trafficking in persons, including by providing victims with the right to stay in the country and access to legal protection and basic services, such as medical treatment, education and employment opportunities equivalent to those afforded to their own citizens;

(e)     Regularize the status of women and men from the Democratic People's Republic of Korea who marry or have a child with a Chinese citizen; and ensure that all such children may realize their rights to birth registration and Chinese nationality where applicable, and have access to education and health care without discrimination;

(f)     Take immediate measures to prevent agents of the Democratic People's Republic of Korea from carrying out further abductions from Chinese territory; prosecute and adequately punish apprehended perpetrators of abduction and demand the extradition of those giving such orders so that they may be tried in accordance with law. China should raise with the Supreme Leader of the Democratic People's Republic of Korea and other high-level authorities the issues of abductions, the infanticide of children entitled to Chinese nationality, forced abortions imposed on repatriated women and other human rights violations that target persons repatriated from China.

91.     The commission of inquiry recommends that the Korean people foster inter-Korean dialogue in a phased approach leading to an agenda for reconciliation. Inter-Korean dialogue could be furthered through such initiatives as friendly sporting events; academic and business interactions; scholarships and apprenticeships for young people from the Democratic People's Republic of Korea; student exchanges; exchanges between civil society organizations, including national Red Cross Societies; contacts between professional organizations and women's groups; and the development of "sister city" relationships and, eventually, the re-establishment of transport and communication links.

92.     The commission of inquiry recommends that States and civil society organizations foster opportunities for people-to-people dialogue and contact in such areas as culture, science, sports, good governance and economic development that provide citizens of the Democratic People's Republic of Korea with opportunities to exchange information and be exposed to experiences outside their home country. The

Democratic People's Republic of Korea and other States should remove applicable obstacles to people-to-people contact, including measures that criminalize travel and contact to the extent that these are not in accordance with relevant obligations under international human rights law.

93.    The commission also recommends that States, foundations and engaged business enterprises provide more support for the work of civil society organizations to improve the situation of human rights in the Democratic People's Republic of Korea, including efforts to document human rights violations and to broadcast accessible information into each country. Eventually, and once conditions are deemed to be appropriate, such foundations and enterprises should join forces with the Governments concerned to coordinate efforts to adopt a coherent plan for the development of the country, creation of livelihoods for the population and the advancement of the situation of human rights.

94.    With regard to the international community and the United Nations, the commission makes the following recommendations:

(a)    The Security Council should refer the situation in the Democratic People's Republic of Korea to the International Criminal Court for action in accordance with that court's jurisdiction. The Security Council should also adopt targeted sanctions against those who appear to be most responsible for crimes against humanity. In the light of the dire social and economic situation of the general population, the commission does not support sanctions imposed by the Security Council or introduced bilaterally that are targeted against the population or the economy as a whole;

(b)    The General Assembly and the Human Rights Council should extend the country-specific human rights monitoring and reporting mechanisms on the Democratic People's Republic of Korea that predate the establishment of the commission; these include the periodic reports of the Secretary-General and the United Nations High Commissioner for Human Rights, as well as the mandate of the Special Rapporteur on the situation of human rights in the Democratic People's Republic of Korea. Such mechanisms should be mandated to focus on ensuring accountability, in particular for crimes against humanity, and should report on the implementation of the commission's recommendations;

(c)    The United Nations High Commissioner for Human Rights, with full support from the Human Rights Council and the General Assembly, should establish a structure to help to ensure accountability for human rights violations in the Democratic People's Republic of Korea, in particular where such violations amount to crimes against humanity. The structure should build on the collection of evidence and documentation work of the commission, and further expand its database. It should be field-based, supported by adequate personnel deployed to the region so as to enjoy sustained access to victims and witnesses. In addition to informing the work of human rights reporting mechanisms and serving as a secure archive for information provided by relevant stakeholders, the work of such a structure should facilitate United Nations efforts to prosecute, or otherwise render accountable, those most responsible for crimes against humanity;

(d)    The High Commissioner should continue the engagement of OHCHR with the Democratic People's Republic of Korea, offering technical assistance and enhancing advocacy initiatives. The High Commissioner should facilitate the implementation of a strategy led by the Special Rapporteur and involving all concerned human rights mechanisms of the United Nations system to address, coherently and without delay, the special issue of international abductions and

20

enforced disappearances and related matters described in the present report. Member States should afford full cooperation to ensure the implementation of such a strategy;

(e)     The High Commissioner should periodically report to the Human Rights Council and other appropriate United Nations organs on the implementation of the recommendations contained in the present report;

(f)     The Human Rights Council should ensure that the conclusions and recommendations of the commission do not pass from the active attention of the international community. Where so much suffering has occurred, and is still occurring, action is the shared responsibility of the entire international community;

(g)     The United Nations Secretariat and agencies should urgently adopt and implement a common "Rights up Front" strategy to ensure that all engagement with the Democratic People's Republic of Korea effectively takes into account, and addresses, human rights concerns, including those collected in the present report. The United Nations should immediately apply this strategy to help to prevent the recurrence or continuation of crimes against humanity in the Democratic People's Republic of Korea. The strategy should contemplate the possibility of the Secretary-General referring the situation to the Security Council;

(h)     States that have historically friendly ties with the Democratic People's Republic of Korea, major donors and potential donors, as well as those States already engaged with the Democratic People's Republic of Korea in the framework of the six-party talks, should form a human rights contact group to raise concerns about the situation of human rights in the Democratic People's Republic of Korea and to provide support for initiatives to improve it;

(i)     States should not use the provision of food and other essential humanitarian assistance to impose economic or political pressure on the Democratic People's Republic of Korea. Humanitarian assistance should be provided in accordance with humanitarian and human rights principles, including the principle of non-discrimination. Aid should only be curbed to the extent that unimpeded international humanitarian access and related monitoring is not adequately guaranteed. Bilateral and multilateral providers of assistance should coordinate their efforts to ensure that adequate conditions of humanitarian access and related monitoring are provided by the Democratic People's Republic of Korea;

(j)     Without prejudice to all the obligations under international law that the Democratic People's Republic of Korea must immediately implement, the United Nations and the States that were parties to the Korean War should take steps to convene a high-level political conference. Participants in that conference should consider and, if agreed, ratify a final peaceful settlement of the war that commits all parties to the principles of the Charter of the United Nations, including respect for human rights and fundamental freedoms. States of the region should intensify their cooperation and consider following such examples as the Helsinki Process.

A/HRC/25/63

## Annex I

*[English only]*

### Correspondence with the Supreme Leader of the Democratic People's Republic of Korea and First Secretary of the Workers' Party of Korea, Kim Jong-un

22

A/HRC/25/63



**United Nations**     **Nations Unies**

유엔 조선민주주의인민공화국 인권조사위원회
**COMMISSION OF INQUIRY ON HUMAN RIGHTS
IN THE DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA**

REFERENCE: COIDPRK/GC/st/62

20 January 2014

Excellency,

     Further to my letter dated 16 July 2013, I am writing you again in my capacity as the Chair of the United Nations Commission of Inquiry on Human Rights in the Democratic People's Republic of Korea. The Commission was established by the Human Rights Council of the United Nations. It has the mandate to investigate alleged grave, systematic and widespread human rights violations in the Democratic People's Republic of Korea with a view to ensuring full accountability, in particular where any such violations amount to crimes against humanity. The Commission has concluded its inquiry, having carefully reviewed the wealth of relevant information which it received in the course of public hearings involving victims and other witnesses, confidential interviews and submissions received from concerned stakeholders.

     The Commission regrets that Your Excellency's Government has not availed itself of the opportunity to cooperate with the Commission, including by taking up repeated offers to participate and to make representations at its public hearings. We also regret the fact that, despite our repeated requests, the Commission has not been invited to visit the Democratic People's Republic of Korea and that it has not been provided with information in any manner that Your Excellency's Government would have considered suitable.

     The Commission has found that systematic, widespread and gross human rights violations have been, and are being, committed by the Democratic People's Republic of Korea, its institutions and officials. In many instances, the violations of human rights found by the Commission entail crimes against humanity. The comprehensive annex to this letter details the findings of the Commission. These findings substantiate and sustain the foregoing conclusions. Any official of the Democratic People's Republic of Korea who commits, orders, solicits or aids and abets crimes against humanity incurs criminal responsibility by international law and must be held accountable under that law.

His Excellency
Mr. Kim Jong-un
Supreme Leader, Democratic People's Republic of Korea
First Secretary of the Workers' Party of Korea
Pyongyang, Democratic People's Republic of Korea
Permanent Mission of the Democratic People's Republic of Korea
  to the United Nations in Geneva
E-mail: mission.korea-dpr@ties.itu.int

OHCHR-PALAIS DES NATIONS, 8-14 AVENUE DE LA PAIX, CH-1211 GENEVA 10
E-MAIL: coidprksubmissions@ohchr.org - FAX: +41 22 917 90 18

23

A/HRC/25/63

UNITED NATIONS  NATIONS UNIES                                    PAGE 2

Even without being directly involved in crimes against humanity, a military commander may be held responsible for crimes against humanity committed by forces under the commander's effective command and control, in the event of failing to exercise control properly over such forces, where (1) the commander knew or, owing to the circumstances at the time, should have known that the forces were committing or about to commit such crimes, and (2) the commander failed to take all necessary and reasonable measures within his power to prevent or repress their commission or to submit the matter to the competent authorities for investigation and prosecution.

On the same basis, a civilian superior will incur personal criminal responsibility if (1) the civilian superior knew, or consciously disregarded, information which clearly indicated that subordinates within his effective responsibility and control were committing crimes against humanity, and (2) the civilian superior fails to take all necessary and reasonable measures within the superior's power to prevent or repress their commission or to submit the matter to competent authorities for investigation and prosecution.

In your capacities as Supreme Leader of the Democratic People's Republic of Korea, First Secretary of the Workers' Party of Korea and Chairman of the Party's Central Military Commission, First Chairman of the National Defence Commission and Supreme Commander of the Korean People's Army, the Commission, therefore, wishes to draw your attention in particular to the following findings:

1.   The Commission has found that officials of the State Security Department, the Ministry of People's Security, the Korean People's Army, the Office of the Public Prosecutor, the judiciary and the Workers' Party of Korea have committed and are committing, crimes against humanity. These officials are acting under the effective control of the central organs of the Workers' Party of Korea, the National Defence Commission and the Supreme Leader of the Democratic People's Republic of Korea. It is open to inference that the officials are, in some instances, acting under your personal control.

2.   The Commission has found that persons detained in political prison camps (*kwanliso*) and other prison camps, those who try to flee your country, adherents to the Christian religion and others considered to be introducing subversive influences are subjected to crimes against humanity. This occurs as part of a systematic and widespread attack of the State against anyone who is considered to pose a threat to the political system and the leadership of the Democratic People's Republic of Korea. The foregoing attack is embedded in the larger patterns of politically motivated human rights violations experienced by the general population, including the discriminatory system of classification based on *songbun*.

3.   The Commission has also found that crimes against humanity have been, and are being, committed against persons from the Republic of Korea, Japan and other countries who have been systematically abducted or denied repatriation, ostensibly to gain labour and other skills for the Democratic People's Republic of Korea. These persons are victims of ongoing crimes of enforced disappearance. Officials who fail to acknowledge their deprivation of liberty or fail to provide available information about their fate and whereabouts may also incur criminal responsibility, even if they did not themselves participate in the original abduction or denial of repatriation.

24

A/HRC/25/63

UNITED NATIONS  NATIONS UNIES                PAGE 3

4.   The Commission has found that crimes against humanity have been, and are being, committed against starving populations. These crimes are sourced in decisions and policies violating the universal human right to food. They were taken for purposes of sustaining the present political system, in full awareness that they would exacerbate starvation and contribute to related deaths. Many of the policies that gave raise to these crimes against humanity continue to be in place, including the deliberate failure to provide reliable data on the humanitarian situation in the Democratic People's Republic of Korea; the denial of free and unimpeded international humanitarian access to populations in need; and discriminatory spending and food distribution.

The Commission urges you to take all necessary and reasonable measures within your power to prevent or repress the commission of further such crimes and to ensure that the crimes against humanity that have been committed are properly investigated and prosecuted. To this point, the Commission has found no indication that the institutions and officials of the Democratic People's Republic of Korea are willing and able to identify and prosecute the perpetrators of the foregoing crimes against humanity. The Commission wishes to draw to your attention that it will therefore recommend that the United Nations refer the situation in the Democratic People's Republic of Korea to the International Criminal Court to render accountable all those, including possibly yourself, who may be responsible for the crimes against humanity referred to in this letter and in the Commission's report.

Finally, I wish to inform you that the full text of the report of the Commission of Inquiry will be presented to the Human Rights Council in Geneva probably on or shortly after 17 March 2014. Copy of the full report in its final form will be provided to the Permanent Mission of the Democratic People's Republic of Korea to the United Nations Office in Geneva in advance of that date.

If it would be helpful to you, officials of the Democratic People's Republic of Korea and the people of your country, the members of the Commission of Inquiry, including myself, would be prepared to travel to Pyongyang. We would hold ourselves in readiness to do this at any time convenient. Such a visit would afford to you, the officials and people of your country the opportunity to hear fully the reasoning and conclusions of the Commission; to ask questions; and to receive replies about the report, its findings and recommendations. The Commission would be ready to participate in a frank exchange of views concerning the way forward to ensure full respect for human rights in the Democratic People's Republic of Korea.

The Commission avails itself of the opportunity to renew its assurances of respect to your Excellency and to the Democratic People's Republic of Korea.

Michael Kirby
Chair

25

A/HRC/25/63

## Annex II

*[English only]*

### Correspondence with China

A/HRC/25/63



United Nations           Nations Unies

유엔 조선민주주의인민공화국 인권조사위원회
**COMMISSION OF INQUIRY ON HUMAN RIGHTS
IN THE DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA**

REFERENCE:   COIDPRK/CC/st/59

16 December 2013

Excellency,

This letter follows up my letter dated 7 November 2013 whereby the Commission had sought the agreement of your Government to visit China. The Commission of Inquiry regrets the decision of the Government of China not to extend such an invitation as conveyed to the Secretariat by telephone on 20 November 2013.

The Commission regrets that it will not be provided the opportunity to meet and consult with officials directly concerned with China's relations with the Democratic People's Republic of Korea (DPRK) as well as experts who would have been able to inform us of the context with respect to China's official positions. The Commission also regrets not having been able to visit the Yanbian Korean Autonomous Prefecture in order to conduct interviews with DPRK citizens in holding centres and other places of detention as well as with representatives of Christian churches and other organizations that work on issues related to the position of DPRK citizens in China.

As you may be aware, the Commission of Inquiry on Human Rights in the Democratic People's Republic of Korea is presently preparing its final report for the Human Rights Council. Access to China would have been instrumental to clarifying and verifying certain facts that pertain to China and that fall under the mandate of the Commission. The Commission would have wished to clarify issues of serious concern which we have outlined below and the specific questions listed in an annex to this letter.

The Commission has been informed by representatives of Your Excellency's Government that China maintains a position that DPRK citizens who enter China without permission are considered economic migrants and thus are not given the opportunity for refugee status determination. We understand that it is the position of your Government that such persons should be repatriated to the DPRK, with some exceptions based on humanitarian grounds.

Without wishing to express any final conclusions at this stage of the inquiry, the body of testimony and other information gathered so far indicates that many of the DPRK citizens who cross the border into China do so owing to a well-founded fear of being persecuted for reasons of religion, and/or membership of a particular social group or political opinion. In addition, persons forcibly repatriated to the DPRK are regularly subjected to torture and arbitrary detention and, in

OHCHR-PALAIS DES NATIONS, 8-14 AVENUE DE LA PAIX, CH-1211 GENEVA 10
E-MAIL: coidprksubmissions@ohchr.org - FAX: +41 22 917 90 18

27

A/HRC/25/63



UNITED NATIONS          NATIONS UNIES

some instances, also to rape, enforced disappearance, summary execution and other gross human rights violations. The Commission also received information on numerous cases of forced abortions and infanticide regarding children believed to have been fathered by Chinese nationals. The Commission is not aware of any effective steps taken by China to ensure that repatriated persons will not be subjected to such violations upon their return to the DPRK.

It would therefore appear that the foregoing repatriation practice breaches China's obligations not to expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture. This obligation emerges from Article 3 of the Convention against Torture, ratified by China on 4 October 1988. Contrary to Article 33 of the Convention Relating to the Status of Refugees, repatriation typically also places DPRK citizens in a position where their life or freedom would be threatened on account of their religion and/or membership of a particular social group or holding a political opinion. The obligation not to expel persons to other States where there are substantial grounds for believing that the person would be in danger of being subject to gross human rights violations also emerges from the requirements of customary international law.

While the inquiry is not yet concluded, the information received so far points towards crimes against humanity being committed by officials of the DPRK against their citizens repatriated from China. There are also reasonable grounds for believing that Chinese officials have in some cases shared with DPRK authorities information about the contacts and conduct of DPRK nationals subject to repatriation. It appears that exchanges are to some degree based on border control-related agreements concluded between the Ministry of Public Security on behalf of the People's Republic of China and the Ministry of State Security on behalf of the Democratic People's Republic of Korea.

The Commission is concerned that conveying such information further aggravates the risk that repatriated DRPK nationals will be subject to torture, enforced disappearance and summary execution, in particular where information conveyed relates to alleged contacts that DPRK citizens may have had with Christian churches or nationals of the Republic of Korea or any attempts they may have made to travel onwards to the Republic of Korea. The Commission would urge your Excellency's Government to caution relevant officials that such conduct on their part could amount to the aiding and abetting crimes against humanity where repatriation and information exchanges are specifically directed towards (or have the purpose of) facilitating the commission of crimes against humanity in the DPRK.

The information gathered so far also indicates that many women from the DPRK who enter China are being trafficked into forced marriages and, in some instances, commercial sexual exploitation. The Commission is aware that China has criminalized human trafficking and is taking steps to identify and prosecute the perpetrators. However, it appears that the policy of repatriating DPRK citizens and the gross violations repatriated persons face in the DPRK makes many women afraid to report crimes of human trafficking to the authorities.

2

28

UNITED NATIONS  NATIONS UNIES

The Commission has received reports that DPRK women, some of whom have been victims of trafficking, who have had children with Chinese men, have been among those who have been captured and returned to North Korea. The Commission has received estimates of children of Chinese fathers and North Korean mothers ranging from 10,000 to 25,000. The status of most of these children appears to be effectively stateless as the Chinese families have been discouraged from registering such children because of the illegal status of their mothers. The Commission has noted that China in its Compulsory Education Law makes provision for nine years of compulsory education to all children living in China irrespective of nationality or race. However, information received by the Commission indicates that a large number of children living in China born to women from the DPRK are deprived of the opportunity to attend school resulting from the parents' fear of being arrested and repatriated by registering their children's names as required by law in order for them to attend school.

The Commission also received indications that agents of the DPRK appear to be operating on Chinese territory and attempting to gather information about DPRK citizens and persons supporting them. On some occasions, they appear even to have abducted DPRK citizens and at least one national of the ROK. The Commission has been informed that on other occasions, Chinese security officials have taken the positive step of warning targeted individuals and thus prevented such abductions.

The Commission would be grateful to receive a reply from your Government with respect to the above concerns, and the questions listed in the annex to this letter, by 30 December 2013 so that it may endeavor to reflect your responses in the Commission's report to the Human Rights Council.

Please accept, Excellency, the assurances of my highest consideration.

Michael Kirby
Chair

His Excellency
Mr. Wu Haitao
Ambassador Extraordinary and Plenipotentiary (Disarmament)
Deputy Permanent Representative of the People's Republic
 of China to the United Nations Office at Geneva
Email: chinamission_gva@mfa.gov.cn

3

29

UNITED NATIONS  NATIONS UNIES

Annex

1. Could you confirm your position of treating all DPRK citizens who enter China without permission as illegal economic migrants and therefore not providing them the opportunity to seek asylum or have their refugee status determined ? If this is not an accurate position taken by your Government, could you explain or elaborate further China's policy on such DPRK citizens ?

2. The Commission understands that China has concluded an agreement with the DPRK in 1986 on "the Mutual Cooperation Protocol for the Work of Maintaining National Security and Social Order in the Border Areas", which was first revised in 1998. Could you confirm this understanding to be correct ? If so, could you provide us with a copy of the agreement currently in force and other related documentation revising such an agreement ? Could you provide the Commission with any other documentation that would explain the position of the authorities of China on the policies applies to DPRK citizens in China?

3. The Commission has received reports that Chinese authorities have forcibly returned DPRK citizens to the DPRK. Could you let us know in which cases China has chosen to return DPRK citizens to the DPRK, and in which cases China has chosen not to return them ? Could you provide us with figures, disaggregated by sex and age, on the numbers of DPRK citizens who were returned to the DPRK ? Could you provide us with figures of how many DPRK citizens were permitted to remain in China under humanitarian considerations and with what status?

4. The Commission has received information that approximately 20,000 work or residency permits have been in recent times provided by China to DPRK citizens. Could you provide details about these permits including what is the remit of these permits, which categories of DPRK citizens have received them, how many have received them, and the procedures for obtaining these permits ? In particular, the Commission requests information on whether such permits were given to undocumented DPRK citizens in China so as to regularize their status.

5. Could you inform us of how many DPRK citizens are estimated to currently reside in China, disaggregated by documented and undocumented status?

6. Could you please indicate to what extent Chinese authorities are providing information to DPRK authorities about the activities and contacts of returned DPRK citizens while they are in China ?

7. To what extent have Chinese authorities cooperated with DPRK authorities in identifying persons for capture and repatriation ? If so, how frequently has this occurred and under what legal framework ?

4

30

UNITED NATIONS  NATIONS UNIES

8.  What protection is extended to DPRK women who have children with Chinese men and
    under what legal framework ? Could you provide us with a figure of how many women with
    Chinese children have been subject to repatriation ? What approach is taken towards the
    children born from mixed marriages of DPRK and Chinese citizens ? The Commission would
    also be grateful for any other information about this population of vulnerable children, and
    what measures are being taken to address their problems?

9.  According to information available to the Commission, pregnant DPRK women who are
    captured in China and are believed to have been impregnated by Chinese men, have been
    subject to forced abortion or their babies subject to infanticide upon return to the DPRK.
    Have the Chinese authorities addressed this human rights violation with the DPRK ? Has
    China considered special measures to protect pregnant DPRK women at risk of refoulement ?

10. The Commission understands that the agreement concluded between China and UNHCR in
    1995 on the establishment of the latter's presence in Beijing allows, inter alia, for UNHCR to
    conduct refugee status determination for asylum-seekers as a temporary measure until the
    Government implements its own refugee protection framework in accordance with the
    Refugee Convention. We also understand, that in order for UNHCR to conduct refugee status
    determination, the Chinese Government has agreed to allow UNHCR personnel unimpeded
    access to asylum seekers. However, we believe that UNHCR has in fact not been permitted to
    visit or operate in the northeastern area of China where a large number of DPRK citizens who
    have fled the DPRK are believed to be residing. Could you provide an explanation for this
    refusal of permission in light of the agreement between UNHCR and China as well as
    China's legal obligations under the Refugee Convention ?

11. We understand that the new *Administration Law on Entry and Exit*, adopted by the Standing
    Committee of China's National People's Congress in July 2012, and came into effect in July
    2013, includes provisions on refugee status. The new legislation allows an "alien" applying
    for refugee status to stay in China with an official temporary identity certificate until the time
    his or her application is decided. Could you confirm that such an opportunity would be
    afforded to DPRK citizens who fled the DPRK including through them being informed of
    such an opportunity if and when they are arrested by the Chinese authorities (for entering
    and/or remaining in China without permission) ?

12. The Commission would also be grateful for any available information on DPRK operatives
    who are reportedly present in China in order to monitor and capture DPRK citizens. What is
    the status of such operatives; are any present with the knowledge of your Excellency's
    Government ? Have any cases of abductions been investigated by the authorities ? Could you
    verify this ? If so, how many DPRK agents are permitted to operate in China, for what period
    of time, and under what guidelines are they entitled to carry out their functions ?

13. The Commission has received reports about the abduction of Chinese, Republic of Korea and
    other nationals from the Chinese mainland by the DPRK. The COI has received information
    that in at least one instance, a perpetrator of such abductions has been arrested and prosecuted

5

UNITED NATIONS  NATIONS UNIES

in a Chinese Court: Liu Yong Hua, involved in the abduction of Republic of Korea pastor Kim Dong Shik (Court reference attached). Could you please advise of other arrests and prosecutions of perpetrators of abductions in China ? Could a certified version of judgments in these cases please be provided to the Commission ?

14. The Commission has received reports of abductions from Macau and Hong Kong in 1978. The Commission would appreciate any information that about the abductions of Ms Hong Lein-jeng and Ms So Moi Chun (both from China) and Ms Anocha Panjoy (from Thailand) abducted from Macau, and Ms Choi Un-hee and Mr Shin Sang Ok (both from the Republic of Korea) who were abducted from Hong Kong.

———————

6

32

A/HRC/25/63



30 December, 2013

Dear Mr. Kirby,

I acknowledge receipt of your letter dated 16 December 2013. I wish to state China's position on issues raised in your letter.

At the outset, I wish to reiterate that China does not support the establishment of the Commission of Inquiry on Human Rights in the Democratic People's Republic of Korea by the Human Rights Council. China's position remains unchanged.

China has repeatedly made clear, on various occasions, its position that DPRK citizens who have entered China illegally do it for economic reasons. Therefore they are not refugees. Their illegal entry not only violates Chinese laws, but also undermines China's border control. Some of them have illegally crossed the border on multiple occasions, some were engaged in illegal and criminal acts such as theft, robbery, illegal harvesting. China has the legitimate rights to address those cases according to law.

To China's knowledge, some NGOs and religious groups from the Republic of Korea, under the pretext of humanitarianism, are engaged in organizing smuggling of DPRK citizens who cross the borders illegally. Their activities are for profit and form a complete profit chain. The above-mentioned organized human trafficking activities not only severely undermine China's social stability and national security, but also constitute crimes universally recognized by the international community.

Mr. Michael Kirby
Chair of the Commission of Inquiry
on Human Rights in the DPRK

OHCHR REGISTRY

- 6 JAN 2014

Recipients : Gill Graham Ivere

33

In recent years, Chinese public security and border guard authorities have seized some DPRK citizens who have repeatedly entered China illegally. This demonstrates that the allegation that repatriated DPRK citizens from China face torture in the DPRK is not true. In addition, the Chinese Government has not found cases related to DPRK women and their children in China mentioned by the Commission.

China will continue to prudently and properly handle the issues of DPRK citizens who enter China illegally in accordance with its domestic law, international law as well as humanitarian principles, on the premise of safeguarding national sovereignty and fundamental interests, bearing in mind the stability of the Korean Peninsula. China firmly opposes any attempt to make this issue a refugee one and to internationalize and politicize the issue.

China hopes that the Commission of Inquiry on Human Rights in the DPRK can function in an objective and impartial manner, and not be misled by unproved information.

China requests this letter be included in the Commission's report to the Human Rights Council.

WU Haitao
Chargé d'affaires a.i. & Ambassador
Permanent Mission of China to the
United Nations Office at Geneva and
Other International Organizations in Switzerland

34



No.GJ/07/2014

The Permanent Mission of the People's Republic of China to the United Nations Office at Geneva and other International Organizations in Switzerland presents its compliments to the Office of the United Nations High Commissioner for Human Rights and requests the latter to convey to the Commission of Inquiry on Human Rights in the Democratic People's Republic of Korea China's following comments regarding the draft report of the Commission.

China is committed to the promotion and protection of human rights through constructive dialogue and cooperation. China is opposed the politicization of human rights issues, including country specific human rights issues. China also believes that what the Human Rights Council does should be conducive to peace and stability on the Korean Peninsula.

China wishes to remind the Commission of China's position on DPRK citizens who have entered China illegally as stated in a letter addressed to the Commission on 30 December 2013. China rejects unfounded allegations relating to China in the report of the Commission.

China requests that this note verbal, together with the letter addressed to the Commission on 30 December 2013 be accurately

The Office of the United Nations High Commissioner for Human Rights
Geneva

35

reflected in the Commission's final report to the Human Rights Council.

The Permanent Mission of the People's Republic of China to the United Nations Office at Geneva and other International Organizations in Switzerland avails itself of this opportunity to renew to the Office of the United Nations High Commissioner for Human Rights the assurances of its highest consideration.



Geneva, 24 January 2014

---