TRACY L. WILKISON
Acting United States Attorney
CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division
JOHN J. LULEJIAN (Cal. Bar No. 186783)
Assistant United States Attorney
      1200 United States Courthouse
      312 North Spring Street
      Los Angeles, California 90012
      Telephone: (213) 894-0721
      Facsimile: (213) 894-0141
      E-mail:    John.Lulejian@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                    UNITED STATES DISTRICT COURT

              FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         Plaintiff,<br><br>              v.<br><br>CHRISTOPHER PHILIP AHN,<br><br>         A Fugitive from the<br>         Government of the<br>         Kingdom of Spain. | No. 2:19-cv-05397-FLA-JPR<br><br>REDACTED UNITED STATES' REPLY IN SUPPORT OF ITS REQUEST FOR CERTIFICATION OF EXTRADITION; DECLARATION OF JOHN J. LULEJIAN; EXHIBIT; APPENDIX<br><br>[18 U.S.C. § 3184]<br><br>Hearing Date: April 9, 2021<br>Hearing Time: 10:00 a.m.<br>Location:    Courtroom of the<br>             Honorable Jean P.<br>             Rosenbluth |

**REDACTED**

1     Plaintiff United States of America, by and through its counsel

2  of record, the Acting United States Attorney for the Central District

3  of California and Assistant United States Attorney John J. Lulejian,

4  hereby files its Reply in Support of its Request for Certification of

5  Extradition.

6     The reply is based on the attached memorandum of points and

7  authorities, all of the documents and exhibits lodged and filed under

8  seal and publicly with the Court (in original and redacted forms),

9  which were submitted by the Government of the Kingdom of Spain in

10 support of its request for extradition in this matter, as well as the

11 attached Declaration of John J. Lulejian and corresponding exhibit

12 and appendix, and such further evidence and argument as the Court may

13 permit.[1]

14

15  Dated: March 22, 2021          Respectfully submitted,

16                                 TRACY L. WILKISON
                                   Acting United States Attorney
17
                                   CHRISTOPHER D. GRIGG
18                                 Assistant United States Attorney
                                   Chief, National Security Division
19

20                                 */s/ John J. Lulejian*
                                   JOHN J. LULEJIAN
21                                 Assistant United States Attorney

22                                 Attorneys for Plaintiff
                                   UNITED STATES OF AMERICA
23

24

25     [1] Spain has submitted a supplement to its extradition request, a
   copy of which is attached to the Declaration of John J. Lulejian,
26 dated 03/22/2021 ("Lulejian Decl."), as Exhibit A.  The United States
   understands that Spain will send the original of this supplement to
27 the U.S. Department of Justice's Office of International Affairs.
   (See Lulejian Decl., ¶ 2.)  Following receipt, the United States will
28 file that original copy with the Court.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................iii

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.   INTRODUCTION...................................................1

II.  ARGUMENT......................................................3

     A.   Spain's Evidence Amply Supports a Finding of Probable
          Cause....................................................3

     B.   AHN's Offenses are Covered by the Treaty Because His
          Conduct is Punishable under Spanish and American Law......7

     C.   The Defenses AHN Attempts to Raise Fail Because They
          are Meritless, Fall Outside the Scope of an
          Extradition Proceeding, and Should be Reserved for the
          Spanish Courts...........................................9

          1.   The North Korean Witness Statements Should Not Be
               Disregarded.........................................9

          2.   AHN's Counter-Narrative Falls Outside the Scope
               of this Extradition Proceeding and is Meritless.....15

          3.   AHN's Meritless Defenses Have No Bearing on
               Whether the Charged Offenses are Covered by the
               Treaty..............................................18

               a.   AHN's Consent Defense is Irrelevant and
                    Meritless......................................18

               b.   AHN'S Defense of Government Ratification is
                    Irrelevant and Meritless.......................21

          4.   AHN's Defenses to Probable Cause are Meritless......24

               a.   AHN is Criminally Responsible for His Own
                    Acts and those of His Co-Conspirators..........24

               b.   AHN's Claims Regarding the Charged Offenses
                    Are Meritless..................................27

                    (A)  Breaking and Entering, Illegal
                         Restraint, Threats, and Robbery with
                         Violence and Intimidation.................27

                    (B)  Causing Injuries.........................27

                    (C)  Criminal Organization....................29

i

1

**<u>TABLE OF CONTENTS (CONTINUED)</u>**

2

<u>DESCRIPTION</u>                                                                                           <u>PAGE</u>

3

     D.    AHN's Humanitarian Claims against Extradition are
            Reserved Exclusively for the Secretary of State's

4

            Consideration...........................................30

5

III. CONCLUSION....................................................34

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**

DESCRIPTION                                                        PAGE

FEDERAL CASES

Ahmad v. Wigen,
     910 F.2d 1063 (2d Cir. 1990).................................. 34

Arias Leiva v. Warden,
     928 F.3d 1281 (11th Cir. 2019)................... 8, 19, 20, 23

Barapind v. Enomoto,
     400 F.3d 744 (9th Cir. 2005).................................. 16

Basic v. Steck,
     819 F.3d 897 (6th Cir. 2016).................................. 25

Bingham v. Bradley,
     241 U.S. 511 (1916)........................................... 16

Boos v. Barry,
     485 U.S. 312 (1988)............................................ 3

Bozilov v. Seifert,
     983 F.2d 140 (9th Cir. 1992).................................. 22

Brown v. Clark,
     No. 08-cv-5567, 2011 WL 2261536
     (C.D. Cal. Feb. 7, 2011)...................................... 13

Charlton v. Kelly,
     229 U.S. 447 (1913)........................................... 15

Clarey v. Gregg,
     138 F.3d 764 (9th Cir. 1998)................................ 7, 8

Collins v. Loisel,
     259 U.S. 309 (1922)....................................... 8, 29

Dixon v. United States,
     548 U.S. 1 (2006)............................................. 23

iii

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

Eain v. Wilkes,
        641 F.2d 504 (7th Cir. 1981)................................ 4

Escobedo v. United States,
        623 F.2d 1098 (5th Cir. 1980)............................. 31

Extradition of Luna-Ruiz,
        No. 13-cv-5059, 2014 WL 1089134
        (C.D. Cal. Mar. 19, 2014)................................. 16

In re Extradition of Mainero,
        990 F. Supp. 1208 (S.D. Cal. 1997)........................ 14

Factor v. Laubenheimer,
        290 U.S. 276 (1933)....................................... 22

Finzer v. Berry,
        798 F.2d 1450 (D.C. Cir. 1986)............................. 3

Gallina v. Fraser,
        278 F.2d 77 (2d Cir. 1960)................................ 33

Garrett v. Madden,
        No. 2:18-cv-09282, 2020 WL 2229497
        (C.D. Cal. Mar. 3, 2020).................................. 13

Gerstein v. Pugh,
        420 U.S. 103 (1975)........................................ 4

Gill v. Imundi,
        747 F. Supp. 1028 (S.D.N.Y. 1990)......................... 34

Glucksman v. Henkel,
        221 U.S. 508 (1911)....................................... 14

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                    PAGE

Grin v. Shine,
      187 U.S. 181 (1902)......................................... 24

Han Kim v. D.P.R.K.,
      774 F.3d 1044 (D.C. Cir. 2014).............................. 13

Hilton v. Kerry,
      754 F.3d 79 (1st Cir. 2014)................................. 33

Hoxha v. Levi,
      465 F.3d 554 (3d Cir. 2006)................................. 17

In re Extradition of Acevedo,
      No. 16-1766, 2017 WL 3491749
      (C.D. Cal. Aug. 11, 2017)................................... 10

In re Extradition of Azizi,
      No. 5:14-xr-90282, 2015 WL 1299791
      (N.D. Cal. Mar. 20, 2015)................................... 17

In re Extradition of Camelo-Grillo,
      No. 16-cv-9026, 2017 WL 2945715
      (C.D. Cal. July 10, 2017).............................. 20, 23

In re Extradition of Fordham,
      281 F. Supp. 3d 789 (D. Alaska 2017).................. 20, 23

In re Extradition of Gang-Choon Han,
      No. 11-cv-2059, 2012 WL 33201.......................... 12, 13

In re Extradition of Lara Gutierrez,
      No. 16-cv-05061, 2017 WL 8231237
      (C.D. Cal. Feb. 22, 2017)................................... 10

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                    PAGE

<u>In re Extradition of McCabe</u>,

    No. 10-XR-90622 NJV, 2011 WL 723561

    (N.D. Cal. Feb. 22, 2011).....................................22

<u>In re Extradition of Santos</u>,

    795 F. Supp. 2d 966 (C.D. Cal. 2011)........................ 33

<u>In re Extradition of Santos</u>,

    228 F. Supp.3d 1034 (C.D. Cal. 2017)..................... 11, 12

<u>In re Murphy</u>,

    No. 98-M-168, 1998 WL 1179109,

    (N.D.N.Y. June 30, 1999)................................... 23

<u>Mainero v. Gregg</u>,

    164 F.3d 1199 (9th Cir. 1999).............................. 33

<u>Manta v. Chertoff</u>,

    518 F.3d 1134 (9th Cir. 2008)........................ 2, 19, 23

<u>Martin v. Warden, Atlanta Pen.</u>,

    993 F.2d 824 (11th Cir. 1993).......................... 33, 34

<u>Melia v. United States</u>,

    667 F.2d 300 (2d Cir. 1981)................................ 25

<u>Munaf v. Geren</u>,

    553 U.S. 674 (2008)................................... 31, 32

<u>Neely v. Henkel</u>,

    180 U.S. 109 (1901)....................................... 31

<u>Noeller v. Wojdylo</u>,

    922 F.3d 797 (7th Cir. 2019)..................... 10, 14, 25

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                    PAGE

Peroff v. Hylton,
      542 F.2d 1247 (4th Cir. 1976)................................. 31

Prasoprat v. Benov,
      421 F.3d 1009 (9th Cir. 2005)................... 31, 32, 33, 34

Quinn v. Robinson,
      783 F.2d 776 (9th Cir. 1986)...................... 2, 16, 32, 33

Sainez v. Venables,
      588 F.3d 713 (9th Cir. 2009)........................... 24, 25

Sandhu v. Burke,
      No. 97-cv-4608, 2000 WL 191707
      (S.D.N.Y. Feb. 10, 2000).................................... 13

Santos v. Thomas,
      830 F.3d 987 (9th Cir. 2016)........................... passim

Shapiro v. Ferrandina,
      478 F.2d 894 (2d Cir. 1973)............................ 10, 11

Trinidad y Garcia v. Thomas,
      683 F.3d 952 (9th Cir. 2012)................................30

United States v. Doe,
      705 F.3d 1134 (9th Cir. 2013)............................. 23

United States v. Fulcher,
      250 F.3d 244 (4th Cir. 2001)........................... 21, 22

United States v. Kin-Hong,
      110 F.3d 103 (1st Cir. 1997)............................. 32

United States v. Lamott,
      831 F.3d 1153 (9th Cir. 2016)............................. 20

vii

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                              PAGE

United States v. Mack,

    164 F.3d 467 (9th Cir. 1999)................................. 22

United States v. Risner,

    No. 3:18-mj-765, 2019 WL 6118377

    (N.D. Tex. Nov. 18, 2019)................................... 14

United States v. Rodriguez,

    766 F.3d 970 (9th Cir. 2014)................................ 29

Warmbier v. Democratic People's Republic of Korea,

    356 F. Supp. 3d 30 (D.D.C. 2018)............................ 13

Venckiene v. United States,

    929 F.3d 843 (7th Cir. 2019)............................ 30, 31

Zanazanian v. United States,

    729 F.2d 624 (9th Cir. 1984)................................. 2


STATE CASES

People v. Cervantes,

    26 Cal. 4th 860 (Cal. 2001)................................. 29

People v. Samuels,

    250 Cal. App. 2d 501 (1st. Dist. 1967)...................... 20

People v. Sargent,

    970 P.2d 409 (Cal. 1999)....................................20

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                           PAGE

FEDERAL STATUTES

18 U.S.C. § 112(a)................................................ 8

18 U.S.C. § 1116(b)(4)(B)........................................ 22

18 U.S.C. § 3184................................................. 32

18 U.S.C. § 3186................................................. 32


STATE STATUTES

Cal. Penal § 242......................................... 8, 20, 29

Cal. Penal § 459................................................ 29

Cal. Penal § 461................................................ 29


TREATIES

Treaty on Extradition between the United States of America
    and Spain, U.S.-Spain, May 29, 1970, 22 U.S.T. 737;
    Supplementary Treaty in Extradition between the United States
    of America and Spain, signed January 25, 1975;
    Second Supplementary Extradition Treaty between the
    United States of America and the Kingdom of Spain,
    U.S.-Spain, Feb. 9, 1998, S. Treaty Doc. No. 102-24
    (1992); Third Supplementary Treaty between the
    United States of America and the Kingdom of Spain,
    U.S.-Spain, Mar. 12, 1996, S. Treaty Doc. No. 105-15
    (1997); and the Instrument on Extradition between
    the United States of America and Spain, as contemplated
    by Article 3(2) of the Agreement on Extradition between

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                PAGE

    the United States and the European Union signed

    25 June 2003, as to the application of the Treaty

    on Extradition between the United States of America

    and Spain signed May 29, 1970, and the Supplementary

    Treaties on Extradition signed January 25, 1975,

    February 9, 1988 and March 12, 1996, U.S.-Spain,

    Dec. 17, 2004 S. Treaty Doc. No. 109-14 (2006),

    with Annex........................................... passim


SPANISH STATUTES

C.P., art. 27............................................. 25, 26

C.P., art. 28............................................. 25, 26

C.P., art. 29............................................. 25, 26

C.P., art. 147............................................ 27, 28

C.P., art. 570 bis........................................... 29

x

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.    INTRODUCTION**

3

Fugitive CHRISTOPHER PHILIP AHN ("AHN") admits that on
4 February 22, 2019, he was part of the group that entered the Embassy
5 of the Democratic People's Republic of Korea in Madrid, Spain ("the
6 Embassy"), where he and his conspirators committed "facially criminal
7 conduct in a foreign jurisdiction."  (Dkt. 175 at 32-33; 175-1 at 5,
8 ¶ 12.)  AHN further admits that (i) he was specifically selected for
9 the mission because of his expertise in "high intensity situations";
10 (ii) certain members of his group carried weapons into the Embassy
11 and tied up its residents; and (iii) he and other members of the
12 group left the Embassy in vehicles belonging to the Embassy.  (Dkt.
13 175-1 at 4-6, ¶¶ 10-12, 16.)  AHN also does not contest the veracity
14 of the eyewitness statements given by Spanish police officers of the
15 physical injuries sustained by the North Korean diplomats and family
16 members, and the supporting medical records documenting injuries
17 suffered by two of the victims.  Nor does he contest the authenticity
18 of the photographs of the crime scene evidencing the extensive damage
19 to the Embassy, as well as the various types of weapons that were
20 left behind by the group.

21

These facts, along with the other evidence submitted by the
22 Kingdom of Spain ("Spain"), fully corroborate the statements provided
23 by the victims and the architecture students who came to their rescue
24 after the attack.  Collectively, the evidence supports a finding that

25

26

27

28

probable cause exists, and AHN's alleged conduct is punishable under both Spanish and American law (dual criminality).[1]

AHN glosses over the substantial evidence in this case and asserts defenses that he contends defeat extradition.  However, these defenses are meritless and fall well outside the narrow scope of an extradition proceeding.  It is the role of the Spanish courts to assess the credibility of witnesses, weigh the competing evidence, evaluate AHN's defenses, and ultimately determine whether he violated Spanish law by participating in the Embassy attack.  In short, AHN's defenses require a trial on the merits, which an extradition proceeding is decidedly not.  Further, it is exclusively the responsibility of the Secretary of State to evaluate AHN's unsubstantiated claim that extradition should be denied because Spain is somehow a "tool" of North Korea that is incapable of ensuring his safety.  In fact, no court has ever denied extradition based on such types of foreign policy and humanitarian arguments.

It goes without saying that the United States condemns North Korea's human rights violations.  But the United States does not condone acts of violence committed by private citizens outside of the United States, including on the territory of a Western European ally. Further, it is Spain, not North Korea, which seeks AHN's

---

[1] AHN does not challenge several of the criteria the court must find to certify his extradition, including: (1) the extradition magistrate has jurisdiction to conduct extradition proceedings; (2) the extradition magistrate has jurisdiction over him; and (3) an extradition treaty is in full force and effect.  See Manta v. Chertoff, 518 F.3d 1134, 1140 (9th Cir. 2008); Quinn v. Robinson, 783 F.2d 776, 783, 790 (9th Cir. 1986); Zanazanian v. United States, 729 F.2d 624, 625-26 (9th Cir. 1984).  Nor does he contest that he is the person who Spain alleges committed the charged crimes.

2

extradition.[2]  And Spain's prosecution of AHN reinforces "the
principle that host states have a special responsibility to ensure
that foreign embassies and the personnel inside them are free from
threats of violence and intimidation," which is a principle that is
"solidly entrenched in the Law of Nations."[3]

As detailed below, the discrete requirements for extradition
have been met, notwithstanding AHN's claims to the contrary.
Accordingly, the United States respectfully requests that the Court
certify AHN as extraditable for the Secretary of State's surrender
decision.

## II.  ARGUMENT

### A.  Spain's Evidence Amply Supports a Finding of Probable Cause

The evidence submitted by Spain in support of its extradition
request is more than sufficient for this Court to find that there is
probable cause to believe AHN committed the offenses for which his
extradition is sought:  (1) Breaking and Entering; (2) Illegal
Restraint; (3) Causing Injuries; (4) Threats; (5) Robbery with
Violence and Intimidation; and (6) Criminal Organization.  Pursuant

---

[2] The United States reiterates, as it has since AHN's arrest,
that if this Court certifies AHN as extraditable and the Secretary of
State issues a surrender order, AHN's extradition to Spain is not
somehow an extradition to North Korea "by proxy," (Dkt. 175 at 14).
Spain does not have an extradition treaty with North Korea.  (Dkt.
118-1 at 6.)  Moreover, Article XIII of the U.S.-Spain Treaty does
not permit Spain to re-extradite AHN to any third-country without the
approval of the United States.  (Dkt. 55-1 at 15-16, Treaty, art.
XIII.)

[3] Finzer v. Berry, 798 F.2d 1450, 1455 (D.C. Cir. 1986)
(quotation and citation omitted), aff'd in part, rev'd in par sub
nom., Boos v. Barry, 485 U.S. 312 (1988).  Indeed, in the reciprocal
context, if a Spanish citizen traveled to Washington, DC,
participated in an attack on an embassy, and returned to Spain, the
United States would be within its rights to request that citizen's
extradition from Spain regardless of which embassy was attacked.

to controlling Supreme Court and Ninth Circuit precedent, this Court should evaluate the facts of this case using the same probable cause standard that it applies in domestic cases.  See, e.g., Santos v. Thomas, 830 F.3d 987, 991 (9th Cir. 2016) ("The Supreme Court has described these extradition hearings to determine probable cause as akin to a grand jury investigation or a preliminary hearing under Federal Rule of Criminal Procedure 5.1.") (citations omitted).  In other words, this Court should consider whether there are "facts and circumstances sufficient to warrant a prudent man in believing that [AHN] had committed or was committing an offense." Gerstein v. Pugh, 420 U.S. 103, 111 (1975) (internal quotation marks and citation omitted).  "Foreign states requesting extradition are not required to litigate their criminal cases in American courts," Santos, 830 F.3d at 991, and "[i]t is fundamental that the person whose extradition is sought is not entitled to a full trial at the magistrate's probable cause hearing," Eain v. Wilkes, 641 F.2d 504, 508 (7th Cir. 1981).

In the instant case, there is no dispute that AHN was part of the group who entered the Embassy carrying weapons, that the group proceeded to handcuff Embassy residents, and that AHN fled the compound in an Embassy vehicle.  (Dkt. 175 at 17-19.)  Moreover, AHN does not contest much of the evidence submitted by Spain, including the following evidence:

- Store receipts and video camera surveillance images showing that the assailants prepared for the attack by purchasing balaclavas, combat knives, pistol holders, imitation pistols, shooting glasses, hinged handcuffs, bolt cutters, tactical flashlights, pliers, electrical tape, and a telescopic ladder. (Dkt. 55-3 at 51-56.)

4

- The testimony of Lynn Gayero Dayao and Teofila Villarroel Orozco, two bystanders who, while waiting for a bus outside the Embassy, heard screams coming from inside the compound. (Dkt. 118-1 at 77-78, 80-81, 100-02.) Ms. Villarroel Orozco testified that she saw a person inside the Embassy lying on the ground being grabbed by several people. (Id. at 100-02.)

- The testimony of Spanish police officers and a bystander, as well as medical reports, regarding the injuries that Cho Sun Hi sustained when she jumped from the Embassy's terrace to avoid being captured by the assailants. (Dkt. 55-3 at 7-8, 17, 39-41; 118-1 at 9, 18-19, 48, 65-66.) Ultimately, Ms. Hi required surgery to repair her severe leg injury. (Dkt. 55-3 at 40; 118-1 at 9; 119 at 15 n.11.)

- Medical records regarding the injuries that the Embassy's Commercial Attaché, Yun Sok So, sustained to his face and hands during the attack. (Dkt. 118-1 at 12; 119 at 17 n.14.)

- Video camera surveillance images and testimony of Spanish police officers, showing how ADRIAN HONG CHANG ("HONG CHANG") thwarted an inquiry by Spanish police officers by posing as a North Korean diplomat and convincing the officers that there was no issue inside of the Embassy. (Dkt. 55-3 at 8, 79; 118-1 at 20-22, 49, 129.)

- Video camera surveillance images of assailants running inside of the Embassy compound, immobilizing and transferring a victim, and leaving the Embassy. (Dkt. 118-1 at 123-27, 130-32.)

- The testimony of the Spanish police officers who observed the victims of the attack exit the Embassy in handcuffs with visible injuries. (Dkt. 118-1 at 26, 52). The oldest victim exhibited the

"most bruises," including injuries on his face consistent with "heavy blows to the head." (Id. at 26.)

- Photographs of the items that the assailants left behind, including cable ties, a box of hinged handcuffs, a tactical flashlight, gloves, pliers, bolt cutter tools, balaclavas, knives, defense spray, imitation pistols, and a shoulder holster. (Dkt. 55-3 at 59-65, 67, 69-74.) The photographs also document the damage to internal doors in the Embassy. (Id. at 66-68.)

This evidence is consistent with, and corroborates, the testimony of the victims of the Embassy attack, as well as the architecture students who came to help them. (See generally Dkt. 55-3 at 15-48.) The victims and witnesses described, in detail, how the assailants (AHN, HONG CHANG, and their co-conspirators) entered the Embassy under false pretenses and against their will, threatened them, restrained them, beat them, and stole their electronic devices. (See generally id.) Mr. So identified AHN from a nine-person photographic array as "one of the 4 or 5 people who, at the start of the attack, hit him at the entrance of the property until they managed to restrain him, assaulting him and hitting him in order to immobili[z]e him." (Id. at 21-22.). Mr. So also described how the assailants placed a bag over his head, carried him to a room in the basement of the Embassy, and threw him to the ground. (Dkt. 55-3 at 9, 18, 80.) It was only afterwards that the assailants urged Mr. So to defect, which he refused to do. (Id. at 9-10, 18, 80.)

Mr. So was not the only victim of the attack. Among the other victims was Jang Ok Gyong (Mr. So's wife) and their minor son, who endured the traumatic experience of being held hostage in their room

6

after the assailants broke the lock on their door and kept guard. (Dkt. 55-3 at 29-32, 33-34.)  And as discussed above, Ms. Hi (Song Guk Jang's wife), was so terrified by the attack that she jumped from the Embassy's terrace.  (Dkt. 55-3 at 7-8, 17, 39, 79.)

### B. AHN's Offenses are Covered by the Treaty Because His Conduct is Punishable under Spanish and American Law

The offenses for which Spain seeks AHN's extradition are covered by the extradition treaty between the United States and Spain.[4] Under the Treaty, the offenses for which Spain requests AHN's extradition must be punishable under both Spanish and American law, and at least one of the offenses must be punishable by more than one-year imprisonment.[5]  The "primary focus of dual criminality has always been on the conduct charged."  <u>Clarey v. Gregg</u>, 138 F.3d 764,

---

[4] Treaty on Extradition between the United States of America and Spain, U.S.-Spain, May 29, 1970, 22 U.S.T. 737; the Supplementary Treaty in Extradition between the United States of America and Spain, signed January 25, 1975; the Second Supplementary Extradition Treaty between the United States of America and the Kingdom of Spain, U.S.-Spain, Feb. 9, 1998, S. Treaty Doc. No. 102-24 (1992); the Third Supplementary Treaty between the United States of America and the Kingdom of Spain, U.S.-Spain, Mar. 12, 1996, S. Treaty Doc. No. 105-15 (1997); and the Instrument on Extradition between the United States of America and Spain, as contemplated by Article 3(2) of the Agreement on Extradition between the United States and the European Union signed 25 June 2003, as to the application of the Treaty on Extradition between the United States of America and Spain signed May 29, 1970, and the Supplementary Treaties on Extradition signed January 25, 1975, February 9, 1988 and March 12, 1996, U.S.-Spain, Dec. 17, 2004 S. Treaty Doc. No. 109-14 (2006), with Annex (collectively the "Treaty").  (A copy of this treaty is filed with the Court at Dkt. 55-1 at pages 8-19.)

[5] <u>See</u> Treaty, art. II(A) ("An offense shall be an extraditable offense if it is punishable under the laws in both [the United States and Spain] by deprivation of liberty for a period of more than one year or by a more severe penalty."); <u>see also</u> Treaty, art. II(D) ("If extradition has been granted for an extraditable offense, it shall also be granted for any other offense specified in the request even if the latter offense is punishable by less than one year's deprivation of liberty, provided that all other requirements for extradition are met.").

766 (9th Cir. 1998); see also Collins v. Loisel, 259 U.S. 309, 316 (1922) (dual criminality satisfied "if the particular act charged is criminal in both jurisdictions."). Critically, the alleged conduct must be "taken as true" for purposes of the dual criminality analysis. See, e.g., Arias Leiva v. Warden, 928 F.3d 1281, 1293-94 (11th Cir. 2019) (citation omitted). In other words, this Court must examine whether AHN's conduct, as alleged by Spain, would violate our own laws, without inquiring into the merits of the charges or any defenses. Id.

Here, Spain alleges that AHN was part of a group that invaded a foreign government's embassy; assaulted, restrained, and threatened its residents; seized electronic devices; and then fled in vehicles belonging to the embassy. (See generally Dkt. 55-3). Based on such alleged misconduct, Spain seeks AHN's extradition so that he can stand trial for offenses carrying a punishment of more than one-year imprisonment. (See id. at 86-90.) Such alleged misconduct, if it was committed in the United States, plainly would be punishable under federal and state laws carrying a maximum punishment of more than one-year imprisonment. (Declaration of John J. Lulejian, dated 03/22/2021 ("Lulejian Decl."), at 1-3 (Appendix B (Revised) setting forth examples of federal and state offenses which would cover AHN's conduct).)[6]

---

[6] The United States inadvertently failed to include the federal and state statutes that could apply to AHN's conduct underlying the Spanish offense of "Causing Injuries." (Dkt. 119-2.) These statutes include Cal. Penal § 242 (Battery) and 18 U.S.C. § 112(a) (Protection of foreign officials, official guests, and internationally protected persons). Accordingly, the United States has revised Appendix B. (See Lulejian Decl. ¶ 3, App. B.)

Accordingly, AHN's offenses are covered by the Treaty, and his claim that the dual criminality element is not satisfied fails.

### C. The Defenses AHN Attempts to Raise Fail Because They are Meritless, Fall Outside the Scope of an Extradition Proceeding, and Should be Reserved for the Spanish Courts

#### 1. The North Korean Witness Statements Should Not Be Disregarded

AHN's claim that the charged offenses are not covered by the Treaty, and that probable cause does not exist, is dependent on his belief that the statements of the victims, as well as the architectural students, are all unreliable because of their national origin. (Dkt. 175 at 26-29.) As a threshold matter, this claim has no factual basis because the testimony of these victims and witnesses is corroborated by the other evidence submitted by Spain, including the testimony of Spanish law enforcement and bystanders, as well as the video surveillance camera images, photographs of the crime scene, the store receipts, and the medical records.

Moreover, AHN's attempt to portray all North Koreans (diplomats, family members, and students alike) as inherently unreliable because of their national origin is antithetical to our own laws and principles. See, e.g., 9th Cir. Model Crim. Jury Instr. 1.7 (2020) (when considering credibility of witnesses jurors "must avoid bias, conscious or unconscious, based on a witness's . . . national ancestry . . . in [their] determination of credibility"). Where, as here, the United States has received a valid extradition request from a trusted treaty partner alleging the violation of its domestic laws, the nationality of the witnesses should not factor into the probable cause determination.

9

In any event, AHN's attempt to impeach the credibility of the victim and witness statements contravenes the bedrock principle of extradition law that credibility determinations are reserved for the trier of fact in the requesting country.  See, e.g., Santos, 830 F.3d at 993 ("an individual contesting extradition may not . . . call into question the credibility of the government's offer of proof"); Noeller v. Wojdylo, 922 F.3d 797, 807 (7th Cir. 2019) ("Evidence that contradicts the demanding country's proof or poses questions of credibility—i.e., contradictory evidence—is off-limits.").[7]  Further, a "judge's refusal to examine the credibility of the testimony and statements included in the translated material [is] clearly proper, since the declarants [are] not before him."  Shapiro v. Ferrandina,

---

[7] This Court has followed such precedent and rejected probable cause challenges based on the credibility of witness statements offered into evidence by the United States.  For example, in In re Extradition of Lara Gutierrez, the Court rejected a fugitive's claim that a witness statement "border[ed] on incredible."  No. 16-cv-05061, 2017 WL 8231237, at *4 (C.D. Cal. Feb. 22, 2017).  The Court nonetheless found that the statement satisfied the probable cause standard:

> [T]hese types of arguments about the credibility of [a witness's] account are misplaced in these proceedings.  The circumscribed nature of this Court's inquiry does not permit the Court to weigh the credibility of [the witness's] statements.  Rather, the Court must determine whether any competent evidence establishes probable cause.

(Id.)  Similarly, in In re Extradition of Acevedo, the Court rejected another fugitive's claim that a witness statement was "suspect and more likely than not false."  No. 16-1766, 2017 WL 3491749, at *8 n.4 (C.D. Cal. Aug. 11, 2017).  The Court explained that notwithstanding the fugitive's claim, the evidence did not undermine a finding of probable cause:

> [T]hese arguments raise factual disputes regarding the weight and credibility of evidence.  Such determinations are beyond the scope of this extradition proceeding and are properly reserved for trial in the requesting country."

Id.

478 F.2d 894, 905 (2d Cir. 1973).  This rationale has particular force here, where the presiding Spanish judge who is closest to the facts determined that the North Korean victims who made statements are credible.  (See Dkt. 118-1 at 6.)  A contrary finding does not simply question the credibility of the victims, but it questions the judgment and competency of the Spanish jurist, which may raise serious international comity concerns.

Contrary to AHN's claim (Dkt. 175 at 26), the Ninth Circuit's en banc decision in Santos v. Thomas does not give license for this Court to disregard the North Korean victim and witness statements and the Spanish judge's credibility determination.  In Santos, two co-conspirators of the fugitive recanted their prior testimony before a Mexican judge in open court as soon as they were outside the control of the police.  See 830 F.3d at 997-98; see also, In re Extradition of Santos, 228 F. Supp.3d 1034, 1050 (C.D. Cal. 2017).  Based on those specific facts, the appellate court narrowly held that proof of the fact that a witness statement was "obtained by coercion may be treated as 'explanatory' evidence that is admissible in an extradition hearing."  830 F.3d at 1008.  However, the Santos court expressly cautioned that "the scope of our holding here is limited, and that our decision should not be taken as a license to engage in mini-trials on the question of coercion or torture."  Id. at 1007.  That means "[t]he extradition court does not have to determine which party's evidence represents the truth where the facts are contested."  Id.  Thus, "[w]here an extradition court first considers evidence that a statement was improperly obtained, but concludes that it is impossible to determine the credibility of the allegations without

exceeding the scope of an extradition court's limited review, the
court has fulfilled its obligations . . . Probable cause is not
undermined, and the court must certify the extradition." Id.[8]

Here, AHN merely speculates that the North Korean witnesses were
coerced.  Such speculation falls well short of the type of clear-cut
proof that would satisfy any narrow coercion exception to the general
rule that the requesting country's evidence must be taken as true.
Unlike in Santos, none of the North Korean witnesses have
subsequently recanted and stated that their original testimony was
the product of torture at the hands of the investigating foreign
authority.  See id. at 997-98.  Further, in response to this Court's
October 23, 2020, Order (Dkt. 154), the FBI confirmed that it had
found no information in its files indicating that the North Korean
witnesses were coerced.  (Dkt. 159.)  And tellingly, after two years
of investigation, AHN has adduced no competent evidence that the
North Korean witnesses were coerced.

Undeterred, AHN attempts to manufacture a coercion claim based
on a U.N. human rights report about North Korea, and a report issued
by his expert, a North Korean scholar with no personal knowledge of
this case.  (Dkt. 175-3 at 2-15, 64-100.)  However, such types of
reports are inadmissible and cannot be used to establish facts.  See,
e.g., In re Extradition of Gang-Choon Han, No. 11-cv-2059, 2012 WL

_____

[8] AHN errantly cites the district court opinion in Santos (Dkt.
175 at 25) for the proposition that, by merely alleging coercion, he
can shift the burden to the United States to prove the negative.
This proposition is not correct.  The district court shifted the
burden in that case due to the unique set of circumstances in which
the witnesses had recanted their testimony and stated that their
original testimony had been coerced through physical beatings by the
police.  See Santos, 228 F. Supp. 3d at 1040.

33201, at *1, at n.2 (C.D. Cal. Jan. 6, 2012) ("To the extent the [fugitive] also seeks to offer an expert opinion regarding factual issues, this opinion lacks foundation"); Sandhu v. Burke, No. 97-cv-4608, 2000 WL 191707, at *12 (S.D.N.Y. Feb. 10, 2000) (rejecting fugitive's attempt to introduce testimony of witness who had no personal knowledge of instant case, but who instead sought to opine on Indian police corruption generally); cf., e.g., Garrett v. Madden, No. 2:18-cv-09282, 2020 WL 2229497, at *20 (C.D. Cal. Mar. 3, 2020) (an expert is not permitted to "supply case-specific facts about which he has no permissible knowledge") (internal quotation marks and citation omitted); Brown v. Clark, No. 08-cv-5567, 2011 WL 2261536, at *6 (C.D. Cal. Feb. 7, 2011)("Using the expert to introduce facts and then explain what those facts meant was improper.").[9]

AHN also seeks to infer coercion from the fact that Mr. So served as an interpreter when Spanish law enforcement interviewed the other North Korean witnesses.  (Dkt. 175 at 20-21, 27-29.)  However, such inference is unsupported.  As the Honorable Santiago Pedraz Gómez, Magistrate Judge of the Central Examining Court Number 5, explains, the Spanish authorities used Mr. So as an interpreter "due

---

[9] Han Kim v. D.P.R.K., 774 F.3d 1044 (D.C. Cir. 2014), on which AHN relies heavily, is not to the contrary.  Although the court considered reports about North Korea's human rights violations as circumstantial evidence that the regime had killed the victim, it emphasized that "[o]ur conclusion would no doubt differ if we lacked confirmed evidence that the DPPK was involved in Reverend Kim's disappearance."  See 774 F.3d at 1051.  In any event, that was not an extradition case where the merits of the case will be tried before a different court.  Nor did it involve the situation here, where North Koreans witnesses have come forward to testify but the veracity of such testimony is being called into question by virtue of their nationality.  For similar reasons, AHN's citation to Warmbier v. Democratic People's Republic of Korea is inapposite.  See 356 F. Supp. 3d 30, 47 (D.D. C. 2018)(noting absence of North Korean testimony and undisputed facts regarding North Korea's culpability).

13

to practical reasons, in light of the logical difficulties in finding
interpreters of such a minority dialect as [the] North Korean
language." (Lulejian Decl., ¶ 2, Ex. A at 3.)  Further, Magistrate
Judge Gómez has confirmed that using Mr. So as the interpreter
complied with Spanish law.  (Id.)

Similar attempts to discredit the United States' evidence based
on mere supposition have been uniformly rejected.  See, e.g., In re
Extradition of Mainero, 990 F. Supp. 1208, 1226 (S.D. Cal. 1997)
("[B]efore we can indict evidence as tainted by the coercive effect
of torture, satisfactory evidence must be presented.  Argument,
inference and innuendo is all that has really been presented here.");
see also, e.g., Noeller, 922 F.3d at 807 (claim that witness was
"subject to undue influence from other family members who are biased
against him" was a credibility attack that has "no place in
extradition hearings"); United States v. Risner, No. 3:18-mj-765,
2019 WL 6118377, at *20-21 (N.D. Tex. Nov. 18, 2019) (fugitive's
argument that the victim's relative exerted undue influence fell
"outside the scope of the Court's limited role in an extradition
proceeding").  Accordingly, Spain's use of Mr. So as an interpreter
is not a basis to deny extradition.  See e.g., Glucksman v. Henkel,
221 U.S. 508, 512 (1911) ("It is common in extradition cases to
attempt to bring to bear all the factitious niceties of a criminal
trial at common law.  But it is a waste of time.  For while, of
course, a man is not to be sent from the country merely upon demand
or surmise, yet if there is presented, even in somewhat untechnical
form according to our ideas, such reasonable ground to suppose him

14

guilty as to make it proper that he should be tried, good faith to the demanding government requires his surrender.").

At bottom, AHN will have a full and fair opportunity to challenge the credibility of the North Korean witnesses before the Spanish courts if he is extradited.  This Court should not supplant the role of the Spanish judiciary.[10]

### 2.   AHN's Counter-Narrative Falls Outside the Scope of this Extradition Proceeding and is Meritless

While asserting that the North Korean witness statements should be disregarded, AHN improperly asks this Court to admit his own self-serving declaration and other material through which he seeks to offer a different narrative of events.  (Dkt. 175 at 30-32.)  Because this evidence contradicts the evidence submitted by Spain, AHN's request must be denied as contrary to law.[11]

It is hornbook extradition law that contradictory evidence falls outside the scope of an extradition hearing and is reserved for the trier of fact in the requesting country.  See e.g., Charlton v. Kelly, 229 U.S. 447, 461-62 (1913) (upholding magistrate judge's decision to exclude "witnesses produced to contradict the testimony for the prosecution" because such an "objection . . . should be taken before or at the time of his trial for the crime, and heard by the

---

[10] Spain, a Western European country that is party to the European Convention on Human Rights, will provide AHN with due process consistent with the national and supranational laws to which it is bound.

[11] Accordingly, the United States expressly objects to the admissibility of the following redacted and sealed documents: (i) AHN's Declaration (Dkt. 175-1); (ii) the Declaration of Naeun Rim (Dkt. 175-2); (iii) AHN's medical records; and (iv) the character letters, the U.N. Report, and the Report of Robert Collins annexed to the Declaration of Christopher Jumin Lee (Dkt. 175-3).

court having jurisdiction of the crime"); <u>Santos</u>, 830 F.3d at 993 (a fugitive may not "produce witnesses whose testimony contradicts evidence already offered by the government"); <u>Barapind v. Enomoto</u>, 400 F.3d 744, 752 (9th Cir. 2005) (en banc) (holding that affidavit which contradicted allegations in extradition request was properly excluded because "a trial would be required to determine who was telling the truth"); <u>Quinn v. Robinson</u>, 783 F.2d 776, 815 (9th Cir. 1986) ("The magistrate does not weigh conflicting evidence and make factual determinations but, rather, determines only whether there is competent evidence to support the belief that the accused has committed the charged offense."); <u>In re Extradition of Luna-Ruiz</u>, No. 13-cv-5059, 2014 WL 1089134, at *14 (C.D. Cal. Mar. 19, 2014) ("Resolving the conflict between the competing versions of the facts presented in the government's evidence and relator's proffered declarations would entail weighing conflicting evidence, assessing the relative credibility of witnesses, and resolving factual disputes, functions that are beyond the scope of an extradition proceeding.  Therefore, relator's declarations are not admissible."). Indeed, admitting such contradictory evidence would defeat the very purpose of having extradition treaties, as the requesting country would then need to introduce rebutting evidence and thus effectively try its case in the United States.  See e.g., <u>Bingham v. Bradley</u>, 241 U.S. 511, 517 (1916) ("It is one of the objects of [the extradition statute] to obviate the necessity of confronting the accused with the witnesses against him.").

AHN's attempt to recast his alternative narrative of events as "explanatory," rather than contradictory, evidence is meritless.

Explanatory evidence has been narrowly defined to include "clear-cut proof" which negates probable cause.  See e.g., Hoxha v. Levi, 465 F.3d 554, 561 (3d Cir. 2006).  "Evidence that does not accept the requesting country's evidence as true [is] considered 'contradictory,' and not 'explanatory,' evidence."  In re Extradition of Azizi, No. 5:14-xr-90282, 2015 WL 1299791, at *3 (N.D. Cal. Mar. 20, 2015).  Here, AHN's counter-narrative constitutes impermissible contradictory evidence. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████   In addition, AHN's claim that one of the Embassy residents left the door open so that he and his co-conspirators could enter (Dkt. 175-1 at ¶ 12) is directly contradicted by video camera surveillance images, as well as the testimony of Song Jim Choe.[12]  Further, AHN's statement that he did not hit anyone (Dkt. 175-1 at 5, ¶ 12) is directly contradicted by Mr. So's identification of AHN, out of a nine-person lineup, as one of the persons who struck him (Dkt. 55-3 at 21-22), as well as the

---

[12] Specifically, Mr. Choe testified that HONG CHANG entered the Embassy under the false pretense that he wanted to meet with Mr. So, but when Mr. Choe went to find Mr. So, HONG CHANG used the opportunity to open the Embassy door and let in AHN and his co-conspirators.  (Dkt. 55-3 at 23-24.)  Mr. Choe's testimony is corroborated by video camera surveillance images showing HONG CHANG first entering the Embassy alone, and then returning to the front entrance to allow the other assailants to enter, at which point they started running inside the Embassy compound.  (Dkt. 118-1 at 116-26.)

medical records confirming Mr. So's injury (Dkt. 118-1 at 12; 119 at 17 n.11).[13]

In any event, AHN's striking claim that the attack on the Embassy was actually a staged kidnaping (Dkt. 175-1 at 3, ¶ 8) carries no indicia of reliability. AHN's sole support for this claim is a conversation that he purportedly had with HONG CHANG just hours before the attack. (Id.)  Moreover, even if ████████████ ██████, that did not grant AHN and his co-conspirators license to restrain, assault, and threaten the other Embassy residents.  The fact that these victims were not aware of ███████████ ████████████ that AHN alleges is evidenced by the fact that Ms. Hi was so frightened by the attack that she jumped off the terrace to her detriment. (Dkt. 55-3 at 7-8, 39-41.)  Thus, even if the Court were to admit AHN's declaration, resolving his consent defense requires a trial on the merits, which this extradition hearing is not.

Accordingly, AHN's evidence is inadmissible in this proceeding and his attempt to argue an alternative narrative of events is misplaced.

        3.   <u>AHN's Meritless Defenses Have No Bearing on Whether the Charged Offenses are Covered by the Treaty</u>

            *a.*   *AHN's Consent Defense is Irrelevant and Meritless*

AHN's unsupported claim ████████████████████████ ████████████████████████ has no bearing on whether

---

[13] AHN claims that he could not have hit Mr. So because his right hand was fractured (Dkt. 175-1 at 5, ¶ 12), but he could easily have struck Mr. So with his left hand, or he could have used his right hand in a manner that did not cause him further injury. Regardless, the severity of AHN's injury and its bearing on Spain's case should be evaluated by the Spanish courts.

18

the charged offenses are covered by the Treaty, and thus, is meritless.  As discussed above, for purposes of assessing whether AHN's conduct would be punishable under American law, the Court must accept Spain's allegations as true.  See Arias, 928 F.3d at 1293. Here, Spain alleges that the attack on the Embassy was not consensual, but rather that AHN and his co-conspirators entered the Embassy against the will of its residents, assaulted, restrained, and threatened the diplomats and their family members ███████████ █████████████████████████████████████████████████████████ ████████████████  AHN's contradictory claim ████████████ ████████████████████████ must be reserved for the Spanish courts in connection with a trial on the merits.

    AHN attempts to circumvent the fact that his consent defense falls outside the scope of an extradition hearing by incorrectly claiming that it is relevant to his mens rea, which he asserts must be assessed as part of the dual criminality analysis.  (Dkt. 175 at 10, 30, 32).  This claim fails because, as the Ninth Circuit has held, to the extent that the applicable federal or state statute has a specific intent requirement, such intent may be inferred from the conduct alleged by the requesting country.  Manta v. Chertoff, 518 F.3d 1134, 1142-43 (9th Cir. 2008).  Neither the Ninth Circuit, nor any other circuit, has held that mens rea is a backdoor channel by which a fugitive may introduce contradictory evidence that is otherwise inadmissible.  See e.g., Arias, 928 F.3d at 1294 ("[W]hen assessing dual criminality, we look only at the charges on paper; it is up to the courts of the requesting country to adjudicate their merits.").

Further, AHN's conduct is punishable under statutes, such as battery (Cal. Penal § 242), that lack a specific intent requirement. See e.g., United States v. Lamott, 831 F.3d 1153, 1157 (9th Cir. 2016) ("[B]attery is a general intent crime."); People v. Sargent, 970 P.2d 409, 418 (Cal. 1999) (same).  Defenses to general intent crimes unquestionably fall outside the scope of an extradition hearing.  See e.g., Santos, 830 F.3d at 993 ("evidence in defense" should be excluded); Arias, 928 F.3d at 1294 ("the fact that defenses may be available in the United States . . . does not defeat extradition under the dual criminality principle") (internal quotation marks and citation omitted); In re Extradition of Camelo-Grillo, No. 16-cv-9026, 2017 WL 2945715, at *2 (C.D. Cal. July 10, 2017) ("The dual criminality requirement does not consider possible affirmative defenses"); In re Extradition of Fordham, 281 F. Supp. 3d 789, 799 (D. Alaska 2017) ("It is settled that the dual criminality requirement does not encompass possible affirmative defenses").[14]

Moreover, even if AHN's consent defense is somehow relevant to dual criminality, it still would require a trial on the merits to adjudicate and therefore remains outside the scope of an extradition hearing.  Tellingly, none of the domestic cases cited by AHN relating to mens rea (Dkt. 175 at 30-31) were decided at the probable cause stage.

---

[14] Notably, under California law, "consent of the victim is not generally a defense to assault or battery, except in a situation involving ordinary physical contact or blows incident to sports." People v. Samuels, 250 Cal. App. 2d 501, 513 (1st. Dist. 1967).

1

2

                     *b.   AHN'S Defense of Government Ratification is*
                            *Irrelevant and Meritless*

3       In addition to claiming ███████████████████████████

4   ███████████████████████████, AHN also makes the unsupported

5   claim that he believed "any work he did with Mr. Hong was . . . on

6   behalf of the United States."  (Dkt. 175 at 32.)  AHN's claim—which

7   if adopted would open the floodgates for all fugitives to thwart

8   extradition by similarly claiming that they believed their crimes

9   were authorized by the United States—falls outside the scope of the

10  Treaty and is meritless.

11      As a threshold matter, AHN has not met the elements required for

12  the defense that he seeks to assert.  A defendant who seeks to raise

13  a public authority defense must show he honestly believed he was

14  acting in cooperation with the government.  See e.g., United States

15  v. Fulcher, 250 F.3d 244, 252-53 (4th Cir. 2001).  While AHN asserts

16  in his brief that he believed he was "acting under the direction of

17  the United States government" (Dkt. 175 at 32), he does not swear to

18  that fact in his declaration or provide any corroborating evidence.

19  Instead, he simply notes his belief that the United States may have

20  authorized prior defection missions.  (Dkt. 175-1 at 3, ¶7.)  Nor

21  does AHN's declaration address what he believed the United States

22  purportedly authorized, assuming he believed the government

23  authorized anything at all in this particular case.  For example, he

24  does not allege that he believed the United States authorized

25  assaulting, restraining, and threatening the Embassy residents,

26  damaging the Embassy, and seizing property from the Embassy.

27

28

1    But even if AHN could demonstrate that he honestly believed that

2 the United States had authorized all of the unlawful actions, that

3 would not be sufficient. "While an honest belief that a defendant is

4 acting in cooperation with the government is a necessary element of

5 establishing innocent intent, it is not alone sufficient." Fulcher,

6 250 F.3d at 252.  Rather, AHN must also show that "the government

7 official or officials upon whose authority the defendant relied

8 possessed actual authority to authorize his otherwise criminal acts."

9 Id. at 253; see also, e.g., United States v. Mack, 164 F.3d 467, 474

10 (9th Cir. 1999) (court properly refused to instruct jury regarding

11 public-authority defense to federal offenses that relied on

12 authorization by local law enforcement).  AHN has not even attempted

13 to make such a showing here.  It is axiomatic that one nation can

14 never authorize the violation of another country's laws.  Indeed, if

15 a Spanish citizen traveled to the United States and attacked another

16 country's embassy, the Spanish citizen could be prosecuted here

17 regardless of whether he claimed that Spain had authorized the

18 attack.[15]  Cf., e.g., Bozilov v. Seifert, 983 F.2d 140, 143 (9th Cir.

19

20    [15] Contrary to AHN's claim (Dkt. 175 at 31 n.10), the federal
statutes cited in Appendix B apply regardless of the status of U.S.-
North Korea relations.  For dual criminality purposes, the proper

21 inquiry is whether a similar attack on an embassy in the United
States would generally be punishable under American law.  See e.g.,

22 In re Extradition of McCabe, No. 10-XR-90622 NJV, 2011 WL 723561, at
*10 (N.D. Cal. Feb. 22, 2011) ("Dual criminality exists when the

23 offense charged in the country seeking extradition 'is generally
recognized as criminal in both countries.'") (quoting Factor v.

24 Laubenheimer, 290 U.S. 276, 300 (1933)).  AHN similarly errs in
claiming that the victims all must be "foreign officials" in order

25 for the statutes cited in Appendix B to apply.  Notably, 18 U.S.C.
§§ 112(a) & 1201 protect "foreign officials" and "internationally

26 protected persons," the latter of which include both representatives
of a foreign government and family members.  See 18 U.S.C.

27 § 1116(b)(4)(B).  Finally, contrary to AHN's claim, 18 U.S.C. §§ 956,
113, 2111 are applicable for dual criminality purposes without

28                                      (footnote cont'd on next page)

1992) (dual criminality satisfied when fugitive "could have been

charged with [an offense] by the United States if the two countries'

positions had been reversed").

Regardless, as discussed above, extradition courts examine only

the conduct alleged by the requesting country–not the fugitive's

alternative narrative in the form of an affirmative defense–in

considering whether the alleged offenses would be punishable under

federal or state law. See, e.g., Manta, 518 F.3d at 1142-43; Arias,

928 F.3d at 1293-94. Accordingly, AHN's purported belief that the

United States sanctioned the Embassy attack has no bearing on the

Court's limited determination. This fact is reinforced by the Ninth

Circuit's holding that a defendant's belief he was working with the

government is an affirmative defense rather than a challenge to the

government's case in chief. See United States v. Doe, 705 F.3d 1134,

1146 (9th Cir. 2013).[16] As discussed above, affirmative defenses fall

outside the scope of an extradition proceeding. See, e.g., Santos,

830 F.3d at 992; Camelo-Grillo, 2017 WL 2945715, at *2 Fordham, 281

F. Supp. 3d at 789.

---

regards to their special maritime or territorial jurisdiction requirement. See, e.g., In re Murphy, No. 98-M-168, 1998 WL 1179109, at *5 (N.D.N.Y. June 30, 1999) (finding dual criminality satisfied by 18 U.S.C § 113 without regards to jurisdictional requirement).

[16] Specifically, in United States v. Doe, the Ninth Circuit held that "Doe's defense . . . that he believed he was working for the FBI" was an affirmative defense that Doe had the burden to prove by a preponderance of the evidence. 705 F.3d at 1146. In so holding, the appellate court rejecting Doe's argument, similar to the one asserted by AHN, that his belief that the government had ratified his conduct "negate[d] criminal intent" and was "therefore an element which must be disproved by the government beyond a reasonable doubt." Id. The Ninth Circuit reasoned that Dixon v. United States, 548 U.S. 1 (2006), had "changed the legal landscape" such that "crimes requiring that a defendant act 'knowingly' simply require the government to prove knowledge of the facts constituting the offense." Doe, 705 F.3d at 1146.

23

Finally, in any event, AHN's claim that he believed the U.S. government ratified the attack on the Embassy cannot be adjudicated in the context of this extradition proceeding, but rather would require a trial on the merits.  Tellingly, none of the domestic cases cited by AHN that involved such a defense (Dkt. 175 at 32) were decided at the probable cause stage.

Accordingly, this Court should reject AHN's unsupported claim that he cannot be extradited because the United States government purportedly authorized his criminal conduct.

### 4.   AHN's Defenses to Probable Cause are Meritless

#### a.   AHN is Criminally Responsible for His Own Acts and those of His Co-Conspirators

In challenging probable cause, AHN opines (Dkt. 175 at 33-34) that he is not responsible for the misconduct of his co-conspirators based on his unsupported opinion of Spanish law on criminal participation.  However, AHN's assertions contravene Spain's reasoned interpretation of its own laws.  As Magistrate Judge Gómez explains, AHN "could be criminally liable for the crimes charged either as the perpetrator or as an accomplice." (Lulejian Decl., ¶ 2, Ex. A at 3.) Magistrate Judge Gómez supports his conclusion with citations to the applicable provisions of the Spanish Penal Code.  (Id.)  Pursuant to controlling Supreme Court and Ninth Circuit precedent, this Court should defer to Spain's interpretation of its own laws.  See e.g., Grin v. Shine, 187 U.S. 181, 190 (1902) ("It can hardly be expected of us that we should become conversant with the criminal laws of [the country seeking extradition].")); Sainez v. Venables, 588 F.3d 713, 717 (9th Cir. 2009) ("adhering to our established approach of giving

24

credence to foreign proceedings" out of "respect for other nations' sovereignty and because we recognize the chance of erroneous interpretation is much greater when we try to construe the law of a country whose legal system is not based on common law principles") (internal quotation marks and citation omitted); Noeller, 922 F.3d at 806 ("United States courts hearing extradition requests have consistently expressed an unwillingness to interpret foreign law to invalidate arrest warrants."); Basic v. Steck, 819 F.3d 897, 901 (6th Cir. 2016); Melia v. United States, 667 F.2d 300, 303 (2d Cir. 1981). Indeed, an extradition has never been denied based on the fugitive's opinion of foreign law.[17]

In any event, AHN's claim that Spanish law on criminal participation does not apply to his situation is meritless. Article 27 of the Spanish Penal Code provides that "[t]hose criminally responsible for crimes and [misdemeanors] are the principals and their accessories." (Dkt. 55-3 at 91.) Article 28 clarifies that a person is deemed a principal, even if he did not personally commit the offending act, if he "cooperates in the commission thereof by an act without which a crime could not have been committed." (Id.) And under Article 29, a person can also be held criminally responsible as an accessory if he "co-operate[s] in the perpetration of the criminal offence with prior or simultaneous deeds." (Lulejian Decl., ¶ 2, Ex. A at 5.)

---

[17] Deference to a foreign country's interpretation of its own laws is particularly appropriate in extradition proceedings because fugitives will have ample opportunity to contest issues of foreign law before the foreign courts if they are extradited, and those foreign courts are best equipped to adjudicate such matters.

Here, under Article 27, AHN is criminally responsible for his own acts, including entering and remaining inside the Embassy against the will of its residents, as well as his assault on Mr. So.  (See e.g., Dkt. 55-3 at 21-22.).  In addition, under Article 28, AHN is liable as a principal for the acts of his co-conspirators.  While AHN denies he played a principal role in the attack, such claim is belied by his own admission that HONG CHANG specifically asked him to participate in the mission because of his specialized skillset in "high intensity situations."  (Dkt. 175-1 at ¶ 10).[18]  But even if AHN was not deemed liable as a principal for the acts of his co-conspirators, under Article 29, he could still be held criminally responsible as an accessory.  As discussed above, all that is required to be deemed an accessory is that the person "co-operate in the perpetration of the criminal offense with prior or simultaneous deeds."  (Lulejian Decl. ¶ 2, Ex. A at 5.)  In this case, AHN's simultaneous deeds include entering, and then remaining, inside the Embassy against the will of its residents, and fleeing in an Embassy vehicle.  (See generally Dkt. 55-3.)  Accordingly, AHN can be held criminally responsible for both his own acts and those of his co-conspirators.

---

[18] While AHN studiously avoids any mention of what he personally did during the four-and-a-half hours that he was inside the Embassy, it strains credulity to believe that he would have flown all the way from the United States to Madrid to be a casual observer of events. As discussed above, Mr. So identified AHN as one of the persons who assaulted him.  (Dkt. 55-3 at 21-22.)

b.   *AHN's Claims Regarding the Charged Offenses Are Meritless*

(A)   Breaking and Entering, Illegal Restraint, Threats, and Robbery with Violence and Intimidation

AHN's claims relating to four of the six charges—Breaking and Entering, Illegal Restraint, Threats, and Robbery with Violence and Intimidation—are based exclusively on his meritless claim that the Court should disregard Spain's evidence, and instead believe his uncorroborated counter-narrative.  (Dkt. 175 at 35-38.)  These claims should be rejected for the reasons discussed above.

(B)   Causing Injuries

The offense of Causing Injuries, codified at Article 147 of the Spanish Penal Code, prohibits a person from using "any means or procedure" to "cause another individual an injury that impairs his or her bodily, physical, or mental integrity."  (Dkt. 55-3 at 87.)  Spain's evidence supporting this offense includes not only the testimony of the North Korean victims and witnesses, but also the Spanish police officers who observed the injuries suffered by multiple diplomats when they left the Embassy.  (See, e.g., Dkt. 118-1 at 26) (police officer testifying that oldest individual exiting Embassy exhibited the "most bruises," including injuries on his face consistent with "heavy blows to the head").)[19]  AHN's assertion that "[t]he record indicates that only two individuals [Mr. So and Ms. Hi] suffered injuries that are corroborated by evidence other than the testimony of North Korean witnesses" (Dkt. 175 at 37) is simply incorrect.

_____

[19] It appears that the officer was referring to Mr. Jang since he is significantly older than the other diplomats.

1    Moreover, AHN's claims relating to Mr. So and Ms. Hi's injuries

2  are meritless.  With respect to Mr. So, AHN misreads the Treaty in

3  claiming (Dkt. 175 at 37) that the supporting medical records

4  "obliterate" probable cause.  Contrary to AHN's claim, it does not

5  matter whether Mr. So's injuries were severe enough to qualify for a

6  punishment of more than one-year imprisonment under Article 147 of

7  the Spanish Penal Code, as opposed to a lesser penalty.  As discussed

8  above, pursuant to Article II(D) of the Treaty, extraditable offenses

9  include those which carry a penalty of less than one-year

10  imprisonment so long as there is at least one other offense that is

11  punishable by more than one-year imprisonment.  See Treaty, Art. II

12  (D).  In this case, AHN does not dispute that all of the other

13  offenses for which his extradition is sought carry a maximum

14  punishment of more than one-year imprisonment.

15    Regarding Ms. Hi, who suffered a severe leg injury after jumping

16  from the Embassy's terrace, AHN claims that her injury was not

17  foreseeable.  This defense is meritless.  As Ms. Hi explains, she

18  jumped from the terrace because she believed that the Embassy had

19  been captured.  (See Dkt. 55-3 at 7-8, 39-41.)  Her belief was based

20  on the fact that she heard fighting taking place outside her room,

21  "thuds on the floor," and someone speaking with a South Korean

22  accent.  (Id.)  AHN does not allege, much less offer any proof, that

23  either he or his co-conspirators gave Ms. Hi any advanced warning of

24  the attack.  There is probable cause to believe that AHN could

25  foresee that the Embassy residents could be harmed during the attack.

26  And as the California Supreme Court has held, "[t]he precise

27  consequence need not have been foreseen; it is enough that the

28

defendant should have foreseen the possibility of some harm of the kind which might result from his act." People v. Cervantes, 26 Cal. 4th 860, 871 (Cal. 2001); see also e.g., United States v. Rodriguez, 766 F.3d 970, 983 (9th Cir. 2014) ("In many situations giving rise to criminal liability, the death or injury is not directly caused by the acts of the defendant but rather intervening forces or events, such as . . . escape attempts . . . .") (internal quotation marks and citation omitted).[20]

Accordingly, AHN's claims regarding this offense are without merit and should thus be rejected.

### (C)   Criminal Organization

Under Article 570 bis of the Spanish Penal Code (Criminal Organization), a person is prohibited from, among other things, "cooperat[ing]" in "any [ ] matter" with an organization that "assigns various tasks or functions with the aim of committing crimes." (Dkt. 55-3 at 90.)  Here, AHN admits that Free Joseon was behind the Embassy attack.  (See, e.g., Dkt. 175 at 36 (noting

---

[20] In passing, AHN makes the dual criminality argument that there is no "corresponding crime in the United States for indirectly 'causing' injury." (Dkt. 175 at 37.).  However, pursuant to controlling Supreme Court precedent, the proper inquiry is whether the underlying conduct would be criminal in the United States, not whether there is an identical statute.  See, e.g., Collins, 259 U.S. at 312 ("The law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions.").  Here, the conduct supporting the "causing injuries" offense includes the invasion of the Embassy, the assault on the diplomats, and other unlawful conduct that precipitated Ms. Hi's decision to jump from the terrace.  Such conduct is plainly punishable in the United States. See e.g., Cal. Penal §§ 459, 461 (Forcible Entry and Detainer); Cal. Penal § 242 (Battery).

photographs of weapons that were "left behind after <u>Free Joseon</u> and Mr. Ahn had departed the embassy) (emphasis added).)[21]  While AHN disputes that Free Joseon's aim was to commit any crimes (<u>Id.</u> at 35), Spain's evidence regarding the brutal Embassy attack perpetrated by AHN and his co-conspirators, some or all of whom were members of Free Joseon, demonstrates otherwise.  Further, AHN's suggestion that he has not sufficiently cooperated with Free Joseon (Dkt. 175 at 35) is belied by both his participation in the Embassy attack and his past work on behalf of the organization.  (<u>See</u> Dkt. 175-1 at 2-6, ¶¶ 4-16.)

Accordingly, AHN's meritless claims regarding this offense should be rejected.

### D. AHN's Humanitarian Claims against Extradition are Reserved Exclusively for the Secretary of State's Consideration

AHN asks the Court to ignore the longstanding rule of non-inquiry and find that Spain is not capable of securing his safety while in Spanish custody.  (Dkt. 175 at 38-41).  Such a claim fails because Spain's ability to protect AHN is an issue falls outside the scope of this extradition proceeding and is reserved exclusively for the Secretary of State's consideration.[22]  <u>See, e.g.</u>, <u>Venckiene v. United States</u>, 929 F.3d 843, 864-65 (7th Cir. 2019) ("To the extent

---

[21] AHN also concedes that Free Joseon is an "known" organization that has operated for some time (Dkt. 175 at 8, 15), thus fulfilling the requirements that the organization be "stable in nature" and operate for "an indefinite period." (Dkt. 55-3 at 90.)

[22] Notably, the Secretary of State has access to regional experts, including on-the-ground personnel, who can assess any present threats and advise on Spain's ability to mitigate any safety concerns while AHN is in Spanish custody.  Also, if appropriate, the Secretary "may make confidential diplomatic inquiries and receive confidential diplomatic assurances."  <u>Trinidad y Garcia v. Thomas</u>, 683 F.3d 952, 961 (9th Cir. 2012) (Thomas, J., concurring).

[the fugitive] contend[s] that she will be subject to physical harm from sources outside the [requesting country's] government, these are humanitarian arguments that are in the purview of the Secretary of State in extradition proceedings."); <u>Peroff v. Hylton</u>, 542 F.2d 1247, 1249 (4th Cir. 1976) (rejecting claim that extradition should be denied because there were "potential assassins in Swedish prisons").

The Ninth Circuit, like every other circuit, has "long adhered to the rule of non-inquiry-that it is the role of the Secretary of State, not the courts, to determine whether extradition should be denied on humanitarian grounds." <u>Prasoprat v. Benov</u>, 421 F.3d 1009, 1116 (9th Cir. 2005); <u>see also</u>, <u>e.g.</u>, <u>Escobedo v. United States</u>, 623 F.2d 1098, 1107 (5th Cir. 1980) ("[T]he degree of risk to [the fugitive's] life from extradition is an issue that properly falls within the exclusive purview of the executive branch."). The Supreme Court, in extradition and similar cases, has relied on these non-inquiry principles to hold that federal courts should not "pass judgment on foreign justice systems." <u>Munaf v. Geren</u>, 553 U.S. 674, 702 (2008). For example, in <u>Munaf</u>, the Supreme Court held that it was the Executive Branch, not the Judiciary, who should evaluate claims asserted by American citizens that their military transfer to Iraq would likely result in torture. <u>Id.</u> ("The Executive Branch may, of course, decline to surrender a detainee for many reasons, including humanitarian ones."). In so holding, the <u>Munaf</u> Court cited <u>Neely v. Henkel</u>, 180 U.S. 109 (1901), an extradition case, for the proposition that it is not the role of the Judiciary to "assess practices in foreign countries." <u>Munaf</u>, 553 U.S. at 701.

"The rule of non-inquiry, like extradition procedures generally,
is shaped by concerns about institutional competence and by notions
of separation of powers." United States v. Kin-Hong, 110 F.3d 103,
110 (1st Cir. 1997). "It is not that questions about what awaits the
relator in the requesting country are irrelevant to extradition; it
is that there is another branch of government, which has both final
say and greater discretion in these proceedings, to whom these
questions are more properly addressed." Id. at 111. Notably, the
Executive Branch has the unique ability to obtain assurances it
considers reliable and to monitor compliance with any such
assurances. See, e.g., Munaf, 553 U.S. at 702; Kin-Hong, 110 F.3d at
110 ("The State Department alone, and not the judiciary, has the
power to attach conditions to an order of extradition.").

The rule of non-inquiry also dovetails with the extradition
statutory framework. Under 18 U.S.C. § 3184, "the judicial
officer's inquiry is limited to a narrow set of issues concerning
the existence of a treaty, the offense charged, and the quantum of
evidence offered." Kin-Hong, 110 F.3d at 109. Pursuant to
18 U.S.C. § 3186, once a fugitive has been certified as
extraditable, "[i]t is then within the Secretary of State's sole
discretion to determine whether or not the [fugitive] should
actually be extradited." Kin-Hong, 110 F.3d at 109. Thus, as the
Ninth Circuit has held, "[t]he extradition magistrate's authority
has been constrained by statute and caselaw to a narrow inquiry,
such that the magistrate judge does not have any discretion to
exercise." Prasoprat, 421 F.3d at 1016; see also e.g., Quinn, 783
F.2d at 789-90 (Secretary of State has "sole discretion . . . to

refuse extradition on humanitarian grounds because of the procedures or treatment that await a surrendered fugitive").  AHN cites no precedent, and the United States is aware of none, for his ask that the Court disregard the rule of non-inquiry and usurp the Secretary of State's responsibility to evaluate his humanitarian claim.[23]

AHN's reliance on dicta from Gallina v. Fraser, 278 F.2d 77, 79 (2d Cir. 1960), an inapposite case that is more than 60 years old, does not lead to a different result.  (Dkt. 175 at 38-39.)  In Gallina, the Second Circuit speculated that a future case could arise in which the fugitive "would be subject to procedures or punishment so antipathetic to a federal court's sense of decency" that a departure from the rule of non-inquiry would be warranted.  Id. While the Ninth Circuit has "occasionally repeated this caveat," it has "never relied on it to create a humanitarian exception to extradition."  Mainero v. Gregg, 164 F.3d 1199, 1210 (9th Cir. 1999). To the contrary, in Prasoprat, the Ninth Circuit "flatly declined to create or apply a humanitarian exception."  In re Extradition of Santos, 795 F. Supp. 2d 966, 991 (C.D. Cal. 2011) (citing Prasoprat, 421 F.3d at 1016).  The Ninth Circuit is not alone.  "No court has yet applied such a theoretical Gallina exception."  Hilton v. Kerry, 754 F.3d 79, 87 (1st Cir. 2014).[24]

---

[23] AHN presents no evidence that Spain is incapable of securing his safety.  Moreover, while AHN references information about threats in the aftermath of the Embassy attack, he has cited nothing recent.

[24] In fact, "[t]he Second Circuit itself has . . . distanced itself from Gallina."  Martin v. Warden, Atlanta Pen., 993 F.2d 824,

(footnote cont'd on next page)

1    This Court should not depart from the longstanding rule of non-

2   inquiry, the extradition statutory framework, and the Ninth Circuit's

3   explicit instruction that "[a]n extradition magistrate lacks

4   discretion to inquire into the conditions that might await a fugitive

5   upon return to the requesting country." Prasoprat, 421 F.3d at 1016.

6   AHN cannot be allowed to contravene the extradition statute and

7   decades of case law that make it unambiguously clear that it is the

8   Secretary's responsibility to evaluate AHN's humanitarian claims

9   against extradition.

10  **III. CONCLUSION**

11    The United States respectfully requests that the Court certify

12  AHN's extradition to Spain for the Secretary of State's surrender

13  decision.

---

830 n.10 (11th Cir. 1993) (citing Ahmad v. Wigen, 910 F.2d 1063, 1066
(2d Cir. 1990)); see also, e.g., Gill v. Imundi, 747 F. Supp. 1028,
1049 (S.D.N.Y. 1990) ("the promise of Gallina's dictum [has] . . .
been excised" by Ahmad).  In Ahmad, the Second Circuit referenced
Gallina but still concluded that "the degree of risk to [appellant's]
life from extradition is an issue that properly falls within the
exclusive purview of the executive branch."  910 F.2d at 1066
(quotation marks and citation omitted).

34

**DECLARATION OF JOHN J. LULEJIAN**

I, John J. Lulejian, declare as follows:

1.    I am an Assistant United States Attorney and have been assigned to prosecute <u>United States v. Christopher Philip Ahn</u>, Case No. 2:19-cv-05397-JFW-JPR.  I make this declaration in support of the United States' Reply Memorandum in Support of its Request for Certification of Extradition.

2.    Attached hereto as Exhibit A is a true and correct copy of Spain's supplement to the extradition request, dated 03/18/2021.  I am informed and believe that Spain will send the original of the supplement to the U.S. Department of Justice's Office of International Affairs ("OIA").  Upon receipt, the United States will file the original document with the Court.

3.    Attached hereto as Appendix B (Revised) is a revised summary of the offenses charged in Spain and some of the offenses which could be charged in the United States, along with the maximum penalties for those offenses.

4.    I declare under penalty of perjury that the foregoing is true and correct.


Executed this <u>22nd</u> day of March 2021, at Los Angeles County, California.


                                    _/s/ John J. Lulejian_____
                                    JOHN J. LULEJIAN

# EXHIBIT A

 MINISTERIO
DE JUSTICIA

SECRETARÍA DE ESTADO DE JUSTICIA

DIRECCIÓN GENERAL DE COOPERACIÓN
JURÍDICA INTERNACIONAL Y DERECHOS
HUMANOS

MAGISTRATURA DE ENLACE ANTE LAS
AUTORIDADES DE LOS ESTADOS UNIDOS

March 18th, 2021

S/REF:          Christopher Philp Ahn

N/REF:          DP 1396/2019

FECHA:          18 DE MARZO, 2021

ASUNTO:         AHN (DP 1396/2019)

DESTINATARIO:   Mr. Vaughn A. Ary
                Director
                Office of International Affairs
                U.S. Department of Justice, Criminal División
                1301 New York Avenue, N.W
                Washington, D.C., 20005

Dear Mr. Ary:

      Pursuant to Articles X. F and XII of the Extradition Treaty between Spain and the United States of America, enclosed please find information in support of the request for the extradition of Christopher Philp Ahn.

Washington, D.C., March 18, 2021

The Liaison Magistrate of Spain to the United States
María de las Heras García

– 1 –

**JUZGADO CENTRAL DE INSTRUCCIÓN Nº 5 – AUDIENCIA NACIONAL**
**D.P. 1396/2019**

**DOCUMENTO SUPLEMENTARIO EN APOYO DE LA EXTRADICIÓN DEL CRISTOPHER PHILIP AHN**

Yo, Santiago Pedraz Gómez, Magistrado Juez del Tribunal Central de Instrucción número 5 desde 26 de noviembre de 2020, hago esta declaración complementaria en apoyo de la solicitud de extradición de Christopher Philip AHN (en adelante "AHN"), para que pueda ser procesado en España por los siguientes delitos: (i) lesiones (-art. 147 del Código Penal); (ii) detenciones ilegales (arts. 163 y 165 del Código Penal); (iii) amenazas (art. 169 y 171 del Código Penal); (iv) allanamiento de morada (art. 202 y 203 del Código Penal); (v) robo con violencia e intimidación (arts. 237, 241, 242 del Código Penal); y (vi) organización criminal (art. 570 bis del Código Penal).

Entiendo que se ha presentado "Opposition to the Request for Extradition filed by The United States" en el que se realizan ciertas alegaciones en relación con la ley española y la investigación judicial de este caso.

I

Respecto a la participación criminal en el delito en España, según el art. 27 del Código penal, son responsables criminalmente de los delitos los autores y los cómplices. El art. 29 regula la participación a título de cómplice.

De acuerdo con esta regulación, AHN podría ser responsable penalmente de los delitos que se le imputan bien como autor o bien como cómplice. Una copia del art. 29 del Código Penal se incluye en este documento como anexo I.

II

Respecto a la asistencia proporcionada por el Sr. So como intérprete en las declaraciones prestadas por los testigos norcoreanos, respondió a razones prácticas, dadas las lógicas dificultades para encontrar intérpretes de un dialecto tan minoritario como es el norcoreano. En estas circunstancias, el Sr. So podía expresarse perfectamente en español y en norcoreano y, por tanto, estaba en condiciones de realizar una traducción adecuada de las declaraciones de sus compatriotas, sin que ello infrinja ninguna disposición legal.

Madrid, 16 de marzo de 2021

Santiago Pedraz Gómez
Magistrate Judge
Central Investigative Court number 5
Spain

- 2 -

**CENTRAL EXAMINING COURT NUMBER 5 (AUDIENCIA NACIONAL)**
**D.P. 1396/2019**

**SUPPLEMENTAL DOCUMENT IN SUPPORT OF THE EXTRADITION OF**
**CHRISTOPHER PHILIP AHN**

I, Santiago Pedraz Gómez, Magistrate Judge of the Central Examining Court number 5, since November 26, 2020, make this supplementary statement in support of the Request of Extradition of Christopher Philip AHN (hereinafter "AHN"), so that he can be prosecuted in Spain for the following crimes - (i) injuries (art. 147 of the Criminal Code); (ii) illegal detentions (arts. 163 and 165 of the Criminal Code); (iii) threats (arts. 169 and 171 of the Criminal Code); (iv) breaking and entering (arts. 202 and 203 of the Criminal Code); (v) robbery with violence and intimidation (arts. 237, 241, 242 of the Criminal Code); and (vi) criminal organization (art. 570 bis of the Criminal Code).

I understand that an "Opposition to the Request for Extradition filed by The United States" has been submitted in which certain allegations are made in relation to the Spanish law and the judicial investigation.

I

Concerning criminal participation in the crime in Spain, according to article 27 of the Criminal Code, those criminally responsible for criminal offences are the offenders and their accessories. The article 29 provides for the criminal liability of the accessories.

According to this regulation, AHN could be criminally liable for the crimes charged either as the perpetrator or as an accomplice. A copy of the article 29 of the Penal Code is included in this document as annex I.

II

With respect to the assistance provided by Mr. So as an interpreter in the statements given by North Korean witnesses, the decision was due to practical reasons, in light of the logical difficulties in finding interpreters of such a minority dialect as North Korean language. In these circumstances, Mr. So was perfectly fluent in Spanish and North Korean and was therefore in a position to make a proper translation of his compatriots' statements, which is not in contravention with any legal provision.

Madrid, March 18, 2021

Santiago Pedraz Gómez
Magistrate Judge
Central Examining Court number 5
Spain

– 3 –



# ANNEX I





# CRIMINAL CODE

## TITLE II
## ON PERSONS CRIMINALLY RESPONSIBLE FOR CRIMINAL OFFENSES

Article 29

Accessories are those who, not being included in the preceding Article, co-operate in the perpetration of the criminal offence with prior or simultaneous deeds.

# CODIGO PENAL

## TÍTULO II
## DE LAS PERSONAS CRIMINALMENTE RESPONSABLES
## DE LOS DELITOS Y FALTAS

Artículo 29

Son cómplices los que, no hallándose comprendidos en el artículo anterior, cooperan a la ejecución del hecho con actos anteriores o simultáneos.



# APPENDIX B (REVISED)

**APPENDIX B (REVISED) - DUAL CRIMINALITY**

| Offenses Charged in Spain[1] | Offenses Which Could Be Charged in the United States |
|---|---|
| *Illegal Restraint*<br>[C.P., arts.163 & 165]<br><br>Maximum Sentence:  4 years | *Protection of foreign officials, official guests, and internationally protected persons*<br>[18 U.S.C. § 112(a)]<br><br>Maximum Sentence:  10 years<br><br>*Kidnapping – Foreign official or official guest*<br>[18 U.S.C. § 1201(a)(4)]<br><br>Maximum Sentence:  Life<br><br>*Assaults within maritime and territorial jurisdiction*<br>[18 U.S.C. § 113(a)(6)]<br><br>Maximum Sentence:  10 years<br><br>*False Imprisonment*<br>[Cal. Penal §§ 236, 237, 1170(h)]<br><br>Maximum Sentence:  3 years<br><br>*Battery*<br>[Cal. Penal §§ 242, 243(d), 1170(h)]<br><br>Maximum Sentence:  4 years |

---

[1] The maximum sentences of imprisonment for the Spanish offenses are set forth in the Extradition Request.  (Dkt. 55-3 at 2.)

| Offenses Charged in Spain | Offenses Which Could Be Charged in the United States |
|---|---|
| *Breaking and Entering* [C.P., arts. 202 & 203]<br><br>Maximum Sentence:  2 years | *Protection of foreign officials, official guests, and internationally protected persons* [18 U.S.C. § 112(a)]<br><br>Maximum Sentence:  10 years<br><br>*Protection of property occupied by foreign governments* [18 U.S.C. § 970(a)]<br><br>Maximum Sentence:  5 years<br><br>*Forcible entry and detainer* [Cal. Penal § 459, 461]<br><br>Maximum Sentence:  6 years |
| *Causing Injuries* [C.P., arts. 147(1)]<br><br>Maximum Sentence:  3 years | *Protection of foreign officials, official guests, and internationally protected persons* [18 U.S.C. § 112(a)]<br><br>Maximum Sentence:  10 years<br><br>*Battery* [Cal. Penal §§ 242, 243(d), 1170(h)]<br><br>Maximum Sentence:  4 years |
| *Threats* [C.P., arts. 169 & 171]<br><br>Maximum Sentence:  2 years | *Protection of foreign officials, official guests, and internationally protected persons* [18 U.S.C. § 112(b)]<br><br>Maximum Sentence:  6 months<br><br>*Criminal Threats* [Cal. Penal § 422(a), 1170(h)]<br><br>Maximum Sentence:  3 years |

2

| Offenses Charged in Spain | Offenses Which Could Be Charged in the United States |
|---|---|
| Robbery with Violence and Intimidation [C.P., arts. 237, 241, & 242]<br><br>Maximum Sentence:  5 years | *Robbery and Burglary*<br>*Special maritime and territorial jurisdiction*<br><br>[18 U.S.C. § 2111]<br><br>Maximum Sentence:  15 years<br><br><br>*Robbery*<br>[Cal. Penal § 211, 213]<br><br>Maximum Sentence:  2 years or more, depends on the degree |
| Criminal Organization [C.P., art. 570 <u>bis</u>.]<br><br>Maximum Sentence:  8 years | *Conspiracy*<br>[18 U.S.C. § 371]<br><br>Maximum Sentence:  5 years<br><br><br>*Conspiracy to kill, kidnap, maim, or injure persons or damage property in a foreign country*<br>[18 U.S.C. § 956]<br><br>Maximum Sentence:  25 or 35 years<br><br><br>*Expedition against friendly nation*<br>[18 U.S.C. § 960]<br><br>Maximum Sentence:  3 years<br><br><br>*Conspiracy*<br>(Cal. Penal § 182, 1170(h)]<br><br>Maximum Sentence:  3 years |

3