Naeun Rim – State Bar No. 263558
    nrim@manatt.com
MANATT, PHELPS & PHILLIPS, LLP
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 312-4380
Facsimile: (310) 312-4224

Ekwan E. Rhow - State Bar No. 174604
    erhow@birdmarella.com
Christopher Jumin Lee - State Bar No. 322140
    clee@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Petitioner
Christopher Philip Ahn

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES,<br><br>          Plaintiff,<br><br>     v.<br><br>CHRISTOPHER PHILIP AHN,<br><br>          Respondent. | CASE NO. 2:19-CV-5397 FLA (JPR)<br><br>**NOTICE OF FILING OF PETITION FOR WRIT OF *HABEAS CORPUS* BY PERSON IN FEDERAL CUSTODY UNDER 28 U.S.C. § 2241** |

1    PLEASE TAKE NOTICE that on June 23, 2022, Relator Christopher Philip

2  Ahn filed a Petition for Writ of Habeas Corpus by Person in Federal Custody under

3  28 U.S.C. § 2241 ("Petition") with the United States District Court of the Central

4  District of California in Case No. 2:22-CV-04320.

5    The Petition seeks *habeas* review of the May 22, 2022, Order entitled

6  "Reluctant Certification of Extraditability." (Dkt. 233.) A copy of said Order is

7  attached hereto.

8

9  DATED:  June 23, 2022        Naeun Rim
                                MANATT, PHELPS & PHILLIPS, LLP
10

11                             By:    */s/ Naeun Rim*
                                      _____
12                                    Naeun Rim
                                      Attorneys for Petitioner
13                                    Christopher Philip Ahn

14

15  DATED:  June 23, 2022        Ekwan E. Rhow
                                 Christopher J. Lee
16                               Bird, Marella, Boxer, Wolpert, Nessim,
                                 Drooks, Lincenberg & Rhow, P.C.
17

18                             By:    */s/ Christopher J. Lee*
                                      _____
19                                    Christopher J. Lee
                                      Attorneys for Petitioner
20                                    Christopher Philip Ahn

21

22

23

24

25

26

27

28

# ATTACHMENT

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF<br><br>CHRISTOPHER PHILIP AHN,<br><br><br>A Fugitive from the Government of the Kingdom of Spain. | ) Case No. CV 19-5397-FLA (JPR)<br>)<br>)<br>) RELUCTANT CERTIFICATION OF<br>) EXTRADITABILITY<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

In April 2019, the U.S. Attorney's Office for the Central District of California, acting on behalf of the Kingdom of Spain, filed a Complaint requesting the extradition of Christopher Philip Ahn, a middle-aged U.S. citizen and Marine Corps veteran with no criminal record.  Ahn is among a small group of men, all or some of them part of an organization called Free Joseon,[1]

_____

[1] According to Wikipedia, Joseon was "the last dynastic kingdom of Korea" and ended in October 1897, when it was replaced by the Korean Empire.  Joseon, Wikipedia (last modified Apr. 27, 2022, 2:21 p.m.), https://en.wikipedia.org/wiki/Joseon.  Free Joseon, "a covert anti-North Korean activist group," has declared itself to be the "true representative government of the people of

1

accused of a host of crimes arising from their entry into the North Korean embassy in Madrid, Spain, on February 22, 2019. In part because of his participation in the embassy incident, North Korea wants to kill Ahn. I must decide whether to certify his extradition to Spain, where North Korea can much more easily murder him. Although I conclude that the law requires me to certify, I do not think it's the right result, and I hope that a higher court will either tell me I'm wrong or itself block the extradition.

* * *

After Ahn was arrested, the United States filed a formal request for extradition, supported by documentation from Spain, and then a revised such request. In the three years since the case was filed the parties have submitted various memoranda and evidence relating to the extradition, which the Court has carefully read, in most instances many times. On May 25, 2021, the Court conducted an extradition hearing, at which Ahn appeared with counsel. The Court heard sworn testimony from Tufts Professor Sung-Yoon Lee and an unsworn statement from Cynthia Warmbier[2] as well as argument from both parties.

_____

North Korea" and is "known to support North Korean defectors." Free Joseon, Wikipedia (last modified Mar. 5, 2022, 9:30 a.m.), https://en.wikipedia.org/wiki/Free_Joseon.

[2] Warmbier is the mother of Otto Warmbier, a University of Virginia college student who was tortured and murdered by the North Korean regime in 2016 and 2017 for "allegedly taking down a poster with a political slogan supporting North Korea's dictator, Kim Jong-Il, from a hotel's staff-only area." Warmbier v. Democratic People's Republic of Korea, 356 F. Supp. 3d 30, 38 (D.D.C. 2018). The government did not object to her oral statement's admission. (May 25, 2021 Hr'g Tr. at 154, ECF No. 231 (throughout, the Court

2

Ahn does not dispute that he and others, including Adrian Hong Chang, a former TED fellow and longtime activist against North Korea's ruling Kim family, entered the embassy that day in February 2019.  As discussed in greater depth below, Ahn claims the group was asked by unidentified residents there to help them defect; indeed, Hong and Ahn had previously been involved in similar efforts.  The United States seems to suggest that the group might instead have intended to terrorize the embassy residents and steal information; no one disputes that when the group finally left, after about four and a half hours, they took with them computer drives, a cell phone, and other electronic information — which they promptly turned over to the FBI.  Spain has diplomatic relations with North Korea.  The United States, on the other hand, has declared North Korea a state sponsor of terrorism, and with very few exceptions, bars North Koreans from entering the country.

Ahn has raised several challenges to his extradition.  He argues that probable cause is lacking, in part because much of the evidence the government relies on — namely, the statements of the North Koreans who were inside the embassy that day — is not "competent."[3]  He also challenges the existence of "dual

uses the pagination generated by its official Case Management/Electronic Case Filing system).)  It did, however, object to a written statement from both of Warmbier's parents. (See Ahn's Suppl. Ex. E, ECF No. 200-2; Resp. at 3, ECF No. 214.) Because the Court has not relied on that statement, it need not rule on the government's objection.

[3] The government, too, disputes some of the evidence, arguing that the Court may not consider various declarations, reports, and letters filed by Ahn.  The Court gets to that below.

3

criminality," a requirement in extradition law that the "essential character" "of the acts criminalized by the laws of each country are the same and the laws are 'substantially analogous.'" Manta v. Chertoff, 518 F.3d 1134, 1141 (9th Cir. 2008) (quoting Oen Yin-Choy v. Robinson, 858 F.2d 1400, 1404 (9th Cir. 1988)). Finally, he argues that even if the Court finds probable cause to extradite on all or some of the charges, it should decline to do so under a "humanitarian exception" to extradition.

Spain seeks Ahn's extradition on six counts: breaking and entering, making threats, causing injury, illegal restraint, criminal organization, and robbery with violence or intimidation. At the hearing the Court denied the request for extradition on robbery with violence or intimidation because the United States had offered no definition or explanation for the requirement that the robbery have been "for profit," nor any evidence that the group took anything from the embassy for financial gain, the commonsense understanding of the phrase.[4]  (May 25, 2021 Hr'g Tr. at 97-99.)[5]  The Court also rejected Ahn's dual-criminality argument because any required intent, which he argued the government had no evidence of, may be inferred from action, see Manta, 518 F.3d at 1142-43 (rejecting dual-criminality argument for that reason), and the government's evidence — including, as

---

[4] The North Korean witnesses consistently told the police that they didn't think "the motive for the attack" was robbery. (Revised Req., Ex. C at 19, 25, ECF No. 226-3.)

[5] All future citations to "Tr." at a particular page are to the transcript of the extradition hearing, which was held on May 25, 2021, and is available on the docket at ECF number 231.

explained below, a civilian witness's testimony of one of the
embassy entrants wielding a gun over a man on the ground —
provided probable cause of any necessary specific intent.  (Tr.
at 65.)  And any affirmative defense based on lack of intent,
including that Ahn believed he was acting at the behest of or in
coordination with the U.S. government (see ECF No. 175 at 32-33),
may not be considered by the extradition court.  See, e.g.,
Santos v. Thomas, 830 F.3d 987, 993 (9th Cir. 2016) (en banc); In
re Extradition of Fordham, 281 F. Supp. 3d 789, 799 (D. Alaska
2017) ("It is settled that the dual criminality requirement does
not encompass possible 'affirmative defenses[.]'").  So, what
remained to be decided after the hearing was whether probable
cause existed to extradite Ahn on the other five charges and, if
so, whether the Court should nonetheless refuse to certify
extradition on humanitarian grounds.  The Court must also resolve
various evidentiary issues.

## EXTRADITION LAW

The purpose of an extradition hearing is to determine
"whether there is 'evidence sufficient to sustain the charge
under the provisions of the proper treaty or convention,' or, in
other words, whether there is probable cause."  Vo v. Benov, 447
F.3d 1235, 1237 (9th Cir. 2006) (as amended) (quoting 18 U.S.C.
§ 1384).  Probable cause, in turn, means "such information as
would justify the committal for trial of the person if the
offense had been committed in the requested State."[6]  (Revised

---

[6] Of course, in one sense the crimes with which Ahn is charged
could never have been committed in the United States because it has
no North Korean embassy nor any diplomatic relations at all with

Req., Ex. A, Annex to Extradition Treaty, art. X, § D, ECF No. 226-1); see Quinn v. Robinson, 783 F.2d 776, 782 (9th Cir. 1986). Probable cause means a "fair probability" that the suspect has committed the charged crime, Garcia v. Cnty. of Merced, 639 F.3d 1206, 1209 (9th Cir. 2011), and the burden of proving its existence rests with the United States, see Barapind v. Enomoto, 400 F.3d 744, 747 (9th Cir. 2005) (en banc) (per curiam).  The probable-cause evidence should be "viewed through the lens of common sense."  Florida v. Harris, 568 U.S. 237, 248 (2013).  If the magistrate judge finds probable cause, she "is required to certify the individual as extraditable to the Secretary of State."  Vo, 447 F.3d at 1237 (citation omitted); see also Prasoprat v. Benov, 421 F.3d 1009, 1012, 1016-17 & n.5 (9th Cir. 2005) (noting that magistrate judge has "no discretionary decision to make" and finding that humanitarian exception may not be invoked by magistrate judge (citation omitted)).

The federal rules of evidence and procedure do not apply in extradition proceedings, see Mainero v. Gregg, 164 F.3d 1199, 1206 (9th Cir. 1999), and therefore hearsay is permitted, Manta, 518 F.3d at 1147.  The person whose extradition is sought may present evidence that "explains" the government's evidence but not evidence that "merely 'contradict[s] the testimony for the prosecution.'"  Santos, 830 F.3d at 992 (quoting Collins v.

_____

that country.  This argument depends on the level of generality at which "the offense" is defined.  Because Ahn has not raised this argument — and given that the specific charges in Spain's request for extradition are framed broadly, without tying the crimes to the specific location where they allegedly took place — the Court considers those charges capable of being committed here.

1   Loisel, 259 U.S. 309, 316-17 (1922)).  Whether to admit evidence

2   offered by the fugitive is within the "sound discretion" of the

3   Court.  Hooker v. Klein, 573 F.2d 1360, 1369 (9th Cir. 1978).

4       As many courts have observed, "[t]he difference between

5   'explanatory' and 'contradictory' is easier stated than applied."

6   Santos, 830 F.3d at 992; see also Gill v. Imundi, 747 F. Supp.

7   1028, 1040 (S.D.N.Y. 1990) (describing distinction between

8   "explanatory" and "contradictory" evidence as "somewhat murky").

9   In practice, the Ninth Circuit has found that explanatory

10  evidence "explains away or completely obliterates probable cause,

11  whereas contradictory evidence . . . merely controverts the

12  existence of probable cause, or raises a defense."  Santos, 830

13  F.3d at 992 (cleaned up).  Put another way, contradictory

14  evidence is that which would require the Court to make

15  credibility assessments.  See id. at 993.

**EVIDENTIARY CHALLENGES**

16

17      1.  Christopher Ahn's Declaration and Medical

18          Records

19      Before the hearing, Ahn sought to introduce his own

20  declaration explaining the events of February 22.  (See ECF No.

21  178.)  Although the declaration is under seal, published reports

22  cited by one or both parties have noted Ahn's claim that he

23  entered the embassy with the others because they had received

24  word that one or more of its residents wanted help defecting.  In

25  open court, his counsel described the declaration as relaying

26  Ahn's "subjective understanding . . . that this was something

27  that had been requested by . . . people in the embassy, that they

28  had asked this group, Free Joseon, to stage a kidnapping so that

their family members would not face reprisal back in North Korea" (Tr. at 67) based on their defection (id. at 68, 76). (See also ECF No. 226-3 at 83 (Spanish prosecutorial report noting that before February 22 "Hong Chang had made contact with an unidentified individual at the Embassy who was open to 'defecting.'").) Ahn argues that the evidence in his declaration is "explanatory" because it "explain[s] ambiguities or doubtful elements" in the government's case and "obliterate[s] probable cause," relying on the Santos standard. According to him, "there is no coherent explanation" for why the group entered the embassy other than Ahn's (Tr. at 75); "the narrative put forth by the U.S. government makes no sense" (id. at 73). The government objected to the declaration's admission, arguing that it simply contradicted the evidence showing probable cause.

In one sense, of course, the declaration does "explain" the government's evidence. In it, Ahn explains, yes, why he and the others entered the embassy and offers context necessarily missing from the government's version of events given that he was inside the embassy and none of the North Koreans who were there can offer competent evidence, as explained below. But Ahn's statements "explain" the government's evidence only to the extent they are true. And assessing that would require a prohibited credibility determination. See Santos, 830 F.3d at 993 (forbidding extradition challenges to "credibility of the government's offer of proof"); Barapind, 400 F.3d at 749-50 (noting that credibility of witness's statement could not be assessed without trial, which was beyond scope of extradition proceeding); In re Extradition of Luna-Ruiz, No. CV 13-5059 VAP

8

(AJW)., 2014 WL 1089134, at *14 (C.D. Cal. Mar. 19, 2014)
(excluding relator's declarations because "[r]esolving the
conflict between the competing versions" of events "would entail
weighing conflicting evidence, assessing the relative credibility
of witnesses, and resolving factual disputes, functions that are
beyond the scope of an extradition proceeding"). But see Quinn,
783 F.2d at 815 (noting in context of evaluating government's
proof of identification that "credibility of witnesses and the
weight to be accorded their testimony is solely within the
province of the extradition magistrate"). Indeed, Ahn's account
is akin simply to a defense he would offer at any trial, after
the government had presented its evidence. He concedes that the
Spanish witnesses outside the embassy "reported seeing events
consistent with what a . . . kidnapping would look like to a
third party observer." (Opp'n at 18, ECF No. 175.) Whether that
kidnapping was "staged," as Ahn claims, would be for a trier of
fact to decide, based at least in part on the credibility of the
witnesses.[7]  Such evidence is contradictory. See Santos, 830
F.3d at 993. And contrary to Ahn's refrain that no competent
evidence contradicts his declaration, North Korean witness Cho
Sun Hi's admitted statement at least to some degree suggests that
the group's actions were real, not staged, as discussed further

---

[7] As discussed below, because the North Korean witnesses
likely wouldn't participate in any Spanish trial, there would
presumably be no one to contest Ahn's version of why the group
entered the embassy. But that fact more appropriately goes to why
a humanitarian exception should apply, not whether probable cause
exists based on the evidence now before the Court. See Quinn, 783
F.2d at 815 (noting that it is not extradition court's "role to
determine whether there is sufficient evidence to convict the
accused").

9

1   below.

2       Indeed, the government's version of events isn't entirely
3   implausible.  After all, a group with the avowed purpose of
4   overthrowing the Kim regime might well want to steal records and
5   other information from it, or humiliate it by posting images
6   online of the group's members desecrating photographs of the Kim
7   family, as apparently happened during the embassy incident.  (See
8   ECF No. 200-1 at 17; Ahn's Suppl. Ex. A at 8-9, ECF No. 197-1.)
9   And some things that transpired give credence to the government's
10  story line: embassy resident Cho[8] would presumably not have
11  jumped off an elevated landing to escape, seriously injuring
12  herself, had she been expecting Ahn's group to help her defect or
13  if she had otherwise not believed a hostile invasion was taking
14  place.  (See ECF No. 226-3 at 7-8.)  And if at least some of the
15  embassy residents were in on the "kidnapping," why didn't one of
16  them come to the door when the police arrived and send them away
17  instead of Hong Chang having to impersonate an embassy staffer?
18  (See id. at 8.)  The government's narrative is not so crazy or
19  unsupported as to be untenable.  The Court therefore does not
20  consider Ahn's declaration in deciding this case because it
21  simply "contradicts" the government's evidence.

22      Similarly, Ahn sought to have admitted into evidence medical
23  records showing that one of his hands was healing from a recent
24  fracture at the time of the embassy incident.  (Tr. at 125; Ahn's
25  Suppl. Ex. G, ECF No. 225.)  He therefore could not have hit any

26

27      [8] Although this witness is referred to by different names
28  throughout the record, Prof. Lee testified that she should be
    referred to as "Ms. Cho" (Tr. at 44), so the Court uses that name.

10

of the embassy residents or taken other actions alleged by the government, the argument goes.  (See Tr. at 125-26.)  The government objected, arguing that the evidence was contradictory, not explanatory.  Regardless, it is of little weight because Ahn could have acted with his other hand even had the fractured hand been completely immobilized, which it was not.  Moreover, the evidence of Ahn hitting anyone was found not to be competent, as explained below.  The Court therefore does not consider the medical records in making its probable-cause determination.

    2.   North Korean Witness Statements

    Ahn argues that under Santos, the statements of the North Korean witnesses on the events at the embassy are not "competent" because they were procured by coercion and therefore may not be considered in the probable-cause calculus.  At the hearing the Court agreed, with one limited exception.  Here's why.

    The function of an extradition magistrate judge "is to determine whether there is competent evidence to justify holding the accused to await trail."  Collins, 259 U.S. at 316.  "[A] coerced statement is not competent evidence and cannot support probable cause."  Santos, 830 F.3d at 1001.  "[T]he manner in which evidence used to support probable cause was obtained" is important in determining its competency.  Id. at 1007.  Evidence concerning the competence of other evidence is explanatory, not contradictory.  See id. at 1008.

    For this reason, and because Prof. Lee was present and available to be cross-examined, the Court overruled the

11

government's objections[9] and admitted his testimony on the
competence of the North Korean witnesses' statements; it also
admitted a letter he wrote that was filed on May 18, 2021.[10]
(See ECF No. 197-1.)

    Prof. Lee is "deeply knowledgeable" on the subject of North
Korea.  Warmbier v. Democratic People's Republic of Korea, 356 F.
Supp. 3d 30, 36 (D.D.C. 2018).  He is a Professor of Korean
Studies at the Fletcher School of Law and Diplomacy at Tufts
University.  (See ECF No. 197-1 at 2.)  He has testified as an
expert on North Korea in congressional hearings and briefed then-

---

    [9] One such objection was that unlike in Santos, the witnesses
here did not later recant their original statements.  (See Gov't's
Reply Br. at 24, ECF No. 187.)  But that fact works against the
government.  As Santos recognized, when witnesses recant, the line
between explanatory and contradictory evidence becomes blurry.  See
830 F.3d at 990 ("We hold that evidence of coercion is explanatory,
and may be considered by the extradition court, even if the
evidence includes a recantation." (emphasis added)).  Because
there's little contradictory here about the evidence of coercion —
rather, it simply explains why the witnesses said what they did —
its admissibility is even more clear than in Santos.

    The government also objected that it was improper for the
Court to consider evidence of coercion from an expert witness
because such testimony "cannot be used to establish facts."  (ECF
No. 187 at 24.)  But the cases it cites to support that principle
almost exclusively predate Santos, which expressly carved out an
exception for evidence demonstrating coercion or torture.  (See id.
at 24-25 (citing pre-2016 cases and one from 2020 that did not
involve coercion or torture and is not even an extradition
matter).)  Indeed, under Santos, the Court may consider any
"[r]eliable evidence that the government's evidence was obtained by
. . . coercion."  830 F.3d at 1003.  And in any event, as the
government well knows, the rules of evidence and procedure do not
apply in extradition proceedings.  See id. at 992.

    [10] As will be discussed later in this decision, the Court also
admitted testimony from Prof. Lee concerning the humanitarian
exception.

12

President Barack Obama and Senator Bob Corker on the subject, the latter when he was chair of the Senate Foreign Relations Committee.  (See id.; Tr. at 40.)  The government did not seriously question Prof. Lee's credentials but rather suggested that he was biased because he had some earlier interactions with Hong Chang, apparently the leader of Free Joseon and of the Spanish embassy incident.  (See ECF No. 226-3 at 3.)  Prof. Lee testified that he had invited Hong to speak at Tufts in 2013 and after that had seen him on six additional occasions.  (Tr. at 51, 55.)  He acknowledged admiring Hong Chang.  (Id. at 52.)

Prof. Lee testified about the reliability of statements made by North Korean officials in general as well as those made after the incident in this case.  He did not offer any evidence on the propriety of the embassy incident or any other topic directly concerning Hong Chang.  That he admires someone who has devoted his adult life to fighting a totalitarian regime is hardly cause for concern; it's to be expected.  (See id. at 74.)  Morever, Ahn offered evidence nearly identical to Prof. Lee's from Robert Collins, a widely recognized expert on North Korea.  See Warmbier, 356 F. Supp. 3d at 48; (ECF No. 175-3 at 4-15).  Although the Court did not admit that evidence because Collins was not available to be cross-examined, it mirrors Prof. Lee's and serves to corroborate it.  Accordingly, the Court, in its "sound discretion," found Prof. Lee's testimony and letter reliable and has considered them in deciding this case.  (See Tr. at 60-62.)

Prof. Lee testified that North Korean government witnesses' statements are "inherently unreliable."  (ECF 197-1 at 11.)

North Koreans abroad are "captives of the state whose loved ones
and associates back home are held hostage against their actions
abroad." (Id.)   The witnesses here can be expected to have
"[c]onspire[d] together and tell the Spanish authorities
falsehoods and tales of exaggerated coercion and victimization
out of fear of retribution." (Id.)   If they were thought to have
tried to defect, they would "face the certainty of banishment to
a gulag with their entire family and even execution." (Id.)
Further suggesting that the witnesses' statements were coerced
was the role of the North Korean Acting Ambassador, Yun Sok So,
who was present in the embassy the day of the incident, "as the
sole interpreter in the statements to the police on the embassy
incident made by all other North Korean nationals — each one of
them his subordinate." (Id. at 14.)

     Prof. Lee testified that the situation for those North
Koreans who hold government posts, and particularly those in
foreign countries, is even more dire than for average citizens.
As an example, he noted that when a North Korean university
professor defected to South Korea in 1997, "5,000 of his friends,
relatives, distant relatives, [and] colleagues" were "all killed"
in North Korea. (Tr. at 58.)   There is a "vast and extreme
punishment that befalls . . . any traitor in North Korea's eyes,
any defector." (Id.)   As a result, the North Koreans at the
embassy would have had a "compelling need to keep their story
together" for fear that officials back home might think the
intruders were there to help one or more of them defect. (Id. at
53.)   And anyone who attempts to defect from North Korea "must be
punished by death." (Id. at 43); see also 22 U.S.C. § 7801(5)

14

1  (finding that "North Korean Penal Code is [d]raconian,

2  stipulating capital punishment and confiscation of assets for a

3  wide variety of 'crimes against the revolution,' including

4  defection, attempted defection, [and] slander of the policies of

5  the Party or State" (first alteration in original)).  With Acting

6  Ambassador So — the only North Korean present during the raid who

7  had diplomatic immunity and "who is superior to every single

8  North Korean involved" — acting as the translator for all the

9  witnesses' statements, the other North Koreans would be under

10  "enormous pressure . . . to keep to his version of the story."[11]

11  (Tr. at 53-54.)

12      Prof. Lee's testimony is not the only evidence here of

13  coercion.  Our own Congress has found that "the government of

14  North Korea attempts to control all information" and "strictly

15  curtails freedom of speech."  § 7801; see also U.S. State Dep't

16  Bureau of Democracy, Human Rights, and Labor, 2020 Country

17  Reports on Human Rights Practices: Democratic People's Republic

18  of Korea, § 1.E (Mar. 30, 2021), https://www.state.gov/reports/

19  2020-country-reports-on-human-rights-practices/north-korea

20  (noting "reports of bribery and corruption" in North Korea's

21  "investigations or preliminary examination process"); U.N. Human

22  Rights Council, Rep. of the Comm'n of Inquiry on Human Rights in

23  the Democratic People's Republic of Korea, ¶ 26, U.N. Doc.

24  A/HRC/25/63 (Feb. 7, 2014) (Ex. C to ECF No. 175-3) (describing

25

26      [11] Not only did So act as the translator for all of the North

27  Koreans' official statements, he also was the one who primarily
    spoke to the police when the residents first emerged from the
    embassy, after Ahn and the rest had left.  (See Gov't's Redacted

28  Ex. at 26, ECF No. 118-1 (Spanish police officer's statement).)

as one of North Korea's "most striking features" "its claim to an absolute monopoly over information"). And the very lack of an extradition treaty between the United States and North Korea signals that we do not trust "evidence" from that country. See Ahmad v. Wigen, 726 F. Supp. 389, 411 (E.D.N.Y. 1989) ("Congress and the executive branch do not enter into extradition treaties with countries in whose criminal justice system they lack confidence."), aff'd, 910 F.2d 1063 (2d Cir. 1990); Han Kim v. Democratic People's Republic of Korea, 774 F.3d 1044, 1048 (D.C. Cir. 2014) (noting that North Korea is "known to intimidate defectors and potential witnesses").

It can hardly be doubted, then, that the statements the North Korean witnesses gave to the Spanish police and judiciary, all translated by So, were coerced. The government's arguments to the contrary are easily batted away. It objects that other evidence corroborates some witnesses' statements. But the rule of Santos is not aimed at "exclud[ing] presumptively false evidence but . . . prevent[ing] fundamental unfairness in the use of evidence whether true or false." 830 F.3d at 1003 (emphasis in original). It contends that the Court is impermissibly making a credibility call rather than a competence finding, and is unlawfully doing so based on nationality. Nonsense. Again, the Court has not considered at all whether the North Korean witnesses' statements were true or false; it looked only at whether they were forced to make them. Prof. Lee's testimony and our own congressional and State Department findings show that they were. And the Court has hardly written off all possible statements coming from any North Korean. As an initial matter,

16

these are North Korean government officials far from home, sent abroad with the knowledge that almost any false step might result in harm, even death, to their family and friends.  That's a far cry from the average citizen on the street in North Korea.

Moreover, as the Court explained at the hearing, it found one statement by a North Korean not coerced, although it was a close call.  Not enough evidence demonstrated that the initial statements of witness Cho, who jumped from an elevated terrace at the embassy and made what the Court found to be the equivalent of excited utterances to the police — translated by Google Translate and not Acting Ambassador So — were coerced.[12]  (Tr. at 171.) That finding shows that the Court did not simply write off all North Koreans' statements wholesale because of where they were born.

---

[12] Some of Cho's initial statements were fantastical — South Koreans had entered the embassy and were "killing people" and "eating" them (ECF No. 118-1 at 19) — and Prof. Lee convincingly testified that her "decades of inculcation and indoctrination would have triggered her to say such things." (Tr. at 44.)  Indeed, "this is common North Korean verbiage that appears in North Korean textbooks."  (Id.); see also 2014 U.N. Rep. ¶ 27 ("The State operates an all-encompassing indoctrination machine that takes root from childhood[.]")  He also noted that her hesitance to give the police certain identifying information was likely a "desperate desire to try to limit what she tells authorities probably out of concerns that what she says may be weighed against her back home where I presume she has loved ones and associates who are held hostage against every word, every action that North Koreans stationed abroad take." (Id. at 56.)  In light of her agitation when she made the statements (see ECF No. 118-1 at 65 (Spanish bystander who first helped her testifying that she was "in a high state of anxiety and panic")) and given that neither So nor any other North Koreans were present, the Court found that her statements were not so coerced as to be inadmissible.  (Tr. at 171.)  Thus, it considers them for the limited evidentiary value they have.

17

Finally, the government argues that there was nothing unusual about Acting Ambassador So serving as a translator for the other residents of the embassy, saying that it happens all the time with other countries' diplomats.  (See, e.g., ECF No. 187-1 at 4 (Spain explaining that So was used as translator for "practical reasons").)  But some examples the government gave of such practices concerned "meetings" and other diplomatic business, not criminal investigations and court proceedings. (Tr. at 49-50.)  In any event, even if having the highest-ranking member of a diplomatic mission act as a translator in a criminal proceeding were not unheard of, it would not excuse its happening here because So was deeply self-interested.  Even assuming he didn't enlist Free Joseon's help to defect — which of course in North Korea would be punishable by death — and accepting his testimony about what happened, he was in charge when a group of armed men took over the embassy, beat up the residents, and got away with computers and other information-laden devices.  Surely he must have feared significant reprisal simply by virtue of his having allowed the raid to happen on his watch.  As Prof. Lee testified, he would have made sure the other North Koreans' statements matched his, whether by coercing them to say what he wanted or simply translating them as he liked.

Because they were almost certainly coerced, the Court has not considered the North Koreans' statements to the Spanish police and judiciary (except for Cho's initial statement) because that evidence is not competent.

3.  <u>Other Evidence</u>

At the hearing the Court admitted Ahn's proffered evidence

18

of the 2014 U.N. Report of the Commission of Inquiry on Human
Rights in the Democratic People's Republic of Korea and his
attorney's declaration.  (Tr. at 63.)  Although it did not admit
for purposes of the probable-cause determination the letters of
support his friends and family members had submitted at the time
of his bail hearings (id. at 63-64), they are part of the record
and the Court has considered them in the section below on the
humanitarian exception.

**PROBABLE CAUSE**

So the question becomes whether the government's other
evidence amounts to probable cause supporting the remaining five
charges.  Probable cause is "not a high bar." Kaley v. United
States, 571 U.S. 320, 338 (2014).  It serves "only a gateway
function." Id. at 339.  The Court must consider the probable-
cause evidence "through the lens of common sense." Harris, 568
U.S. at 248.  As long as the government's competent evidence
supports a scenario in which Ahn committed the charged crimes,
probable cause exists.  For four of the five remaining charges,
it does.  Indeed, Ahn essentially admits as much.  (See ECF No.
175 at 32-33 (acknowledging that group's actions constituted
"facially criminal conduct").)

Ahn contends that under Spanish law he is not responsible
for any misconduct committed by those who entered the embassy
with him.  (See id. at 33-34.)  But Spain says otherwise (see ECF
No. 187-1 at 4 (Spanish Magistrate Judge's statement of Spanish
law on criminal responsibility); ECF No. 187 at 47), and this
Court is not in a position to ignore that.  See Grin v. Shine,
187 U.S. 181, 190 (1902) ("It can hardly be expected of us that

19

1    we should become conversant with the criminal laws of" requesting

2    countries).  And Ahn's argument, which is not supported by any

3    reference to Spanish law, seems to be contradicted by Article 27

4    of the Spanish Penal Code, which provides that "[t]hose

5    criminally responsible for crimes . . . are the principals and

6    their accessories."  (ECF No. 226-3 at 91.)

7        The competent evidence supporting extradition here is

8    enough:

9        Although Ahn did not arrive in Spain until the morning of

10   the embassy incident (see id. at 3), his compatriots prepared for

11   the operation by buying balaclavas, knives, imitation pistols,

12   handcuffs, flashlights, electrical tape, and a ladder the day

13   before, as shown by store receipts and video-camera surveillance

14   (see id. at 51-56).  And Ahn does not contest that he went to and

15   entered the embassy with the others, as surveillance footage

16   seems to show.[13]

17

---

18   [13] Ahn has never challenged the authenticity of the
     surveillance footage from the embassy even though it was not handed

19   over to the Spanish police right away and could have been tampered
     with for the same reasons the North Korean witnesses' statements

20   were coerced — to support the would-be defectors' cover story.  As
     Prof. Lee pointed out, about an hour and a half passed between when

21   the "so-called infiltrators" left the embassy and when Acting
     Ambassador So allowed Spanish police to enter, "ample time to

22   coordinate and to lay out . . . damaging evidence."  (Tr. at 54;
     see also ECF No. 118-1 at 52 (Spanish police officer testifying

23   that they were not allowed into the embassy until "[m]uch, much
     later," for a "short search"); ECF No. 197-1 at 11-14 (Prof. Lee

24   noting many contradictions in North Koreans' statements concerning
     injuries and handcuffing).)  Moreover, some of the footage,

25   particularly that taken after dark, is grainy and difficult to make
     out.  Even without the footage, though, probable cause exists that

26   Ahn committed the crimes with which he is charged (except robbery
     with violence and intimidation and criminal organization, which the

27   Court has rejected for unrelated reasons).  Accordingly, the Court

28

20

Two civilians who were waiting for a bus outside the embassy when Ahn and the others entered heard "screams" from inside the compound (ECF No. 118-1 at 77, 80-81, 101), and one of them testified that when she peeked through a hole in the compound's wall she saw someone on the ground with three people on top (id. at 80-81), one of them holding a pistol (id. at 81).[14]  The other witness saw people on top "grabbing the person who was on the ground."  (Id. at 102.)

Spanish police and a bystander testified that Cho, the woman who jumped from the embassy's terrace to escape the intruders, was very scared and appeared to be seriously injured.  (See ECF No. 226-3 at 7-8, 17, 39-41; ECF No. 118-1 at 9, 18-19, 48, 65-66.)  She told responding police, through Google Translate, that "individuals had entered the Embassy and they were killing people, were eating people and there were children there," and she "continued insisting that we had to go in, that something very serious was happening in the Embassy."  (ECF No. 118-1 at 19-20; see also id. at 27, 48.)  Spanish police also testified that after they went to the embassy to investigate, Hong answered the door and pretended to be North Korean, telling the officers nothing was wrong and that if they had heard noises inside it was

_____

generally, although not entirely, avoids relying on the security footage.  See Cornejo-Barreto v. Siefert, 218 F.3d 1004, 1008 (9th Cir. 2000) ("To isolate any possible taint . . . on the evidence supporting the probable cause determination, the judge considered the sufficiency of the evidence without the challenged confessions."), labeled "advisory" by 379 F.3d 1075, 1086 (9th Cir. 2004).

[14] A "student" who was with this witness apparently thought the people were just "practi[c]ing."  (ECF No. 118-1 at 81.)

21

because "he couldn't open a door" and had had to "give it a kick" (id. at 21; see also id. at 49) — suggesting, of course, that the true North Koreans were either involuntarily incapacitated or could not be trusted to say that they were fine because they in fact were not in on the caper, and that when they heard the police at the door they had made noise to try to attract attention.

Officers stationed outside the embassy saw Ahn and his group leave in embassy cars "quite fast" and "at great speed," one of those cars with its lights off.  (Id. at 50-51; see also id. at 24.)  They took with them pen drives, computers, hard drives, and a mobile telephone belonging to the North Koreans.[15]  (ECF No. 226-3 at 3, 9.)

After police were allowed to enter the compound, they found scattered about various accoutrements of criminal activity, including restraints, handcuffs, knives, and replica guns, items consistent with those Ahn's cohorts had bought before the incident.  (See id. at 9.)

Finally, it is not lost on the Court that the embassy incident took place mere days before President Trump was to meet with Kim Jong-Un for a second summit.  See, e.g., Ankit Panda, Second Trump-Kim Summit to Take Place February 27-28 in Vietnam, The Diplomat (Feb. 6, 2019), https://thediplomat.com/2019/02/

---

[15] Ahn argues that if all the group had wanted was to steal information, they wouldn't have stayed "five hours."  (Tr. at 83.) (It was actually four and a half.)  But remember: things did not go as planned.  Once the police showed up about an hour in, the "so-called infiltrators," as Prof. Lee described them (id. at 54), would have had to rethink their mission, their escape, and their story.

22

second-trump-kim-summit-to-take-place-february-27-28-in-vietnam.
It's not a stretch to think that Free Joseon, a group intent on
undermining Kim's rule, might have wanted to create bad publicity
for North Korea before the summit by whatever means it could,
regardless of whether any embassy resident wanted to defect.

This evidence satisfies the government's burden of showing
probable cause to believe that the group who entered the embassy
that day committed crimes there.  Except as to the criminal-
organization allegation, none of Ahn's arguments as to specific
charges undermine that evidence, as explained below.

1.   <u>Breaking and Entering</u>

Relying on his own declaration, Ahn argues that no breaking
and entering occurred for reasons the Court does not explicitly
recount here because the declaration is under seal.  But the
Court has ruled that declaration inadmissible "contradictory"
evidence.  Moreover, although the remaining evidence is open to
interpretation, it amounts to probable cause of breaking and
entering.  At least one of the government's photo stills might
depict one of the members of the group holding his foot in the
door to keep it open after Hong Chang, masquerading as someone
else, was allowed in.  (<u>See</u> Gov't's Suppl. Ex. at 3, 5, ECF No.
202-1.)  Just after the group's entry the two civilian witnesses
saw people being restrained on the ground, one of the intruders
displaying a gun.  (ECF No. 118-1 at 81.)  Finally, that Hong,
not one of the embassy's occupants, came to the door to talk to
the police while masquerading as a North Korean diplomat suggests
that the real North Koreans were restrained or unwilling to tell
the police that everything was okay because Ahn and the group had

in fact entered without permission or under false pretenses.

### 2.   Illegal Restraint

Ahn's arguments concerning this charge again rest mostly on his declaration, which the Court has declined to admit.  Several uncontested facts show probable cause to believe that the group restrained the North Koreans: they (although not Ahn himself) bought restraints the day before they entered the embassy; when the police came to the door, Hong, posing as a North Korean, answered, suggesting that the real North Koreans were all restrained or unwilling to play along; and when the North Koreans finally emerged from the building after the group had fled, some were wearing restraints.  It will be for the trier of fact to decide whether to believe Ahn's explanation for how and why they came to be restrained.

### 3.   Causing Injuries

Ahn acknowledges that medical records show serious injuries to Cho from when she jumped off the terrace to escape the strangers in the embassy and some "basic injury" "with no aesthetic damage" to Acting Ambassador So.  (ECF No. 175 at 37.) He argues that he could not have foreseen the former's injuries and that the minimal harm caused to So means this charge would carry a penalty of only up to three months, "falling far short of the Treaty's requirement that extraditable offenses be punishable 'by deprivation of liberty for a period of more than a year.'" (Id.)

But the government has the better argument here.  As it points out (see ECF No. 187 at 40), under the treaty, extradition is appropriate on any crime carrying a penalty of less than a

year as long as one of the other extraditable offenses is
punishable by more than a year (see ECF No. 226-1 at 10).   The
other offenses on which the Court orders Ahn extradited all carry
a potential punishment of more than a year, and the minimum for
illegal restraint is four years.   (See ECF No. 226-3 at 87-88.)
Thus, even were the Court to consider So's only marginal
"injuries," extradition would be appropriate on the causing-
injury charge.   But the government wins on Cho's much more
serious injuries, too, as surely those who entered the embassy
could have expected that anyone present who was not "in" on any
staged kidnapping might have reacted as she did in an attempt to
escape.   See United States v. Rodriguez, 766 F.3d 970, 983 (9th
Cir. 2014) ("In many situations giving rise to criminal
liability, the death or injury is not directly caused by the acts
of the defendant but rather intervening forces or events, such as
. . . escape attempts[.]" (citation omitted)); (see also ECF No.
226-3 at 87 (crime of causing injuries occurs when someone, "via
any means or procedure, cause[s] another individual an injury")).

    4.   Threats

    Ahn claims that the evidence of threats "is derived entirely
from the testimony of North Korean witnesses."   (ECF No. 175 at
36.)   In fact, at least one civilian witness saw one of the
embassy entrants wielding a gun at the occupants, and another saw
a person being held down on the ground.   This, along with the
receipts showing that Hong and the others purchased replica guns
and other tools of a forced break-in, is enough to show probable
cause that they "threaten[ed] others with causing them . . .
detriment entailing homicide, injuries, . . . offenses against

25

liberty, [or] torture." (ECF No. 226-3 at 88); cf., e.g., United States v. Grajeda, 581 F.3d 1186, 1191 (9th Cir. 2009) (noting that using deadly weapon to "threaten" great bodily injury constitutes crime of violence).

   5.   Criminal Organization

   A "criminal organization" is "a group formed of more than two people that is stable in nature and operates for an indefinite period, which, in an arranged and coordinated manner, assigns various tasks or functions with the aim of committing crimes." (ECF No. 226-3 at 90.)

   Ahn contests that Spain has shown that Free Joseon has the "aim of committing crimes," has operated for an "indefinite period," or even that he is a member of it. (ECF No. 175 at 34-35.) He points out that unlike the others involved in the incident, he did not arrive in Spain until that morning and was not part of the planning that took place beforehand, with the purchase of various items that were apparently used at the embassy. (See id.)

   As for this last argument, all that is required for liability is that someone "cooperate with" the organization "in any . . . manner." (ECF No. 226-3 at 90.) Even if Ahn was not a member of Free Joseon or whatever other organization entered the embassy that day, he "cooperated with" it.

   Ahn's other arguments fare better, however. Two possible "organizations" were involved here: Free Joseon or the discrete group of people who planned to and then entered the North Korean embassy in Spain on February 22, 2019. If the Court takes Ahn at his word and attributes the day's events to Free Joseon (see Tr.

26

at 128; see also ECF No. 175 at 36), then the government has not presented evidence that it is a "criminal" organization "with the aim of committing crimes."  It has not pointed to any other crimes ever committed by Free Joseon or its predecessor organizations.  And its leader was a widely respected civil-rights activist and former TED fellow (see Tr. at 51-52, 54-55), hardly the profile of an inveterate criminal.  The government seems to think that the alleged commission of crimes on February 22, 2019, alone satisfies the criminal-organization requirements (see ECF No. 187 at 42), but a plain reading of the statute's language requires the group to have as an ongoing aim committing crimes, which no evidence here shows.  The government's reading renders impermissibly superfluous the statute's language mandating that the "criminal" organization be stable in nature and of indefinite duration.  See Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253 (1992) (observing that "courts should disfavor interpretations of statutes that render language superfluous"); cf. In re Comm'r's Subpoenas, 325 F.3d 1287, 1301 (11th Cir. 2003) (applying that rule of statutory construction to foreign-treaty language), overruled on other grounds by Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241 (2004).

On the other hand, if the "organization" at issue is simply those who entered the embassy that day, then the government has not shown that it is "stable in nature" and has "operated for an indefinite period."  Indeed, nothing demonstrates that that group "operated" together before or beyond that finite period.

The government has not shown probable cause to believe that Ahn committed the criminal-organization crime.

27

* * *

For all these reasons, probable cause exists to extradite Ahn to Spain on the charges of breaking and entering, illegal restraint, causing injuries, and threats but not on robbery with violence or intimidation or criminal organization.

## HUMANITARIAN EXCEPTION

Under the "rule of noninquiry," the Secretary of State, not the courts, generally determines whether the United States should refuse to extradite someone for humanitarian reasons. Prasoprat, 421 F.3d at 1016. The rule arises from the Secretary's need to consider any foreign-policy implications of refusing extradition, something the Secretary is generally in a better position to know than a court.[16] See id.

Still, the Ninth Circuit has alluded to the theoretical existence of a "humanitarian exception" that would allow a court to refuse to certify extradition when extraordinary circumstances made extradition unjust. Id. (collecting cases). Although neither party has cited any instance of a court finding such an exception warranted, see also id., that may be at least in part because if an extradition court invoked the exception and refused to extradite, the government would have no mechanism to bring the case further scrutiny in a court of appeals, see Hooker v. Klein, 573 F.2d 1360, 1364 (9th Cir. 1978) (noting that when magistrate judge denies extradition request, government's only remedy is to

---

[16] Some contend that the rule has its origins in the ugly history of judges refusing to inquire into how fugitive slaves would be treated were they returned to their owners. See Christopher H. Pyle, Extradition, Politics, and Human Rights 119 (2001).

28

start extradition process over again); <u>United States v. Doherty</u>, 786 F.2d 491, 501 (2d Cir. 1986) (holding that when extradition court refuses to certify extradition, "sole recourse" for United States is to file another extradition request because direct appeal is not available), or because when courts have been alarmed for humanitarian reasons about extraditing someone, they have tended to find another reason to deny extradition rather than relying on those humanitarian concerns, <u>see</u> John T. Parry, <u>Int'l Extradition, the Rule of Non-Inquiry, and the Problem of Sovereignty</u>, 90 B.U. L. Rev. 1973, 1990-91 (Oct. 2010).

But even if the exception exists, the Ninth Circuit has made clear that a magistrate judge may not invoke it.  <u>See</u> <u>Prasoprat</u>, 421 F.3d at 1016 ("[T]he magistrate judge does not have any discretion to exercise."), 1017 ("[T]he magistrate judge did not have the authority to refuse to issue a certificate of extradition on humanitarian grounds.").  "Once the magistrate judge determines that the crime is extraditable and there is probable cause to sustain the charge, 'it is the Secretary of State, representing the executive branch, who determines whether to surrender the fugitive.'"  <u>Id.</u> (quoting <u>Blaxland v. Commonwealth Dir. of Pub. Prosecutions</u>, 323 F.3d 1198, 1208 (9th Cir. 2003)).

Because of this unequivocal language, the Court reluctantly must reject Ahn's argument that it can apply the humanitarian exception.  He argues that none of the cases saying it can't concerned "a <u>non-treaty partner</u> intend[ing] to commit an extrajudicial assassination of the Relator and that the opportunity to assassinate him exponentially increases if he

29

leaves the United States, independent of the procedures and
policies of the requesting nation." (Reply to Gov't's Resp. to
Suppl. Exs. at 4-5, ECF No. 222 (emphasis in original).) That's
all true, as is his focus on the rule of noninquiry generally
prohibiting an extradition court from "examining the penal
systems of <u>requesting nations</u>" and not some outside force. (<u>Id.</u>
at 5 (emphasis in original) (citing <u>Lopez-Smith v. Hood</u>, 121 F.3d
1322, 1327 (9th Cir. 1997).)

But courts have also applied the rule of noninquiry — and
refused to consider a humanitarian exception — when, as here, the
threat came from a source unrelated to the requesting country's
government. <u>See, e.g.</u>, <u>United States v. Lui Kin-Hong</u>, 110 F.3d
103, 111 (1st Cir. 1997) (rejecting relator's argument that
extradition to Hong Kong was impermissible because city was to
revert to China by time of any trial and thus fairness of
judicial process there could not be guaranteed); <u>Sindona v.
Grant</u>, 619 F.2d 167, 174-75 (2d Cir. 1980) (applying rule even
though fugitive presented evidence of assassination threats in
requesting nation from "political enemies on the left");
<u>Venckiene v. United States</u>, 929 F.3d 843, 864-65 (7th Cir. 2019)
(rejecting claim that fugitive would be "subject to physical harm
from sources outside the [requesting] government" as basis for
denying extradition because "these are humanitarian arguments
that are in the purview of the Secretary of State in extradition
proceedings"); <u>Perloff v. Hylton</u>, 542 F.2d 1247, 1249 (4th Cir.
1976) (rejecting claim that extradition should be denied because
of "potential assassins in Swedish prisons"); <u>Koskotas v. Roche</u>,
740 F. Supp. 904, 909, 917 (D. Mass. 1990) (applying rule to

30

assassination threats in requesting nation from terrorists).

Ahn argues that those cases are different because the threat here is "institutional," from a "sovereign state that consciously chooses to use assassination, kidnapping, and terrorism as an instrument of policy." (Tr. at 142-43); see also 2014 U.N. Rep. ¶ 24 (finding that North Korea "systematic[ally]" commits "crimes against humanity based on State policies"). But why should the source of the threat matter if the relator winds up dead just the same? The truly significant difference here from those cases is that the Court needn't make any messy inquiry into just how real the threat is: the FBI has conceded that North Korea wants to kill Ahn and that that threat is easier to carry out in Spain than here in the United States. (See Rim Decl. ¶ 3, ECF Nos. 173-3 & 223 (unsealing Rim Decl.)) And our own State Department (never mind Prof. Lee) has found that North Korea stops at no border to avenge the Kim name. See U.S. State Dep't Bureau of Democracy, Human Rights, and Labor, 2020 Country Reports on Human Rights Practices: Democratic People's Republic of Korea, Exec. Summary (Mar. 30, 2021), https://www.state.gov/reports/ 2020-country-reports-on-human-rights-practices/north-korea ("Significant human rights issues included . . . politically motivated reprisals against individuals located outside the country.").

Ahn does not really expand on his argument that the "institutionality" of the threat somehow makes a difference. But if what he means is that as a state sponsor of terrorism, North Korea has the resources and the resolve to kill him no matter what measures Spain might take, and that therefore any assurances

31

from it that the State Department might extract concerning his safety aren't worth a roll of pennies, with that the Court wholeheartedly agrees.  As North Korea's assassinations and kidnappings on European and other nations' (but not the United States's) soil reveal (see ECF No. 175-3 at 77; Ahn's Suppl. Ex. F at 49, ECF No. 203-1), it doesn't care about angering those like Spain who partner with it in some way or another.  Moreover, for many reasons unrelated to North Korea, the U.N. Committee Against Torture has questioned the effectiveness of our State Department's reliance on diplomatic assurances from a requesting nation to ensure an extraditee's safety.  See U.N. Comm. Against Torture, 36th Sess., Conclusions and Recommendations of the Committee Against Torture, May 1-19, 2006, ¶ 21, U.N. Doc. CAT/C/USA/CO/2 (May 18, 2006); see also Jane C. Kim, Note, Nonrefoulement Under the Convention Against Torture: How U.S. Allowances for Diplomatic Assurances Contravene Treaty Obligations and Federal Law, 32 Brook. J. Int'l L. 1227, 1232 (2007) (arguing that "the use of non-reviewable and insufficiently reliable diplomatic assurances, whether or not given in good faith, effectively derogates" laws intended to prevent human-rights abuses).

Some argue, with profound force, that courts have been guilty of abdicating their responsibility to ensure the fundamental fairness of extraditions, inappropriately ceding such power almost entirely to the executive branch.  See generally, e.g., Parry, supra; Matthew Murchison, Note, Extradition's Paradox: Duty, Discretion, and Rights in the World of Non-Inquiry, 43 Stan. J. of Int'l L. 295, 296 (Summer 2007)

32

(describing rule of noninquiry as "glaring blind-spot for the
judiciary").

    The Court understands that in the usual case, "it is for the
political branches, not the judiciary, to assess practices in
foreign countries and to determine national policy in light of
those assessments." Munaf v. Green, 553 U.S. 674, 700-01 (2008).
But "[t]he Supreme Court has never used the term 'rule of non-
inquiry,' let alone explicated its scope or proper application."
Trinidad y Garcia v. Thomas, 683 F.3d 952, 992 (9th Cir. 2012)
(en banc) (Berzon, J., concurring & dissenting).  And as many
have noted, the Secretary of State is not a neutral
decisionmaker.  See, e.g., id. (Berzon, J., concurring &
dissenting); Murchison, supra, at 313 n.129 (collecting such
observations).  Rather, according to these observers, "[t]he
State Department cannot be trusted to weigh the rights of
individuals against the government's own international law
enforcement and foreign policy agenda."  Murchison, supra, at 313
n.129; see also Meredith Angelson, Note, Beyond the Myth of "Good
Faith": Torture Evidence in International Extradition Hearings,
41 N.Y.U. J. Int'l L. & Pol. 603, 629 (Spring 2009) ("[T]he
interests of the relator may easily be lost in the [State
Department's] calculation of whether or not to deny
extradition.").  Perhaps for this reason, "Munaf affirmatively
left open . . . the question of whether . . . in 'a more extreme
case in which the Executive has determined that a detainee is
likely to be tortured but decides to transfer him anyway,'" a
court might have authority to intervene.  Trinidad, 683 F.3d at
991 (Berzon, J., concurring & dissenting) (quoting Munaf, 553

33

U.S. at 702).  Here, of course, "the Executive," in the form of the FBI, admits that North Korea wants to kill Ahn and has advised that the safest place for him is here, in the United States.[17]  (See ECF No. 173-3 at 2.)

None of this changes the categorical language of the cases the Court is bound to follow.  The stakes here are high on both sides, and given the Ninth Circuit's no-exceptions, couldn't-be-clearer language barring a magistrate judge from invoking a humanitarian exception and the government's inability to appeal any refusal to extradite, my hands are tied.[18]

Based on what I know,[19] I believe that extraditing Ahn to

---

[17] The government has suggested in passing that the fact that Ahn is still alive means that the threat to his life is not substantial.  But his continuing to breathe may be precisely because he has remained in the United States, where North Koreans generally cannot venture.  Moreover, North Korea may be incentivized not to harm Ahn for as long as Hong Chang, the ringleader of the group and presumably the primary target of North Korea's ire, remains at large, for surely the United States (or any other country) would not extradite Hong if Ahn were killed by North Korea before Hong was captured and extradited.  Thus, as far as Ahn is concerned, North Korea may simply be biding its time.

[18] Under the rule of noninquiry, "Courts faced with potentially disturbing claims can compile reassuring string cites of cases in which their predecessors refused . . . to inquire into possible violations of human rights."  Parry, supra, at 1995-96 (advocating for "rule of limited inquiry" to replace rule of noninquiry).  Although that long list of cases — many of them trotted out in the government's briefing — constrains me to certify extradition, I am not reassured.

[19] I recognize that the government may have information concerning Ahn that it doesn't wish to share with him or even the Court.  For instance, some of the newspaper accounts cited to the Court quoted sources saying that he was or has been a CIA agent (although the Court does not see how, if true, that would weigh in favor of extraditing him).  See, e.g., John Hudson, U.S. Authorities Make First Arrest in Mysterious Raid of North

34

Spain would be "antipathetic" to our common "sense of decency," the standard first set out for a humanitarian exception to extradition.  See Gallina v. Fraser, 278 F.2d 77, 79 (2d Cir. 1960); see also 2014 U.N. Rep. ¶ 86 (concluding that North Korea's "crimes" "shock the conscience of humanity").  I lay out here the reasons why I wish I could invoke a humanitarian exception to keep Ahn in the United States, and I humbly ask the Ninth Circuit to clarify that it didn't mean to rule the exception out categorically.[20]  There would be no shame in that. Certainly no one could have ever imagined a case like this one, and the humanitarian exception deserves to be considered anew in its context.  See Emami v. U.S. Dist. Ct., 834 F.2d 1444, 1453 (9th Cir. 1987) (noting that Ninth Circuit has "left open the possibility that . . . considerations . . . might someday cause [it] to develop a humanitarian exception in a case where the

_____

Korea's Embassy in Spain, Wash. Post (Apr. 19, 2019), https://www.washingtonpost.com/world/national-security/us-authorities-make-first-arrest-in-mysterious-raid-of-north-koreas-embassy-in-spain/2019/04/19/bfee15e2-d984-4600-9b63-14270f9b0bb3_story.html.  The Court can rule based only on what it knows.

   [20] Of course, the district judge might grant any habeas petition Ahn files, perhaps preventing the issue from reaching a higher court.  Indeed, although Ninth Circuit law seems clear that a magistrate judge may not invoke the humanitarian exception, a district judge may not be so constrained.  See Trinidad, 683 F.3d at 995 (Berzon, J., concurring and dissenting) (noting that judicial habeas review of extradition orders prevents "inappropriate concentration of power within a single branch," "ensuring that the executive's discretion to extradite is exercised within the parameters of the law"); see also id. at 996.

facts warranted it").[21]

1.  <u>Ahn's Life Will Be in Danger in Spain</u>

Early on in this case, the FBI confirmed that North Korea has called for Ahn's execution.  The government has never disputed this.  Indeed, given the expert testimony from Prof. Lee and what we know of North Korea's past behavior, the existence of a hit is hardly surprising.  North Korea tortures and kills those who cross it; it is a state sponsor of terrorism.  Defection is punishable by death, and apparently assisting it is too.  <u>See</u> § 7801(5); <u>see also</u> <u>Han Kim</u>, 774 F.3d at 1046 (describing regime's abduction from China, torture, and murder of reverend who helped North Korean defectors and refugees).  And North Korea's torture and killing of Otto Warmbier for taking a poster of the supreme leader off the wall of his hotel certainly doesn't bode well for Ahn and his cohorts, who reportedly filmed themselves removing framed photos of the Kim family from the wall of the embassy and smashing them to the ground, releasing that footage on the internet for the world to see.[22]  (<u>See</u> ECF No.

---

[21] Some of the "facts" relied on in this section come from media reports cited to the Court by Ahn and his counsel.  The government has never contested the accuracy of Petitioner's cited reports, and because this entire section is dictum in any event, I accept the contents of those reports and rely on a few outside sources of my own.

[22] Except, of course, for those doomed to live in North Korea, where access to the worldwide web is "notoriously restrict[ed]," Saira Asher, <u>What the North Korean Internet Really Looks Like</u>, BBC News (Sept. 21, 2016), https://www.bbc.com/news/world-asia-37426725, and not available to ordinary citizens, <u>see</u> U.S. State Dep't, <u>supra</u>, § 2.A (reporting that internet access in 2020 was "limited to high-ranking officials and other designated elites" and was "constantly monitored").

203-1 at 31 (still of photos being removed from wall); ECF No. 226-3 at 19-20 (statement of Acting Ambassador So); ECF No. 197-1 at 8-9 (Prof. Lee stating that smashing of photos at embassy means North Korea "will go to the ends of the earth to take down Mr. Ahn and the other alleged participants").)

Ahn faces retribution from North Korea not just for his actions here but also because it has become known that he was involved in helping Kim Han-Sol, Kim Jong-Un's nephew, "disappear" after his father, whom many considered to be the rightful heir to the North Korean throne, was assassinated by North Korea and the nephew's life appeared also to be in danger. (See ECF Nos. 197-1 at 10 & 175 at 40 (citing Lee Min-hyung, Kim Han-Sol Escaped with Help of Anti-North Korea Group, The Korea Times (last updated May 29, 2019), https://www.koreatimes.co.kr/www/nation/2019/05/356_269710.html); Tr. at 145, 147-48.)

While the government does not contest that North Korea seeks to assassinate Ahn — indeed, the FBI first brought the threat to his attention — it downplays the risk, arguing that Spain should be able to protect him.  But even if Spain could somehow protect Ahn if and while he was in custody there — unlikely, given North Korea's ruthless resolve to kill its enemies and its ties to a Spanish citizen apparently engaged in criminal activities on its behalf (see ECF No. 197-1 at 6-7; see also id. at 6 (Prof. Lee noting that North Korea "routinely conspire[s] with criminal networks in Europe")) — he presented evidence that he would likely be granted bail in that country while awaiting any trial. (Tr. at 139; Ahn's Appl. Recons. at 20, ECF No. 33 at 20; ECF No. 33-1 at 97-113.)  Stripped of any protection possible in jail –

37

solitary confinement or the like — Ahn would become even more

vulnerable.  (Tr. at 141.)  Uncontested evidence shows that North

Korea has abducted its enemies from numerous European countries,

including the Netherlands, Austria, and Italy, and it has killed

on foreign soil, including Kim Jung-Un's half-brother, in a

Malaysian airport.  (ECF No. 197-1 at 4-6.)  In one instance of

apparent retribution shortly before the embassy incident here,

North Korea apparently kidnapped from Italy the 17-year-old

daughter of an official who defected from the embassy there,

repatriating her to North Korea, where she has not been heard

from since.[23]  (ECF No. 175 at 17; ECF No. 222 at 3-4 (citing

newspaper accounts).)

    And of course, because Spain has diplomatic relations with

North Korea and the United States does not, Ahn is much safer

here.  With very few exceptions North Koreans are not allowed

into this country (see ECF No. 197-1 at 6 (noting that North

Koreans admitted into United States to participate in United

Nations must stay within 25 miles of diplomatic mission in

_____

    [23] Perhaps Ahn assisted in this defection as well, another
reason for North Korea to go after him.  (See ECF No. 226-3 at 83
(Spanish prosecutorial report noting that Ahn was in Italy in late
October 2018, along with Hong Chang and another participant in the
Spanish-embassy incident)); Choe Sang-Hun, North Korean Diplomat,
Missing Since 2018, Is in Seoul, Lawmaker Says, N.Y Times
(Nov. 27, 2020), https://www.nytimes.com/2020/10/06/world/asia/
defector-north-korea.html (noting that Italian defection took place
in Nov. 2018); William Cole, Daughter of North Korea's Ambassador
to Italy Has Been 'Kidnapped by Kim Jong-Un's Agents' and Taken
Back to Pyongyang After Her Parents Disappeared in Alleged
Defection,   DailyMail.com   (Feb.   21,   2019),
https://www.dailymail.co.uk/news/article-6728541/
North-Korean-ambassadors-daughter-kidnapped-Kim-Jong-Uns-agents-
parents-defect.html (same).

38

midtown Manhattan)), whereas Spain apparently allows entry to "students" and others from that country, who have much greater freedom of movement (id. at 6, 12-13; see also ECF No. 226-3 at 10).  Ahn presented uncontested evidence that the FBI advised his counsel that he "should not leave the United States as a matter of safety."  (ECF No. 173-3 at 2; see Tr. at 136.)

The government's assurances are even less convincing considering the evidence presented at the hearing.  Cindy Warmbier explained how she and her husband were repeatedly told by the State Department that their son would be "okay," only to have him finally returned in a vegetative state, to die soon after.  (Tr. at 155-56.)  Yes, this and the other examples of North Korea's insatiable vengeance are anecdotal, but because of our nonexistent relations with North Korea — again, a nation we have declared a state sponsor of terrorism — the limited anecdotal information available carries outsized weight.  See Han Kim, 774 F.3d at 1045 ("[T]hrough terror and intimidation [North Korea] prevents any information about [its] crimes from escaping to the outside world.").  However sincere Spain's intentions and secure its prisons, Ahn faces a serious risk of being assassinated there.  In Prof. Lee's words, "[T]here should be no doubt that Christopher Ahn is at risk of being killed if he is extradited outside the United States" because North Korea "is in fact a model terrorist state whose murderous reach is global, whose resources for carrying out acts of international terrorism are vast, and whose will to assassinate high-value targets is indefatigable."  (ECF No. 197-1 at 3-4 (emphasis omitted).)

Ahn surely does not deserve to die for the offenses with

1  which he is charged.  And there's no reason for him to.  The

2  treaty between Spain and the United States can just as well be

3  honored here, for it explicitly provides that the State

4  Department can refuse to extradite a U.S. national and instead

5  try him here.  (Revised Req., Ex. A, Annex to Extradition Treaty,

6  art. IV, ECF No. 226-1.)[24]  Of course, as explained below, this

7  whole extradition is likely an exercise in futility and no trial

8  will take place anywhere, including in Spain, another reason why

9  the humanitarian exception should be available.

10         2.  <u>Spain Likely Can't Try Ahn</u>

11         Spain certainly has an important interest in telegraphing to

12  its diplomatic partners that it will take whatever steps

13  necessary to ensure their safety and security when in the

14  country.  <u>See</u> <u>Finzer v. Berry</u>, 798 F.2d 1450, 1455 (D.C. Cir.

15  1986) (noting that "host states have a special responsibility to

16  ensure that foreign embassies and the personnel inside them are

17  free from threats of violence and intimidation").  But at the

18  hearing, Prof. Lee testified that North Korea was extremely

19  unlikely to make its witnesses available to testify in any trial,

20

21         [24] Indeed, if the Court believed it had any authority to apply
    the humanitarian exception, it would not be inclined to impose it
22  outright but rather to order that if the United States did not
    invoke article IV of the treaty within a certain number of days,
23  the Court would then refuse to extradite him on humanitarian
    grounds.   But  even  if  a  magistrate  judge  could  apply  the
24  humanitarian exception, it seems only the State Department, not a
    judge, may attach conditions to an extradition order.  <u>See</u> <u>Emami</u>,
25  834 F.2d at 1453.  Unfortunately, "[v]esting the sole power to make
    demands for assurances in the executive branch does not effectively
26  protect  an  individual's  rights  because  the  executive  may  be
    preoccupied with political, military, or foreign policy concerns."
27  Andrew J. Parmenter, Comment, <u>Death by Non-Inquiry</u>, 45 Washburn
    L.J. 657, 679-80 (Spring 2006).
28

                                      40

much less allow them to be cross-examined.  (Tr. at 59.)  To his
knowledge, the statements the North Koreans gave to the Spanish
authorities marked the first time the country had ever
participated in any judicial proceeding in any other country.
(Id. at 58-59 (surmising that embassy officials did so because
they needed cover story to explain their actions)); see also
Warmbier, 356 F. Supp. 3d at 41 (noting that default was taken
against North Korea after it failed to appear); Han Kim, 774 F.3d
at 1045, 1048 (noting that North Korea "refused to appear in
court and subject itself to discovery" in civil suit filed by
family members of regime opponent who was abducted, tortured, and
killed by North Korea).  All of the North Koreans but the Acting
Ambassador have apparently been called back to North Korea and
are not available to accept any kind of process.  (Tr. at 59.)

     Spain apparently requires in criminal trials that "the
evidence will be heard first-hand through the testimony of
witnesses, rather than through the reading of documents."
Stephan C. Thaman, Europe's New Jury Systems: The Case of Spain
and Russia, 62 Law & Contemp. Probs. 233, 241 n.43 (Spring 1999);
see also U.S. State Dep't Bureau of Democracy, Human Rights, and
Labor, 2020 Country Reports on Human Rights Practices: Spain,
§ 1.E (noting that in Spain, defendants "may confront prosecution
. . . witnesses"); Spanish Const. Dec. 29, 1978, § 120
("Proceedings shall be predominantly oral, especially in criminal
cases").  Pretrial statements are generally not admissible if the
witness was not subjected to adversarial cross-examination when
they were made.  See Dennis P. Riordan, The Rights to a Fair
Trial and to Examine Witnesses Under the Spanish Constitution and

the European Convention on Human Rights, 26 Hastings Const. L.Q.
373, 391, 402-03 (Winter 1999).

Because the United States has signed an extradition treaty
with Spain, it's not the Court's role to inquire whether its
legal system is fair.  See Glucksman v. Henkel, 221 U.S. 508, 512
(1911) ("We are bound by the existence of an extradition treaty
to assume that the trial will be fair.").  But that's not what
it's doing.  It's pointing out that Spain likely won't be able to
adhere to its own procedures for trying criminal defendants
because the North Koreans are virtually certain not to
participate in any trial.  While the Court has found the
remaining evidence sufficient to support the very low probable-
cause standard, it's probably not enough to sustain an actual
criminal conviction in any country with which we have an
extradition treaty, particularly in light of Ahn's likely
uncontested explanation for the events of that day.

Because shipping Ahn off to Spain, where his life will be in
grave danger from a force our government recognizes as evil, to
await a trial that will likely never happen is inhumane and may
well violate due process, see Martin v. Warden, 993 F.2d 824, 829
(11th Cir. 1993) (recognizing that "constitutional rights of
individuals, including the right to due process, are superior to
the government's treaty obligations"), I — or some judge or
judges — should be able to stop it.

3.   The State Department Has Already Rebuffed
     Entreaties Not to Turn Ahn over to Spain

In the usual case, a court considers the probable-cause
question first, and then the State Department reviews the matter

42

to make certain extradition is appropriate.  <u>See, e.g.</u>, <u>Meza v.
U.S. Att'y Gen.</u>, 693 F.3d 1350, 1357 (11th Cir. 2012) ("[T]he
Secretary decides, at least in the first instance, whether to
refuse extradition on humanitarian grounds after she receives the
certification of extradition from the magistrate judge."); (<u>see
also</u> Tr. at 150).  Thus, it might make sense in those instances
that an extradition court needn't stumble over any humanitarian
concerns because they would be considered by the executive
branch.  But here we already know that the State Department, for
whatever reason, is unlikely not to turn Ahn over to Spain.
Ahn's counsel represented at the hearing that she had met
repeatedly with State Department officials to try to work out
some sort of deal to stop Ahn's extradition, to no avail.  (Tr.
at 150-51.)  And under questioning from the Court at the hearing,
the government acknowledged that there would be "ramifications"
were certification denied.  (<u>Id.</u> at 167; <u>see also</u> ECF No. 214 at
7 (government arguing that "[a]ny judgment that Spain is
incapable of protecting Ahn's safety could have significant
diplomatic repercussions").)

North Korea has made clear it's watching what happens here:
it has asked that the "terrorists and their wire-pullers" be
brought to justice and is "wait[ing] for the result in patience."
(ECF No. 197-1 at 10); Agence France Press, <u>'Grave Terrorist
Attack': North Korea Condemns Raid on Its Madrid Embassy</u>, The
Guardian (Mar. 31, 2019), https://www.theguardian.com/world/2019/
mar/31/grave-terrorist-attack-north-korea-condemns-raid-on-its-
madrid-embassy.  The executive branch may have foreign-policy-
related incentives not to unnecessarily displease the regime.

43

See, e.g., Jon Herskovitz & Jeong-Ho Lee, Biden Nuclear Envoy Ready for Talks 'Anytime' With North Korea, Bloomberg (June 20, 2021), https://www.bloomberg.com/news/articles/2021-06-21/ biden-s-nuclear-envoy-seeks-help-on-north-korea-with-allies.  But if Ahn's extradition rests on a political agenda, isn't it precisely the role of the courts to step in to prevent any human-rights abuse?  Indeed,

> it is important to emphasize that a habeas court reviewing [torture claims] would not be called upon to consider whether extradition would further our foreign policy interests or, if so, how much to weigh those interests.  Rather, it would be required to answer only the straightforward question of whether a fugitive would likely face torture in the requesting country.

Mironescu v. Costner, 480 F.3d 664, 672 (4th Cir. 2007) (rejecting notion that rule of noninquiry is inviolate but recognizing that Ninth Circuit is among circuits holding to the contrary); see United States v. Fernandez-Morris, 99 F. Supp. 2d 1358, 1371-72 (S.D. Fla. 1999) (finding that "rule of non-inquiry . . . is not inviolate" and describing Bolivian extradition request as "shocking" but refusing to extradite on other grounds).  And as one commentator put it, "[t]he idea . . . that the judiciary may lack the institutional competence to adjudicate the prospective treatment of the relator upon transfer, defies logic, as the same federal courts carry out this very inquiry on a regular basis."  M. Cherif Bassiouni, International Extradition 661 (6th ed. 2014) (citing Parry, supra, at 2004-06).

Bassiouni refers, of course, to immigration cases, in which

44

federal courts routinely delve into delicate issues concerning
"evidence of gross, flagrant or mass violations of human rights
within the country of removal" from "the government or forces
that the government is unwilling or unable to control."  Ahmed v.
Keisler, 504 F.3d 1183, 1191 (9th Cir. 2007); 8 C.F.R.
§ 208.16(c)(3)(iii) (standards for eligibility for withholding of
removal under Convention Against Torture).  We don't cede all
authority to another branch of government in such circumstances,
and we shouldn't do so here.  Cf. Boumediene v. Bush, 553 U.S.
723, 797 (2008) ("Within the Constitution's separation-of-powers
structure, few exercises of judicial power are as legitimate or
as necessary as the responsibility to hear challenges to the
authority of the Executive to imprison a person."); Valley Forge
Christian Coll. v. Ams. United for Separation of Church & State,
454 U.S. 464, 474 (1982) (noting that separation of powers does
not require that "Judicial Branch shrink from a confrontation
with the other two coequal branches of the Federal Government").
Indeed, in many extradition cases, unlike in immigration ones,
and as is true here, the life and liberty of a U.S. citizen are
at stake.

Even in the extradition context, a court can inquire into
whether a treaty partner used torture or other coercion to secure
confessions or other evidence supporting probable cause,
regardless of whether such findings might harm political
relations, see Santos, 830 F.3d at 1007 & n.9; similarly,
extradition courts routinely consider sensitive questions
concerning violent political uprisings in treaty partners in
determining whether to apply the political-offense exception to

45

1  extradition.[25]  Why then can't judges assess evidence of human-
2  rights abuses bearing on the fundamental fairness of extradition
3  proceedings even if doing so might rankle our treaty partners or
4  foil a foreign-policy initiative?  It happens all the time in
5  foreign courts, see, e.g., Parry, supra, at 2009 ("[S]everal
6  countries, including Canada, Germany, Ireland, the Netherlands,
7  and the United Kingdom, allow [judicial] inquiry in certain
8  circumstances, such as when the extraditee's human rights are at
9  risk."), and those countries have not become international
10 pariahs, see Caroline Stover, Note, Torture and Extradition:
11 Using Trinidad y Garcia to Develop a New Role for Courts, 45
12 Colum. Hum. Rts. L. Rev. 325, 351 (Fall 2013) ("[T]he argument
13 for diplomatic flexibility is significantly undermined by the
14 fact that other countries (with just as strong an interest in
15 diplomacy) place the Torture Determination with the courts.").

16      The government cites a Second Circuit case for the
17 proposition that "the Secretary never has directed extradition in
18 the face of proof that the extraditee would be subjected to
19 procedures or punishment antipathetic to a federal court's sense
20 of decency" and that "it is difficult to conceive" of it doing
21 so.  (ECF No. 214 at 5 n.3 (citing Ahmad, 910 F.2d at 1067).)
22 Tell that to Kulver Singh Barapind.  He argued that the court
23 should refuse to extradite him on humanitarian grounds because he
24 would be tortured on his return to India.  See In re Extradition

25

26      [25] A court may refuse to extradite under the political-offense
27 exception only when, among other things, there is self-directed
   political unrest in the requesting nation, see Vo, 447 F.3d at
28 1241, a circumstance not present here.

of Singh, 170 F. Supp. 2d 982, 1038-39 (E.D. Cal. 2001).  The
State Department nonetheless delivered him to that country, where
security forces apparently "applied electric shocks to his ears"
and "beat him," India: Punjab Case Shows Need for Anti-Torture
Law, Human Rights Watch (Sept. 27, 2012), https://www.hrw.org/
news/2012/09/27/india-punjab-case-shows-need-for-anti-torture-law,
allegedly for five days, see Kenneth Ofgang, Court Says India
Immune From Torture Suit by Sikh, Metropolitan News-Enterprise
(Dec. 22, 2016), http://www.metnews.com/articles/2016/
bara122216.htm; see also Bassiouni, supra, at 943 (noting that
relator in Sindona, 619 F.2d at 174-75, was murdered in his cell
after State Department extradited him to Italy, just as he had
predicted would happen when he argued for humanitarian
exception).

As Ahn has repeatedly pointed out, this case is like no
other.  It can't be right or fair that in the extraordinary
circumstances presented here, a judge has no discretion not to
send a U.S. citizen off to his likely assassination by a state
sponsor of terrorism.  See Munaf, 553 U.S. at 702 (entertaining
possibility that in "extreme case" when Executive branch finds
that "detainee is likely to be tortured but decides to transfer
him anyway," court could intervene); Gallina, 278 F.2d at 79
(noting that humanitarian exception may exist when extradition
would be "antipathetic to a federal court's sense of decency");
Mainero v. Gregg, 164 F.3d 1199, 1210 (9th Cir. 1999) (citing
Gallina for same proposition).

4.   Christopher Ahn Is by All Accounts a Good Person

I don't know Christopher Ahn.  But those who do consider him

47

to be an exceptional person of virtuous character.  (See ECF No. 33-1 at 10-50.)  At the time of the embassy raid he was in his late 30s and had no criminal record.  (See ECF No. 33-1 at 18, 37.)  He served his country honorably in the Marines for six years.  (See ECF No. 203-1 at 34.)  A Medal of Honor winner who knows him calls him a "faithful and dutiful Marine" whose "life is predicated on honor and duty."  (Id. at 35.)  He has volunteered for many charitable organizations.  (See, e.g., ECF No. 33-1 at 28, 33-36, 45, 50.)  Even the crimes with which Spain has charged him were almost certainly motivated by altruism — a desire to help the oppressed, brutalized, starved people of North Korea, who can't help themselves[26] — rather than greed or lust or power or addiction, the typical motivators of the criminal mind. (See ECF No. 203-1 at 36 (Marine Corps colonel stating that Ahn's "consistent dedication to working against human suffering, injustice, and oppression speaks volumes to the values he holds in his heart").)

Ahn's strength of character is further shown by his conduct while on release awaiting this decision.  Despite the onerous provisions this Court placed not only on him but on those it appointed as third-party custodians (among the many more who volunteered), he has not, to the Court's knowledge, violated even the most insignificant condition of his release, not even once. (Tr. at 177.)  Of course, to some degree that's to be expected from someone released on bond (although perhaps not always

---

[26] See generally 2014 U.N. Rep. ¶¶ 46-55 (noting that North Korea has "used food as a means of control over the population" and that "hunger and malnutrition continue to be widespread").

48

anticipated, at least not in this Court's experience).  But the circumstances of how and why Ahn even came to be in custody speak to his character.  The other known participants in the embassy breach apparently remain fugitives.  But Ahn returned to his home in Southern California, refusing to run from the authorities or indeed from North Korea after the FBI informed him, before he had been arrested on the Spanish charges, that North Korea had placed a hit on him.  (See generally ECF No. 33 at 21-23 & cited Exs.) He would not leave the home where he helped care for his nearly blind grandmother and ill mother.  (See id.)

I'm not naive, and I know there may be more to Christopher Ahn than meets the eye.  But no one disputes that he has devoted a good portion of his life to helping others, including in our U.S. military.  As noted, some have speculated that the CIA was behind the embassy raid.  One can imagine many reasons why, if that were true, the United States would not admit it.  But even assuming Ahn was acting at the direction of his country and not simply to help those trapped in an evil empire, that's only but another reason why that same country shouldn't shove him into Kim Jung-Un's grasping arms.

Yes, Ahn should have to face a court reckoning of some kind for possibly violating at least the letter of the law.  But he should not be cast off to face an uncertain fate at the hands of a despot, perhaps sacrificed to advance a foreign-policy agenda. If I thought I could, I would require any trial of Ahn to be here in the United States, and I hope that a judge or judges tasked with fixing law instead of simply following it will do just that.

## FINDINGS

1.   The undersigned judicial officer is authorized under 18 U.S.C. § 3184 and General Order 05-07 to conduct an extradition hearing.

2.   The undersigned judicial officer and the U.S. District Court for the Central District of California have personal jurisdiction over Ahn and subject-matter jurisdiction over the case, as Ahn was arrested in this district.  See § 3184.

3.   An extradition treaty between the United States and the Kingdom of Spain is currently in force.  (See ECF No. 226-1 at 2 (Heinemann Decl. ¶ 2 (recounting history of treaty)).)

4.   Ahn is the subject of an April 12, 2019 arrest warrant issued by the U.S. District Court for the Central District of California at Spain's request based on its own arrest warrant.

5.   The charges on which Ahn is wanted and as to which extradition is sought constitute extraditable offenses under the treaty.

6.   Even without considering the evidence the Court has found not to be competent, probable cause exists to believe that Ahn committed the crimes of breaking and entering, illegal restraint, causing injuries, and threats under Spanish law but not robbery with violence or intimidation or criminal organization.  Based on the foregoing findings, the Court concludes that Ahn is extraditable on those four charges only; the Court hereby certifies this finding to the Secretary of State as required under § 3184.

IT IS THEREFORE ORDERED that the Clerk of the Court deliver to the Assistant U.S. Attorney a certified copy of this Reluctant

50

Certification of Extraditability and forward without delay certified copies of the same to the Secretary of State (to the attention of the Office of the Legal Adviser) and the Director, Office of International Affairs, Criminal Division, U.S. Department of Justice, in Washington, D.C., for appropriate disposition.

IT IS FURTHER ORDERED that Ahn be committed to the custody of the U.S. Marshal for the Central District of California pending final disposition of this matter by the Secretary of State and arrival of agents of the requesting state unless within 30 days of the date of this Order he files a Petition for Writ of Habeas Corpus challenging the Court's certification of extradition.  If he does not do so, he must surrender to the U.S. Marshal no later than noon on the 30th day after the date of this Order.  If he does file a habeas petition within the 30 days, he will remain free on bond under the same terms and conditions as previously imposed unless the Court orders otherwise.  See Salerno v. United States, 878 F.2d 317, 317 (9th Cir. 1989) (applying special-circumstances bail test when fugitive appealed denial of habeas petition certifying extradition).

Should this Order not be challenged through a habeas petition or should the District Judge deny any such petition, Ahn, together with any evidence seized incidental to his arrest, must be transferred to the custody of agents of the requesting state at such time and place as mutually agreed on by the U.S. Marshal and the authorized representatives of the Kingdom of Spain, to be transported to Spain, unless the Ninth Circuit intervenes.

51

**CONCLUSION**

Because I believe that <u>Prasoprat</u> and the other law by which I am bound does not foreclose a higher court, as opposed to a magistrate judge, from applying the humanitarian exception, I hold out some hope that this court will not become an "accomplice" to Ahn's otherwise inevitable extradition.  <u>See</u> <u>From Thomas Jefferson to Edmond Charles Genet, 12 September 1793</u>, Founders Online, Nat'l Archives, https://founders.archives.gov/ documents/Jefferson/01-27-02-0098 (Jefferson observing that to deliver fugitives to countries where they would be mistreated was to become "accomplice" to that mistreatment).  Cindy Warmbier said that Ahn needed a "strong woman" to "stand up to North Korea."  (Tr. at 155.)  I regret that I am too weak, in power if not in will, to save him from the threat of torture and assassination by that outcast nation.

IT IS SO FOUND AND ORDERED this 9th day of May, 2022.

JEAN P. ROSENBLUTH
U.S. Magistrate Judge